BRUCE L. SIMON (CA SBN 96241)
*bsimon@pswlaw.com*
NEIL SWARTZBERG (CA SBN 215133)
*nswartzberg@pswlaw.com*
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

DANIEL L. WARSHAW (CA SBN 185365)
*dwarshaw@pswlaw.com*
MICHAEL H. PEARSON (CA SBN 277857)
*mpearson@pswlaw.com*
**PEARSON SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*Co-Lead Counsel on behalf of Indirect Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: German Automotive Manufacturers Antitrust Litigation<br><br>This Document Relates To:<br>ALL INDIRECT PURCHASER ACTIONS | MDL No. 2796<br><br>Assigned to the Honorable Charles R. Breyer<br><br>**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**


I. NATURE OF THE ACTION .......... 1

II. PARTIES .......... 4

A. PLAINTIFFS .......... 4

B. DEFENDANTS .......... 13

i. The Audi Defendants .......... 13

ii. The BMW Defendants .......... 14

iii. The Daimler-Mercedes Defendants .......... 15

iv. The Porsche Defendants .......... 15

v. The Volkswagen Defendants .......... 16

C. DEFENDANTS' CO-CONSPIRATORS AND AGENTS WHO ARE NOT NAMED AS DEFENDANTS HEREIN .......... 17

i. The Bosch Entities .......... 17

ii. Unnamed Co-Conspirators and Agents .......... 17

III. JURISDICTION AND VENUE .......... 18

IV. INTERSTATE COMMERCE AND ANTITRUST INJURY .......... 19

V. FACTUAL ALLEGATIONS .......... 19

A. THE U.S. MARKET FOR GERMAN PASSENGER VEHICLES .......... 19

i. Overview of the Market .......... 19

ii. Marketing and Sales of German Passenger Vehicles .......... 25

iii. Defendants' History of Investigations and Violations of the Law .......... 30

B. DEFENDANTS' COLLUSION IN THE GERMAN PASSENGER VEHICLE MARKET .......... 33

i. Government Investigations into Defendants' Collusion on German Passenger Vehicles .......... 33

ii. Defendants' Actions in Furtherance of the Conspiracy .......... 38

iii. Collusion on AdBlue Tanks .......... 44

iv. Collusion on Steel .......... 50


PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

v. Collusion on "Science" ........ 54

vi. Collusion on Other Technologies ........ 56

vii. Defendants Had Ample Opportunities to Conspire Regarding German Passenger Vehicles ........ 57

(a) The VDA ........ 57

(b) The ADA ........ 67

(c) The AVI ........ 68

viii. Characteristics of the U.S. Market for German Passenger Vehicles Support the Existence of the Conspiracy ........ 69

(a) High Barriers to Entry ........ 69

(b) High Concentration of Manufacturers of Products Sold within Differentiated Product Markets ........ 69

(c) The Price Premium for German Passenger Vehicles ........ 78

(d) Suppression of Technology Diminishes Price Competition ........ 80

VI. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ........ 80

VII. CLASS ALLEGATIONS ........ 82

A. NATIONWIDE CLASS ........ 82

B. INDIVIDUAL STATE CLASSES ........ 83

VIII. CLAIMS FOR RELIEF ........ 91

IX. PRAYER FOR RELIEF ........ 146

X. DEMAND FOR JURY TRIAL ........ 147

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1. Plaintiffs Glen Reder, Lonny Gold, William Nelson, Kelly Tseunis, Rudolf Grodzen, Michael Doyle, Victor Vilaplana, David Jacoby, Mark Rosenberg, Simon Barker, Alan Cordover, Michael Lindquist, Robert Pasternak, Peter Abraham, Dajana Spasojevic, Kevin Sopczak, Daneclan III, L.P., Stephen Kelley, Pierre Rumpf, Michael Vigorito, Vikram Chatrath, Angela Frost, Cynthia Waltz, Natalie Collins, Frank Palumbo, Anthony Hughes, Mary Kathlene Harmon, Raymond Wetzstein, Susan Graham, Elan Brandt, Robert B. Kinkade, Matthew Leonard, David Taylor, Robert Caldwell, Billy Owen, Frederick Hawkins, and Bilt-Rite Furniture, Inc. (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action for damages and injunctive relief against the following Defendants: Audi AG, Audi of America, Inc., and Audi of America, LLC (together, "Audi"); Bayerische Motoren Werke AG ("BMW AG"), BMW (US) Holding Corp., and BMW of North America, LLC (together, "BMW"); Daimler AG, Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC (together, "Daimler-Mercedes"); Dr. Ing. h.c.F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. (together, "Porsche"); and Volkswagen AG and Volkswagen Group of America, Inc. (together, "Volkswagen") (collectively, "Defendants"). Plaintiffs allege, based on information and belief as well as investigation of counsel, as follows:

## I. NATURE OF THE ACTION[1]

2. This antitrust class action is about the leading German automobile manufacturers—Audi, BMW, Daimler-Mercedes, Porsche, and Volkswagen—abusing their collective market power to illegally stifle competition, hinder innovation and garner ill-gotten profits, all to the detriment of the Plaintiffs and the Classes defined herein.

3. As far back as the 1990s, Defendants, who referred to themselves as the "Fünfer Kreis," or in English the "Circle of Five," regularly attended conspiratorial meetings among themselves and with other co-conspirators to illegally coordinate on technical development, costs,

[1] English-language quotes from German-language sources are based on translations of the German text. Unless otherwise noted, if an English-language translation has been made by a German-language publication and cited herein, then the text of that cited translation has been used.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

prices, suppliers, and other competitive aspects regarding everything from brake controls and chassis to electronics and car assemblies.

4. Defendants' conspiracy, in which they and co-conspirators agreed to share commercially-sensitive information and reached unlawful agreements on competitive aspects of their automobile manufacturing businesses, was carried out with the aim of excluding, restraining, and suppressing competition. This illegal conduct harmed consumers by, *inter alia*, causing them to pay unlawfully inflated prices for new passenger vehicles (*e.g.*, cars, SUVs, passenger vans, and light-duty trucks) manufactured or sold by Defendants (hereinafter referred to as "German Passenger Vehicles").

5. In addition to improper agreements and exchanges of information related to suppliers and price, a primary focus of Defendants' conspiracy was on limiting the pace and extent of innovation, thereby causing the German Passenger Vehicles to have fewer features and reduced performance than they would have had absent the conspiracy, while still charging a premium. The cost savings associated with reduced innovation should have yielded reduced prices of German Passenger Vehicles, but such savings were not passed on to Plaintiffs and the Classes. In addition, the absence of competition on innovation deprived Plaintiffs and the Classes of the consumer surplus that normally exists in a competitive market (*i.e.*, the value of innovation that is not captured by a manufacturer's price increases). Relatedly, the lack of competition on innovation also allowed Defendants to simultaneously consolidate their position as an oligopoly and reduce price competition because of the absence of differentiated features and performance in German Passenger Vehicles. In sum, Defendants' cartel effectively deprived consumers of competitive innovation and resulted in higher prices than would have been charged in a competitive market.

6. A critical component of the conspiracy was Defendants' establishing and exploiting consumers' willingness to pay a price premium for German Passenger Vehicles. They did so by touting that the price premium was based on the supposedly advanced engineering, performance, and quality of German Passenger Vehicles—superiority that was ostensibly due to intense innovation and competition among and between Defendants. But, in fact, Defendants secretly agreed to eliminate or severely curtail innovation and competition. Thus, Defendants were able to

illegally profit by charging a price premium while simultaneously colluding to undermine incentives to innovate and compete. Defendants also worked together to maintain the illusion of competition and innovation in their vehicles. In essence, Defendants colluded to maintain the fiction of ever-improving quality to secure a price premium for German Passenger Vehicles, while at the same time colluding among themselves not to spend the money or create the innovation needed to make that level of quality a reality.

7. Authorities from the European Commission's Competition department ("ECC") in Brussels and Germany's Federal Cartel Office ("FCO") in Bonn have both confirmed that they are investigating Defendants' participation in such anticompetitive activities.

8. Significantly, two of the three controlling parent companies in the conspiracy, Volkswagen AG (which controls the Volkswagen, Audi, and Porsche defendants) and Daimler AG (which controls the Daimler-Mercedes defendants), have admitted to the ECC and FCO both the existence and purpose of the cartel, and some details of those admissions have become public.

9. Volkswagen AG and Daimler AG have each (i) admitted to the ECC and/or the FCO that they coordinated with other Defendants and other named and unnamed co-conspirators on competitive aspects of their businesses, and (ii) cooperated with the ECC and/or the FCO in the hopes of obtaining amnesty or leniency for their anticompetitive misconduct. Also, following raids of Defendants' offices by government authorities as recently as October 2017, BMW AG announced that it was conducting an internal investigation into the company's involvement in this scheme.

10. Plaintiffs bring this class action on behalf of themselves and all others similarly situated and seek to represent those who, from at least since January 1, 1996 through the present (hereinafter referred to as the "Class Period"), purchased or leased a new German Passenger Vehicle manufactured or sold by Defendants, their co-conspirators, or their subsidiaries or affiliates in the United States.

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

11. Defendants have conspired to raise, fix, stabilize or maintain prices of and restrain competition within the market for German Passenger Vehicles in the United States during the Class Period. The impacts of Defendants' unlawful and anticompetitive conduct are ongoing and continue to this day.

12. Plaintiffs seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. §1) and various state antitrust, consumer protection and equitable laws as alleged herein. Plaintiffs demand a trial by jury.

## II. PARTIES

### A. PLAINTIFFS

#### i. Alabama[2]

13. Plaintiff William Nelson is an Alabama resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Audi A6 from an Audi dealership in Birmingham, Alabama in 2014.

#### ii. Arizona

14. Plaintiff Kelly Tseunis is an Arizona resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2000 BMW X5 from a BMW dealership in Phoenix, Arizona in 2000; a 2006 BMW X5 from a BMW dealership in Phoenix, Arizona in 2006; and a 2013 BMW X5 from a BMW dealership in Scottsdale, Arizona in 2013.

#### iii. California

15. Plaintiff Glen Reder is a California resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2003 Audi A6 from an Audi dealership in

[2] The Plaintiffs named herein may be referred to by the state(s) in which they are listed. For example, Plaintiff William Nelson may be referred to as the "Alabama Plaintiff(s)."

Woodland Hills, California in 2003; a 2007 BMW 525i from a BMW dealership in Torrance, California in 2007; a 2008 Audi TT from an Audi dealership in Pasadena, California in 2008; a 2013 BMW X3 from a BMW dealership in Thousand Oaks, California in 2013; a 2013 BMW X6 from a BMW dealership in Calabasas, California in 2013; a 2015 Mercedes Benz E400 from a Mercedes Benz dealership in Calabasas, California in 2015; and a 2015 Mercedes Benz ML250 from a Mercedes Benz dealership in Calabasas, California in 2015.

16. Plaintiff Rudolf Grodzen is a California resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2014 BMW 328d from a BMW dealership in Santa Clarita, California in 2014; and a 2016 BMW 328d from a BMW dealership in Santa Clarita, California in 2016.

17. Plaintiff Michael Doyle is a California resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2013 Mercedes Benz E350 from a Mercedes Benz dealership in Signal Hill, California and a 2016 BMW 535 GT from a BMW dealership in Signal Hill, California in 2016.

18. Plaintiff Victor Vilaplana is a California resident who indirectly purchased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2004 Mercedes Benz C230 from a Mercedes Benz dealership in Carlsbad, California in 2004; a 2013 Mercedes Benz ML350 from a Mercedes Benz dealership in Carlsbad, California in 2013; and an Audi Q7 from an Audi dealership in Beverly Hills, California in 2014.

iv. <u>Colorado</u>

19. Plaintiff David Jacoby is a Colorado resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 BMW X3 from a BMW dealership in Loveland, Colorado in 2014.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

20. Plaintiff Mark Rosenberg is a Colorado resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2005 Volkswagen Touareg from a Volkswagen dealership in Aurora, Colorado in 2005.

v. Florida

21. Plaintiff Simon Barker is a Florida resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2013 Mercedes Benz GLK250 from a Mercedes Benz dealership in Tampa, Florida in 2013.

22. Plaintiff Alan Cordover is a Florida resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2007 BMW 328i from a BMW dealership in Coconut Creek, Florida in 2007; a 2009 Porsche Cayman from a Porsche dealership in Englewood, New Jersey in 2010; and a 2013 Mercedes Benz C250 from a Mercedes Benz dealership in Ft. Lauderdale, Florida in 2013.

23. Plaintiff Michael Lindquist is a Florida resident who:

a. Indirectly purchased or leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2006 BMW 550i from a BMW dealership in Lakeland, Florida in 2006; a 2007 BMW 750i from a BMW dealership in Lakeland, Florida in 2007; and a 2008 Volkswagen Passat from a Volkswagen dealership in Brandon, Florida in 2008; and

b. Indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 1997 BMW 528i from a BMW dealership in Bayside, New York in 1997; a 2000 BMW 528i from a BMW dealership in Bayside, New York in 2000; and a 2003 BMW 540i from a BMW dealership in Bayside, New York in 2003.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

24. Plaintiff Robert Pasternak is a Florida resident who:

a. Indirectly purchased or leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Volkswagen Tiguan from a Volkswagen dealership in Coconut Creek, Florida in 2015; and a 2016 Porsche Panamera from a Porsche dealership in West Palm Beach, Florida in 2016; and

b. Indirectly purchased or leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2007 Mercedes Benz R320 from a Mercedes Benz dealership in Bloomfield Hills, Michigan in 2007.

vi. Hawaii

25. Plaintiff Peter Abraham is a Hawaii resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2002 Mercedes Benz C230 from a Mercedes Benz dealership in Honolulu, Hawaii in 2002; a 2014 Mercedes Benz CLA250 from a Mercedes Benz dealership in Honolulu, Hawaii in 2013; and a 2016 Porsche Cayman from a Porsche dealership in Honolulu, Hawaii in 2015.

vii. Illinois

26. Plaintiff Lonny Gold is an Illinois resident who indirectly purchased or leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Mercedes Benz ML320 from a Mercedes Benz dealership in Lake Bluff, Illinois in 2008; and a 2015 BMW 535 from a BMW dealership in Lake Bluff, Illinois in 2014.

27. Plaintiff Dajana Spasojevic is an Illinois resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2012 Audi A7 from an Audi dealership in Estates, Illinois in 2011; a 2012 Mercedes Benz CL550 from a Mercedes Benz dealership in Estates, Illinois in 2011; a 2012 Mercedes Benz SLS from a Mercedes Benz dealership in Burr Ridge,

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Illinois in 2012; a 2013 Volkswagen Passat from a Volkswagen dealership in Countryside, Illinois in 2013; a 2014 BMW 650xi from a BMW dealership in Westmont, Illinois in 2014; and a 2017 Porsche Panamera from a Porsche dealership in Napleton, Illinois in 2017.

28. Plaintiff Kevin Sopczak is an Illinois resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2007 Mercedes Benz C280 from a Mercedes Benz dealership in Rockford, Illinois in 2007; a 2009 Mercedes Benz C300 from a Mercedes Benz dealership in Sycamore, Illinois in 2009; and a 2012 Mercedes Benz ML350 from a Mercedes Benz dealership in Sycamore, Illinois in 2012.

viii. Iowa

29. Plaintiff Daneclan III, L.P. is an Iowa limited partnership that indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2011 BMW 535xi from a BMW dealership in Davenport, Iowa in 2011.

ix. Massachusetts

30. Plaintiff Stephen Kelley is a Massachusetts resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2011 BMW X5 from a BMW dealership in Shrewsbury, Massachusetts in 2010.

31. Plaintiff Pierre Rumpf is a Massachusetts resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Mercedes Benz E250 from a Mercedes Benz dealership in Lynnfield, Massachusetts in 2015.

32. Plaintiff Michael Vigorito is a Massachusetts resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2017 Audi A4 from an Audi dealership in Burlington, Massachusetts in 2017.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

x. Michigan

33. As alleged more fully in paragraph 24 above, Plaintiff Robert Pasternak is a Florida resident who indirectly purchased or leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2007 Mercedes Benz R320 from a Mercedes Benz dealership in Bloomfield Hills, Michigan in 2007.

xi. Minnesota

34. Plaintiff Vikram Chatrath is a Minnesota resident who:

a. Indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2017 Porsche 718 Boxster from a Porsche dealership in Maplewood, Minnesota in 2017; and

b. Indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Mercedes Benz E400 from a Mercedes Benz dealership in Sioux Falls, South Dakota in 2015; and a 2017 Mercedes Benz GLE350 from a Mercedes Benz dealership in Sioux Falls, South Dakota in 2016.

35. Plaintiff Angela Frost is a New Mexico resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2017 Mercedes Benz GLC300 from a Mercedes Benz dealership in Minneapolis, Minnesota in 2017.

xii. Montana

36. Plaintiff Cynthia Waltz is a Montana resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Mercedes Benz R320 from a Mercedes Benz dealership in Missoula, Montana in 2007.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

xiii. Nevada

37. Plaintiff Natalie Collins is a Nevada resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Audi A5 from an Audi dealership in Henderson, Nevada in or about 2007 or 2008.

xiv. New York

38. Plaintiff Frank Palumbo is a New York resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Mercedes Benz R350 from a Mercedes Benz dealership in Massapequa, New York in 2008; a 2012 Audi A8 from an Audi dealership in Huntington, New York in 2011; and a 2016 Mercedes Benz GLE350 from a Mercedes Benz dealership in Southampton, New York in 2016.

39. As alleged more fully in paragraph 23 above, Plaintiff Michael Lindquist is a Florida resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 1997 BMW 528i from a BMW dealership in Bayside, New York in 1997; a 2000 BMW 528i from a BMW dealership in Bayside, New York in 2000; and a 2003 BMW 540i from a BMW dealership in Bayside, New York in 2003.

xv. North Carolina

40. Plaintiff Anthony Hughes is a North Carolina resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including 1998 Audi A6 from an Audi dealership in Cary, North Carolina in or around 1998; a 2000 Audi A4 from an Audi dealership in Cary, North Carolina in or around 2000; a 2005 Audi A6 from an Audi dealership in Greenville, North Carolina in or around 2005; a 2012 Audi Q5 from an Audi dealership in Cary, North Carolina in 2011; a 2013 Audi A4 from an Audi dealership in Greenville, North Carolina in 2013; a 2014 Audi Q5 from an Audi dealership in Cary, North Carolina in 2013; and a 2017 Audi Q5 from an Audi dealership in Wilmington, North Carolina in 2017.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

41. Plaintiff Mary Kathlene Harmon is a Florida resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2001 BMW X5 from a BMW dealership in Charlotte, North Carolina in 2002.

xvi. <u>North Dakota</u>

42. Plaintiff Raymond Wetzstein is a North Dakota resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2016 Porsche Cayenne from a Porsche dealership in Fargo, North Dakota in 2015.

xvii. <u>Oregon</u>

43. Plaintiff Susan Graham is an Oregon resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including 2012 Volkswagen Tiguan from a Volkswagen dealership in Eugene, Oregon in 2012; a 2013 Audi Q5 from an Audi dealership in Wilsonville, Oregon in 2013; a 2016 Audi Q3 from an Audi dealership in Wilsonville, Oregon in 2016; and a 2017 Mercedes Benz GLC300 from a Mercedes Benz dealership in Eugene, Oregon in 2017.

xviii. <u>Pennsylvania</u>

44. Plaintiff Elan Brandt is a Pennsylvania resident who indirectly leased or purchased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 1998 Audi A4 from an Audi dealership in Conshohocken, Pennsylvania in 1998; a 2003 Audi A4 convertible from an Audi dealership in Conshohocken, Pennsylvania in 2003; a 2006 Audi A4 convertible from an Audi dealership in Wynnewood, Pennsylvania in 2006; a 2009 or 2010 Audi A5 from an Audi dealership in Wynnewood, Pennsylvania in or about 2009 or 2010; and a 2014 Audi S5 from an Audi dealership in Wynnewood, Pennsylvania in 2014.

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

45. Plaintiff Robert B. Kinkade is a Pennsylvania resident who indirectly purchased, for use and not for resale, one or more German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Volkswagen Passat from a Volkswagen dealership in Lancaster, Pennsylvania in 2014.

xix. Rhode Island

46. Plaintiff Matthew Leonard is a Rhode Island resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 BMW 535 from a BMW dealership in Middletown, Rhode Island in 2007; and a 2018 BMW 530 eDrive from a BMW dealership in Middletown, Rhode Island in 2017.

xx. South Carolina

47. Plaintiff David Taylor is a South Carolina resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Mercedes Benz S550 from a Mercedes Benz dealership in Columbia, South Carolina in 2008; a 2015 Mercedes Benz S550 from a Mercedes Benz dealership in Columbia, South Carolina in 2014; and a 2015 Mercedes Benz S63 from a Mercedes Benz dealership in Columbia, South Carolina in 2014.

xxi. South Dakota

48. As alleged more fully in paragraph 34 above, Plaintiff Vikram Chatrath is a Minnesota resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Mercedes Benz E400 from a Mercedes Benz dealership in Sioux Falls, South Dakota in 2015; and a 2017 Mercedes Benz GLE350 from a Mercedes Benz dealership in Sioux Falls, South Dakota in 2016.

xxii. Tennessee

49. Plaintiff Robert Caldwell is a Tennessee resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2012 BMW 528 from a BMW dealership in

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Nashville, Tennessee in 2013; a BMW 535 from a BMW dealership in Nashville, Tennessee in 2013; and a Mercedes Benz CLS63S from a Mercedes Benz dealership in Nashville, Tennessee in 2014.

xxiii. Utah

50. Plaintiff Billy Owen is a Utah resident who indirectly purchased, for use and not for resale, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2015 Volkswagen Beetle from a Volkswagen dealership in St. George, Utah in 2015.

xxiv. Wisconsin

51. Plaintiff Frederick Hawkins is a Pennsylvania resident who indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an unlawfully inflated price during the Class Period, specifically including a 2008 Mercedes Benz ML350 from a Mercedes Benz dealership in Wausau, Wisconsin in 2008; a 2009 Mercedes Benz E350 from a Mercedes Benz dealership in Wausau, Wisconsin in or around 2009; and a 2011 Mercedes Benz E350 from a Mercedes Benz dealership in Wausau, Wisconsin in or around 2011.

52. Plaintiff Bilt-Rite Furniture, Inc. is located in Wisconsin and indirectly leased, for use and not for resale or sublease, one or more new German Passenger Vehicles at an artificially inflated price during the Class Period, specifically including a 2009 BMW 328xi from a BMW dealership in Greenfield, Wisconsin; a 2011 BMW 328xi from a BMW dealership in Greenfield, Wisconsin; a 2014 BMW X3 from a BMW dealership in Greenfield, Wisconsin; and a 2017 BMW X3 from a BMW dealership in Glendale, Wisconsin in 2017.

**B. DEFENDANTS**

i. The Audi Defendants

53. Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany, and is the parent company of Audi of America, Inc. and Audi of America, LLC. Audi AG is a wholly-owned subsidiary of Volkswagen AG. Audi AG designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District, during the Class Period. Audi

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

AG directs the activities of its subsidiaries, which act as its agents in the selling of German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

54. Defendant Audi of America, Inc. is incorporated in New Jersey, with its principal place of business in Herndon, Virginia, and is a wholly owned subsidiary of Audi AG. Audi of America, Inc. advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

55. Defendant Audi of America, LLC is incorporated in Delaware, with its principal place of business in Herndon, Virginia, and is a wholly owned subsidiary of Audi AG. Audi of America, LLC advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

ii. <u>The BMW Defendants</u>

56. Defendant Bayerische Motoren Werke AG is a German corporation with its principal place of business in Munich, Germany and is the parent company of BMW (US) Holding Corp. and BMW of North America, LLC. BMW AG designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including this District, during the Class Period. BMW AG directs the activities of its subsidiaries, which act as its agents in the selling of German Passenger Vehicles, throughout the United States, including in this District, during the Class Period.

57. Defendant BMW (US) Holding Corp. is a Delaware corporation with its principal place of business in Woodcliff Lake, New Jersey, and is a wholly owned subsidiary of BMW AG. BMW (US) Holding Corp. advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

58. Defendant BMW of North America, LLC is a Delaware limited liability corporation with its principal place of business in Woodcliff Lake, New Jersey, and is a wholly owned subsidiary of BMW AG. BMW of North America, LLC advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

iii. The Daimler-Mercedes Defendants

59. Defendant Daimler AG is a German corporation with its principal place of business in Stuttgart, Germany, and is the parent company of Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC. Daimler AG designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District, during the Class Period. Daimler AG directs the activities of its subsidiaries, which act as its agents in the selling of German Passenger Vehicles, throughout the United States, including in this District, during the Class Period.

60. Defendant Mercedes-Benz USA, LLC is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia, and is a wholly owned subsidiary of Daimler AG. Mercedes-Benz USA, LLC designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District, during the Class Period. Mercedes-Benz USA, LLC operates a regional sales office, a parts distribution center, and a customer service center in New Jersey.

61. Defendant Mercedes-Benz U.S. International, Inc. is an Alabama corporation, with its principal place of business in Vance, Alabama, and is a wholly owned subsidiary of Daimler AG. Mercedes-Benz U.S. International, Inc. manufactures German Passenger Vehicles distributed and sold throughout the United States, including in this District, during the Class Period.

62. Defendant Mercedes-Benz Vans, LLC is a Delaware limited liability corporation with its principal place of business in Ladson, South Carolina, and is a wholly owned subsidiary of Daimler AG. Mercedes-Benz Vans, LLC manufactures German Passenger Vehicles distributed and sold throughout the United States, including in this District, during the Class Period.

iv. The Porsche Defendants

63. Defendant Dr. Ing. h.c.F. Porsche AG is a German corporation with its principal place of business in Stuttgart, Germany and is the parent company of Porsche Cars North

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

America, Inc. Porsche AG is a wholly-owned subsidiary of Volkswagen AG.[3] Porsche AG designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District, during the Class Period. Porsche AG directs the activities of its subsidiaries, which act as its agents in the selling of German Passenger Vehicles, throughout the United States, including in this District, during the Class Period.

64. Defendant Porsche Cars North America, Inc. is incorporated in Delaware, with its principal place of business in Atlanta, Georgia, and is a wholly owned subsidiary of Porsche AG. Porsche Cars North America, Inc. advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

v. The Volkswagen Defendants

65. Defendant Volkswagen AG is a German corporation with its principal place of business in Wolfsburg, Germany, and is the parent company of Volkswagen Group of America, Inc., the Audi defendants, and the Porsche defendants. Volkswagen AG designs, develops, manufactures, distributes and sells German Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District, during the Class Period. Volkswagen AG directs the activities of its subsidiaries, which act as its agents in the selling of German Passenger Vehicles, throughout the United States, including in this District, during the Class Period. In 2016, Volkswagen AG was the largest automobile manufacturer in the world, with reported sales revenue of more than $250 billion.

66. Defendant Volkswagen Group of America, Inc. is incorporated in New Jersey, with its principal place of business in Herndon, Virginia, and is a wholly owned subsidiary of Volkswagen AG. Volkswagen Group of America, Inc. advertises, markets, and sells German Passenger Vehicles throughout the United States, including in this District, during the Class Period.

[3] Today, Porsche AG is under the Volkswagen corporate umbrella, but that was not always the case during the alleged conspiracy. Volkswagen and Porsche have always maintained a close relationship, in part because Porsche's founder designed the original Volkswagen Beetle and his descendants long owned stock in Volkswagen. The two carmakers merged in 2011.

### C. DEFENDANTS' CO-CONSPIRATORS AND AGENTS WHO ARE NOT NAMED AS DEFENDANTS HEREIN

i. The Bosch Entities

67. Robert Bosch GmbH is a German limited liability company with its principal place of business in Gerlingen, Germany, and is the parent company of Robert Bosch LLC. Robert Bosch GmbH directs the activities of its subsidiaries and with Robert Bosch LLC, designs, manufactures, develops, and supplies automotive technology and parts, including to the Defendants for use in German Passenger Vehicles, such as for use in those vehicles' diesel emissions systems, among others.

68. Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan. Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH, and designs, manufactures, develops, and supplies automotive technology and parts, including to the Defendants for use in German Passenger Vehicles, such as for use in those vehicles' diesel emissions systems, among others.

69. Alleged co-conspirators Robert Bosch GmbH and Robert Bosch LLC are hereinafter referred to collectively as "Bosch."

70. Bosch, which encompasses some 340 subsidiaries and companies, is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector supplies parts to the automotive industry.

71. During the Class Period, Bosch developed technologies and provided components used by Defendants in German Passenger Vehicles. This relationship between Bosch and Defendants requires extremely close collaboration, with Bosch employees often being embedded in Defendants' offices.

ii. Unnamed Co-Conspirators and Agents

72. Various persons and/or firms not named as defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

conspirators whether named or not named as defendants in this Complaint.

73. Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

## III. JURISDICTION AND VENUE

74. Plaintiffs bring this action against Defendants under (i) Section 16 of the Clayton Act (15 U.S.C. § 26) seeking equitable and injunctive relief for violations of Section 1 of the Sherman Act (15 U.S.C. § 1); and (ii) the state antitrust, unfair competition, consumer protection, unfair trade practice and unjust enrichment laws set forth, seeking damages, restitution and other relief for violations of those laws. Therefore, this Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331, 1137; and, (ii) for the state law claims, pursuant to 28 U.S.C. §§ 1332(d) and 1367, based on the fact that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

75. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), based on the fact that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants are licensed to do business in, are doing business in, had agents in, or are found to or transact business in this District.

76. This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of German Passenger Vehicles throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and/or (d) was engaged in an illegal antitrust conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

77. Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

78. In connection with German Passenger Vehicles, Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and such conduct gives rise to the claims of Plaintiffs and the members of the Classes. Also, German Passenger Vehicles manufactured abroad by Defendants and sold in the United States are goods brought into the United States for sale, and therefore are import commerce.

## IV. INTERSTATE COMMERCE AND ANTITRUST INJURY

79. The Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States to Plaintiffs and members of the Classes.

80. During the Class Period, each Defendant manufactured, distributed and/or sold German Passenger Vehicles in the United States, in a continuous and uninterrupted flow of interstate commerce.

81. During the Class Period, Defendants were leaders in the market for passenger vehicles, both globally and in the United States.

82. The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States to Plaintiffs and members of the Classes.

## V. FACTUAL ALLEGATIONS

### A. THE U.S. MARKET FOR GERMAN PASSENGER VEHICLES

#### i. Overview of the Market

83. Audi, BMW, Daimler-Mercedes, Porsche, and Volkswagen are among the oldest and largest German automobile manufacturers. While other German automobile manufacturers

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

exist, these manufacturers named as Defendants dominate the market for German Passenger Vehicles, especially in the United States. These manufacturers have seen their share of the overall U.S. automobile market grow substantially during the Class Period,[4] which includes their disproportionately high—almost half—share of the luxury vehicle sector.[5] Further, until the "clean diesel" scandals were exposed in 2015, these manufacturers controlled virtually the entire diesel vehicle sector.[6]

84. However, focusing only on the U.S. market for German Passenger Vehicles, the collective market share and market power of Defendants is undeniably dominant—they control 100%.[7]

85. German Passenger Vehicles have been regarded as among the best vehicles in the world, renowned for their engineering excellence and cutting-edge technology.[8]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] *See infra* Figure 9, "1996-2015 German Automaker Share of U.S. Sales" (showing growth from approximately 3% to 9%).

[5] *See infra* Figure 10, "U.S. Vehicle Sales 2017 Market Share by Region – Luxury Brands."

[6] *See infra* Figure 11, "Shares of Diesel Vehicles Sales in U.S. 2010 – June 2017."

[7] *See infra* Figure 7, "U.S. Vehicle Sales Market Share – German Brands" and Figure 8, "U.S. Vehicle Sales Market Share by Country – European Brands" (showing BMW, Daimler-Mercedes, Porsche and Volkswagen/Audi accounting for 100% of German Passenger Vehicle sales and 83% of European vehicle sales in the U.S. market).

[8] *See, e.g., Industry Overview: The Automotive Industry in Germany*, GERMANY TRADE & INVEST, 5 (2016-17), https://www.gtai.de/GTAI/Content/EN/Invest/_SharedDocs/Downloads/GTAI/Industry-overviews/industry-overview-automotive-industry-en.pdf; Chris Tutor, *Fortune offers 10 reasons why German cars rule*, FORTUNE (July 2, 2012, 5:59 PM), https://www.autoblog.com/2012/07/02/fortune-offers-10-reasons-why-german-cars-rule/.

86. And the reputation of German Passenger Vehicles as being superior to vehicles from carmakers in other countries is expressly promoted by Defendants. For example, in the 2014 overview of the German car industry published by *Verband der Automobilindustrie* (in English, German Association of the Automobile Industry), Defendants touted the significance of the "Made in Germany" label; "This underlines the German motor manufacturers' high level of export orientation *and certainly also the outstanding global reputation of vehicles* '*Made in Germany*.'"[9]

87. German Passenger Vehicles are also considered distinct from automobiles manufactured by competitors, in part, because Defendants have spent billions of dollars advertising the virtues of German engineering. Defendants have long advertised German Passenger Vehicles by emphasizing quality, precision engineering, industry-leading luxury, and advanced technical features.[10] These advertising efforts have helped to set German Passenger Vehicles apart from the rest of the wider automobile market and serves as the foundation for the price premium Defendants demand for their vehicles.

88. To further support the wide-spread notion of the superiority of German Passenger Vehicles and the price premium they command, Defendants have an established practice of comparing themselves to each other in their advertising. Further support for German Passenger Vehicles being distinct, including being sold within differentiated product markets and commanding price premiums, is the fact that industry experience indicates that the Defendants have an established practice of not only comparing themselves to each other in their advertising, but dealerships also open in locations where fellow cartel members' vehicles are sold.

89. Consumer preference for German Passenger Vehicles shows cohesiveness in the market. Industry experience based on second-choice surveys indicates that purchasers of German Passenger Vehicles are more likely to consider other German Passenger Vehicles as their second

---

[9] *Facts and Figures – Overview*, VDA.DE (emphasis added), https://www.vda.de/en/services/facts-and-figures/facts-and-figures-overview.html (last visited Mar. 6, 2018).

[10] *See infra* Section V(A)(ii): "Marketing and Sales of German Passenger Vehicles" and *infra* Figures 1 through 5, inclusive, therein.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

choice. This supports the ability of Defendants to affect consumers even in segments where their combined market share would otherwise seem less significant. For the customers for whom one Defendant's product is their first choice, their next choice is most likely another Defendant's product—a product which also offers fewer features and lesser performance than it would have absent the conspiracy. The existence of such second-choice preference among consumers also provides Defendants with a form of market power disproportionate to their raw share of the market across all segments in which they sell vehicles.

90. In fact, because German Passenger Vehicles (as compared to vehicles from other carmakers) are sold within differentiated product markets, the impact of Defendants' collusion can be seen as comparable to the "unilateral effects" that antitrust authorities seek to prevent when considering proposed mergers.[11]

91. As a result of the above-described aspects of the market for German Passenger Vehicles, consumers in the United States paid, according to preliminary estimates, a premium for German Passenger Vehicles across all vehicle segments.[12]

92. By refusing to compete, including by limiting the pace and extent of innovation, Defendants, *inter alia*: (i) produced German Passenger Vehicles with fewer features and lesser performance; (ii) kept their research and development costs down thereby increasing their profit margins;[13] (iii) eliminated consumer surplus (*i.e.*, the value of innovation that is not captured by a manufacturer's price increases); and (iv) reduced price competition among German Passenger Vehicles. Each of these aspects of the conspiracy, along with others, detrimentally affected

---

[11] Unilateral effects arise where, as a result of a merger, competition between the products of the merging firms is eliminated, allowing the merged entity to unilaterally exercise market power at the risk of harming consumers. *See, e.g.,* ICN Merger Working Group: Investigation and Analysis Subgroup, *ICN Merger Guidelines Workbook*, INTERNATIONALCOMPETITIONNETWORK.ORG, 7 (April 2006), http://www.internationalcompetitionnetwork.org/uploads/library/doc321.pdf.

[12] *See infra* Section V(B)(viii)(c): "The Price Premium for German Passenger Vehicles."

[13] As alleged herein, Defendants' conspiracy went beyond stifling technological innovation and, as more fully set forth in Section V(B)(iv), included collusion regarding the price of steel, a major input for auto manufacturing.

consumers and artificially inflated the prices for German Passenger Vehicles, consequently increasing Defendants' profit margins relative to the but for world in which Defendants either competed on innovation or, alternatively, where they did not conspire to hide their lack of true innovation.

93. Defendants' collusion also exacerbated the already massive barriers to entry in the automobile market. As a general matter, research and development costs, as well as manufacturing infrastructure, are tremendously expensive in the automotive industry. Indeed, new manufacturer entrants in the automobile industry are rarely successful.[14] Moreover, most new vehicle models require a lengthy design, development, and testing phase, as well as new tooling—even for existing production lines. By sharing technology and agreeing among cartel members to limit the scope and rate of innovation, Defendants significantly reduced those costs for themselves. Meanwhile, their competitors were left to compete on an uneven playing field as they still faced those substantial costs.[15]

94. Historically, due in part to Defendants' own efforts, there have been very few passenger vehicles sold in the United States that directly compete with German Passenger Vehicles. And the manufacturers of those vehicles that might be viewed as competing with

---

[14] Tesla, which has been selling automobiles since 2008, has yet to be profitable, and has survived due to hundreds of millions of dollars in private and public funding.

[15] In fact, Defendants limited carmaker membership in their conspiracy to the five major German carmakers named as Defendants herein, apparently rejecting requests from Jaguar, Volvo, Renault, and Fiat to join their collusion, and seeking to justify the exclusion of GM-owned Opel and Ford from industry groups. *See* Frank Dohmen, Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017), https://magazin.spiegel.de/SP/2017/30/152270400/index.html (English version: http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html) (requests from Jaguar, Volvo, Renault, Fiat); *see also* Bertel Schmitt, *Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says*, FORBES (July 22, 2017, 10:24 AM), https://www.forbes.com/sites/bertelschmitt/2017/07/22/dieselgate-product-of-vast-vw-bmw-daimler-car-cartel-conspiracy-fresh-report-says/#7fb5c5457ce8 (exclusion of Opel, Ford); *see also* Handelsblatt Staff, *Anatomy of a (Possible) Cartel*, HANDELSBLATT GLOBAL (July. 24, 2017, 8:02 PM), https://global.handelsblatt.com/companies/anatomy-of-a-possible-cartel-802221 (exclusion of Opel, Ford).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

German Passenger Vehicles have faced difficulties competing while maintaining profitability. This is true even if German Passenger Vehicles are compared to the broader U.S. market for passenger vehicles from European carmakers. Brands from Sweden, the United Kingdom, and Italy each produce and sell passenger vehicles that attempt to compete in the U.S. market for technologically-advanced, high-performing European cars. But the manufacturers of each of those arguably competing brands capture relatively limited market share, and each has faced significant challenges competing with Defendants since the collusion began.

95. Passenger vehicles from Volvo and Saab are (or, in Saab's case, were) perhaps the most direct competitors to the German Passenger Vehicles in the United States. But both of those manufacturers of European-branded vehicles have undergone a series of unprofitable periods, acquisitions, and bankruptcies since the onset of the alleged cartel. After a period of American ownership under Ford (1999-2009), Volvo is now owned by Chinese conglomerate Geely Holding Group. Although Volvo still sells cars in the United States, only recently (in 2014, after the Geely acquisition) did it stop the general decline of its limited U.S. market share.[16] Similarly, Saab also had a period of American ownership under General Motors (2000-2010). But it had an even more limited U.S. market share than Volvo, and, after declaring bankruptcy in 2011, General Motors shuttered the Saab brand.[17]

96. The United Kingdom's major car brands have faced similar challenges. Land Rover and Jaguar were also under the American ownership of Ford (2000-2008 and 1999-2008, respectively). But even with Ford's expansive dealer network and distribution infrastructure, sales of those European-branded vehicles were often not profitable. In 2008, Ford sold Jaguar and Land

---

[16] *See infra, e.g.*, Figure 8, "U.S. Vehicle Sales Market Share by Country – European Brands" (showing Volvo's limited U.S. market share of all European vehicles); *see also* Nick Gibbs, *How Volvo defied the odds: Beating forecasts and raking in cash under Chinese ownership*, AUTOMOTIVE NEWS (Apr. 17, 2017, 12:01 AM), http://www.autonews.com/article/20170417/RETAIL01/304179963/volvo-sales-united-states-up (2007-2016 graph showing Volvo's rebound in 2014).

[17] *See infra, e.g.*, Figure 8, "U.S. Vehicle Sales Market Share by Country – European Brands" (showing Saab's limited U.S. market share of all European vehicles).

Rover to Indian automaker Tata Motors. These European-branded vehicles also have had only limited U.S. market share.[18]

97. Italy's Fiat and Alfa Romeo vehicles only started returning to the U.S. market in 2009 after Italian corporate parent Fiat Automobiles S.p.A. acquired American automaker Chrysler and renamed itself Fiat Chrysler Automobiles S.p.A. However, both Fiat's and Alfa Romeo's U.S. market share is very small.[19]

98. As a result of Defendants' collusion, German Passenger Vehicles have enjoyed near-complete dominance in the U.S. market for passenger vehicles from European carmakers. For consumers, this has meant that there is limited choice in the market. Even where there is an apparent choice among German Passenger Vehicles, the differences are largely illusory. As Defendants controlled, *inter alia*, the rate of technological innovation and effectively shared the costs of such innovation, and because they otherwise coordinated on and exchanged sensitive information on key aspects of car making (such as the pricing of steel), they were able to reap the benefits of supra-competitive pricing for German Passenger Vehicles sold in the U.S. market.

ii. Marketing and Sales of German Passenger Vehicles

99. Defendants carefully curated their marketing and intentionally targeted U.S. consumers for decades. To U.S. consumers, German Passenger Vehicles commanded a premium price due to promises of superior innovation and engineering.

/ / /

/ / /

/ / /

---

[18] *See infra, e.g.*, Figure 8, "U.S. Vehicle Sales Market Share by Country – European Brands" (showing Land Rover's and Jaguars' respective limited U.S. market shares of all European vehicles).

[19] For example, in 2016 Fiat's U.S. sales were approximately 1.8% of all European vehicles and Alfa Romeo's were approximately 1/60 of those. Timothy Cain, *U.S. Auto Sales Brand Rankings – 2016 Year End*, GOODCARBADCAR.NET (Jan. 4, 2017), http://www.goodcarbadcar.net/2017/01/usa-2016-auto-brand-sales-results-rankings/ (showing U.S. sales of 32,742 Fiats and 516 Alfa Romeos in 2016).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

100. For example, Volkswagen's long-used tagline, "That's the power of German engineering," conveyed that customers would receive cutting edge technology, for which consumers paid a premium.[20] "Volkswagen has long touted 'German engineering' as the key difference between its cars and their competitors."[21] In a 2014 Super Bowl advertisement, German engineers sprouted wings each time a Volkswagen automobile reached 100,000 miles.[22] Volkswagen's Vice President of Marketing, Vinay Shahani, noted of the ad, "We are thrilled with this year's creative, which highlights the enthusiasm around our brand and our vehicles' German engineering in a humorous spot that embodies the Volkswagen spirit."[23] An example of a Volkswagen advertisement at an auto show is as follows:

**FIGURE 1**




Revealed: Volkswagen Passat Performance Concept - Detroit 2013 (Image 4), KBB.COM, https://www.kbb.com/car-news/all-the-latest/revealed-volkswagen-passat-performance-concept-_-detroit-2013/2000008964/ (last visited Mar. 13, 2018).

---

[20] Alextube145, *That's the Power of German Engineering. That's Das Auto. Volkswagen Jetta*, YOUTUBE (Sept. 5, 2012), https://www.youtube.com/watch?v=Aw8K233BdL0.

[21] Don Sherman, *What, Exactly, Does Volkswagen Mean by "German Engineering," Anyway?*, CAR AND DRIVER (Jan. 3, 2017, 8:15 AM), https://blog.caranddriver.com/what-exactly-does-volkswagen-mean-by-german-engineering-anyway/.

[22] Blue Cobs, *VW Super Bowl Commercial Get Wings Super Bowl Ad 2014*, YOUTUBE (Feb. 2, 2014), https://www.youtube.com/watch?v=sylr-XHKcPg.

[23] David Gianatasio, *Ad of the Day: Volkswagen Gets Its Wings in 2014 Super Bowl Ad*, ADWEEK (Jan. 28, 2014), http://www.adweek.com/brand-marketing/ad-day-volkswagen-gets-its-wings-2014-super-bowl-commercial-155270/.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

101. Likewise, claims of superior design and technology have been at the heart of BMW's marketing in the United States for decades. BMW advertises its automobiles in the United States as "the ultimate driving machine," powered by "performance, design, innovation and efficiency."[24] BMW boasts of its "pure BMW performance" and "innovative eDrive technology" and claims that "[a]t the heart of every BMW is advanced engineering that ensures maximum power and performance."[25] "Always innovative, BMW has pioneered technology that creates exhilarating and efficient driving experiences," BMW claims.[26] An example of BMW's advertisement on its website is as follows:

**FIGURE 2**

BMW

The Ultimate
Driving Machine

Home, BMWUSA.COM, http://www.bmwusa.com/ (last visited Mar. 13, 2018).

/ / /

/ / /

---

[24] Vehicles, BMWUSA.COM, https://www.bmwusa.com/vehicles/bmwi.html (last visited Mar. 6, 2018).

[25] Inside BMW, BMWUSA.COM, http://www.bmwusa.com/InsideBMW.aspx (last visited Mar. 6, 2018).

[26] *Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

102. Daimler-Mercedes similarly publicizes its engineering innovation, targeting U.S. consumers. In 2011, Daimler-Mercedes launched a brand campaign celebrating "125 Years of Innovation."[27] The Mercedes-Benz USA website touts Daimler-Mercedes' history as an innovator to U.S. consumers: "Leading through innovation. Even more than its meticulous engineering, Mercedes-Benz is defined by its continuous innovation. Since inventing the car in 1886, we've simply never stopped reinventing it."[28] An example of Diamler-Mercedes' advertisement on its website is as follows:

**FIGURE 3**




Innovation, MBUSA.COM, https://www.mbusa.com/mercedes/benz/innovation (last visited Mar. 13, 2018).

/ / /

/ / /

[27] Inchcape Mercedes-Benz, *Mercedes-Benz Celebrates 125 Years of Innovation*, YOUTUBE (Apr. 5, 2011), https://www.youtube.com/watch?v=PTxclPfn-uc.

[28] Innovation, MBUSA.COM, https://www.mbusa.com/mercedes/benz/innovation (last visited Mar. 6, 2018).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

103. In contrast to its repressive activities, Audi's company motto is "Vorsprung durch Technik," or, in English, "Advancement through Technology." Audi has also used the tagline "Truth in Engineering" in its print and television advertising in the United States.[29] An example of an Audi advertisement at an auto show is as follows:

**FIGURE 4**




Photos from the 2015 New England International Auto Show, OLGA KHVAN, https://www.bostonmagazine.com/arts-entertainment/2015/01/16/new-england-international-auto-show-2015-photos/#gallery-2-13 (last visited Mar. 13, 2018).

/ / /

/ / /

/ / /

---

[29] *Audi Celebrates 'Truth in Engineering' With New Creative Campaign Debuting This Week*, MARKET WIRED (May 13, 2013, 9:00 PM), http://www.marketwired.com/press-release/audi-celebrates-truth-in-engineering-with-new-creative-campaign-debuting-this-week-1789921.htm.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

104. Porsche's "There is no substitute" campaign is one of the longest-standing in the industry.[30] Porsche consistently advertises in print and media that its vehicles are superior. In fact, Porsche often directly attacks its competitors, specifically those manufacturers named as Defendants herein. An example of a Porsche advertisement from its official Twitter account is as follows:

**FIGURE 5**




Porsche Twitter, PORSCHE USA, https://twitter.com/porsche/status/480026297272242176 (last visited Mar. 13, 2018).

iii. Defendants' History of Investigations and Violations of the Law

105. Defendants have a history of involvement in automotive industry scandals.[31]

106. As recently as February 10, 2018, ECC Commissioner Margrethe Vestager acknowledged that the German car industry is prone to forming cartels. She noted that there have

---

[30] PORSCHE, http://www.porscheusa.com (last visited Mar. 6, 2018).

[31] Before the Class Period, then-CEO of Daimler AG (Dr. Joachim Zahn) had no qualms about telling then-CEO of BMW AG (Eberhard von Kuenheim) that BMW should not make gull wing-styled cars that Daimler-Mercedes had made famous, or that Daimler-Mercedes was focusing on the market for six-cylinder cars, while BMW needed to focus on four-cylinder cars. *See* Bob Lutz, *Icons and Idiots: Straight Talk on Leadership*, Penguin Group (2013) at 64 ("[BMW] is selling way too many big six-cylinder sedans and coupes. And that must also cease. Six-cylinder cars are our [Daimler-Mercedes's] specialty! We also do fours, but we agree that's a good field for BMW, as well. You do good fours. Concentrate on those. We'll go easy on fours.").

already been ten established cartels in the industry, and explained that "[w]hen products are very similar and it is difficult to differentiate the quality, it is obviously tempting for manufacturers to negotiate to divide the market or orders."[32]

107. In 1998, Volkswagen AG was fined €102 million (later reduced to €90 million) based on Volkswagen and its Italian importer obstructing re-exports of Volkswagen and Audi cars from Italy into Germany and Austria. At the time, the fine was one of the highest ever imposed on a single company.[33]

108. In 2001, the ECC imposed a €30.96 million fine on Volkswagen AG for retail price maintenance measures on the German automobile market. The fine was levied based on Volkswagen AG instructing its German Volkswagen dealers in 1996 and 1997 to show "price discipline" and not to sell the new Passat at prices significantly below the recommended retail price.[34]

109. In 2010, Daimler AG and three of its subsidiaries resolved charges brought by the United States Department of Justice related to a Foreign Corrupt Practices Act ("FCPA") investigation into the company's worldwide sales practices. A Daimler AG Russian subsidiary and a Daimler AG German subsidiary each pleaded guilty to criminal informations charging violations based on anti-bribery provisions of the FCPA. Daimler AG and one of its Chinese subsidiaries entered into a deferred prosecution agreement and agreed to the filing of criminal

---

[32] CPI, *EU: Car industry vulnerable to cartels says Vestager*, COMPETITION POLICY INTERNATIONAL (Feb. 11, 2018), https://www.competitionpolicyinternational.com/eu-car-industry-vulnerable-to-cartels-says-vestager/; *see also EU-Kommissarin: Autoindustrie anfällig für Kartelle*, ZEIT ONLINE (Feb. 10, 2018, 12:22 PM), http://www.zeit.de/news/2018-02/10/eu-kommissarin-autoindustrie-anfaellig-fuer-kartelle-180210-99-12197.

[33] *See Commission fines Volkswagen ECU 102 million following consumer complaints*, EUROPEAN COMMISSION PRESS RELEASE DATABASE (Jan. 28, 1998), http://europa.eu/rapid/press-release_IP-98-94_en.htm?locale=en; *see also Commission imposes a € 30.96 million fine on Volkswagen AG for retail price maintenance measures on the German market*, EUROPEAN COMMISSIONS PRESS RELEASE DATABASE (May 31, 2001), http://europa.eu/rapid/press-release_IP-01-760_en.htm?locale=en.

[34] *See Commission imposes a € 30.96 million fine on Volkswagen AG for retail price maintenance measures on the German market*, *supra* fn.33.

informations charging violations also based on the FCPA. In total, Daimler AG and its subsidiaries paid $93.6 million in criminal fines and penalties.[35]

110. As discussed in further detail below, Defendants' collusion on the size of AdBlue tanks resulted in Volkswagen's cheating on diesel emissions tests. In 2015, Volkswagen AG admitted that it had cheated, and was the target of regulatory investigations in multiple countries, including the United States, where it paid more than $20 billion in criminal penalties and civil restitution.[36] In connection with the so-called "defeat device," Volkswagen pleaded guilty to conspiring to defraud the United States and Volkswagen's U.S. customers and to violate the Clean Air Act, including by lying to and misleading U.S. customers about whether certain Volkswagen, Audi and Porsche vehicles complied with emissions standards, and by concealing material facts about the cheating scheme from U.S. authorities.[37]

/ / /

/ / /

/ / /

/ / /

---

[35] *See* DOJ Office of Public Affairs, *Daimler AG and Three Subsidiaries Resolve Foreign Corrupt Practices Act Investigation and Agree to Pay $93.6 Million in Criminal Penalties*, JUSTICE.GOV (Apr. 1, 2010), https://www.justice.gov/opa/pr/daimler-ag-and-three-subsidiaries-resolve-foreign-corrupt-practices-act-investigation-and.

[36] Also, in the past year, German prosecutors have been investigating efforts by Daimler AG, Porsche AG, and Robert Bosch GmbH to implement diesel emissions cheating schemes similar to Volkswagen and/or to facilitate that scheme. German authorities have ordered that thousands of Porsche Cayenne SUVs with 'defeat devices' similar to those in Volkswagen vehicles be bought back or modified so that they are compliant. Additionally, German authorities are also considering an official or voluntary recall for about 11,000 BMW diesel vehicles which have been found to contain software which manipulates exhaust system emissions during testing. Similar allegations of cheating on diesel emission have been levied against Daimler AG and are the subject of ongoing investigations, including by the United States Department of Justice.

[37] *See* DOJ Office of Public Affairs, *Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests*, JUSTICE.GOV (Jan. 11, 2017), https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

111. In 2016, European truck makers Daimler AG, Volkswagen-owned MAN, DAF, Iveco, and Volvo-Renault were fined €2.93 billion by ECC authorities in connection with a conspiracy that not only fixed prices of the trucks, but also stuck consumers with the costs of complying with emissions rules. All of these companies paid record fines, except MAN, which received leniency for reporting the misconduct to antitrust authorities.

## B. DEFENDANTS' COLLUSION IN THE GERMAN PASSENGER VEHICLE MARKET

### i. Government Investigations into Defendants' Collusion on German Passenger Vehicles

112. The European Commission follows a rigorous and confidential procedure for investigating antitrust violations. Every case begins with an initial assessment phase during which the ECC examines whether the case merits the opening of an investigation and, if so, provisionally defines the focus of the investigation. But only cases with sufficient merit will proceed, in part, so that the ECC can best utilize its enforcement resources on cases where it appears likely that a significant violation may be found, for example cases which have a major negative impact on competition and create consumer harm.[38] Moreover, in order to open an investigation the ECC's guidelines require that there be "reasonable indications of a likely infringement."[39] At the end of the initial investigative phase, the ECC will either pursue the case as a matter of priority and proceed with conducting an in-depth investigation, or close the investigation. Generally, the substance of an investigation will remain confidential from the public until a Statement of Objections is issued that outlines the charges to the parties.[40]

---

[38] *See EU Competition Law, Rules Applicable to Antitrust Enforcement Volume I: General Rules*, EUROPA.EU, 77-83 (July 1, 2013), *Commission notice on best practices for the conduct of proceedings concerning Articles 101 and 102 TFEU*, available at http://ec.europa.eu/competition/antitrust/legislation/handbook_vol_1_en.pdf.

[39] Antitrust Manual of Procedures, EUROPA.EU, 102-109 (March 2012), *Opening of Proceedings, Conditions for opening of proceedings*, available at http://ec.europa.eu/competition/antitrust/antitrust_manproc_3_2012_en.pdf

[40] *See Procedures in anticompetitive agreements (Article 101 TFEU cases)*, EUROPA.EU, (footnote continued)



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

113. Importantly, the ECC also operates a leniency program (based on the Leniency Notice).[41] That program provides "the framework for rewarding cooperation in the Commission investigation by undertakings [*i.e.*, companies] which are or have been party to secret cartels affecting the Community."[42]

114. The Leniency Notice emphasizes that "[b]y their very nature, secret cartels are often difficult to detect and investigate without the cooperation of undertakings [*i.e.*, companies] or individuals implicated in them." The Leniency Notice also explains that, as result of the clandestine nature of cartels "the Commission considers that it is in the Community interest to reward undertakings [*i.e.*, companies] involved in this type of illegal practices *which are willing to put an end to their participation and co-operate in the Commission's investigation*, independently of the rest of the undertakings involved in the cartel."[43]

115. Leniency is not available for lesser anti-competitive infringements, nor is it available to a company that claims it did not participate in a cartel.[44] Therefore, a company that has made a leniency application has by definition admitted that it has participated in a "secret cartel[]."[45]

---

http://ec.europa.eu/competition/antitrust/procedures_101_en.html (last visited Mar. 6, 2018).

[41] *See Competition: Commission adopts revised Leniency Notice to reward companies that report cartels*, EUROPEAN COMMISSION PRESS RELEASE DATABASE (Dec. 6, 2007), http://europa.eu/rapid/press-release_IP-06-1705_en.htm?locale=en.

[42] *Commission Notice on Immunity from fines and reduction of fines in cartel cases*, OFFICIAL JOURNAL OF THE EUROPEAN UNION (Aug. 12, 2006), Introduction, para. 1, http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52006XC1208(04)&from=EN.

[43] *Id.* at Introduction, para. 3 (emphasis added).

[44] *Id.*

[45] Article 101(1) of the Treaty on the Functioning of the European Union primarily governs such serious infringements of competition law in the EU that have the "the prevention, restriction or distortion of competition" as the "object" of the participants' conduct. Article 101(1) TFEU. Those serious infringements are generally seen as comparable to horizontal conspiracies under Sherman Act Section 1 that are deemed *per se* violations of antitrust law. *See, e.g.*, Craig Callery, *Should the European Union embrace or exorcise Leegin's "rule of reason"?* (2011) in CARTELS AND ANTI-COMPETITIVE AGREEMENTS, VOL. I (ed. Sandra Marco Colino 2016) p. 101. By contrast, lesser infringements of competition law in the EU that have "the prevention, restriction or (footnote continued)

116. In addition, a company seeking leniency must provide the ECC with extensive details relating to the cartel and its operations.[46] And if such details or other cooperation with the ECC is not fulsome, the company risks losing the protection against high fines provided by the leniency program.[47] In addition, companies generally refrain from applying for leniency unless they are certain that they are implicated in a serious infringement. The reason is that the leniency process also brings about risks for the applicant. For instance, although a leniency application allows a company to receive immunity from fines if it comes forward first, it does not cover the company from follow-on damage claims. In fact, the leniency applicant often risks being the primary target of these follow-on claims. In addition, the leniency applicant takes the risk that the application may be considered invalid (or that other infringements unknown to the applicant at the time of the application may be discovered).

117. For companies that are not seeking leniency and are instead the target of investigative inspections (often called "dawn raids"), the ECC requires that those, too, only be conducted when there are sufficient indicia that the target has violated EU competition law. Specifically, such inspections can only be carried out by ECC officials when there are "reasonable grounds for suspecting an infringement of the competition rules by the undertaking concerned."[48] This test has been established to avoid arbitrary investigations by the ECC.

/ / /

/ / /

---

distortion of competition" as merely the "effect" of the participants' conduct are generally seen as comparable to conduct under Sherman Act Section 1 that is governed by the "rule of reason" – because of potential pro-competitive justifications. *Id.*

[46] *Commission Notice on Immunity from fines and reduction of fines in cartel cases, supra* fn.42, Introduction, para. 9.

[47] *Id.* at Introduction, para. 12.

[48] C-94/00, *Roquette Frères SA v Directeur général de la concurrence, de la consommation et de la répression des fraudes, and Commission of the European Communities* (October 22, 2002), paras. 54-55, available at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A62000CJ0094.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

118. In this case, considering the above-referenced provisions relating the ECC's investigations and consideration of leniency, there must be: (i) significant support for the antitrust authorities investigating the Defendants, including via well-founded raids as recent as October 2017 against BMW AG; and (ii) perhaps more importantly, what amount to admissions by two of the three parent companies that they were involved in a "secret cartel." Both Daimler AG and Volkswagen AG have sought leniency and have provided cooperation which effectively means they have admitted the existence of a secret cartel.

119. As first reported by leading news outlets on or about July 21, 2017, including the investigative cover story in the German-language weekly publication *Der Spiegel* (later supplemented with a follow-up article in *Der Spiegel* in late January 2018), antitrust authorities started investigating the collusion alleged herein at least as early as 2016, but perhaps as far back as 2014.[49] These news outlets, which exposed the Defendants' regular meetings to coordinate and/or exchange information on costs, prices, suppliers, technical development and other competitive aspects of their respective vehicle businesses, also reported that both the ECC authorities in Brussels and FCO in Bonn have been investigating such conduct.[50]

120. On July 22, 2017, those antitrust authorities confirmed these reports and stated that they had received information on Defendants' coordinated activities and that they were investigating allegations of an antitrust cartel among the Defendants.[51] Those investigations have

---

[49] *See Das Auto-Syndikat*, *supra* fn.15; Reuters Staff, *German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, REUTERS (July 21, 2017, 5:15 AM), http://www.reuters.com/article/germany-emissions-cartelidUSL5N1KC39X; Jan Keuchel, Volker Votsmeier, *Motorsäuberung mit AdBlue: Verdacht der Absprache bei deutschen Autokonzernen*, HANDELSBLATT (July 21, 2017, 5:57 AM), http://www.handelsblatt.com/my/unternehmen/industrie/motorsaeuberung-mit-adblue-verdacht-der-absprache-bei-deutschen-autokonzernen/20085722.html; Frank Dohmen, Dietmar Hawranek, *Das Nächste Kartell*, DER SPIEGEL (Jan. 26, 2018), https://magazin.spiegel.de/SP/2018/5/155477210/index.html (English version: http://www.spiegel.de/international/germany/cartel-suspicion-secret-price-fixing-among-german-carmakers-a-1190036.html).

[50] *Das Auto-Syndikat*, *supra* fn.15; *Das Nächste Kartell*, *supra* fn.49.

[51] *See* Mark Thompson, *European officials probe claims of huge German car cartel*, CNN MONEY (footnote continued)



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

been highly publicized due to the dawn raids, one occurring as recently as October 2017, at the headquarters of not only Volkswagen AG and Daimler AG, but also BMW AG.[52]

121. In July 2017, when the cartel was first publicly exposed, media reports indicated that Volkswagen AG self-reported to authorities in July 2016, apparently unaware that Daimler AG had previously self-reported, possibly as early as 2014.[53] On information and belief based on investigation of counsel, Volkswagen AG has made multiple proffers to antitrust authorities. In other words, there is apparently a contest between Volkswagen AG and Daimler AG to cooperate

---

(July 23, 2017, 3:17 PM), http://money.cnn.com/2017/07/22/investing/german-car-cartel-investigation/index.html.

[52] *See Antitrust: Commission confirms inspection in the car sector in Germany*, EUROPEAN COMMISSION PRESS RELEASE DATABASE (Oct. 20, 2017), http://europa.eu/rapid/press-release_STATEMENT-17-4084_en.htm (otherwise reported as raid on BMW); *Antitrust: Commission confirms inspections in the car sector in Germany*, EUROPEAN COMMISSION PRESS RELEASE DATABASE (Oct. 23, 2017), http://europa.eu/rapid/press-release_STATEMENT-17-4103_en.htm (otherwise reported as raids on Daimler and Volkswagen); Andreas Cremer, Alissa de Carbonnel, *BMW raided in cartel investigation as Daimler claims immunity*, REUTERS (Oct. 20, 2017, 6:33 AM), https://www.reuters.com/article/us-eu-antitrust-bmw/bmw-raided-in-cartel-investigation-as-daimler-claims-immunity-idUSKBN1CP1QU (ECC authorities raided BMW on October 16, 2017); Jan Schwartz, Andreas Cremer, *EU raids Daimler and VW in widening cartel inquiry*, REUTERS (Oct. 23, 2017, 5:55 AM), https://www.reuters.com/article/us-eu-antitrust-volkswagen/eu-raids-daimler-and-vw-in-widening-cartel-inquiry-idUSKBN1CS1OK (ECC authorities raided Daimler and Volkswagen on October 23, 2017); Reuters Staff, *BMW probe into cartel allegations needs more time: CEO*, REUTERS (Nov. 2, 2017, 2:46 AM), https://www.reuters.com/article/us-bmw-results-cartel/bmw-probe-into-cartel-allegations-needs-more-time-ceo-idUSKBN1D71AN.

[53] *See* Bertel Schmitt, *German Car Cartel Triggers Rat-Out-Race Between Daimler, Volkswagen and BMW*, FORBES (July 25, 2017, 11:59 AM), https://www.forbes.com/sites/bertelschmitt/2017/07/25/german-car-cartel-triggers-rat-out-race-between-daimler-volkswagen-and-bmw/#606640dc5c1a (Daimler reporting to ECC); Thomas Kirchner, Hans Leyendecker, Klaus Ott, *Illegale Absprachen: EU kennt seit Jahren Kartell-Verdacht in Autobranche*, SÜDDEUTSCHE ZEITUNG (July 26, 2017, 6:09 PM), http://www.sueddeutsche.de/wirtschaft/illegale-absprachen-eu-kennt-seit-jahren-kartell-verdacht-in-autobranche-1.3604314 (Daimler self-reporting to ECC and FCO); *see also* Reuters Staff, *BMW Halts Project Talks After Daimler Blew Whistle – Sueddeutsche*, REUTERS (July 25, 2017, 12:01 PM), https://uk.reuters.com/article/uk-germany-emissions-daimler-bmw/bmw-halts-project-talks-after-daimler-blew-whistle-sueddeutsche-idUKKBN1AA2GK; *see also Daimler ist Kronzeuge im Kartellverfahren*, Handelsblatt (Oct. 20, 2017, 8:44 AM), http://www.handelsblatt.com/unternehmen/industrie/sonderkosten-dieselkrise-belastet-daimler/20481062.html (Daimler AG confirming its status as leniency applicant with ECC).

with antitrust authorities in the hopes of obtaining leniency for their misconduct. While Daimler AG may have been first to approach those authorities, Volkswagen AG may still be eligible for some form of leniency in exchange for cooperation.

122. Documents from these investigations indicate that Defendants colluded on, at least, braking systems, air suspensions, clutches, and diesel engines.[54]

ii. Defendants' Actions in Furtherance of the Conspiracy

123. According to reporting by *Der Spiegel* and other leading German news publications, Defendants regularly met, at least since the late-1990s, to coordinate on technical development, component pricing, suppliers, and additional competitive aspects regarding everything from brake controls and chassis to electronics and drivetrains for German Passenger Vehicles. Industry group meetings that facilitated collusion are estimated to have involved at least 200 employees and 60 "working groups," with at least 1,000 such meetings taking place since 2011.[55]

124. Volkswagen AG has admitted to the ECC that "Daimler, BMW, Volkswagen, Audi and Porsche made agreements 'for many years, at least since the 1990s, up to today' about the development of their vehicles, costs, suppliers and markets."[56] Volkswagen AG has also informed the ECC that the Defendants "discussed vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems."[57] Volkswagen AG even acknowledged that for itself, as well as Audi and Porsche, "behavior in violation of cartel law" may have occurred. For example, Volkswagen AG explained in its written submission to European antitrust authorities that there had been an "exchange of internal, competitively sensitive

---

[54] *See German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, *supra* fn.49.

[55] *Id.*; *see also Das Auto-Syndikat*, *supra* fn.15; *Motorsäuberung mit AdBlue: Verdacht der Absprache bei deutschen Autokonzernen*, *supra* fn.49; *Das Nächste Kartell*, *supra* fn.49.

[56] *Das Auto-Syndikat*, *supra* fn.15.

[57] *German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, *supra* fn.49.



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

technical data," and Defendants had jointly established "technical standards" and had agreed to use "only certain technical solutions" in new vehicles.[58]

125. The scope of the information that the Defendants exchanged was broad. For example, Defendants had a diesel emissions working group that coordinated on specifications for the cleaning tanks (AdBlue tanks) used in diesel emissions systems. Defendants knew those tanks were too small and would cause illegal pollution in cities throughout the United States and around the world. Although collusion on the size of AdBlue tanks and the fallout from that particular component of the conspiracy may have been the catalyst for Defendants' anticompetitive conduct coming to light, Defendants' conspiracy is much broader.

126. Another component of Defendants' cartel is their long-standing agreement with the German steel industry to set the price of steel—a key material cost for the production of vehicles. In addition to components and raw materials, Defendants conspired regarding "science"—which has since been debunked—to mislead consumers and governments regarding their technologies, specifically diesel emissions.

127. As supported by the multiple submissions by Volkswagen AG to the ECC and/or the FCO, the conspiracy focused on several other categories of automotive components and technologies. As such, evidence of collusion on additional automotive components and technologies is likely to emerge.

128. Defendants also used seemingly legitimate industry associations to facilitate their secret conspiracy. Such associations included:

- *Verband der Automobilindustrie* (in English, German Association of the Automotive Industry; "VDA");
- *Abgaszentrum der Automobilindustrie* (in English, Emissions Center of the German Automotive Industry; "ADA");
- *Arbeitsgemeinschaft der Eisen und Metall verarbeitenden Industrie* (in English, Working Group of the Iron- and Metal-Processing Industry; "AVI"); and

---

[58] *Das Auto-Syndikat*, *supra* fn.15.



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

- *Europäischen Forschungsvereinigung für Umwelt und Gesundheit im Transportsektor* (in English, European Research Group on Environment and Health in the Transport Sector; "EUGT").

129. For example, Defendants utilized industry working groups, including those at the VDA, for key automobile components and technologies as the bodies through which their engineers and other employees would meet, exchange competitively sensitive information, and reach clandestine agreements to limit technological innovation and otherwise coordinate on critical aspects of Defendants' design and manufacture of automobiles. Volkswagen AG has admitted to antitrust authorities that more than 1,000 such meetings took place since 2011. The working groups included those for: "engine," "car body," "chassis," "electric/electronic" and "total vehicle."[59]

130. Similarly, Defendants used the VDA "raw materials" group, as well as AVI meetings, to develop and agree on a common strategy for purchasing steel to manufacture German Passenger Vehicles. Defendants also used AVI meetings to exchange sensitive information regarding sales figures and expectations, foreign markets, and new technologies.[60] In particular, Defendants created so-called "guidelines for material price compensation" that used baseline pricing and adjustments that were determined by an agreed-upon index, to fix the purchase price of steel.[61] The collusion on steel prices was not limited to Defendants, but also included their key suppliers.

131. Although Defendants' collusion related to AdBlue tanks and steel purchases may be the most prominently reported aspects of the cartel, Defendants' collusion was designed to and did encompass nearly all areas of automobile development.[62]

---

[59] *See Id.*; *See also Anatomy of a (Possible) Cartel*, *supra* fn.15.

[60] *See Das Nächste Kartell*, *supra* fn.49.

[61] *Id.*

[62] *See German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, *supra* fn.49.

132. Defendants' misconduct first started emerging in the wake of scandals related to many of the Defendants cheating to avoid diesel emissions laws and in connection with an investigation into collusion in the German steel industry. Government authorities, however, have since confirmed that official investigations are now looking into more far-reaching misconduct by Defendants in the German automotive industry.[63]

133. That Defendants' collusive agreements were broad in scope and long in duration is further supported by the fact that top executives and board members were apparently aware of such agreements.[64]

134. As further described herein, the Defendants met, *inter alia*, at their corporate offices in Ingolstadt, Munich, Stuttgart, and Wolfsburg and at the big automobile trade shows in Geneva, Frankfurt, and Paris, as well as industry associations such as the VDA and ADA, as well as AVI and EUGT.[65]

135. At these meetings (and in related communications), Defendants exchanged commercially-sensitive information and reached agreements that went well beyond areas that might be permissible under the law.[66]

136. Defendants' collusion was far-reaching, but in particular with respect to technical innovation, Defendants understood that when one of them was to introduce a breakthrough technology, steps needed to be taken to ensure that the others were able to offer that technology as well. Instead of pursuing legal, albeit expensive, methods such as reverse-engineering to understand and compete with another German Passenger Vehicle, Defendants willingly shared the sensitive, breakthrough information among themselves.[67]

---

[63] *See Das Auto-Syndikat*, *supra* fn.15; *Das Nächste Kartell*, *supra* fn.49.

[64] *See Id.*; *see also Motorsäuberung mit AdBlue: Verdacht der Absprache bei deutschen Autokonzernen*, *supra* fn.49.

[65] *See Id.*

[66] *See Id.*

[67] *See Das Auto-Syndikat*, *supra* fn.15.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

137. As one of the Defendant managers who participated in the working group that addressed the drag co-efficient for vehicles explained: "This motto of 'giving and taking' is correct and, in this manner, it is also experienced in a friendly manner in the working group."[68]

138. For example, minutes from a meeting in Bad-Kissingen establish that Defendants discussed the cost, weight, technical risks, and crash issues regarding the development of soft-top convertibles, and then collectively agreed that soft-top convertible roofs should be permitted only to operate at vehicle speeds below 50 kilometers per hour; as stated in those minutes, there should be "[n]o arms race when it comes to speeds [for soft-top convertibles]." The result: soft convertible tops from Audi, BMW, Daimler-Mercedes, Porsche, and Volkswagen can be opened and closed only at vehicles speeds of up to 30 miles per hour.[69] Because the Defendants agreed that none of them would develop a soft-top convertible that could be operated at higher speeds—regardless of whether the technology would make it possible—they ensured that such a feature would not be available to consumers. This harmed consumers who purchased any of the Defendants' convertibles without harming Defendants' sales. That is because even if consumers wanted to choose a different vehicle, Defendants' conduct was likely to make consumers' second choice similarly technically stifled. And as alleged above, for a purchaser of a German Passenger Vehicle, their second choice is typically another German Passenger Vehicle.

139. This coordination was consistent with the long-standing agreement among Defendants that none of them would develop technologies others also were not going to offer.[70]

140. Instead of competing to offer the best technology to consumers to set themselves apart and justify the premium prices charged for "German engineering," the Defendants' exchanges of this type of competitively sensitive technical information reduced or eliminated uncertainty about the current or future market behavior of ostensible competitors and undermined free market competition in the market for German Passenger Vehicles.

---

[68] *Id.*

[69] *Id.*

[70] *See Id.*

141. The Defendants' collusion was not limited to technical development or material costs. Defendants also cooperated on other supply-chain issues, such as the selection of suppliers. One such instance of coordination on suppliers occurred at a September 24, 2013 meeting of Defendants' managers in the "pneumatic suspension" working group, where they "discussed supplier performance." Defendants together reviewed and criticized the performance of ZF Friedrichshafen AG, one of the biggest suppliers in that segment, with Defendants' managers giving the supplier similar bad marks for both order processing and product quality. Daimler-Mercedes's representative said ZF Friedrichshafen AG performed poorly in the processing of electronically transmitted orders and only addressed problems when pressured to do so. Porsche's representative said that ZF Friedrichshafen AG had poor quality products.[71]

142. In another example, at a September 14, 2011 meeting in Bayreuth, when managers from Defendants' "diesel motors" working group were discussing a sensor to be used, one of the Defendants' managers explained that, in that instance, it was less important that they reach consensus on the particular sensor to be developed, and more critical that there be consensus on the supplier; "Our agreement that a sensor needs to be developed is not the critical issue, but the joint definition of the supplier is."[72]

143. In addition, Defendants were aware of the antitrust implications (if not outright illegality) of their working groups' coordinated efforts and agreements. For example, one Volkswagen manager wrote in an e-mail related to the sharing of information on drag coefficients, that there were "considerable concerns that problems could arise if a competitor [outside the manufacturer defendants] did in fact file a complaint [with cartel authorities]."[73] Regardless of their appreciation of the implications of their conduct, Defendants proceeded to cooperate and coordinate their efforts to the detriment of the Plaintiffs and the members of the Classes.

/ / /

---

[71] *See Id.*

[72] *Id.*

[73] *Id.*



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

iii. Collusion on AdBlue Tanks

144. Starting in the early-2000s, facing calls from consumers and governments to curtail automobile pollutants, in particular greenhouse gas carbon dioxide, the Defendants needed to develop solutions for their vehicles' emissions. Japanese manufacturers had developed hybrid electric-gas vehicles, but the Defendants had not successfully developed viable, competitive hybrid technologies. Instead, they looked to reinvent their German Passenger Vehicles powered by diesel engines. While diesel engines had more limited carbon dioxide emissions than gasoline engines, diesel engines produce nitrogen oxide, another potent source of pollution.[74]

145. To solve that problem, the Defendants looked to refine an established method for treating the nitrogen oxide emissions (mixing them with a pollution-neutralizing substance), and then branding their diesel vehicles as "clean" diesels. Specifically, a urea mixture (known as AdBlue) would combine with nitrogen oxide emissions and then split the emissions into the harmless components of water and nitrogen.[75] Figure 6 depicts this treatment system:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[74] *See Id.*

[75] *See Id.*



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**FIGURE 6**




SCR Technology, CLEANAIRBLUE, http://cleanairblue.com/scr-technology/ (last visited Mar. 13, 2018).




Volkswagen Presentation to EPA on Diesel Engine Future, Slide 21 (2006), VOLKSWAGEN, https://www.slideshare.net/juanmbarnett/volkswagen-presentation-to-epa-on-diesel-engine-future-2006 (last visited Mar. 13, 2018).

/ / /

/ / /

146. But as with numerous other vehicles systems and components, how the Defendants developed and deployed their individual solutions for using urea to clean nitrogen oxide emissions was not left to competition and market forces, and, as a direct and proximate result thereof, Defendants were not incentivized to innovate this technology further to gain a competitive advantage.

147. Instead, at numerous meetings starting at least as early as 2006, Defendants discussed and agreed on, *inter alia*, the size and suppliers of the tanks for AdBlue, as well as certain component pricing matters for their diesel cleaning systems. And, as one Audi employee described them, these meetings were "secret."[76]

148. Large AdBlue tanks could treat a greater volume of pollutants, but would have been expensive and taken up space that might be used otherwise (*e.g.*, for passengers, cargo or other car equipment). So the Defendants all agreed on small tanks.[77]

149. At an initial meeting in Sindelfingen on April 5, 2006, Defendants' working group of "chassis" managers said that it was absurd for each of the individual carmakers to use different size AdBlue tanks, and that they urgently needed a "coordinated approach" on tank sizes—it was unacceptable that each carmaker could simply do what it wanted with respect to tank size.[78]

150. As noted above, cost played a key role in the call for a coordinated approach on the size of AdBlue tanks. A presentation from the working group addressing the AdBlue issue emphasized that if AdBlue injection were the technology of the future, and millions of tanks, pumps, and brackets were to be installed in vehicles, the carmakers could "save up to €80 per vehicle" by agreeing on a standard tank size.[79]

151. Defendants worked closely to monitor and fine tune their collusion, especially regarding AdBlue tanks. For example, when initial agreements to keep the AdBlue tanks between

---

[76] *See Id.*

[77] *See Id.*

[78] *See Id.*

[79] *See Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

17 and 23 liters were not being followed, there was a follow-up meeting in October 2007 at which the Defendants' managers criticized the fact that the carmakers had not agreed on a single supplier to make the AdBlue tanks. As reflected in meeting minutes, those managers also emphasized that there was an "urgent need for cooperation among the companies," and that a "uniform escalation logic should be agreed to." To ensure compliance, specific individuals from the various Defendants were tasked with the responsibility of effecting the tank-related agreements. As the meeting minutes show; "The responsible individuals are, first, the "drive" managers and, second, the "chassis" managers."[80]

152. By September 2008, after additional follow-up meetings, the Defendants agreed to install an 8 liter AdBlue tank for all diesel vehicles. Again, key rationales expressed for having such small AdBlue tanks were that they did not cost as much as larger tanks and left more space in the vehicle, despite—knowing full well that an 8 liter tank would only hold enough AdBlue to clean a vehicle's diesel emissions for approximately 6,000 miles.[81]

153. After the Defendants agreed in 2008 to use an 8 liter AdBlue tank, they were aware at least by 2010 that this size limitation would cause problems, especially in the U.S. market. U.S. regulators required that by 2014 the urea tanks contain enough AdBlue to ensure that they would only have to be refilled during an inspection or service after about 16,000 kilometers (approximately 10,000 miles). A document prepared by Audi indicated that to satisfy that requirement, vehicles on average would need "a minimum tank volume of 19 liters;" an assessment with which BMW, Daimler-Mercedes, and Volkswagen all agreed.[82]

154. But again, the carmakers' marketing departments, which felt that tanks of that size were too large, prevailed. Audi managers reiterated to cartel members that the issue had to be resolved "across the board" and that a "coordinated scenario for the future" was urgently needed.

/ / /

---

[80] *See Id.*

[81] *See Id.*

[82] *See Id.*

155. Even though: (1) a larger tank would allow more nitrogen oxide emissions to be treated; (2) the amount of AdBlue in a small tank would prove insufficient to properly clean the nitrogen oxide emissions; and (3) the Defendants understood that even greater governmental restrictions on the levels of nitrogen oxide emissions would likely be imposed in the future, the Defendants still decided, through a series of agreements culminating in June 2010, to only use small tanks; 16 liters (United States) and 8 liters (Europe).[83]

156. The Defendants also agreed as early as 2006 that the AdBlue tanks should, if possible, be produced by only two manufacturers and installed in such a manner as to prevent refilling by the end-use customers.[84]

157. Significantly, the highest echelons in each of Defendants' organizations were aware of these agreements to restrict competition regarding AdBlue tanks.[85] In its written submission to the ECC, Volkswagen said that top management was involved: "An internal Audi presentation resulted in a commitment by German automobile manufacturers at the executive level."[86]

158. The Defendants' collusion on AdBlue tanks not only adversely impacted consumers in the form of, *inter alia*, inflated prices, but as pollution laws became more restrictive, the collusion on the AdBlue tanks led to some of the Defendants (namely Volkswagen) developing intricate schemes to evade such laws.

159. After the Defendants' agreement in 2010, Volkswagen reaffirmed that Defendants were to equip their diesel passenger vehicles only with small AdBlue tanks. Volkswagen's concern was that if Defendants were not consistent in their offering, then U.S. authorities may realize that small AdBlue tanks were insufficient to properly clean diesel emissions as required. Volkswagen feared that offering different-sized AdBlue tanks would cause U.S. emissions

---

[83] *See Id.*

[84] *See Id.*

[85] Defendants' top leadership apparently also had knowledge of the agreements to fix the price of steel that was purchased for the manufacture of German Passenger Vehicles. *See infra* Section V(B)(iv), "Collusion on Steel."

[86] *Das Auto-Syndikat*, *supra* fn.15.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

regulators to question how some companies were getting away with less AdBlue while others needed substantially more to clean their diesel emissions. Volkswagen, for its part, had illegally solved the cartel-created problem of using a 16 liter AdBlue tank by designing the now well-known software "defeat device" for its vehicles. That device was able to sense when a vehicle was being emissions tested and made certain adjustments to the emissions control systems so that the vehicle's pollution output would be lower (compliant) than during real-world driving (non-compliant), thereby violating U.S. emissions standards.[87]

160. The Defendants' 2010 agreement continued to be enforced in the years to follow. For example, in May 2014, an Audi representative sent an email urgently warning against any manufacturer breaking the agreement. The Audi representative explained that the need to inject greater amounts of AdBlue into the exhaust system (in order to comply with increasingly restrictive pollution regulations) could "expand into an arms race with regard to tank sizes." But as the Audi representative also explained, that was a course that "we should continue to avoid at all costs." So here too was another competitive "arms race" that the cartel successfully avoided through its collusion.[88]

161. Significantly, shortly after *Der Spiegel* first reported on the cartel, the news magazine also reported that documents submitted to ECC authorities by Volkswagen AG show that the collusion was not limited to the carmakers. Bosch, which supplied and was instrumental in the development on the AdBlue emission systems, worked with Defendants to limit the amount of AdBlue used to clean diesel emissions. It has been publicly reported that coordination between Bosch and Defendants was taken with the aim of ensuring that pollution regulators, such as the California Air Resources Board ("CARB") and the United States Environmental Protection Agency ("EPA"), did not second-guess the diesel emissions from Defendants' vehicles.[89]

---

[87] *See Id.*

[88] *Cf. Id.* ("[n]o arms race when it comes to speeds [for soft-top convertibles].").

[89] *See* Frank Dohmen, Dietmar Hawranek, *VW-Papier enthüllt*, SPIEGEL ONLINE (July 28, 2017, 1:58 PM), http://www.spiegel.de/wirtschaft/unternehmen/bosch-beteiligt-bei-absprachen-von-
(footnote continued)

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

162. For example, in an October 2006 letter written by a Volkswagen manager after a meeting with Bosch and the other Defendants, the manager explained that everyone wanted a limit on the amount of AdBlue to be injected "because of the limited size of the urea tanks, [but] [n]obody wants to report the real motivation of this limitation to the authorities (CARB, EPA)."[90] Similarly, a 2008 email regarding a meeting among Defendants from Bosch to Audi executives Wolfgang Hatz, former Head of Engine Development, and Giovanni Pamio, former Head of Thermodynamics, confirmed that "this issue [limiting use of the pollutant-neutralizer AdBlue] should not be mentioned in any way to the US authorities EPA and CARB so as not to jeopardize the launch [of diesel vehicles with AdBlue] in the US."[91] Notably, these two Audi executives have since been arrested.

163. Defendants' collusion regarding the AdBlue tanks in their diesel passenger vehicles was an essential aspect of the greater conspiracy to stifle innovation and maintain price premiums. In order to keep Defendants' longstanding cartel hidden from authorities and those harmed thereby, several Defendants resorted to further defrauding consumers and government regulators by using defeat devices to cheat diesel emissions tests. Said collusion also proved to Defendants how successful and profitable their collective efforts to stifle innovation could be, and how they could use the cover of supposed standard setting to disguise their collusive efforts.

iv. Collusion on Steel

164. Defendants further coordinated to fix the price of one of the core components of automobiles: steel. Specifically, Defendants, along with co-conspirators, worked together to unify

---

daimler-bmw-audi-volkswagen-und-porsche-a-1160101.html; *see also Ende eines Kartells*, DER SPIEGEL (July 29, 2017), https://magazin.spiegel.de/SP/2017/31/152378907/index.html.

[90] *VW-Papier enthüllt, supra* fn.89.

[91] *Neue Enthüllungen Zum Kartell-Skandal*, BILD (July 28, 2017, 8:51 AM), http://www.bild.de/bild-plus/geld/wirtschaft/abgas-skandal/bosch-war-an-geheim-absprachen-der-autohersteller-beteiligt-52686252.bild.html; Jack Ewing, *Former VW Engine Chief Arrested, Signaling Widening Emissions Case*, N.Y. TIMES (Sept. 28, 2017), https://www.nytimes.com/2017/09/28/business/volkswagen-diesel-cheating.html.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

the purchase price of steel used in German Passenger Vehicles with the aim of creating "a commonality of costs."[92]

165. To appreciate why Defendants acted in concert to fix the price of steel, it is important to understand the steelmaking process, the pricing components of steel, and the purchase of steel in the automobile industry.

166. The manufacture of steel primarily begins with the processing of two raw materials: iron ore and coking coal. The rock containing iron ore is ground and the iron ore extracted. The coking coal is cleansed of impurities in a coke oven. The iron ore and coking coal are then placed into a blast furnace and heated to create molten iron. The resulting product is known as raw or crude steel. The production of steel for automobiles, however, also requires steel manufacturers to mix raw steel with scrap steel and certain precious metals and alloys, like copper, nickel and molybdenum. Together, these materials account for as much as 40% of the overall steel price.[93]

167. All of the components that make up the steel used in German Passenger Vehicles are subject to price fluctuations. In fact, these raw materials have been known to double in price in only a few months.[94] As a result, German steel producers have little control over the prices of these materials.[95]

168. German steel producers account for these rapid and dramatic price fluctuations by entering into short-term purchasing agreements with their customers. However, such short-term

---

[92] *Das Nächste Kartell*, *supra* fn.49; Karin Matussek, *Volkswagen, BMW, Daimler Raided Over Steel-Buying Cartel*, BLOOMBERG (July 5, 2016, 1:55 AM), https://www.bloomberg.com/news/articles/2016-07-05/german-auto-industry-faces-probe-over-steel-buying-cartel.

[93] *See Das Nächste Kartell*, *supra* fn.49.

[94] Raw materials have been estimated to account for almost half of the cost of a car, with steel accounting for almost half of the raw materials in a car. *See* Henry Kallstrom, *Raw materials – the biggest cost driver in the auto industry*, YAHOO FINANCE (Feb. 10, 2015), https://finance.yahoo.com/news/raw-materials-biggest-cost-driver-180628123.html.

[95] *See Das Nächste Kartell*, *supra* fn.49.

arrangements are problematic for the automobile industry. Automobile manufacturers, such as Defendants, which set model prices for an entire year (and take several years to develop a model), want as much cost stability as possible for the components that go into making their cars.[96]

169. Starting in the 1990s, Defendants sought to combat fluctuating steel prices. But they did not do so by independently negotiating individual agreements with German steel producers. Instead, they collaborated to devise a shared pricing formula that segmented the price for steel into two parts. Defendants and German steel producers agreed that raw steel would account for the first component of the price, with each Defendant negotiating with the German steel producers on a long-term price per ton, which created a less volatile baseline price. Defendants and the German steel producers further agreed that the second component of the price would be a surcharge calculated using a purchase price index that was maintained by the *Wirtschaftsvereinigung Stahl* (in English the German Steel Federation; "VW Stahl"). This surcharge applied to scrap steel, precious metals, and alloys.[97]

170. Put simply, Defendants all agreed on both a common purchase method and a common purchase price index for their steel purchases.

171. Certain documents reflecting details of the Defendants' collusion on steel prices have been widely reported recently. For example, at a March 16, 2007 meeting of the VDA "raw materials" working group in Wiesbaden at the Nassauer Hof Hotel, the members memorialized their shared strategy for purchasing steel calling them the "guidelines for material price compensation," and noted that their pricing system needed to be "preserved." The VDA group included its long-time leader, Francisco Garcia Sanz, board member and Procurement Chief for Volkswagen AG, and, according to meeting minutes from that day, dubbed this shared pricing agreement as "painsharing."[98]

/ / /

---

[96] *See Id.*

[97] *See Id.*

[98] *See Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

172. The meeting minutes, which are labeled "TOP 5" in apparent reference to the manufacturer defendants, also indicate that Garcia Sanz "communicated with his colleagues in procurement at the vehicle manufacturer[s]," had "coordinated" with them on this issue, and that they "agreed in advance" on formalizing the guidelines.[99]

173. Defendants continued to use this coordinated pricing system for several years. Due to the longevity of the agreements, Germany's FCO believes that "the respective CEOs or board members of the automobile manufacturers in question were aware of the suspected collusion."[100]

174. The Defendants' collusion was also carried out in meetings of the Düsseldorf-based AVI, whose leading members are the German steelmakers and the VDA, which included Defendants. Those meetings have taken place twice a year since 2004 (primarily at the Sheraton Frankfurt Airport Hotel & Conference Center, but also at Defendants' offices, including at Daimler AG's factory near Stuttgart) and provided a forum for the steelmakers' representatives to meet with automobile manufacturers (Defendants) and auto parts suppliers, such as Bosch. While the formal meetings included general presentations related to the industry, representatives and executives from Defendants would openly discuss sensitive business secrets in detail with each other, including sales figures and expectations, foreign markets, and new technologies.[101]

175. Defendants' long-standing collusion on steel prices exhibited significant resilience. After government officials began investigating anticompetitive conduct in the German steel industry, VW Stahl eliminated the purchase price index for scrap metal at the end of 2015. But Defendants were apparently not interested in independently negotiating steel prices with German steel producers, and they began looking for a solution that would allow their anticompetitive behavior to continue.[102]

/ / /

---

[99] *Id.*

[100] *Id.*

[101] *See Id.*

[102] *See Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

176. On January 26, 2016, an executive from BMW AG sent an e-mail to his counterpart at Volkswagen AG saying that the companies needed to quickly switch to an "appropriate replacement index." Also in January 2016, a similar email from a Daimler AG employee to a German steel producer said that "defining a new foundation, was necessary for the calculation of the scrap surcharge."[103]

177. Defendants' collusion regarding a unified pricing formula for steel quelled competition. Because Defendants were not actively negotiating on their own behalf, consumers were forced to pay inflated prices for German Passenger Vehicles. Absent collusion, Defendants would have: (i) competed with each other to obtain the best purchase price for steel from German steel producers; and (ii) competed with each other on their vehicles' profit margins related to the purchase price of steel. Thus, the steel collusion as alleged herein included methods and purposes that were common to the overall collusion of Defendants in stifling innovation. The steel collusion was part and parcel of the overall conspiracy by Defendants to collectively contain their costs while continuing to pocket the premium charged for their German Passenger Vehicles, rather than passing that savings onto the consumers.

v. Collusion on "Science"

178. Defendants and co-conspirators also worked closely together to generate now-debunked "science" that was aimed at promoting German Passenger Vehicles, in particular their diesel vehicles.

179. In 2007, the EUGT was formed, with all of its funding coming from BMW AG, Daimler AG, Volkswagen AG, and Robert Bosch GmbH.[104] As noted herein, that was precisely the time when Volkswagen and other Defendants were making a major push to promote a "clean" diesel launch in the U.S. market, as well as in Europe and other parts of the world, while at the same time facing stricter emissions regulations, especially in the United States. A primary

---

[103] *Id.*

[104] Although Robert Bosch GmbH withdrew its support of EUGT in June 2013, BMW AG, Daimler AG and Volkswagen AG did not dissolve the EUGT until 2017.



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

purpose of the EUGT was to sponsor research and hire scientists to conduct studies that could defend the use of diesel.[105]

180. For example, as recently reported by *The New York Times*, one of the EUGT's U.S.-based studies was initiated in 2014 using monkeys to test the health effects of diesel emissions, in particular nitrogen dioxide, a known carcinogen.[106] But that "scientific" study apparently used a Volkswagen Beetle with a "defeat device" that exposed the monkeys in a lab environment to less pollutants (as much as 40 times less) than if the vehicle emissions were generated in the real world. As reported: "[T]he American scientists conducting the test were unaware of one critical fact: The Beetle provided by Volkswagen had been rigged to produce pollution levels that were far less harmful in the lab than they were on the road. The results were being deliberately manipulated."[107]

181. The misconduct did not stop there. Even though that "scientific" study was started before the "clean diesel" fraud was discovered in September 2015, documents show that in August 2016 (after the public exposure of the fraud) Michael Spallek, head of the EUGT and a Volkswagen AG employee, asked that the lab present its findings. Spallek's email said: "The E.U.G.T. point of view is that it's time to try to finalize the report and to present or discuss the problems of the study in a scientific way ASAP."[108]

182. The EUGT was also behind research and studies that challenged both the World Health Organization's 2012 decision to classify diesel exhaust as a carcinogen, and support the

---

[105] *See* Jack Ewing, *10 Monkeys and a Beetle: Inside VW's Campaign for 'Clean Diesel'*, N.Y. TIMES (Jan. 25, 2018), https://www.nytimes.com/2018/01/25/world/europe/volkswagen-diesel-emissions-monkeys.html.

[106] "In 2012, 72,000 people in Europe died prematurely because of nitrogen dioxide pollution, which comes primarily from diesel vehicles, according to a report released last year by a committee of the European Parliament." *Id.*

[107] *Id.*; *see also* Hanno Charisius , Stefanie Dodt, Max Hägler and Klaus Ott, *Auch Menschen wurden Schadstofftests ausgesetzt*, SÜDDEUTSCHE ZEITUNG (Jan. 28, 2018, 11:41 PM), http://www.sueddeutsche.de/wirtschaft/auto-lobby-auch-menschen-wurden-abgastests-ausgesetzt-1.3843804.

[108] *10 Monkeys and a Beetle: Inside VW's Campaign for 'Clean Diesel,' supra* fn.105.

banning of diesel vehicles from cities to reduce pollution. The EUGT even financed studies that the German Federal Environment Agency recently described as using dubious methodologies in order to support the claim that establishing low-emissions zones in cities only had a marginal effect on pollution levels.[109]

vi. Collusion on Other Technologies

183. The Defendants' collusion was wide-ranging and not limited to technologies and materials alleged herein. As noted herein, Volkswagen has (i) admitted to the ECC that "Daimler, BMW, Volkswagen, Audi and Porsche made agreements 'for many years, at least since the 1990s, up to today' about the development of their vehicles, costs, suppliers and markets[;]"[110] and (ii) informed the ECC that the Defendants "discussed vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems."[111] Moreover, Defendants not only had jointly established "technical standards" and agreed to use "only certain technical solutions" in new vehicles, but there was also an understanding that none of them would leap-frog the others with ground-breaking innovations.[112]

184. Therefore, the additional collusion by Defendants otherwise described herein—on convertible tops, selection of suppliers for diesel sensors, and selections of suppliers for pneumatic suspensions—is significant.[113]

185. Since Volkswagen AG has admitted to antitrust authorities that more than 1,000 such meetings took place since 2011 across a wide range of VDA working groups, and since the investigations related to steel pricing indicate that the Defendants used AVI gatherings to openly

---

[109] *See Id.*

[110] *Das Auto-Syndikat*, *supra* fn.15.

[111] *German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, *supra* fn.49.

[112] *See Das Auto-Syndikat*, *supra* fn.15.

[113] *See Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

discuss sensitive business secrets, including sales expectations and new technologies,[114] evidence of collusion on even more technologies will likely emerge as regulatory and other investigations continue.

vii. Defendants Had Ample Opportunities to Conspire Regarding German Passenger Vehicles

186. In addition to meeting at each other's corporate offices and at auto shows, as discussed above, Defendants also used the cover of several official associations and research groups to carry out their conspiracy. Such associations and groups included, but are not limited to, the VDA and ADA, as well as the AVI.[115] Both the meetings at corporate offices and auto shows, as well as the meetings held in connection with industry association and research groups, provided the Defendants both the opportunities and the means by which they established and furthered their conspiracy.

(a) *The VDA*

187. The VDA is a trade association with its headquarters in Berlin, Germany and offices in Brussels, Moscow, and Beijing. It represents over 620 companies involved in research, development, and production for the automotive industry in Germany. Unlike other national automotive industry trade associations, the VDA represents manufacturers of passenger cars and commercial vehicles, as well as their component suppliers. This distinctive feature ostensibly facilitates direct dialogue and rapid decision-making within the German automotive industry. Together, the companies composing the VDA generate revenue of more than €400 billion per year.

/ / /

---

[114] *See Id.*

[115] Defendants also worked together on other research and development groups, such as the EUGT discussed herein. Some of these groups have been closed and/or disbanded since the publication of the collusion alleged herein. *See* Stefan Menzel, *VW schließt Abgaszentrum ADA und führt Verhaltenskatalog ein*, HANDELSBLATT (Feb. 20, 2018, 7:08 PM), http://www.handelsblatt.com/my/unternehmen/industrie/konsequenzen-aus-affenskandal-vw-schliesst-abgaszentrum-ada-und-fuehrt-verhaltenskatalog-ein/20982458.html.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

188. VDA members are divided into three Manufacturer Groups: automobile manufacturers (MG I); trailer, special body, and bus manufacturers (MG II); and automotive suppliers (MG III). Defendants Audi, BMW, Daimler-Mercedes, Porsche, and Volkswagen are members of the VDA and belong to MG I. Bosch is a member of the VDA and belongs to MG III. The three Manufacturer Groups of the VDA are each represented on both the Managing Board and Presiding Board of the VDA.[116]

189. Top-level executives from Defendants routinely sit on the VDA's Managing Board and Presiding Board. Currently, the CEO for each named parent defendant sits on the VDA's Managing Board: Daimler AG CEO Dieter Zetsche, Porsche AG CEO Oliver Blume, BMW AG CEO Harald Krüger, Volkswagen AG CEO Mattias Müller, and Audi AG CEO Rupert Stradler. Alleged co-conspirator Robert Bosch GmbH CEO Volkmar Denner is also a Board Member. Currently, Daimler AG CEO Dieter Zetsche sits on the VDA's Presiding Board.[117]

190. Each of the VDA's three Manufacturing Groups operates under the auspices of a specific VDA business unit; MG I under Business Unit A, MG II under Business Unit C, and MG III under Business Unit B. Each Business Unit is headed by a Managing Director.[118]

191. VDA Business Unit A consists of the following departments: Technology, Logistics, Environmental Policy and Technical Environmental Protection, Research Association for Automotive Technology (FAT), Quality Management Center (QMC), Classic Cars, Industry's Co-ordination Unit for Electric Mobility, and Co-ordinated Unit Networked and Automated Driving. The current Managing Director of Business Unit A is Joachim Damansky.[119]

---

[116] *See* Members, WDA.DE, https://www.vda.de/en/association/members.html (last visited March 7, 2018).

[117] *See* Managing Board and Presiding Board, WDA.DE, https://www.vda.de/en/association/organization/managing-board-presiding-board.html (last visited March 7, 2018).

[118] *See* Organizational Chart, WDA.DE, https://www.vda.de/en/association/organization/organizational-chart.html (last visited March 7, 2018).

[119] *See* Managing Directors, WDA.DE, https://www.vda.de/en/association/organization/managing-
(footnote continued)



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

192. According to the VDA's website, "[t]he Research Association of Automotive Technology (FAT) unites all German passenger and commercial vehicle manufactures as well as numerous suppliers under the auspices of the VDA for the purpose of carrying out pre-competitive joint research." Further, "[i]n specialist working groups, members from the industry define and implement the individual projects. Quick decision-making guarantees that research projects commensurate with the needs of FAT member companies are promptly implemented." FAT's research is concentrated in the areas of safety, technical environmental research, energy efficiency and electrical integration, material and manufacturing technologies and calculation methods, and commercial vehicles transport systems.[120] Each area of concentration has a set of working groups conducting research.

193. According to its website, the VDA's QMC has existed since 1997. Its responsibilities range "from developing systems and methods to shaping the future of quality management systems in the automotive industry." Representatives from each of the named parent defendants currently sit on the VDA's QMC committee: Werner Zimmermann and Rudolf Nofz (Audi AG), Anton Heiss and Johann Ebenbichler (BMW AG), Peter Bleyhl and Christof Stanger (Daimler AG), Frank Moser and Ludwig Schares (Porsche AG), and Michael Scholl (Volkswagen AG). Birte Lübbert and Armin Troeger-Alefeld (Robert Bosch GmbH) are also on the committee.[121]

/ / /

/ / /

/ / /

/ / /

---

directors.html (last visited March 7, 2018).

[120] *See* Research Association of Automotive Technology (FAT), WDA.DE, https://www.vda.de/en/association/departments/fat/responsibilities-and-objectives.html (last visited March 7, 2018).

[121] *See* Zusammensetzung des Qualitätsmanagement Ausschuss (QMA), WDA.DE, http://vda-qmc.de/fileadmin/redakteur/Startseite/QMA.pdf (last visited March 7, 2018).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

194. VDA Business Unit B consists of the following departments: Automotive Supply Industry, SMEs and Startups, Aftermarket, Exhibitions, Taxes and Custom Duties, Law and Insurance, Human Resources, Finance, and Central Services. The current Managing Director for Business Unit B is Klaus Bräunig.[122]

195. VDA Business Unit C consists of the following departments: Commercial Vehicles, Trailers, Bodies, and Buses; Economic Policy and VDA Branch Office in Brussels; Transport Policy; In-house Communication; and Markets, Analyses, Raw Materials, and Statistics. The current Managing Director of Business Unit C is Kurt-Christian Scheel.[123]

196. In addition to Defendants, the VDA includes foreign suppliers and foreign-owned carmakers, such as Ford and Opel. In general, the Defendants would attend official meetings, but Defendants' working group managers would then meet in side-sessions operating outside of the official VDA meetings, and would exclude the foreign suppliers or foreign-owned car manufacturers from those unofficial meetings.[124]

197. The VDA organizes the *International Automobil-Ausstellung* (in English, the International Motor Show Germany; "IAA"). The IAA is the world's largest motor show. It is held annually, with passenger vehicles displayed in odd-numbered years in Frankfurt am Main and commercial vehicles displayed in even-numbered years in Hanover. It is the leading trade fair for mobility, transportation, and logistics. The exhibition bills itself as showcasing the entire value creation chain, from the development of individual ideas to comprehensive mobility solutions. Passenger vehicle IAA shows were held in September during the years 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, and 2017. Top-level executives from Defendants routinely attend and give presentations at the IAA.

---

[122] *See* Managing Directors, *supra* fn.119.

[123] *See* Organizational Chart, *supra* fn.118.

[124] *See Das Auto-Syndikat*, *supra* fn.15; *see also Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says*, *supra* fn.15; *see also Anatomy of a (Possible) Cartel*, *supra* fn.15.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

198. The VDA also hosts an annual Technical Congress for the German automotive industry, which Defendants regularly attend. The Technical Congresses address environmental, energy and electric mobility, and vehicle safety and electronics issues. Top-level representatives of the automotive industry deliver presentations at the Technical Congress, which is attended by several hundred participants from the areas of business, academia, and politics, including ambassadors and delegates of foreign countries. The Technical Congresses are accompanied by an exhibition that showcases a wide range of innovations in the automotive industry. These events provide numerous opportunities for Defendants to meet and exchange information. Defendants and co-conspirators routinely sent representatives to these events, including:

a. The 19th Technical Congress was held April 5-6, 2017 at the Kosmos, Berlin. Participants included representatives from Audi (Larissa Braun); Bosch (Dr. Rolf Bulander, Dr. Steffen Berns, Ulrich Schulmeister, and Steffen Eppler); BMW (Dr. Christoph Grote and Prof. Klaus Kompaß); Daimler-Mercedes (Ola Källenius, Renata Jungo Brüngger, Prof. Dr. Rodolfo Schöneburg, Dr. Peter Schramm, and Hartmut Kovasc); and Volkswagen (Dr. Axel Heinrich and Dr. Ulrich Eichhorn); as well as Prof. Dr. Johanna Wanka, of the Federal Minister, Federal Ministry of Education and Research.

b. The 18th Technical Congress was held March 17-18, 2016 at the Forum am Schlosspark, Ludwigsburg. Participants included representatives from Audi (Dr. Stefan Niemand and Reinhard Otten); Volkswagen (Dr. Helge Neuner); BMW (Prof. Klaus Kompaß); Bosch (Dr. Rolf Bulander, Dr. Christian Passmann, Axel Pethe, Dr. Matthias Klauda, and Dr. Stjepan Dujmovic); Porsche (Dr. Michael Steiner, Alexander Hitzinger, and Thilo Koslowski); and Daimler-Mercedes (Prof. Dr. Thomas Weber and Klaus Schartel); as well as Rainer Bomba, Federal Transport Secretary; Jochen Flasbarth, Federal Environment Secretary; and Gertrud Sahler, Federal Ministry for the Environment, Conservation, Construction and Nuclear Safety.

c. The 17th Technical Congress was held March 19-20, 2015 at the FILharmonie in Filderstadt. Participants included representatives from BMW (Peter Langen, Dr. Thomas Helmer, Prof. Klaus Kompaß, Dieter May, Dr. Lei Wang, and Dr. Christoph Grote); Bosch (Dr. Volkmar Denner, Christian Appel, Bernhard Bihr, Stefan Hoffmann, Dr. Stefanie

Jackisch, Dr. Stefan Kampmann, Dr. Bernd Lichtenberg, Dr. Rolf Nicodemus, Dr. Michael Strugala, Dr. Matthias Klauda, and Wolf-Henning Scheider); and Daimler-Mercedes (Prof. Dr. Thomas Weber and Peter Häußermann).

d. The 16th Technical Congress was held March 20-21, 2014 at the Hanover Fairgrounds. Participants included representatives from Audi (Christian Hilpoltsteiner); BMW (Dr. Andreas Eder, Stefan Feit, Dr. Günter Reichart, Gerhard Woerle, and Martin Hauschild); Bosch (Dr. Uta Fischer, Andreas Wagner, and Carsten Martin Rommel); Daimler-Mercedes (Dr. Ralf Herrtwich, Johann Seefried, and Bernhard Holzapfel); and Volkswagen (Prof. Dr. Martin Winterkorn, Thomas Ruchatz, and Dr. Arne Bartels).

e. The 15th Technical Congress was held March 21-22, 2013 at BMW Welt in Munich. Participants included representatives from Audi (Wolfgang Dürheimer, Dr. Martin Mühlmeier, and Reiner Mangold); BMW (Dr. Alfred Zeitler, Wolfgang Stütz, Hans-Hermann Braess, Dr. Herbert Diess, Norbert Reithofer, Klaus Kompaß, Dr. Nikolai Ardey, Armin Gräter, Dr. Mihiar Ayoubi, Hans-Jürgen Brüne, Peter Diettrich, Peter Raschl, and Dr. Christoph Grote); Bosch (Georg Blume and Dr. Michael Fausten); Daimler-Mercedes (Dr. Manfred Schuckert, Lars Schröter, Dieter Scheunert, Prof. Dr. Herbert Kohler, Dr. Christine Haller, Helge-Frank Müller, and Dr. Markus Baum); and Volkswagen (Prof. Dr. Jürgen Leohold, Thomas Ruchatz, Dr. Arne Bartels, Dr. Stefan Brosig, Dr. Jan Effertz, Andreas Jungbluth, Dr. Susanne Leifheit, and Dr. Stefanie Achmus).

f. The 14th Technical Congress was held March 22-23, 2012 at the Mercedes Event Center in Sindelfingen. Participants included representatives from Audi (Cynthia Wolsdorff, Dr. Ralf Kunkel and Andreas Gruber); BMW (Dr. Dirk Wisselmann, Dr. Helmut Spannheimer, Dr. Jens Rößing, Dr. Werner Huber and Michael Heimrath); Bosch (Franz Fehrenbach); Daimler-Mercedes (Prof. Dr. Rodolfo Schöneburg, Stefan Sahlmann, Sven Rauscher, Dirk Ockel, Prof. Dr. Ralf Guido Herrtwich, Robert Henrich, Georg Stefan Hagemann, Wolfgang Haennsler, Dr. Uwe Franke, Dr. Jörg Breuer, Jörg Bakker, Dr. Dieter Zetsche and Prof. Dr. Herbert Kohler); and Volkswagen (Dr. Christian Wewetzer, Dr. Bernd Rech, Dr. rer. nat. Winfried Köppen and Prof. Dr. Jürgen Leohold).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

g. The 13th Technical Congress was held March 23-24, 2011 at the Forum am Schlosspark, Ludwigsburg. Participants included representatives from Audi (Michael Dick, Alejandro Vukotich, Dr. Ulrich Widmann, and Thomas Müller); BMW (Armin Gräter); Bosch (Dr. Markus Heyn and Klaus Meder); Daimler-Mercedes (Jörg Bakker, Rainer Justen, Dieter Scheunert, Prof. Dr.-Ing. Rodolfo Schöneburg, Dr. Manfred Schuckert, and Dr. Thomas Weber) and Volkswagen (Dr. Rudolf Krebs).

h. The 12th Technical Congress was held March 24-25, 2010 in Ludwigsburg. Participants included representatives from Audi (Torsten Gollewski, Alejandro Vukotich, Georg-Peter Duba, Tobias Gansen and Claudia Kratzsch); BMW (Simon Fürst, Prof. Dr.-Ing. habil. Raymond Freymann, Peter Langen, and Matthias Klietz); Bosch (Dr. Jürgen Mössinger, Dr. Thomas Kropf, Klaus Meder, and Dr. Bernd Bohr); Daimler-Mercedes (Rodolfo Schöneburg, Michael Fehring, Karl-Heinz Baumann, Dr. Thomas Weber, Dieter Wäller, Hans-Joachim Volkmann, Marcel Hassler, and Dr. Manfred Schuckert); and Volkswagen (Dr. Andreas Titze, Dr. Ulrich Hackenberg, Prof. Dr. Horst Oehlschlaeger, and Dr. Klaus-Peter Schindler).

i. The 11th Technical Congress was held March 25-26, 2009 at Volkswagen headquarters in Wolfsburg. Participants included representatives from Audi (Dipl.-Ing. Thomas Kamla and Dr.-Ing. Peter Gebhard); BMW (Dr.-Ing. e.h. Johannes Liebl, Dr. Werner Huber and Dipl.-Ing. Klaus Kompass); Bosch (Dipl.-Ing. Peter Tyroller, Dr. Steffen Berns and Dr. Dieter Kraft); Daimler-Mercedes (Dipl.-Ing. Jörg Prigl, Prof. Dr. Rodolfo Schöneburg and Dr. Thomas Weber); and Volkswagen (Dr. Ingo Rackow, Dipl.-Ing. Doreen Siebenweiber, Carsten Steffen, Dr. Jens Hadler, Prof. Dr.-Ing. Jürgen Leohold, Prof. Dr. Martin Winterkorn, Dr. Klaus-Peter Schindler, and Dr. Torsten Strutz).

j. The 10th Technical Congress was held April 2-3, 2008 at the Forum am Schlosspark, Ludwigsburg.

k. The 9th Technical Congress was held March 28-29, 2007 at the Mercedes Event Center, Sindelfingen. Participants included representatives from Audi (Dipl.- Ing. Franz Fürst, Dr.-Ing. Michael Holzner, Dipl.-Ing. Eckart Donner and Dipl.-Ing. Thomas Winkle); BMW (Nils Borchers, Dr. Wolfgang Epple, Dipl.-Ing. Rainer Walz, Prof. Dr.-Ing. habil. Raymond

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Freymann, Dr. Juliane Kluge, and Dipl.-Ing. Johannes Liebl); Bosch (Dr.-Ing. Jens Schick, Dr. Rolf Leonhard, Dr. Manfred Dürnholz, Dipl.-Ing. Thomas Lengenfelder and Dr.-Ing. Bernd Bohr); Daimler-Mercedes (Dr. Andreas Truckenbrodt, Dr. Thomas Weber, Dr. Rodolfo Schöneburg, Dr. Dieter Zetsche, David D. Henry, Dr.-Ing. Joachim Schommers, Dr.-Ing. Andreas Lingens, Dr.-Ing. Hermann Breitbach, Dipl.-Ing. Bernd Lindemann, Dr.-Ing. Jürgen Schwarz, and Dipl.-Ing. (FH) Roland Dold); and Volkswagen (Dr. rer. nat. Robert Zobel and Prof. Dr.-Ing. Jürgen Leohold).

l. The 8th Technical Congress was held March 22-23, 2006 at the BMW Forschungs und Innovationszentrum, Munich. Participants included representatives from BMW (Christoph Huß, Prof. Dr. Burkhard Göschel, Josef Haberl, Dr.-Ing. Manfred Klüting, Klaus Kompass, Dr. Werner Huber, Prof. Dr. Burkhard Göschel, Prof. Dr. Mario Theissen, Klaus Borgmann, Dr. Wolfgang Epple, and Peter Langen); Bosch (Dr.-Ing. Rainer Kallenbach, Dr.-Ing. Rainer Kallenbach and Dr. Siegfried Dals); Daimler-Mercedes (Stephan Wolfsried, Dr. Ralf G. Herrtwich, Dr.-Ing. Leopold Mikulic, Dr.-Ing. Joachim Schommers, Dr. Andreas Truckenbrodt, Stephan Wolfsried, and Dr. Ralf G. Herrtwich); and Volkswagen (Dr. Will Specks, Dr.-Ing. Rudolf Krebs, Matthias Rabe, and Dr.-Ing. Markus Lienkamp).

m. The 7th Technical Congress was held March 16-17, 2005 at the Audi Forum in Ingolstadt. Participants included representatives from Audi (Dr. Ulrich Hackenberg, Dr. Michael Holzner, Alejandro Vukotich, Karl-Friedrich Worsdorfer, Ingrid Paulus, Heinz Hollerweger, Thomas Pitour, Wolfgang Hatz and Richard Bauder); BMW (Dr.-lng. Erich Sagan, Eduard Jansen Karl-Ernst Steinberg, Dr.-lng. Heinz Leffler and Dr.-lng. Philip Kohn); Bosch (Dr.-lng. Klaus Harms); Daimler-Mercedes (Prof. Dr.-lng. Thomas Breitling, Dr.-lng. Jorg Breuer, Matthias Schulz, Christian Enderle, Martin Schnabel); and Volkswagen (Dr. Will Specks).

n. The 6th Technical Congress was held March 23-24, 2004 at the Opel Live in Russelheim. Participants included representatives from Audi (Dr. Willibert Schleuter, Dipl.-Ing. (FH) Hubert Hietl); BMW (Hartwig Lobe, Dr. Philip Köhn, and Dr. Michael Eckrich); Bosch (Dr. Udo Wolz, Dr. Dieter Kraft, Prof. Dr. Peter W. Knoll, Dr. Norbert Hoffmann and Wolfgang Drees); Daimler-Mercedes (Volker Wilhelmi, Dr. Rodolfo Schöneburg and Prof. Dr.-Ing. Wolfgang Merker); Porsche (Dr.-Ing. Hans-Jürgen Görich); and Volkswagen (Klaus Lange).



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

o. The 5th Technical Congress was held April 2-3, 2003 at CongressPark, Wolfsburg. Participants included representatives from Audi (Dr.-Ing. Willibert Schleuter); BMW (Dr.-Ing. Norbert Metz, Dr. Burkhard Göschel, Holger Braess, Albrecht Jungk, Dr. Juliane Wolf, and Dr. Klaus Scheuerer); Bosch (Ing. Leopold Bernegger and Dr.-Ing. Bernd Bohr); Daimler-Mercedes (Dr. Michael Rummel, Dipl.-Ing. Johannes Ebner, Prof. Dr. Herbert Kohler and Dr.-Ing. Thomas Weber); and Volkswagen (Dr. rer. nat. Klaus-Peter Schindler, Dr.-Ing. Stefan Carli, Dr. rer. nat. Udo Schriever, Dr.-Ing. Hans-Jürgen Stauss, Dipl.-Phys. Axel Riemann, Dr. rer. pol. Hartmut Heinrich, Dr. Bernd Pischetsrieder, and Dr.-Ing. Wolfgang Steiger).

p. The 4th Technical Congress was held March 20-21, 2002 in Stuttgart.

q. The 3rd Technical Congress was held March 23-24, 2001 in Bad Homburg.

r. The 2nd Technical Congress was held September 28-29, 2000 in Frankfurt.

s. The 1st Technical Congress was held September 1-2, 1999 in Frankfurt.

199. The VDA, including in its published guidelines, has recognized that not all collaboration among competitors is prohibited. But the VDA has also made clear, including in those same guidelines, the difference between acceptable collaboration and unacceptable collusion. For example, the VDA provides examples of unacceptable topics including "price and price strategies, delivery and payment terms with customers and suppliers, and information on company strategies and future market behavior."[125] Specifically, the VDA Competition Law Guidelines provide the following:

a. Topics permitted at Association meetings:

> At Association meetings, competitors may in principle exchange information on the subject area of the meeting. This includes:
>
> - currently planned legislation and its implications for the membership as a whole;

---

[125] Caspar Busse, Thomas Fromm, & Wolfgang Janisch, *Wenn Firmen reden, kann es schnell heikel warden*, SÜDDEUTSCHE ZEITUNG (July 25, 2017, 9:39 AM), http://www.sueddeutsche.de/wirtschaft/autoindustrie-wenn-firmen-reden-kann-es-schnell-heikel-werden-1.3600991.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

- the political environment, general technical/scientific developments and regulatory measures of general interest;
- current economic developments and general developments in the industry (provided these are in the public domain);
- discussions on VDA lobbying activities;
- benchmarking activities provided these involve (as a rule) at least five companies, a neutral third party conducts the benchmarking, anonymises and aggregates the findings before being disclosed to the said companies, no disaggregation is possible at the Association meeting, and there is no reference to products or market behaviour (only to internal processes or environmental standards, for example);
- general sector analysis (provided data is aggregated by the VDA or another neutral third party);
- the exchange of general, freely available information (for example general economic data from the KBA, from the Internet or from member company annual reports which have already been published); and
- the review of general business developments, provided the information relates to the company as a whole, the entire product range or other aggregated business areas and has already been lawfully published by the companies in question.

b. Topics not permitted at Association meetings:

Information which companies must not exchange at Association meetings includes but is not limited to:

- information or agreements on prices, price components, discounts, pricing strategies or price calculations or planned price changes;
- terms of delivery or payment and any other contractual provisions in contracts with customers/suppliers provided they have competitive implications;
- information on business strategies or on current or future market behaviour (“signalling”);
- information not yet lawfully published concerning current business;
- developments or business expectations (in particular sales/turnover figures), even if such information provides no indication of the market position of individual products;

- information on profits, profit margins, market shares or planned investments which is not in the public domain;
- information on internal research and development projects;
- information allowing coordinated action vis-à-vis players on the other side of the market (customers or suppliers), in particular relating to offers to third parties (for example, if parties respond to a call for tenders: which lot to tender for; degree of interest in winning the contract);
- the division of geographic or labour markets or sources and express or implied agreements on supply, purchase or other boycotts of specific companies;
- demands from customers or suppliers including the company's own response to these or the response of competitors;
- verification of information received from a customer or supplier; and
- the joint discussion and analysis of statistics permitted pursuant to item a) above, in particular the disaggregation of aggregated data.[126]

200. As alleged herein, the Defendants' secret meetings went far beyond the limited areas considered permissible by the VDA, or allowed by law.

(b) *The ADA*

201. Defendants' involvement with the ADA, which was headquartered at Porsche's offices in Weissach, provided them with numerous opportunities to conspire on developing a joint approach to satisfying increasingly restrictive air-quality protections that governments started to implement in the 1990s.

202. In 1995, Defendants selected Weissach, in the German state of Baden-Württemberg, as the site of the ADA. Each of the Defendants contributed 10 million Deutsche Mark, as well as 12 dedicated engineers to jointly research exhaust emissions systems. The Baden-Württemberg government contributed an additional 7.5 million Deutsche Mark.[127]

---

[126] *VDA Competition Law Guidelines*, VDA.DE (October 2015), 5-6, https://www.vda.de/en/services/Publications/competition-law-guidelines-in-the-vda.html.

[127] *See Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh* (footnote continued)

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

203. As noted above, the Defendants insisted that the ADA needed to exclude foreign-owned car manufacturers such as Opel and Ford. As is now apparent, Defendants used the cover of that research facility to improperly coordinate on their diesel vehicles. Opel reported its exclusion from the ADA to the FCO, which delayed the opening of the research center. But the FCO declined at the time to pursue the matter, seemingly accepting at face value the claim of the ADA managing director Wulf Sebbeße who professed that the ADA's work was limited to the "precompetitive advance development of emission control systems."[128]

204. In reality, the ADA's research specifically targeted the use of absorbers and Denox catalysts to control nitrogen oxides emitted from diesel engines, and Defendants did not want to share with foreign-owned companies the results of their research and development in that area. As discussed further herein, that diesel emissions technology developed and shared within the ADA, is now, along with other technologies, at issue in this litigation.[129]

(c) *The AVI*

205. As discussed in greater detail above, the Defendants' collusion was also facilitated by the Düsseldorf-based AVI, whose leading members are the German steelmakers and the Defendant-led VDA. The AVI had meetings twice a year since 2004 (primarily at the Sheraton Frankfurt Airport Hotel & Conference Center). But the AVI members also met at Defendants' offices, including at Daimler AG's factory near Stuttgart, where Defendants would openly discuss sensitive information, such as sales figures and expectations, as well as foreign markets, and new technologies.[130]

/ / /

/ / /

/ / /

---

*Report Says*, *supra* fn.15; *See Anatomy of a (Possible) Cartel*, *supra* fn.15.

[128] *Id.*

[129] *Id.*

[130] *See Das Nächste Kartell*, *supra* fn.49.

viii. Characteristics of the U.S. Market for German Passenger Vehicles Support the Existence of the Conspiracy

206. The following characteristics of the U.S. market for passenger vehicles from German carmakers support the existence of the conspiracy: (a) high barriers to entry; (b) high concentration of manufacturers of products sold with differentiated product markets; and (c) the price premium for such vehicles.

(a) *High Barriers to Entry*

207. In a conspiracy that lowers costs for manufacturers and increases the price for consumers, market forces would typically attract new entrants seeking to exploit the pricing gap created by that conspiracy's supra-competitive pricing. But when there are high barriers to entry for an industry, new manufacturers outside the conspiracy are less likely to enter the market. Barriers to entry are a key component to facilitating the formation and continuation of a conspiracy.

208. In the automotive market, there are high barriers to entry due to high capital investment costs for plants, machinery, and technical expertise, including a high degree of technical sophistication and relative scarcity for those with experience in those areas, as well as significant energy, transportation, and distribution costs, among others.

209. Here, Defendants' collusion exacerbated the already massive barriers to entry in the U.S. market for passenger vehicles. As noted above, there are significant research and development and manufacturing infrastructure costs, and most new vehicle models require a lengthy design, development, testing and tooling phases. Especially since a primary focus of the collusion was on the sharing of technology and other agreements to limit the scope and rate of innovation, in addition to other cost controls, Defendants were able to significantly reduce those substantial costs for themselves, while competitors (and potential market entrants) still faced them.

(b) *High Concentration of Manufacturers of Products Sold within Differentiated Product Markets*

210. A highly concentrated market facilitates and fosters collusion because, *inter alia*, participants are better able to coordinate on issues and increase their gains from collusion.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

211. Moreover, as noted above, German Passenger Vehicles sold in the United States are within differentiated product markets. And this gives even greater significance to the high concentration of market power collectively wielded by the Defendants vis-à-vis their status as German carmakers because the competitors most likely to take advantage of any single Defendant's lack of true innovation were other cartel members who agreed to not innovate.

212. Differentiated product markets are markets where, *inter alia*, "individual sellers compete more directly with those rivals selling closer substitutes."[131]

213. The automobile industry has long been one in which product differentiation effectively creates cars that are closer substitutes for each other than for some less similar car. For example, a Honda Civic and a Toyota Corolla are generally acknowledged to be closer competition for each other than either is for a Cadillac Escalade. Hence, the industry has long divided itself into segments such as sedans, coupes, convertibles, SUVs, and trucks.

214. Antitrust authorities, including in the United States, refer to markets in which these pockets of closer substitutes compete within a larger market as "differentiated product" markets:

> In some markets the products are differentiated, so that products sold by different participants in the market are not perfect substitutes for one another. Moreover, different products in the market may vary in the degree of their substitutability for one another. In this setting, competition may be non-uniform (*i.e.*, localized), so that individual sellers compete more directly with those rivals selling closer substitutes.[132]

215. In differentiated product markets, the raw market share that a given manufacturer has in a given industry segment can understate the "local" market power that the manufacturer actually has, and for the same reason can dramatically understate the competitive harm that can arise from collusion among the manufacturers of the closest substitutes within the overall market.

/ / /

---

[131] *Horizontal Merger Guidelines, Lessening of Competition Through Unilateral Effects*, JUSTICE.GOV (April 8, 1997), 22-23, https://www.justice.gov/atr/horizontal-merger-guidelines-0#22.

[132] *Id.*



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

216. Therefore, in such situations, antitrust authorities rely on more than just raw market share. Instead, antitrust authorities look to data that can help establish the closeness of competitive substitutes, including "[i]nformation about consumers' actual first and second product choices [that] may be provided by marketing surveys, information from bidding structures, or normal course of business documents from industry participants."[133] The concern in such markets is that coordination across close substitutes, whether through informal means or even by merger, can have a far greater negative impact on consumers than a pure market share analysis might otherwise suggest:

> Substantial unilateral price elevation in a market for differentiated products requires that there be a significant share of sales in the market accounted for by consumers who regard the products of the merging firms as their first and second choices, and that repositioning of the non-parties' product lines to replace the localized competition lost through the merger be unlikely. The price rise will be greater the closer substitutes are the products of the merging firms, *i.e.*, the more the buyers of one product consider the other product to be their next choice.[134]

217. Under this standard, each of Defendants' German Passenger Vehicles is clearly a closer substitute to those of another Defendant than to passenger vehicles from non-German (and especially non-European) carmakers within a particular vehicle segment. Thus, even if Defendants do not have market dominance with a given vehicle segment when viewed broadly, because of preference for and perceived superiority of their vehicles (a perception enhanced by the illegal conduct alleged in this matter), the agreement to collude and not compete had an impact on consumers far greater than the raw market share numbers would indicate.

218. This is what is shown by the second choice surveys hereinabove alleged. As alleged above, for a purchaser of a German Passenger Vehicle, their second choice is typically another German Passenger Vehicle. Thus, even if consumers wanted to choose a different vehicle,

---

[133] *Id* at 23-24.

[134] *Id*; *see also ICN Merger Guidelines Workbook*, *supra* fn.11 (explaining that "unilateral effects" arise where, as a result of a merger, competition between the products of the merging firms is eliminated, allowing the merged entity to unilaterally exercise market power at the risk of harming consumers).

Defendants' conduct was likely to make consumers' second choice similarly technically stifled and subject to the German Passenger Vehicle price premium.

219. Here, high concentration of manufacturers of products sold within differentiated product markets exists throughout the Class Period and is reflected in the figures below.

220. For example, as reflected in Figure 7 below, in 2006 Defendants collectively held 100% of the market share of German Passenger Vehicles sold in United States (or 10,000 in terms of the Herfindahl–Hirschman Index ("HHI"),[135] well above the 2,500 threshold for deeming a market "highly concentrated").[136]

**FIGURE 7**

**U.S. Vehicle Sales 2006 Market Share**

*German Brands*

| Manufacturer | Market Share | HHI | HHI - Assuming Conspiracy |
|---|---|---|---|
| Volkswagen | 30.2% | 913.3 | 10,000.0 |
| Daimler | 37.5% | 1,406.3 | |
| BMW | 29.1% | 847.6 | |
| Porsche | 3.2% | 10.0 | |
| Total | 100.0% | 3,177.2 | 10,000.0 |

*Notes: [1] Audi included in Volkswagen.*
*[2] "HHI - Assuming Conspiracy" treats the German Passenger Vehicle manufacturers as a single entity.*
*Source: WardsAuto (wardsauto.com).*

U.S. Vehicle Sales 2006 Market Share - German Brands




[135] HHI is a measure of market concentration.

[136] *See Horizontal Merger Guidelines, Lessening of Competition Through Unilateral Effects, supra* fn.131 at 34.



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

221. Defendants' market share of German Passenger Vehicles sold in the United States was also 100% in the 10 years before (1996)[137] and after (2016)[138]. The HHI was 10,000 for these years as well.

222. Even if other European passenger vehicles are considered as sufficient substitutes for German Passenger Vehicles, as reflected in Figure 8 below, in 2006 Defendants collectively held 83.0% of the market share of European passenger vehicles sold in United States (or 6,897.1 in terms of HHI, also well above the 2,500 threshold for deeming a market "highly concentrated").[139]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[137] The U.S. market for German Passenger Vehicles in 1996 was broken down as follows: Volkswagen/Audi (36.9%), Daimler-Mercedes (37.6%), BMW (23.7%), and Porsche (1.7%). *See* WardsAuto.com, *Industry Data*, http://www.wardsauto.com (last visited Mar. 14, 2018).

[138] The U.S. market for German Passenger Vehicles in 2016 was broken down as follows: Volkswagen/Audi (36.5%), Daimler-Mercedes (34.8%), BMW (25.0%), and Porsche (3.7%). *Id.*

[139] As noted herein, Defendants limited carmaker membership in their conspiracy to the five major German carmakers, apparently rejecting requests from Jaguar, Volvo, Renault, and Fiat to join their exchange of information, and justifying the exclusion of GM-owned Opel and Ford from the ADA. Again, because German Passenger Vehicles are sold within a differentiated product market, and because Defendants are the primary competitors of each other, the exclusion on non-German carmakers is particularly significant.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**FIGURE 8**

**U.S. Vehicle Sales 2006 Market Share**

*European Brands*

| Manufacturer | Market Share | HHI | HHI - Assuming Conspiracy |
|---|---|---|---|
| *German* | *83.0%* | | |
| Volkswagen | 25.1% | 629.9 | |
| Daimler | 31.1% | 969.9 | 6,897.1 |
| BMW | 24.2% | 584.6 | |
| Porsche | 2.6% | 6.9 | |
| *Swedish* | *11.7%* | | |
| Volvo | 8.9% | 79.8 | 79.8 |
| Saab | 2.8% | 7.6 | 7.6 |
| *British* | *5.3%* | | |
| Land Rover | 3.7% | 13.5 | 13.5 |
| Jaguar | 1.6% | 2.5 | 2.5 |
| Total | 100.0% | 2,294.8 | 7,000.6 |

*Notes: [1] Audi included in Volkswagen. [2] FCA not included.*
*[3] "HHI - Assuming Conspiracy" treats the German Passenger Vehicle manufacturers as a single entity.*
*Source: WardsAuto (wardsauto.com).*

U.S. Vehicle Sales 2006 Market Share by Country - European Brands




223. Defendants' market share of European vehicles sold in the United States was 73.8% in the 10 years before (1996)[140] and 88.7% in the 10 years after (2016)[141]. The HHI was 5,443.3 and 7,866.9 for these years, respectively.

---

[140] The U.S. market for European vehicles in 1996 was broken down as follows: Volkswagen/Audi (27.2%), Daimler-Mercedes (27.8%), BMW (17.5%), and Porsche (1.3%). *See* WardsAuto.com, *supra* fn.137.

[141] The U.S. market for European vehicles in 2016 was broken down as follows: Volkswagen/Audi (32.4%), Daimler-Mercedes (30.9%), BMW (22.2%), and Porsche (3.3%). *Id.*

224. In addition, as reflected in Figure 9 below, Defendants have seen their market share of the overall U.S. automobile market grow substantially from approximately 3% to 9% during the Class Period.

**FIGURE 9**




*Note: Audi included in Volkswagen.*
*Source: WardsAuto (wardsauto.com).*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

225. Defendants Daimler-Mercedes, BMW, Audi, and Porsche controlled almost half of the luxury sector, as reflected in Figure 10 below.

**FIGURE 10**




*Note: "German" is made up of Audi (10.6%), BMW (14.6%), Daimler-Mercedes (15.5%), and Porsche (2.8%).*
*Source: IHS MARKIT*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

226. And, until the "clean diesel" scandals emerged in 2015, Defendants controlled the majority of the diesel sector, as reflected in Figures 11 and 12 below.[142]

**FIGURE 11**

**Shares of Diesel Vehicle Sales in U.S., 2010 - June 2017**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1H 2017 |
|---|---|---|---|---|---|---|---|---|
| Volkswagen | 73.7% | 75.0% | 79.0% | 78.9% | 70.2% | 44.4% | 0.0% | 18.6% |
| BMW | 14.7% | 10.8% | 8.8% | 6.8% | 14.5% | 7.5% | 3.4% | 4.5% |
| Daimler | 9.5% | 14.1% | 12.3% | 12.1% | 9.8% | 5.6% | 1.8% | 0.1% |
| Jaguar Land Rover | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.9% | 5.3% | 12.1% |
| Chrysler | 2.1% | 0.1% | 0.0% | 0.0% | 1.2% | 39.6% | 43.6% | 3.3% |
| GM | 0.0% | 0.0% | 0.0% | 2.2% | 4.3% | 2.1% | 9.3% | 13.0% |
| Ford | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 36.5% | 48.4% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**FIGURE 12**




227. As such, the high concentration within the product markets allowed Defendants to coordinate and conspire without interruption or detection.

[142] From 2000 through 2004, based on fuel economy data kept by the EPA, Defendants' market share for imported diesel vehicles sold in the United States was 100% because Volkswagen was the only manufacturer of such vehicles during that time.

(c) *The Price Premium for German Passenger Vehicles*

228. Economic data supports the idea that there has been a pervasive premium for German Passenger Vehicles, even after controlling for each Defendants' brand value. This premium is stronger in market segments in which multiple German Passenger Vehicle manufacturers compete and in those segments where the German Passenger Vehicle brands' share is largest, which is entirely consistent with the idea that consumers view German Passenger Vehicle brands as closer substitutes to each other than to other cars within the same market segment. The result is that even after controlling for attributes such as fuel economy, model year, engine type, vehicle size, and technological features, as well as the individual brand value for each German brand (which probably includes some perception of the brand as better because it is German), German Passenger Vehicles still have a pervasive and unexplained price premium, which increases with the number of German Passenger Vehicle brands in a given segment. Based on initial analysis of public information across the period 2012 through 2017, the German Passenger Vehicle Premium amounted to additional annual revenue of between $450 million to over $1 billion.

229. This preliminary economic analysis based on public data makes clear that Defendants had the ability to maintain premium prices through their conspiracy simply by agreeing: (a) not to maintain the competitive pace of innovation; and (b) not to disclose to the public their agreement to stifle innovation, thereby maintaining the public perception that a premium on German Passenger Vehicles was merited by actual technological advantages.

230. Figures 13 and 14 below exemplify the German Passenger Vehicle price premium by providing comparisons of feature-adjusted base prices of comparable sedans and SUVs, respectively.

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**FIGURE 13**

| Comparison of Model Year 2016 Sedans | | | | |
|---|---|---|---|---|
| **Make** | **Model** | **Engine** | **Drive** | **Feature-Adjusted Base Price** |
| BMW | 535i Sedan | 300HP I6 | RWD | $54,505 |
| Mercedes Benz | E350 Sedan | 302HP V6 | RWD | $54,025 |
| Audi | A6 3.0T quattro Sedan | 333HP V6 | AWD | $53,535 |
| Acura | RLX Sedan | 310HP V6 | FWD | $49,465 |
| Cadillac | CTS Luxury Sedan | 335HP V6 | RWD | $48,980 |
| Lexus | GS350 Sedan | 311HP V6 | RWD | $47,765 |



*Source: Truedelta.com, MBUSA.com, AudiUSA.com, Lexus.com, Cadillac.com*

**FIGURE 14**

| Comparison of Model Year 2017 SUVs | | | | |
|---|---|---|---|---|
| **Make** | **Model** | **Engine** | **Drive** | **Feature-Adjusted Base Price** |
| Porsche | Cayenne SUV | 300HP V6 | AWD | $58,925 |
| BMW | X5 sDrive35i SUV | 300HP I6 | RWD | $56,120 |
| Mercedes Benz | GLE350 SUV | 302HP V6 | RWD | $52,925 |
| Audi | Q7 3.0T quattro SUV | 333HP V6 | AWD | $50,930 |
| Volkswagen | Touareg Sport SUV | 280HP V6 | AWD | $47,505 |
| Lexus | RX 350 SUV | 295HP V6 | FWD | $43,420 |
| Infiniti | QX60 SUV | 295HP V6 | FWD | $43,700 |
| Lincoln | MKT SUV | 303HP V6 | FWD | $41,990 |
| Acura | MDX SUV | 290HP I6 | FWD | $41,750 |



*Source: Truedelta.com, PorscheUSA.com, BMWUSA.com, Lexus.com, Acura.com*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

231. While the exact premium for German Passenger Vehicles is not known at this time, it is clear that such a premium does in fact exist and Defendants have benefited and profited as a direct and proximate result of the conspiracy alleged herein to the detriment of Plaintiffs and the Classes.

(d) *Suppression of Technology Diminishes Price Competition*

232. The agreements and exchanges of information related to stifling innovation, as well as agreements and exchanges of information related to suppliers and prices of vehicle components, allowed Defendants to control or limit price competition.

233. It is well established as a matter of economics that agreements to suppress or limit technology can be used to avoid price competition.[143]

234. Had Defendants faced competition from one another in terms of innovation and unmatched technological advances, those who did not innovate would have experienced downward pressure on the prices of their German Passenger Vehicles, while those who did would experience lower profit margins as a result of bearing the costs of those innovations.

235. These effects would be especially pronounced as the late-comers to a particular innovation caught up, and then all Defendants would again face higher costs to produce technologically equivalent vehicles again. Defendants avoided price competition, and maintained higher profit margins, by ensuring that no Defendant had such an edge due to technology or innovation and that no upward cycle of innovative completion forced them to provide higher value to consumers

## VI. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

236. Plaintiffs and members of the Classes had no knowledge of the conspiracy alleged herein or facts sufficient to put them on inquiry notice until, at the earliest, July 21, 2017—the date when *Der Spiegel* reported on the Defendants' conduct alleged herein.

/ / /

---

[143] *See* Kurt M. Saunders and Linda Levin, *Better, Faster, Cheaper - Later: What Happens When Technologies Are Suppressed*, 11 Mich. Telecomm. & Tech. L. Rev. 23, 37 (2004).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

237. Before that time, Plaintiffs and members of the Classes were not aware of the Defendants' unlawful conduct, and did not know that they were paying supra-competitive prices for German Passenger Vehicles.

238. There was no public information available to Plaintiffs and members of the Classes before *Der Spiegel* reported on Volkswagen disclosing its coordination, as far back as the 1990s, with the other major German auto manufacturers (the other Defendants) on technical development, costs, prices, suppliers, and other competitive aspects regarding everything from brake controls and chassis to electronics and car assembly.

239. In addition, Plaintiffs and members of the Classes did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein until July 21, 2017.

240. The affirmative acts of Defendants, including acts in furtherance of the conspiracy, were fraudulently concealed by Defendants and carried out in a manner that precluded detection, including public statements regarding competition by Defendants' top leadership. For example, Daimler AG's Dieter Zetsche claimed that Audi, BMW and Daimler-Mercedes were at the forefront of the vehicle business because they were fiercely competing with each other: "To this extent, competition is a bit sinister on each other's toes. In this sense, competition is an incredibly good thing." Similarly, BMW AG's Harald Krüger said, "This competition constantly motivates us to achieve excellence." Volkswagen AG's Matthias Müller also praised the competition of the brands, while Audi CEO Rupert Stadler said that the competition among the Defendants has "given us all a technological advantage."[144]

241. At the major shows in Paris, Frankfurt, Geneva, Detroit, and Tokyo, the executives often deride their competitors' models, though they are usually quoted anonymously. Referring to a Daimler-Mercedes model, a Volkswagen executive says: "It has the clearance of a truck." Commenting on a new Audi, a BMW developer said: "It already looks as old as its predecessor."

[144] *Das Auto-Syndikat*, *supra* fn.15.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

And a Daimler-Mercedes manager said the following about a Volkswagen: "You're better off buying a Skoda. It's €3,000 cheaper and a better car."[145]

242. Moreover, Defendants' and their co-conspirators' conspiracy was inherently self-concealing. German Passenger Vehicles are subject to antitrust regulation, so Plaintiffs and the Class Members reasonably believed that the industry was competitive. As alleged, throughout the course of the conspiracy, Defendants secretly met no less than 1,000 times to coordinate and agree on a wide array of competitive issues. Such secret meetings also helped successfully conceal the decades-long conspiracy until July 21, 2017.

243. Defendants are duty-bound to fully disclose the true nature of their relationship with the other Defendants to Plaintiffs and the Classes. However, as alleged above, Defendants actively concealed the nature of their relationship with other Defendants. Plaintiffs and the Classes reasonably relied on the Defendants' public statements concealing the conspiracy. Therefore, Defendants are estopped from relying on statutes of limitations defenses.

244. For these reasons, Plaintiffs' and the Classes' claims are not time barred.

## VII. CLASS ALLEGATIONS

### A. NATIONWIDE CLASS

245. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class of similarly situated indirect purchasers and/or lessees of German Passenger Vehicles (the "Nationwide Class"):

> All persons and entities who, during the Class Period, indirectly purchased or leased in the United States, for use and not for resale, at least one new German Passenger Vehicle, manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Nationwide Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

[145] *Id.*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**B. INDIVIDUAL STATE CLASSES**

246. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, consumer protection, and common laws of unjust enrichment of the states identified in the Claims for Relief section below. These claims are brought by Plaintiffs on behalf of themselves and similarly situated persons and entities in the identified states as follows:

i. Alabama Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Alabama, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

ii. Arizona Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Arizona, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

iii. California Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in California, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

iv. Colorado Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Colorado, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

v. Florida Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Florida, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

vi. Hawaii Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Hawaii, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

vii. Illinois Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Illinois, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

viii. Iowa Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Iowa, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

ix. Massachusetts Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Massachusetts, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

x. Michigan Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Michigan, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xi. Minnesota Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Minnesota, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

xii. Montana Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Montana, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xiii. Nevada Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Nevada, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xiv. New York Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in New York, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xv. North Carolina Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in North Carolina, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

xvi. North Dakota Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in North Dakota, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xvii. Oregon Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Oregon, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xviii. Pennsylvania Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Pennsylvania, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xix. Rhode Island Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Rhode Island, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

xx. South Carolina Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in South Carolina, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xxi. South Dakota Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in South Dakota, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xxii. Tennessee Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Tennessee, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

xxiii. Utah Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Utah, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

xxiv. Wisconsin Indirect Purchaser Class

All persons and entities who, during the Class Period, indirectly purchased or leased in Wisconsin, for use and not for resale, at least one new German Passenger Vehicle manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased German Passenger Vehicles directly or for resale.

247. The Nationwide Class and every above-listed Indirect Purchaser Class are collectively referred to herein as the "Classes."

248. Following further investigation as well as discovery in the case, definitions of the Classes, including the Class Period defined above, may be modified by amendment, and Plaintiffs reserve the right to join additional class representatives.

249. The Classes are individually so numerous that joinder of all members is impracticable. Even though the exact number of members of the Class is unknown at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in the Classes and that their identities can be readily ascertained from records in the possession of Defendants and/or third parties.

250. Class members are geographically dispersed throughout the United States and its territories.

251. Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the Class members were similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for German Passenger Vehicles purchased or leased from the Defendants (or their subsidiaries and/or co-conspirators).

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

252. Plaintiffs and members of the Classes have all sustained damages during the Class Period as a result of having purchased or leased one or more German Passenger Vehicle indirectly (*i.e.*, from a franchised dealership of one of the Defendants) from Defendants (or their subsidiaries and/or co-conspirators) at supra-competitive prices. Defendants and their co-conspirators' anticompetitive conduct alleged herein, the impact of such conduct, and the relief sought are all issues or questions that are common to each of the Plaintiffs and the members of the Classes.

253. Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel competent and experienced in class action, antitrust and consumer protection litigation. Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the Classes.

254. Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual Class members.

255. The questions of law and fact common to the Classes include, but are not limited to:

a. Whether Defendants engaged in a contract, combination, or conspiracy to raise, fix, maintain, and/or stabilize prices of German Passenger Vehicles sold in the United States;

b. The identity of the participants of the alleged conspiracy;

c. The duration of the alleged conspiracy, and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d. Whether Defendants' conduct caused German Passenger Vehicles to be sold in the United States at artificially high prices;

e. Whether the alleged conspiracy violated the Sherman Act;

f. Whether the alleged conspiracy violated state laws, including antitrust, unfair competition, consumer protection and unfair trade practice laws;

g. Whether Plaintiffs and other members of the Classes are entitled to injunctive relief and, if so, the nature and extent of such relief;

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

h. Whether Plaintiffs and other members of the Classes were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and,

i. Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and Class members, entitling Plaintiffs and the Class members to restitution and/or disgorgement.

256. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.

257. The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Classes. Although the laws of different states are implicated in this Complaint, these laws are substantially similar to one another and can be grouped together in manageable categories.

## VIII. <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (Nationwide Class)

258. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

259. Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

260. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

261. At least as early as January 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in unreasonable restraint of trade to artificially fix, raise, stabilize, and control prices for new German Passenger Vehicles in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

262. The anti-competitive acts were intentionally directed at the United States market for new German Passenger Vehicles and had a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for new German Passenger Vehicles throughout the United States.

263. In formulating and carrying out the alleged agreement, understanding and conspiracy, the Defendants and their co-conspirators did those things that they agreed and conspired to do, including the acts, practices and conduct set forth herein, and have caused unreasonable restraints in the United States' market for new German Passenger Vehicles.

264. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who leased or purchased new German Passenger Vehicles have been harmed by being forced to pay artificially inflated, supra-competitive prices when leasing or purchasing new German Passenger Vehicles in the United States.

265. Defendants' conspiracy had the following effects, among others:

a. Price competition in the market for new German Passenger Vehicles has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for new German Passenger Vehicles sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c. Plaintiffs and members of the Nationwide Class who leased or purchased new German Passenger Vehicles indirectly from Defendants and their co-conspirators during the Class Period have been deprived of the benefits of free and open competition.

266. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their businesses and property by paying more for new German Passenger

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Vehicles leased or purchased indirectly from Defendants and the co-conspirators than they would have paid, and will pay, in the absence of the conspiracy.

267. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

268. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, restraining and preventing the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust and Unfair Competition Laws**
**(State Law Classes)**

269. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

270. At least as early as January 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in unreasonable restraint of trade to artificially fix, raise, stabilize, and/or control prices for new German Passenger Vehicles in the United States in violation of the various state antitrust and other statutes set forth below.

271. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for new German Passenger Vehicles in the United States.

272. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price new German Passenger Vehicles at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the State Classes with respect to new German Passenger Vehicles sold in the United States; and/or

b. participating in meetings, conversations, and communications among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

273. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices with respect to new German Passenger Vehicles.

274. Defendants' anticompetitive acts described above were knowing, willful, and constitute flagrant violations of the state antitrust statutes identified in this Second Claim for Relief.

275. The Defendants' conspiracy, combination and unlawful conduct had a substantial effect on the intrastate commerce of each state, district and territory within the United States, including the following states in which, among other things, a substantial number of new German Passenger Vehicles were sold or leased during the Class Period at artificially inflated prices, excessive prices for the value received as retailers within each state were unable to offer the vehicles at a fair market price.

276. Alabama: Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code §§ 6-5-60, *et seq.*

a. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Alabama; (2) new German Passenger Vehicles were raised, fixed, maintained and/or stabilized at artificially high levels throughout Alabama; (3) Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class were deprived of free and open competition; and (4) Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles, grossly overpaying for the value received.

b. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code §§ 6-5-60, *et seq.* Accordingly, Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class seek all damages and other forms of relief available under Alabama Code §§ 6-5-60, *et seq.*

277. Arizona: Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*.

a. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Arizona; (2) new German Passenger Vehicles were raised, fixed, maintained and/or stabilized at artificially high levels throughout Arizona; (3) Arizona Plaintiff(s) and members of the Arizona Indirect Purchaser Class were deprived of free and open competition; and (4) Arizona Plaintiff(s) and members of the Arizona Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

b. During the Class Period, Defendants' illegal conduct was flagrant and substantially affected Arizona's trade and commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Arizona Plaintiff(s) and members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*. Accordingly, Arizona Plaintiff(s) and members of the Arizona Indirect Purchaser Class are entitled to and seek all damages and other forms of relief available under Arizona Revised Statutes §§ 44-1401, *et seq*.

e. Notice and a copy of this Complaint is being served upon the Arizona Attorney General on behalf of Arizona Plaintiff(s) and the Arizona Indirect Purchaser Class. Ariz. Rev. Stat. § 44-1415.

278. California: Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code §§ 16700, *et seq*., ("The Cartwright Act").

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

a. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

b. Under the Cartwright Act, indirect purchasers have standing to bring and maintain an action for damages and other relief based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

c. Under California law, a trust is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. Cal. Bus. & Prof. Code § 16726.

d. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 of the California Business and Professions Code to fix, raise, stabilize, and/or maintain prices of new German Passenger Vehicles at supra-competitive levels.

e. The aforesaid violations of Section 16720 of the California Business and Professions Code consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and/or stabilize the prices of new German Passenger Vehicles.

f. Defendants' anticompetitive conduct was knowing, willful and constitutes a flagrant violation of the California Business and Professions Code §§ 16700, *et seq*.

g. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices and course of conduct set forth above and the following: Fixing, raising, stabilizing, and/or pegging the price of new German Passenger Vehicles.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

h. The combination and conspiracy alleged herein has had, *inter alia*, the following effects during the Class Period: (1) Price competition in the sale of new German Passenger Vehicles has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for new German Passenger Vehicles sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and/or pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased new German Passenger Vehicles indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

i. As a direct and proximate result of Defendants' unlawful conduct, California Plaintiff(s) and members of the California Indirect Purchaser Class have been injured in their business and property in that they paid more for new German Passenger Vehicles than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, California Plaintiff(s) and members of the California Indirect Purchaser Class seek treble damages, interest, and their cost of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

279. Colorado: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Colorado Revised Statutes §§ 6-4-101, *et seq.*

a. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) price competition on new German Passenger Vehicles was restrained, suppressed, and/or eliminated throughout Colorado; (2) prices of new German Passenger Vehicles were raised, fixed, maintained and/or stabilized at artificially high levels throughout Colorado; (3) Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class were deprived of free and open competition; and (4) Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

b. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

c. As a direct and proximate result of Defendants' unlawful conduct, Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Colorado Revised Statutes §§ 6-4-101, *et seq.* Accordingly, Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class seek all damages and other forms of relief available under Colorado Revised Statutes §§ 6-4-101, *et seq.*

e. Notice and a copy of this Complaint is being served upon the Colorado Attorney General on behalf of Colorado Plaintiff(s) and the Colorado Indirect Purchaser Class. Colo. Rev. Stat. § 6-4-115.

280. Hawaii: Hawaii Plaintiff(s) and Members of the Hawaii Indirect Purchaser Class reserve the rights to bring claims pursuant to Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

281. Illinois: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Compiled Statutes §§ 10/1, *et seq.*

a. The purpose of the Illinois Antitrust Act §§ 740 ILCS 10/1, *et seq.* is "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

b. Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class have standing to pursue claims against the Defendants and their co-conspirators, as the Illinois Antitrust Act provides in relevant part that, "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 ILCS 10/7.

c. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Illinois; (2) prices of new German Passenger Vehicles were raised, fixed, maintained and/or stabilized at artificially high levels throughout Illinois; (3) Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class were deprived of free and



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

open market competition; and (4) Illinois Plaintiff(s) and members of the Illinois Indirect Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce, including by causing the price of new German Passenger Vehicles in Illinois to be artificially elevated to the detriment of the Illinois Plaintiff(s) and the members of the Illinois Indirect Purchaser Class.

e. As a direct and proximate result of Defendants' unlawful conduct, Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class have been deprived of free market competition in Illinois on new German Passenger Vehicles, have paid supra-competitive prices for new German Passenger Vehicles, and thereby have been injured in their business and property and are threatened with further injury. But for Defendants' foregoing alleged conduct the price paid for new German Passenger Vehicles by Illinois Plaintiff(s) and the Illinois Indirect Purchaser Class would have been lower, in an amount to be determined at trial.

f. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Illinois Compiled Statutes §§ 10/1, *et seq.* Accordingly, Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class seek all damages and other forms of relief available under Illinois Compiled Statutes §§ 10/1, *et seq.*

282. Iowa: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.* (the "Iowa Competition Law").

a. The purpose of the Iowa Competition Law is to prohibit "restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

b. Under Iowa law, indirect purchasers such as the Iowa Plaintiff(s) and the members of the Iowa Indirect Purchaser Class have standing to bring and maintain an antitrust class action for damages and other relief based upon the facts alleged in this Complaint.

c. Defendants' combinations or conspiracies had the following effects: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Iowa; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Iowa; (3) the Iowa Plaintiff(s) and members of the

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Iowa Indirect Purchaser Class were deprived of free and open competition; and (4) the Iowa Plaintiff(s) and members of the Iowa Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce, including by causing the price in Iowa of new German Passenger Vehicles to be artificially elevated.

e. As a direct and proximate result of Defendants' unlawful conduct, the Iowa Plaintiff(s) and members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, the Iowa Plaintiff(s) and members of the Iowa Indirect Purchaser Class seek all forms of damages and relief available under Iowa Code §§ 553.1, *et seq*.

283. Michigan: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.* (the "Michigan Antitrust Reform Act").

a. The Michigan Antitrust Reform Act provides, in part, that; "A contract, combination, or conspiracy between 2 or more persons in restraint of . . . trade or commerce in a relevant market is unlawful," (Michigan Comp. Laws Ann. § 445.772) and that any "person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action" for damages and other relief (Michigan Comp. Laws Ann. § 445.778).

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Michigan; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Michigan; (3) Michigan Plaintiff(s) and members of the Michigan Indirect Purchaser Class were deprived of free and open competition; and (4) Michigan Plaintiff(s) and members of the Michigan Indirect

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. During the Class Period, Defendants' illegal conduct substantially affected Michigan's intrastate commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Michigan Plaintiff(s) and members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*. Accordingly, Michigan Plaintiff(s) and members of the Michigan Indirect Purchaser Class seek all damages and other forms of relief available under Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

284. Minnesota: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a. The Minnesota Antitrust Law prohibits and declares unlawful "A contract, combination, or conspiracy between two or more persons in competition . . . for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price" of goods or services. Minnesota Stat. §§ 325D.53.

b. Defendants' combinations or conspiracies had the following effects during the class period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Minnesota; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Minnesota; (3) Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class were deprived of free and open competition; and (4) Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. During the Class Period, Defendants' illegal conduct substantially affected Minnesota's intrastate commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq*. Accordingly, Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class seek all damages and other forms of relief available under Minnesota Annotated Statutes §§ 325D.49, *et seq*.

285. Nevada: The Nevada Unfair Trade Practice Act ("NUTPA") states in part that "free, open and competitive production and sale of commodities . . . is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

a. The purpose of NUTPA includes prohibiting acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize persons and entities engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Nevada; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Nevada; (3) the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class were deprived of free and open competition; and (4) the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada's intrastate commerce.

d. As a direct and proximate result of defendants' unlawful conduct, the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of NUTPA. Accordingly, the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class seek all damages and other forms of relief available under NUTPA.

f. Notice and a copy of this Complaint is being served upon the Nevada Attorney General on behalf of the Nevada Plaintiff(s) and the Nevada Indirect Purchaser Class. Nev. Rev. Stat. Ann. § 598A.210.

286. New York: Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

a. New York's General Business Law prohibits contracts, combinations or agreements in restraint of trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout New York; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout New York; (3) New York Plaintiff(s) and members of the New York Indirect Purchaser Class were deprived of free and open competition; and (4) New York Plaintiff(s) and members of the New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles, purchased products that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

c. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

d. During the Class Period, Defendants' illegal conduct substantially affected New York's intrastate commerce.

e. As a direct and proximate result of Defendants' unlawful conduct, New York Plaintiff(s) and members of the New York Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the New York General Business Laws §§ 340, *et seq*. Accordingly, New York Plaintiff(s) and members of the New York Indirect Purchaser Class seek all damages and other forms of relief available under New York General Business Laws §§ 340, *et seq*.

g. Notice and a copy of this Complaint is being served to the New York Attorney General on behalf of New York Plaintiff(s) and the members of the New York Indirect Purchaser Class. New York Gen. Bus. Law § 340-5.

287. North Carolina: Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

a. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout North Carolina; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

b. During the Class Period, Defendants' illegal conduct substantially affected North Carolina's intrastate commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*. Accordingly, North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class seek all relief available under North Carolina General Statutes §§ 75-1, *et. seq*.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

288. North Dakota: The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade or commerce. N.D. Cent. Code §§ 51-08.1, *et seq*.

a. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout North Dakota; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout North Dakota; (3) the North Dakota Plaintiff(s) and members of the North Dakota Indirect Purchaser Class were deprived of free and open competition; and (4) the North Dakota Plaintiff(s) and members of the North Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

b. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08 (3).

c. During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota's intrastate commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the North Dakota Plaintiff(s) and members of the North Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Uniform State Antitrust Act. Accordingly, the North Dakota Plaintiff(s) and members of the North Dakota Indirect Purchaser Class seek all damages and other forms of relief available under North Dakota Uniform State Antitrust Act.

289. Oregon: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

a. Oregon's antitrust laws generally govern business and trade practices with a policy to "encourage free and open competition in the interest of the general welfare and economy of the state" (Or. Rev. Stat. § 646.715), and prohibit conspiracies, combinations or contracts in restraint of trade or commerce. Or. Rev. Stat. § 646.725.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. Defendants' combinations or conspiracies had the following effects: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Oregon; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Oregon; (3) the Oregon Plaintiff(s) and members of the Oregon Indirect Purchaser Class were deprived of free and open competition; and (4) the Oregon Plaintiff(s) and members of the Oregon Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. Under Oregon law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

e. As a direct and proximate result of Defendants' unlawful conduct, the Oregon Plaintiff(s) and members of the Oregon Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, the Oregon Plaintiff(s) and the members of the Oregon Indirect Purchaser Class seek all damages and other relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

290. <u>Rhode Island</u>: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island General Laws Annotated §§ 6-36-1, *et seq.*

a. The Rhode Island Antitrust Act aims to promote free market trade and commerce throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 6-36-2(a)(2).

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Rhode Island; (2) new German Passenger Vehicles were raised, fixed, maintained and/or stabilized at artificially high levels throughout Rhode Island; (3)

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class were deprived of free and open competition; and (4) Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

d. During the foregoing Class Period, Defendants' illegal conduct substantially affected Rhode Island's intrastate commerce.

e. As a direct and proximate result of Defendants' unlawful conduct, Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Rhode Island General Laws Annotated §§ 6-36-1, *et seq.* Accordingly, Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class seek all damages and other forms of relief available under Rhode Island General Laws Annotated §§ 6-36-1, *et seq.*

g. Notice and a copy of this Complaint is being served to the Rhode Island Attorney General on behalf of Rhode Island Plaintiff(s) and the members of the Rhode Island Indirect Purchaser Class. R.I. Gen. Laws Ann., § 6-36-21.

291. South Carolina: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Code Annotated §§ 39-5-10, *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in South Carolina.

b. The foregoing conduct constitutes "unlawful trade practices," within the meaning of South Carolina Code Annotated § 39-5-20.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout South Carolina; (2) German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Carolina; (3) the South Carolina Plaintiff(s) and the members of the South Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) the South Carolina Plaintiff(s) and the members of the South Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. As a direct and proximate result of the Defendants' conduct, the South Carolina Plaintiff(s) and members of the South Carolina Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code Annotated §§ 39-5-10, *et seq.*, and, accordingly, the South Carolina Plaintiff(s) and members of the South Carolina Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

292. South Dakota: Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a. South Dakota law prohibits restraints of trade or commerce through combination, conspiracy or monopolistic behavior. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout South Dakota; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout South Dakota; (3) South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class were deprived of free and open competition; and (4) South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

c. Under South Dakota law, indirect purchasers have standing to maintain an antitrust action, under the South Dakota Codified Laws, based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

d. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

e. As a direct and proximate result of Defendants' unlawful conduct, South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws §§ 37-1, *et seq*. Accordingly, South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class seek all damages and other forms of relief available under South Dakota Codified Laws §§ 37-1, *et seq*.

293. Tennessee: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

a. Tennessee law prohibits contracts, agreements, trusts or combinations between persons or entities which lessen free competition in the import or sale of goods imported into the state, or which advance or control the price or cost to the consumer. Tenn. Code, § 47-25-101.

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Tennessee; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Tennessee; (3) Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class were deprived of free and open competition; and (4) Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. Indirect purchasers have standing under Tennessee Code § 47-25-106 to maintain an antitrust action against Defendants for the acts complained of in this Complaint.



PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. But for Defendants' conduct set forth herein, the price of new German Passenger Vehicles would have been lower, in an amount to be determined at trial.

e. As a direct and proximate result of Defendants' unlawful conduct, Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Accordingly, Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class seek all damages and other forms of relief available under Tennessee Code Annotated §§ 47-25- 101, *et seq*.

294. Utah: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.* (the "Utah Antitrust Act").

a. The purpose of the Utah Antitrust Act is to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

b. Defendants' combinations or conspiracies had the following effects: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Utah; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Utah; (3) Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class were deprived of free and open competition; and (4) Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain a state antitrust action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

e. As a direct and proximate result of Defendants' unlawful conduct, Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class seek all damages and other forms of relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

295. Wisconsin: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.* (the "Wisconsin Antitrust Act").

a. The Wisconsin Antitrust Act aims "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

b. Defendants' combinations or conspiracies had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Wisconsin; (2) new German Passenger Vehicles prices were raised, fixed, maintained and/or stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class were deprived of free and open competition; and (4) Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an antitrust action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin's intrastate commerce and but for Defendants' unlawful conduct, the price paid for new German Passenger Vehicles in Wisconsin would have been lower.

/ / /

e. As a direct and proximate result of Defendants' unlawful conduct, Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq*. Accordingly, Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class seek all relief available under Wisconsin Statutes §§ 133.01, *et seq*.

296. Plaintiffs and members of the State Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the State Classes have paid more for new German Passenger Vehicles than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

297. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the State Classes.

298. Accordingly, Plaintiffs and the members of the Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection and Unfair Trade Practice Laws**
**(State Law Classes)**

299. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

300. Defendants engaged in unfair competition or unfair, unconscionable, or unlawful acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

301. <u>Alabama</u>: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Alabama Code §§ 8-19-1, *et seq.* (1981).

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Alabama and took efforts to conceal their agreements from the Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class.

b. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and otherwise unlawful acts or practices in violation of Alabama Code § 8-19-5(27).

c. Defendants' unlawful conduct had the following effects: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Alabama; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Alabama; (3) Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class were deprived of free and open competition; and (4) the Alabama Plaintiff(s) and the members of the Alabama Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of the Defendants, the Alabama Plaintiff(s) and the members of the Alabama Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. Certain of the Defendants have been served with a demand letter or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the state of Alabama or not keeping assets within state of Alabama. Ala. Code § 8-19-10(e).

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alabama Code § 8-19-5(27) and, accordingly, the Alabama Plaintiffs and the members of the Alabama Indirect Purchaser Class seek all relief available under the statute.

302. California: Defendants have engaged in unfair competition or unfair, unlawful, or fraudulent acts or practices in violation of California Business and Professions Code §§ 17200, *et seq*.

a. During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*., of the California Business and Professions Code, by engaging in the acts and practices specified above.

b. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200, *et seq*., of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c. The Defendants' conduct as alleged herein violated Section 17200 of the Unfair Competition Law. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Sections 16720, *et seq*., of the California and Business and Professions Code, set forth above.

d. As alleged herein, Defendants' acts, omissions, misrepresentations, practices, as non-disclosures, described above, whether or not in violation of Sections 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

e. Defendants' acts or practices are unfair to consumers of new German Passenger Vehicles in the state of California within the meaning of Sections 17200, *et seq*., of the California Business and Professions Code.

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

f. Defendants' acts and practices are fraudulent and/or deceptive within the meaning of Sections 17200, *et seq.*, of the California Business and Professions Code. As alleged more fully above, Defendants, at all relevant times, made false and/or misleading statements to Plaintiffs and the Classes that the German Passenger Vehicles benefited from superior innovation.

g. The California Plaintiff(s) and members of the California Indirect Purchaser Class are entitled to full restitution and/or restitutionary disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

h. The illegal conduct alleged herein is continuing and there are not sufficient indications that Defendants will not continue such activity into the future.

i. The unlawful and unfair business practices of Defendants, and each of them, as described above have caused and continue to cause the California Plaintiff(s) and the members of the California Indirect Purchaser Class to pay supra-competitive and artificially-inflated prices for new German Passenger Vehicles. The California Plaintiff(s) and the members of the California Indirect Purchaser Class suffered injury in fact and lost money or property as a result of such unfair competition.

j. The California Plaintiff(s) and members of the California Indirect Purchaser Class were injured in their business or property, with respect to purchases of new German Passenger Vehicles in California and are entitled to all damages and other forms of relief available under the California statutes.

303. Colorado: Defendants have engaged in unfair competition or unfair, unconscionable, or unlawful acts or practices in violation of Colorado Revised Statutes Annotated, §§ 6-1-101, *et seq.* (the "Colorado Consumer Protection Act").

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in Colorado.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. The foregoing conduct of the Defendants constitutes "unfair trade practices" and unlawful conduct within the meaning of the Colorado Consumer Protection Act. Colo. Rev. Stat. Ann. § 6-1-105.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Colorado; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Colorado; (3) the Colorado Plaintiff(s) and the Colorado Indirect Purchaser Class were deprived of free and open competition; and (4) the Colorado Plaintiff(s) and the Colorado Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. As a direct and proximate result of the Defendant's conduct, the Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair acts or practices in violation of Colorado Revised Statutes Annotated §§ 6-1-101, *et seq.*, and, accordingly, the Colorado Plaintiff(s) and members of the Colorado Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

304. Florida: Defendants have engaged in unfair competition or unfair or unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. §§ 501.201, *et seq.*

a. Florida law prohibits unfair or unconscionable acts and unfair methods of competition in the conduct of any trade or commerce "in order to protect the consuming public and legitimate business enterprises . . ." Fla. Stat. §§ 501.202, 501.204.

b. Defendants' unlawful conduct, combination and conspiracy constitute unfair or unconscionable acts, and unfair methods of competition under Florida law and had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Florida; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Florida; (3) the Florida Plaintiff(s) and members of the Florida Indirect Purchaser

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Class were deprived of free and open competition; and (4) the Florida Plaintiff(s) and members of the Florida Indirect Purchaser Class paid unfair, supra-competitive, artificially inflated prices for new German Passenger Vehicles.

c. During the Class Period, Defendants' illegal conduct substantially affected Florida's consumers and intrastate commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the Florida Plaintiff(s) and members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

e. Defendants have engaged in unfair competition or unfair acts or practices in violation of Florida Statutes §§ 501.201, *et seq*., and, accordingly, the Florida Plaintiff(s) and members of the Florida Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

305. Hawaii: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 481-1, *et seq*.

a. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Hawaii; (2) new German Passenger Vehicles prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Hawaii; (3) the Hawaii Plaintiff(s) and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) the Hawaii Plaintiff(s) and members of the Hawaii Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

b. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, the Hawaii Plaintiff(s) and members of the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. Defendants have engaged in unfair competition or unfair or unlawful acts or practices in violation of Hawaii Revised Statutes Annotated §§ 481-1, *et seq*., and, accordingly, the Hawaii Plaintiff(s) and members of the Hawaii Indirect Purchaser Class seek all relief available under that statute.

306. Illinois: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Illinois Revised Statutes. 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. (the "Illinois Consumer Fraud and Deceptive Business Practices Act" or "ICFA").

a. As alleged above, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

b. Defendants entered into a contract, combination, or conspiracy to for the purpose of excluding competition or controlling, fixing, or maintaining prices of new German Passenger Vehicles, and thereby substantially impacted trade and commerce on such vehicles in Illinois during the Class Period.

c. Defendants' conduct was unfair or unconscionable within the meaning of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

d. In assessing what constitutes unfair conduct under the ICFA, Illinois law looks to the federal interpretations of unfair conduct under section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45 and "unfairness" may exist if some or all of such criteria are met. 815 ILCS 505/2

e. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout Illinois; (2) new German Passenger Vehicles prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Illinois ; (3) the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class were deprived of free and open competition; and (4) the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles that grossly exceed the value they received.

/ / /

f. Defendants' foregoing unlawful conduct was unfair within the meaning of the Illinois statute, offends the public policy of Illinois, was unethical, oppressive or unscrupulous and caused substantial injury to the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class.

g. Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

h. As a direct and proximate cause of Defendants' unlawful conduct the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class were actually deceived and have been injured in their business or property and are threatened with further injury.

i. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*, and, accordingly, the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

307. Massachusetts: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Massachusetts law. Mass. G.L. c. 93A § 2.

a. Defendants were engaged in trade or commerce as defined by Massachusetts law. G.L. c. 93A.

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Massachusetts; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Massachusetts; (3) the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class were

deprived of free and open competition; and (4) the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class paid supra-competitive, artificially-inflated prices for new German Passenger Vehicles.

d. As a direct and proximate result of Defendants' unlawful conduct, the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class were injured and are threatened with further injury.

e. Certain of the Defendants have been served with a demand letter or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. G.L. c. 93A § 9.

f. By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of Massachusetts law. G.L. c. 93A § 2. Defendants' and their co-conspirators' violations of Chapter 93A of Massachusetts law were knowing or willful, entitling the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class to multiple damages.

308. Michigan: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.901, *et seq.* (the "Michigan Consumer Protection Act").

a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Michigan and took efforts to conceal their agreements from the Michigan Plaintiff(s) and members of the Michigan Indirect Purchaser Class.

b. The Michigan Consumer Protection Act prohibits "unfair, unconscionable, or deceptive methods, acts or practices," including "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws Ann. § 445.903(1).

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

c. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "unfair" and otherwise unlawful acts or practices in violation of Michigan Compiled Laws Annotated § 445.903.

d. Defendants' unlawful conduct had the following effects: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Michigan; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiff(s) and members of the Michigan Indirect Purchaser Class were deprived of free and open competition; and (4) the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

e. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce and consumers.

f. As a direct and proximate result of the unlawful conduct of the Defendants, the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Michigan Compiled Laws Annotated §§ 445.901, *et seq.*, and, accordingly, the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class seek all damages and other forms of relief available under the statute.

309. Minnesota: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Minnesota Statutes Annotated §§ 325F.68, *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in Minnesota.

b. The foregoing conduct of the Defendants was unfair, unconscionable, and constitutes "unlawful trade practices" in violation of Minnesota Statutes Annotated § 325F.69.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Minnesota; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Minnesota; (3) the Minnesota Plaintiff(s) and the Minnesota Indirect Purchaser Class were deprived of free and open competition; and (4) the Minnesota Plaintiff(s) and the Minnesota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. Defendants' unlawful conduct was willful and substantially affected Minnesota's intrastate trade and commerce.

e. As a direct and proximate result of the Defendant's conduct, the Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minnesota Statutes Annotated §§ 325F.68, *et seq*., and, accordingly, the Minnesota Plaintiff(s) and members of the Minnesota Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

310. Montana: Defendants have engaged in unfair competition, or unfair or unconscionable acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code §§ 30-14-101, *et seq*., and the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq*.

a. Defendants' foregoing unlawful conduct had the following effects during the Class Period: (1) German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Montana; (2) German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Montana; (3) the Montana Plaintiff(s) and members of the Montana Indirect Purchaser Class were deprived of free and open competition; and (4) the Montana Plaintiff(s) and members of the Montana Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. During the Class Period, defendants' illegal conduct substantially affected Montana's commerce and consumers.

c. As a direct and proximate result of defendants' unlawful conduct, the Montana Plaintiff(s) and members of the Montana Indirect Purchaser Class have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition, or unfair or unconscionable acts or practices in violation of Mont. Code §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq*., and, accordingly, the Montana Plaintiff(s) and members of the Montana Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

311. Nevada: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598.0903, *et seq.*, and §§ 598A.010 (the "Nevada Unfair Practices Act").

a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Nevada and took efforts to conceal their agreements from the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class.

b. The aforementioned conduct on the part of the Defendants, including their combination and conspiracy, constituted unconscionable and unfair acts or practices in violation of Nevada Revised Statutes Annotated § 598A.060.

c. Defendants' unlawful conduct had the following effects: (1) German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Nevada; (2) German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Nevada; (3) the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class were deprived of free and open competition; and (4) the Nevada Plaintiff(s) and the members of the Nevada Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

/ / /

d. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of the Defendants, the Nevada Plaintiff(s) and the members of the Nevada Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition, or unfair or unconscionable acts or practices, in violation of Nevada Revised Statutes Annotated §§ 598.0903, *et seq.*, and §§ 598A.010, *et seq*. Accordingly, the Nevada Plaintiff(s) and the members of the Nevada Indirect Purchaser Class seek all damages and other forms of relief available under the statutes.

312. New York: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New York Law. N.Y. Gen. Bus. Law. §§ 349, *et seq.*

a. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in New York and took efforts to conceal their agreements from the New York Plaintiff(s) and members of the New York Indirect Purchaser Class.

b. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of New York General Business Law § 349, which resulted in consumer injury, specifically to the New York Plaintiff(s) and the members of the New York Indirect Purchaser Class, and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c. Defendants' unlawful conduct had the following effects: (1) new German Passenger Vehicles price competition was restrained, suppressed, and/or eliminated throughout New York; (2) new German Passenger Vehicles prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New York; (3) the New York Plaintiff(s) and members of the New York Indirect Purchaser Class were deprived of free and open competition;

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

and (4) the New York Plaintiff(s) and members of New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

e. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed new German Passenger Vehicles in New York.

f. The New York Plaintiff(s) and members of the New York Indirect Purchaser Class seek all damages and other forms of relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

313. North Carolina: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1, *et seq*.

a. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and on-competitive levels, the prices at which new German Passenger Vehicles was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class.

b. Defendants' price fixing conspiracy could not have succeeded absent unfair, willful, unconscionable and unlawful conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increase. Defendants' public statements concerning the price of new German Passenger Vehicles created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

mutually agreeing not to divulge the existence of the conspiracy to outsiders, and conducting meetings and conversations in secret.

c. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d. Defendants' unlawful conduct had the following effects: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout North Carolina; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Carolina; (3) the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

e. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed new German Passenger Vehicles in North Carolina.

g. The North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1, *et seq*., and, accordingly, the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class seek all damages and other forms of relief available under the statute.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

314. Pennsylvania: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Pennsylvania Statutes Annotated, Title 73, §§ 201-1, *et seq*.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in Pennsylvania.

b. The foregoing conduct constitutes "unlawful trade practices," within the meaning of Pennsylvania Statutes Annotated, Title 73, § 201-2.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Pennsylvania; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Pennsylvania; (3) the Pennsylvania Plaintiff(s) and the Pennsylvania Indirect Purchaser Class were deprived of free and open competition; and (4) the Pennsylvania Plaintiff(s) and the Pennsylvania Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. As a direct and proximate result of the Defendant's conduct, the Pennsylvania Plaintiff(s) and members of the Pennsylvania Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Pennsylvania Statutes Annotated, Title 73, §§ 201-1, *et seq.*, and, accordingly, the Pennsylvania Plaintiff(s) and members of the Pennsylvania Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

315. Rhode Island: Defendants have engaged in unfair competition or unfair, unconscionable, or unlawful acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

a. The Rhode Island Plaintiff(s) and Members of the Rhode Island Indirect Purchaser Class purchased new German Passenger Vehicles for personal, family, or household purposes.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining at artificial and non-competitive levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Rhode Island.

c. Defendants deliberately failed to disclose material facts to the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for new German Passenger Vehicles. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer and Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' German Passenger Vehicle prices were competitive and fair.

d. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Rhode Island; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Rhode Island; (3) the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class were deprived of free and open competition; and (4) the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

e. As a direct and proximate result of the Defendants' violations of law, the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unfair, unconscionable and unlawful commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f. Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of new German Passenger Vehicles, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing new German Passenger Vehicles at prices born by a free and fair market. Defendants' affirmative

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

misrepresentations and omissions constitute information important to the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class as they related to the cost of new German Passenger Vehicles they purchased.

g. Defendants have engaged in unfair competition or unfair or unlawful acts or practices in violation of Rhode Island Gen. Laws §§ 6-13.1-1, *et seq*., and, accordingly, the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class seek all damages and other forms of relief available under that statute.

316. South Dakota: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24, *et seq*.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in South Dakota.

b. The foregoing conduct constitutes "unlawful trade practices," within the meaning of South Dakota Codified Laws § 37-24-6.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout South Dakota; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Dakota; (3) the South Dakota Plaintiff(s) and the South Dakota Indirect Purchaser Class were deprived of free and open competition; and (4) the South Dakota Plaintiff(s) and the South Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. As a direct and proximate result of the Defendants' conduct, the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24, *et seq.*, and, accordingly, the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class seek all relief available under that statute.

317. Tennessee: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Tennessee Code Annotated §§ 47-18-101, *et seq*.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed or obtained in Tennessee.

b. The foregoing conduct constitutes "unlawful trade practices," within the meaning of Tennessee Code Annotated § 47-18-104.

c. Defendants' unlawful conduct had the following effects during the Class Period: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Tennessee; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Tennessee; (3) the Tennessee Plaintiff(s) and the Tennessee Indirect Purchaser Class were deprived of free and open competition; and (4) the Tennessee Plaintiff(s) and the Tennessee Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. As a direct and proximate result of the Defendant's conduct, the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tennessee Code Annotated §§ 47-18-101, *et seq.*, and, accordingly, the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class seek all relief available under that statute.

318. Utah: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 13-11-1, *et seq.*

a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which new German Passenger Vehicles were sold, distributed, or obtained in Utah and took efforts to conceal their agreements from the Utah Plaintiff(s) and members of the Utah Indirect Purchasers Class.

b. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Utah Code Annotated §§ 13-11-4 and 13-11-5.

c. Defendants' unlawful conduct had the following effects: (1) new German Passenger Vehicle price competition was restrained, suppressed, and/or eliminated throughout Utah; (2) new German Passenger Vehicle prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Utah; (3) the Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class were deprived of free and open competition; and (4) the Utah Plaintiff(s) and the members of the Utah Indirect Purchaser Class paid supra-competitive, artificially inflated prices for new German Passenger Vehicles.

d. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of the Defendants, the Utah Plaintiff(s) and the members of the Utah Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Annotated §§ 13-11-1, *et seq.*, and, accordingly, the Utah Plaintiff(s) and the members of the Utah Indirect Purchaser Class seek all damages and other forms of relief available under the statute.

319. Accordingly, Plaintiffs and the members of the Classes in each of the above jurisdictions seek damages (including statutory damages where applicable) as permitted by a

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

particular jurisdiction's law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment and Disgorgement**
**(State Law Classes)**

320. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

321. To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

322. As a result of their unlawful and inequitable conduct described above, Defendants have and will continue to benefit and be unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices paid, and unlawful profits, on sales of new German Passenger Vehicles.

323. Defendants have benefitted from their unlawful acts, and from Plaintiffs' and the members' of the Classes actions of purchasing or leasing new German Passenger Vehicles and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or members of the Classes for new German Passenger Vehicles. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff(s) and members of the Classes.

324. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles is a direct and proximate result of Defendants' unlawful practices.

325. Pursuit of any remedies against the entities and intermediaries in the chain of distribution from whom Plaintiff(s) and members of the Classes purchased or leased their new German Passenger Vehicles would have been futile given that those intermediaries are not currently known to Plaintiff(s) and the members of the Classes to have participated in Defendants' unlawful combination and conspiracy, and, accordingly, would not compensate Plaintiffs or the members of the Classes for their related damages.

326. Plaintiff(s) and members of the following Indirect Purchaser Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct in their respective state, and are entitled to the establishment of a constructive trust

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

consisting of all ill-gotten gains from which Plaintiff(s) and the members of the Indirect Purchaser Classes of the following states: Alabama, Arizona, California, Florida, Hawaii, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Montana, Nevada, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, and Wisconsin.

327. Alabama: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Alabama is a direct and proximate result of Defendants' unlawful practices set forth above.

a. The financial benefits Defendants derived rightfully belong to the Alabama Plaintiff(s) and members of the Alabama Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Alabama Plaintiff(s) and the members of the Alabama Indirect Purchaser Class.

b. Defendants should be ordered to make restitution for the benefit of Alabama indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Alabama at illegally inflated prices.

328. Arizona: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Arizona is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Arizona Plaintiff(s) and members of the Arizona Indirect Purchaser Class members who paid anti-competitive prices to Defendants' benefit and to the detriment of the Arizona Plaintiff(s) and the members of the Arizona Indirect Purchaser Class.

b. Plaintiffs and Class Members have been impoverished by the overcharges for German Passenger Vehicles resulting from Defendants' unlawful conduct.

c. Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received from the Arizona Plaintiff(s) and the members of the Arizona Indirect Purchaser Class.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. In the alternative, the Arizona Plaintiff(s) and the members of the Arizona Indirect Purchaser Class have no remedy at law.

e. The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of new German Passenger Vehicles to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Arizona at unlawfully and artificially inflated prices.

329. California: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in California is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the California Plaintiff(s) and members of the California Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the California Plaintiff(s) and the members of the California Indirect Purchaser Class.

b. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of the California Plaintiff(s) and the members of the California Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of California indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles at illegally inflated prices.

330. Florida: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Florida is a direct and proximate result of Defendants' unlawful practices.

/ / /

a. The financial benefits Defendants derived rightfully belong to the Florida Plaintiff(s) and members of the Florida Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Florida Plaintiff(s) and the members of the Florida Indirect Purchaser Class.

b. Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the sale or lease of new German Passenger Vehicles in Florida at illegally inflated prices.

331. Hawaii: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Hawaii is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Hawaii Plaintiff(s) and the members of the Hawaii Indirect Purchaser Class who paid anticompetitive prices that inured to the Defendants' benefit and to the detriment of the Hawaii Plaintiff(s) and the members of the Hawaii Indirect Purchaser Class.

b. Defendants were enriched by their illegal activities at the expense of Hawaii indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Hawaii indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Hawaii at illegally inflated prices.

332. Illinois: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Illinois is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Illinois Plaintiff(s) and members of the Illinois Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Illinois' indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Illinois indirect purchasers because it would be against equity, justice, and good conscience to allow Defendants to retain the benefits of the sale or lease of new German Passenger Vehicles in Illinois at illegally inflated prices.

333. Iowa: The economic benefit Defendants derived from suppressing competition and/or the payment by the Iowa Plaintiff(s) and the members of the Iowa Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in Iowa is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Iowa Plaintiff(s) and the members of the Iowa Indirect Purchaser Class who paid anticompetitive prices that inured to the Defendants' benefit and to the Iowa indirect purchasers' detriment.

b. Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of new German Passenger Vehicles and, thus, Defendants should be ordered to make restitution for the benefit of the Iowa Plaintiff(s) and the members of the Iowa Indirect Purchaser Class because it would be unjust and inequitable to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Iowa at illegally inflated prices.

334. Massachusetts: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Massachusetts is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Massachusetts Plaintiff(s) and the members of the Massachusetts Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Massachusetts Plaintiff(s) and members of the Massachusetts Indirect Purchaser Class.

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

b. Defendants were aware of and appreciated the benefit bestowed upon them by the Massachusetts Plaintiff(s) and the members of the Massachusetts Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust and inequitable and unfair to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Massachusetts at illegally inflated prices.

335. Michigan: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Michigan is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class.

b. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Michigan Plaintiff(s) and the members of the Michigan Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Michigan indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Michigan indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Michigan at illegally inflated prices.

336. Minnesota: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Minnesota is a direct and proximate result of Defendants' unlawful practices.

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

a. The financial benefits Defendants derived rightfully belong to the Minnesota Plaintiff(s) and the members of the Minnesota Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Minnesota Plaintiff(s) and the members of the Minnesota Indirect Purchaser Class.

b. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Minnesota Plaintiff(s) and the members of the Minnesota Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in Minnesota at illegally inflated prices.

337. Montana: The economic benefit Defendants derived from suppressing competition and/or the payment by the Montana Plaintiff(s) and the members of the Montana Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in Montana is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Montana Plaintiff(s) and the members of the Montana Indirect Purchaser Class who paid anticompetitive prices to the Defendants' financial benefit and to the detriment of the Montana Plaintiff(s) and members of the Montana Indirect Purchaser Class.

b. Defendants should be ordered to make restitution for the benefit of Montana indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Montana at illegally inflated prices.

338. Nevada: The economic benefit Defendants derived from suppressing competition and/or the payment by the Nevada Plaintiff(s) and the members of the Nevada Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in Nevada is a direct and proximate result of Defendants' unlawful practices.

/ / /

a. The financial benefits Defendants derived rightfully belong to the Nevada Plaintiff(s) and the members of the Nevada Indirect Purchaser Class who paid anticompetitive prices to the Defendants' financial benefit and to the detriment of the Nevada Plaintiff(s) and members of the Nevada Indirect Purchaser Class.

b. Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Nevada at illegally inflated prices.

339. New York: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in New York is a direct and proximate result of Defendants' unlawful practices.

a. The New York Plaintiff(s) and members of the New York Indirect Purchaser Class are the intended end users from whom Defendants expect to derive profits from the manufacture of their new German Passenger Vehicles and without whom there would be no appreciable market for the vehicles in New York. Upon purchase or lease of a new German Passenger Vehicle in New York from an intermediary dealership, the New York Plaintiff(s) and members of the New York Indirect Purchaser Class obtained a vehicle warranty from the Defendant manufacturer.

b. The financial benefits Defendants derived rightfully belong to the New York Plaintiff(s) and the members of the New York Indirect Purchaser Class who paid anti-competitive prices to the Defendants' financial benefit and profit and to the detriment of the New York Plaintiff(s) and the members of the New York Indirect Purchaser Class.

c. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

/ / /

/ / /

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

d. Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in New York at illegally inflated prices

340. North Carolina: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in North Carolina is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the North Carolina Plaintiff(s) and the members of the North Carolina Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the North Carolina Plaintiff(s) and members of the North Carolina Indirect Purchaser Class.

b. The financial benefits the Defendants derived as a result of Defendants' unlawful practices were not conferred on the Defendants officiously, gratuitously, or voluntarily.

c. The financial benefits Defendants derived from the North Carolina Plaintiff(s) and the members of the North Carolina Indirect Purchaser Class who paid anti-competitive prices for new German Passenger Vehicles is measurable.

d. Defendants have knowingly accepted and retained the benefits bestowed upon them by the North Carolina Plaintiff(s) and the members of the North Carolina Indirect Purchaser Class.

e. Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of North Carolina indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in North Carolina at illegally inflated prices.

341. North Dakota: The economic benefit Defendants derived from suppressing competition and/or the payment by the North Dakota Plaintiff(s) and the members of the North

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Dakota Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in North Dakota is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the North Dakota Plaintiff(s) and the members of the North Dakota Indirect Purchaser Class who paid anticompetitive prices to the Defendants' benefit and to the detriment of the North Dakota Plaintiff(s) and the members of the North Dakota Indirect Purchaser Class.

b. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of the North Dakota Plaintiff(s) and the members of the North Dakota Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of North Dakota indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of the lease or sale of new German Passenger Vehicles in North Dakota at illegally inflated prices.

342. Oregon: The economic benefit Defendants derived from suppressing competition and/or the payment by the Oregon Plaintiff(s) and the members of the Oregon Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in Oregon is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Oregon Plaintiff(s) and the members of the Oregon Indirect Purchaser Class who paid anticompetitive prices to the Defendants' financial benefit and to the detriment of the Oregon Plaintiff(s) and the members of the Oregon Indirect Purchaser Class.

b. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

c. Defendants were enriched by their illegal activities at the expense of Oregon indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Oregon indirect purchasers because it would be

unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Oregon at illegally inflated prices

343. Pennsylvania: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Pennsylvania is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Pennsylvania Plaintiff(s) and the members of the Pennsylvania Indirect Purchaser Class who paid anticompetitive prices that inured to the Defendants' benefit and to the detriment of the Pennsylvania Plaintiff(s) and members of the Pennsylvania Indirect Purchaser Class.

b. Defendants were aware of the benefit bestowed upon them by the Pennsylvania Plaintiff(s) and the members of the Pennsylvania Indirect Purchaser Class and accepted them under inequitable circumstances.

c. Defendants were enriched by their illegal activities at the expense of Pennsylvania indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Pennsylvania indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Pennsylvania at illegally inflated prices.

344. Rhode Island: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Rhode Island is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class.

b. Defendants are aware of and appreciate the benefits bestowed upon them by the Rhode Island Plaintiff(s) and members of the Rhode Island Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Rhode Island indirect purchasers of new German Passenger Vehicles and thus Defendants should be

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

ordered to make restitution for the benefit of Rhode Island indirect purchasers because it would be unjust to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Rhode Island at illegally inflated prices.

345. South Carolina: The economic benefit Defendants derived from suppressing competition and/or the payment by the South Carolina Plaintiff(s) and the members of the South Carolina Indirect Purchaser Class of monopolistic and artificially inflated prices for new German Passenger Vehicles in South Carolina is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the South Carolina Plaintiff(s) and the members of the South Carolina Indirect Purchaser Class who paid anticompetitive prices to the Defendants' benefit and to the detriment of the South Carolina Plaintiff(s) and members of the South Carolina Indirect Purchaser Class.

b. Defendants were enriched by their illegal activities at the expense of South Carolina indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of South Carolina indirect purchasers because it would be unjust to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in South Carolina at illegally inflated prices.

346. South Dakota: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in South Dakota is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class.

b. Defendants were aware of the benefit bestowed upon them by the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of new German Passenger Vehicles and thus Defendants should be

ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in South Dakota at illegally inflated prices.

d. In the alternative, the South Dakota Plaintiff(s) and members of the South Dakota Indirect Purchaser Class have no remedy at law.

347. Tennessee: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Tennessee is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class.

b. Defendants were aware of or appreciated the benefits bestowed upon them by the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Tennessee at illegally inflated prices.

d. It would be futile for the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they each indirectly purchased or leased at least one new German Passenger Vehicle, as those intermediaries are not presently known to have participated in Defendants' illegal combination and conspiracy and would not compensate the Tennessee Plaintiff(s) and members of the Tennessee Indirect Purchaser Class for Defendants' unlawful conduct.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

348. Utah: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Utah is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class.

b. Defendants were aware of or appreciated the benefit bestowed upon them by the Utah Plaintiff(s) and members of the Utah Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of the Utah indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Utah indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the financial benefits of the lease or sale of new German Passenger Vehicles in Utah at illegally inflated prices.

349. Wisconsin: The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for new German Passenger Vehicles in Wisconsin is a direct and proximate result of Defendants' unlawful practices.

a. The financial benefits Defendants derived rightfully belong to the Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class who paid anti-competitive prices to the Defendants' benefit and to the detriment of the Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class.

b. Defendants were aware of or appreciated the benefit bestowed upon them by the Wisconsin Plaintiff(s) and members of the Wisconsin Indirect Purchaser Class.

c. Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of new German Passenger Vehicles and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of the leasing and sales of new German Passenger Vehicles in Wisconsin at illegally inflated prices.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Determine that the claims alleged herein under the Sherman Act, state antitrust, unfair competition, consumer protection and/or unfair trade practice laws may be maintained as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and Order that reasonable notice of this action be given to members of the Classes;

B. Appoint Plaintiffs as Class Representatives for the Classes, and Interim Co-Lead Counsel as Co-Lead Class Counsel and the Plaintiffs' Steering Committee as additional Class Counsel;

C. Adjudge and decree that the unlawful conduct, contract, conspiracy, or combination alleged herein is:

i. An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

ii. A *per se* violation of Section 1 of the Sherman Act; and

iii. An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition laws set forth herein, as well as in violation of the state and consumer protection and unfair trade practice laws set forth herein;

D. Award damages to Plaintiffs and the members of the Classes, to the maximum extent allowed, and enter a joint and several judgment in favor of Plaintiffs and the members of such classes against Defendants, in an amount to be trebled to the extent allowed;

E. Award restitution and/or disgorgement of profits unlawfully gained to Plaintiffs and members of the Classes, to the maximum extent allowed;

F. Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G. Award Plaintiffs and the members of the Classes pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H. Award Plaintiffs and the members of the Classes their costs of suit, including reasonable attorneys' fees, as provided by law; and

I. Award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, including pursuant to Federal Rule of Civil Procedure 38(b), on all issues where a right to such trial exists.

DATED: March 15, 2018

**PEARSON, SIMON & WARSHAW, LLP**

By: *__/s/ Bruce L. Simon__*
BRUCE L. SIMON

*Co-Lead Counsel on behalf of Indirect Purchaser Plaintiffs*

LESLEY E. WEAVER (CA SBN 191305)
*lweaver@bfalaw.com*
**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, California 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

STEVEN A. HART
*shart*@hmelegal.com
**HART MCLAUGHLIN & ELDRIDGE**
121 West Wacker Drive, Suite 1050
Chicago, Illinois 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243

KIMBERLY A. JUSTICE
*kjustice@ktmc.com*
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

W. JOSEPH BRUCKNER
*wjbruckner@locklaw.com*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

ELIZABETH C. PRITZKER (CA SBN 146267)
*ecp@pritzkerlevine.com*
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

CHRISTOPHER A. SEEGER
*cseeger@seegerweiss.com*
**SEEGER WEISS LLP**
77 Water Street
New York, New York 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

ALLAN STEYER (CA SBN 100318)
*asteyer@steyerlaw.com*
**STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP**
One California Street, Third Floor
San Francisco, California 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234

MELISSA R. EMERT
*memert@ssbny.com*
**STULL, STULL & BRODY**
6 East 45th Street, Fifth Floor
New York, New York 10017
Telephone: (954) 341-5561
Facsimile: (954) 341-5531

*Plaintiffs' Steering Committee Counsel on behalf of Indirect Purchaser Plaintiffs*

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

W. DANIEL "DEE" MILES, III
*Dee.Miles@BeasleyAllen.com*
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, Alabama 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

MARC H. EDELSON
*medelson@edelson-law.com*
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, Pennsylvania 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676

JOSHUA H. GRABAR
*jgrabar@grabarlaw.com*
**GRABAR LAW OFFICE**
1735 Market Street, Suite 3750
Philadelphia, Pennsylvania 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6150

RICHARD M. HAGSTROM
*rhagstrom@hjlawfirm.com*
**HELLMUTH & JOHNSON, PLLC**
8050 West 78th Street
Edina, Minnesota 55439
Telephone: (952) 941-4005
Facsimile: (952) 941-2337

THOMAS M. HNASKO
*thnasko@hinklelawfirm.com*
**HINKLE SHANOR LLP**
P.O. Box 2068
Santa Fe, New Mexico 87504
Telephone: (505) 982-4554
Facsimile: (505) 982-8623

LYNN LINCOLN SARKO
*lsarko@kellerrohrback.com*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

ROSEMARY M. RIVAS (CA SBN 209147)
*rrivas@zlk.com*
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

JOHN R. MALKINSON
*jmalkinson@mhtriallaw.com*
**MALKINSON & HALPERN, P.C.**
33 North Dearborn Street, Suite 1540
Chicago, Illinois 60602
Telephone: (312) 427-9600
Facsimile: (312) 750-1912

KEVIN A. SEELY (CA SBN 199982)
*kseely@robbinsarroyo.com*
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, California 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

PAUL F. NOVAK
*pnovak@weitzlux.com*
**WEITZ & LUXENBERG, P.C.**
719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone: (313) 800-4170
Facsimile: (646) 293-6508

FRED T. ISQUITH
*isquith@whafh.com*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4714
Facsimile: (212) 686-0114

DAN DRACHLER
*ddrachler@zsz.com*
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue, 32nd Floor
New York, New York 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969

*Additional Counsel on behalf of Indirect Purchaser Plaintiffs*