1  WARREN T. BURNS (Tx. Bar No. 24053119)
   *Admitted to appear Pro Hac Vice*
2  wburns@burnscharest.com
   BURNS CHAREST, LLP
3  900 Jackson Street, Suite 500
   Dallas, TX 75202
4  Tele: (469) 904-4550 / Fax: (469) 444-5002

5  Co-Lead Counsel on behalf of Direct Purchaser Plaintiffs

6  [Additional Counsel Listed on Signature Page]

7
              **UNITED STATES DISTRICT COURT**
8             **NORTHERN DISTRICT OF CALIFORNIA**
              **SAN FRANCISCO DIVISION**
9

10  Audubon Imports, LLC, d/b/a Mercedes Benz of       Case No. 3:17-md-02796-CRB
    Baton Rouge, Autohaus Acquisition, Inc., Estate
11  Motors, Inc., Powders Automobiles, Inc., f/k/a     CONSOLIDATED DIRECT
    Powders Volkswagen, Inc., and Powders             PURCHASER CLASS ACTION
12  Volkswagen Audi, Inc., Team Imports, LLC d/b/a     COMPLAINT
    Team Audi and Team VW, Tom Schmidt,
13  Wyoming Valley Motors, Inc. d/b/a Wyoming          JURY TRIAL DEMANDED
    Valley BMW, and Bronsberg & Hughes Pontiac,
14  Inc. d/b/a Porsche Wyoming Valley, individually
    and on behalf of all others similarly situated,
15
16               Plaintiffs,
17
           vs.
18
    Bayerische Motoren Werke Aktiengesellschaft
19  (BMW AG), BMW(US) Holding Corp., BMW of
    North America, LLC, Volkswagen AG,
20  Volkswagen Group of America, Inc. d/b/a
    Volkswagen of America, Inc. and Audi of
21  America, Inc., Audi Aktiengesellschaft (Audi
    AG), Audi of America, LLC, Dr. Ing. h.c. F.
22  Porsche AG, Porsche Cars of North America, Inc.,
    Daimler Aktiengesellschaft (Daimler AG),
23  Daimler North America Corporation, Mercedes-
    Benz U.S. International, Inc., Mercedes-Benz
24  Vans, LLC, and Mercedes-Benz USA, LLC,
25
26               Defendants.
27
    _____
    CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
28                                            Case No. 3:17-md-02796-CRB

1

## TABLE OF CONTENTS

I.      INTRODUCTION ..............................................................................................1

II.     PARTIES ..........................................................................................................3

        A.      Plaintiffs ................................................................................................3

        B.      Defendants .............................................................................................5

                Volkswagen Defendants ........................................................................5

                Audi Defendants ....................................................................................7

                Porsche Defendants................................................................................8

                Daimler Defendants .............................................................................10

                BMW Defendants .................................................................................12

III.    JURISDICTION AND VENUE .....................................................................13

IV.     FACTUAL ALLEGATIONS .........................................................................19

        A.      Defendants and the U.S. Market for German Passenger Vehicles ...........19

        B.      Dealers of German Automobiles .........................................................21

        C.      Defendants' History of Collusion .......................................................21

        D.      Defendants' Collusion Stifled Innovation ..........................................32

        E.      Defendants Knew Their Conduct Was Illegal .....................................35

        F.      Volkswagen Reports the Cartel Agreement to the EC.........................36

        G.      Defendants' Conduct was the Product of an Agreement and/or Concerted Action.....................................................................................................39

        H.      Defendants' Control of Dealer Profit Margins ...................................41

V.      THE CARTEL AGREEMENT AND/OR CONCERTED ACTION VIOLATED THE SHERMAN ACT AND CAUSED PLAINTIFFS AND CLASS MEMBERS TO SUFFER HARM ......................................................................................42

VI.     DEFENDANTS ENGAGED IN UNLAWFUL CONDUCT IN, AND DIRECTED AT, THE FORUM .....................................................................43

i

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

VII.    CLASS ACTION ALLEGATIONS ........................................................44

        A.      Class Definition ...........................................................44

        B.      Class Certification Requirements Under Rule 23 .....................................44

VIII.   STATUTES OF LIMITATION ARE TOLLED ...................................................48

        A.      Discovery Rule...........................................................48

        B.      Fraudulent Concealment ...........................................................48

        C.      Estoppel...........................................................50

IX.     CLAIM FOR RELIEF:  VIOLATION OF THE SHERMAN ACT AND THE
        CLAYTON ACT ...........................................................51

X.      PETITION FOR RELIEF ...........................................................53

XI.     DEMAND FOR JURY TRIAL ...........................................................54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1      Plaintiffs Audubon Imports, LLC, d/b/a Mercedes Benz of Baton Rouge ("Audubon

2  Imports"); Autohaus Acquisition, Inc. ("Autohaus"); Estate Motors, Inc. ("Estate Motors");

3  Powders Automobiles, Inc., f/k/a Powders Volkswagen, Inc., and Powders Volkswagen Audi,

4  Inc. ("Powders"); Team Imports, LLC d/b/a Team Audi and Team VW ("Team Imports"); Tom

5  Schmidt ("Schmidt"); Wyoming Valley Motors, Inc. d/b/a Wyoming Valley BMW ("Wyoming

6  Valley BMW"); and Bronsberg & Hughes Pontiac, Inc. d/b/a Porsche Wyoming Valley

7  ("Porsche Wyoming Valley"), collectively "Plaintiffs,"  bring this action on behalf of

8  themselves, and all others similarly situated, against (1) the Defendants collectively known as

9  "Volkswagen":  Volkswagen AG and Volkswagen Group of America, Inc. d/b/a Volkswagen of

10  America, Inc. and Audi of America, Inc.; (2) the Defendants collectively known as "Audi":

11  Audi AG and Audi of America, LLC; (3) the Defendants collectively known as "Porsche":  Dr.

12  Ing. h.c. F. Porsche AG, and Porsche Cars of North America, Inc.; (4) the Defendants

13  collectively known as "Daimler":  Daimler AG and Mercedes-Benz USA, LLC; and (5) the

14  Defendants collectively known as "BMW": Bayerische Motoren Werke AG and BMW North

15  America, LLC to recover treble damages and the costs of this suit, including reasonable

16  attorneys' fees, as well as for injunctive relief, pursuant to the Sherman Act (15 U.S.C. §§ 1–7)

17  and the Clayton Act (15 U.S.C. §§ 12–27).  Many relevant facts presently are known only to

18  Defendants, and documents containing those facts are in Defendants' sole control.  Plaintiffs

19  allege the following based upon information and belief, the investigation of counsel, and

20  personal knowledge as to the factual allegations pertaining to themselves:

21  **I.**    **INTRODUCTION**

22      1.    For decades, the leading German automobile manufacturers managed to build

23  brands that were the envy of the automotive world.  Volkswagen, Audi, Porsche, Daimler

24  (Mercedes), and BMW (collectively, "Defendants") built reputations in the United States, and

25  elsewhere, for their "German engineering" based on technological prowess, innovation, and

26

27

28

1   fierce competition for the hearts and minds of automobile dealers.  For at least the past two

2   decades, those reputations have been built on lies.

3         2.      From at least 1995 to the present (the alleged "Cartel Period"), Defendants

4   engaged in a conspiracy designed to eliminate competition among manufacturers and to increase

5   their profits.  Defendants did so by agreeing to reduce product quality, deter innovation, and not

6   fully compete against each other in selling millions of passenger vehicles ("German

7   Automobiles") in the United States ("the Cartel Agreement").

8         3.      Plaintiffs and the class they seek to represent — licensed and authorized dealers

9   of German Automobiles manufactured and sold by Defendants —purchased new German

10  Automobiles directly from Defendants during the alleged Cartel Period.

11        4.      According to detailed press reports, four Defendants have reportedly admitted to

12  European Union authorities that they participated in suspected cartel conduct with each other and

13  the other Defendants.  The details of Defendants' suspected cartel activity have been documented

14  in meeting agendas and minutes, as well as memoranda secretly maintained by Defendants.

15  While Plaintiffs do not yet have access to these materials, public press reports and disclosures

16  reveal that Defendants' executives and employees met literally thousands of times over the past

17  twenty years to effectuate the Cartel Agreement to fix, stabilize, or coordinate prices. Defendants

18  communicated often and in secret, and they exchanged detailed and highly sensitive technical

19  information on virtually every aspect of automobile engineering.  The information Defendants

20  exchanged is of the type not expected to be shared by companies in actual competition.

21  Defendants agreed to hide their long-running Cartel Agreement because they knew that their

22  conduct was unlawful and, if the truth were discovered, it would harm Defendants' carefully

23  cultivated reputation described above and foreclose the stream of the resulting supra-competitive

24  profits the Agreement allowed Defendants to illegally earn.

25

26

27

28

5.     The Cartel Agreement inevitably resulted in artificially inflated profits for Defendants.  But for the Cartel Agreement, the Defendants would have competed to provide the best products at the lowest prices to U.S. dealers, such as Plaintiffs and the proposed class. Defendants lined their coffers with their illegal profits during the alleged Cartel Period at the expense of Plaintiffs and the proposed class, all of whom paid "a much too high price" for the German Automobiles they purchased.[1]

6.     Defendants' misconduct constituted *per se* violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs accordingly bring this suit on behalf of themselves and a putative class of direct purchasers of German Automobiles ("Direct Purchaser Class"[2]), located in the United States for the damages proximately caused by Defendants' illegal cartel, as well as for injunctive relief.    Defendants are jointly and severally liable for all damages proximately caused to Plaintiffs and the Direct Purchaser Class by these violations.

## II.     PARTIES

### A.     Plaintiffs

7.     Plaintiff Audubon Imports is a limited liability corporation organized and operated under the laws of the State of Louisiana. Audubon Imports bought, owned and operated a Mercedes-Benz dealership in Baton Rouge, Louisiana from January 1, 2005, to September 1,

---

[1] *Deutsche Presse-Agentu* a/k/a *German Press Agency*, *EU-Kartellwächter prüfen Vorwürfe gegen Autobauer*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/news /wirtschaft/auto-eu-kartellwaechter-pruefen-vorwuerfe-gegenautobauer-dpa.urn-newsml-dpa-com-20090101-170722-99-350077; *see also* Sven Egenter and Benjamin Wehrmann, *"The cartel"/German carmakers might face "wave of lawsuits,"* Clean Energy Wire, https://www.cleanenergywire.org/news/cartel-german-carmakers-might-face-wave-lawsuits.

[2] The Class is defined in paragraphs 129-130 below.

2008. Audubon Imports purchased Mercedes-Benz vehicles directly from the Daimler Defendants.

8.      Plaintiff Autohaus is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its corporate office in Ephrata, Pennsylvania and a sales facility in Harrisburg, Pennsylvania.  From 2000 to 2010, Volkswagen authorized and licensed Autohaus to sell and service Volkswagen-branded vehicles, and from 2000 to 2008, Volkswagen authorized and licensed Autohaus to sell and service Audi-branded vehicles.  Following the sale of its Audi and VW franchises, Autohaus relocated its corporate offices to Florida.  During the alleged Cartel Period, Autohaus purchased Volkswagen and Audi automobiles directly from the Volkswagen and Audi Defendants.

9.      Plaintiff Estate Motors is a New York corporation that from 1967 until April 2017 was a franchised dealer of new Mercedes-Benz vehicles and parts. Estate Motors sold and serviced, among other things, new and used Mercedes-Benz motor vehicles to customers from the New York, New Jersey and Connecticut Tri-State area.  At all relevant times, Estate Motors operated its franchised business pursuant to a dealer agreement with Mercedes-Benz.  During the Cartel Period, Estate Motors purchased Mercedes-Benz automobiles directly from the Daimler Defendants.

10.      Plaintiff Powders Automobiles, Inc., f/k/a Powders Volkswagen, Inc., and Powders Volkswagen Audi, Inc., is a corporation organized and operated under the laws of the State of Wyoming.  Plaintiff owned and operated an Audi and Volkswagen dealership in Casper, Wyoming from 1969 to 2011.  During the Cartel Period, Powders Automobiles purchased Audi and Volkswagen vehicles directly from the Volkswagen and Audi Defendants.

11.      Plaintiff Team Imports is an Indiana limited liability company and a franchised dealer of new Audi and Volkswagen vehicles, and has sold those brands and parts since 1999 to

consumers in the Merrillville, Indiana area.  During the Cartel Period, Team Imports purchased Volkswagen and Audi automobiles directly from the Volkswagen and Audi Defendants.

12.     Plaintiff Tom Schmidt bought, owned, and operated a Volkswagen dealership called Ed Schmidt Auto, Inc. in Perrysburg, Ohio from 1989 to 2015.  Tom Schmidt is a citizen of Ohio, and Ed Schmidt Auto, Inc. is a corporation organized and operated under the laws of the State of Ohio.  Schmidt, through his dealership, purchased Volkswagen vehicles directly from the Volkswagen Defendants.

13.     Plaintiff Wyoming Valley BMW is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a sales facility in Wilkes-Barre, Pennsylvania. From 1972 until 2018, Wyoming Valley BMW was a licensed and authorized franchised dealer for the sales and service of BMW-branded vehicles.  During the Cartel Period, Wyoming Valley BMW purchased BMW automobiles directly from the BMW Defendants.

14.     Plaintiff Porsche Wyoming Valley is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a sales facility in Wilkes-Barre, Pennsylvania. From approximately 1990 until 2018, Porsche Wyoming Valley was a licensed and authorized franchised dealer for the sales and service of Porsche-branded vehicles. During the Cartel Period, Porsche Wyoming Valley purchased Porsche automobiles directly from the Porsche Defendants.

B.     **Defendants**

       **Volkswagen Defendants**

15.     **Volkswagen AG**, also known as Volkswagen Group ("VW Group"), is a German corporation with its principal place of business in Wolfsburg, Germany.  It is one of the world's largest automobile manufacturers by sales, and is in the business of designing, developing, manufacturing, and selling automobiles.  Volkswagen AG is the parent corporation of (among

others) Audi AG, Porsche AG, and the American subsidiaries of all three brands.  According to Volkswagen AG, it sold 10.3 million cars worldwide in 2016, including 6.47 million Volkswagen-branded cars, 1.87 million Audi-branded cars, and over 237,000 Porsche-branded cars.  In 2016, Volkswagen AG sold more cars than any other automobile manufacturer in the world.  Combined with its other brands, Volkswagen controls approximately 13% of the worldwide passenger car market, and a considerably greater share of the American market for German Automobiles.  Volkswagen AG's sales revenue in 2016 totaled €217 billion (approximately $255 billion) and €213 billion (approximately $248 billion) in 2015.

16.     **Volkswagen Group of America, Inc. ("VWGOA")** is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. VWGOA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen- and Audi-branded automobiles, in all 50 states.  VWGOA is Volkswagen AG's principal North American subsidiary.  It has approximately 6,000 employees in the United States and sells its vehicles through a 1,000-dealer network with more than 30 corporate/subsidiary locations.  In 2016 alone, VWGOA sold 322,948 vehicles.

17.     Volkswagen AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under numerous brand names (including Lamborghini, Bentley, Bugatti, SEAT, Skoda, as well as Ducati motorcycles, Scania and MAN commercial vehicles, and the Volkswagen, Audi, and Porsche brands) worldwide, including the United States. VWGOA advertises, markets, warrants, and distributes new Volkswagen automobiles in all 50 states.  Volkswagen AG exerts a close degree of control over the actions of its subsidiaries, including VWGOA.  For example, Volkswagen AG regularly submitted to VWGOA the

paperwork necessary to complete required applications needed to obtain certificates of conformity for a significant number of vehicles sold by Volkswagen AG in the United States.

18.     Together, the Volkswagen defendants developed, marketed, distributed, and sold millions of vehicles in the United States since joining the cartel alleged in the Complaint.  They also together developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in the United States, with the intent that these documents would be distributed in all 50 states, and caused those materials to be disseminated throughout the United States.

**Audi Defendants**

19.     **Audi AG** is a German corporation with its principal place of business in Ingolstadt, Germany.  Volkswagen AG acquired Audi AG's predecessor corporations between 1965 and 1969.  Audi AG is a subsidiary of Volkswagen AG and is the corporate parent of Audi of America, LLC.  Audi AG designs, develops, manufacturers, and sells luxury automobiles. According to Audi AG, it sold 1.87 million cars worldwide in 2016, setting a new sales record, with sales revenues in 2016 totaling €59.3 billion (approximately $69.7 billion).  Audi AG's operating profit in fiscal year 2016 was €4.8 billion (approximately $5.63 billion).

20.     **Audi of America, Inc.** is an organizational unit of Defendant VWGOA, which is a New Jersey corporation doing business in every state and the District of Columbia, with its principal place of business in Herndon, Virginia.  During the relevant period, Audi of America, Inc. was continuously doing business through a chain of distributors and dealers in the United States, by advertising, promoting, distributing, and selling Audi cars.  In 2016, Audi AG sold more than 200,000 vehicles into the U.S. market to some 290 dealers nationwide through Audi of America, Inc.  On information and belief, Audi of America, Inc. was aware of, and party to, the Cartel Agreement.

21.     **Audi of America, LLC**, ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and advertises, markets and sells Audi automobiles in all 50 states. In 2016 alone, Audi America sold 210,213 vehicles in the United States.

22.     Audi AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Audi brand worldwide.  Audi America advertises, markets, warrants, and distributes new Audi automobiles in all 50 states.  During the relevant period, Audi AG continuously engaged in business in the United States by, among other things, interacting with its wholly owned subsidiaries in the United States.  Audi AG exerted a close degree of control over Audi America, and regularly submitted information to VWGOA necessary for VWGOA to complete required applications to obtain certificates of conformity needed to sell Audi-branded vehicles in the United States.  Since joining the alleged Cartel, the Audi defendants worked together develop, market, distribute or arrange for distribution of, and/or sold millions of vehicles in the United States.  They also together developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in the United States, with the intent that these documents would be distributed in all 50 states, and caused those materials to be disseminated throughout the United States.

**Porsche Defendants**

23.     **Dr. Ing. h.c. F. Porsche AG** ("Porsche AG") is a German corporation with its principal place of business in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles.  Porsche AG is a wholly-owned subsidiary of Volkswagen AG. According to Porsche AG, it sold over 237,000 cars worldwide in 2016, setting a new sales

record.  Sales revenues in 2016 totaled €22.3 billion (approximately $26.2 billion).  Porsche AG's operating profit in fiscal year 2016 was €3.87 billion ($4.55 billion).

24.     Porsche AG has had a close relationship with Volkswagen because its founder, Ferdinand Porsche, designed the first Volkswagen Beetle in the 1930s and 1940s.  The two carmakers have cooperated on several vehicles in the decades since then. Members of the Porsche family long owned a significant stake in Volkswagen and served on the board, but Porsche AG was a separate and independent corporation until relatively recently.  In 2011, Volkswagen AG and Porsche AG consummated a merger that resulted in the Porsche and the related Porsche families' holding company maintaining a controlling 52.2% stake in Porsche AG, while Porsche AG became a subsidiary of Volkswagen AG along with the other brands in the Volkswagen portfolio (such as Audi).

25.     **Porsche Cars North America, Inc.** ("PCNA") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia.  PCNA is a wholly-owned subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states.  These vehicles are designed to meet U.S. and California standards regarding emissions compliance and other regulations.  According to Porsche AG, its 2016 United States results were the best in Porsche history, with 54,280 automobiles delivered.  On information and belief, PCNA was aware of, and party to, the Cartel Agreement.

26.     Porsche AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Porsche brand worldwide.  PCNA advertises, markets, warrants, and distributes new Porsche automobiles in all 50 states.  Porsche AG exerts a close degree of control over PCNA.  Together, the Porsche defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged in this

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

Complaint.  They also together developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in the United States, with the intent that these documents would be distributed in all 50 states, and caused those materials to be disseminated throughout the United States.

### Daimler Defendants

27.     **Daimler AG** is a German corporation with its principal place of business in Stuttgart, Germany.  It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles, and during the alleged Cartel Period, Daimler designed, engineered, manufactured, tested, marketed, supplied, sold, and distributed certain of these automobiles specifically for sale in the United States.  In 2016, Daimler's Mercedes-Benz and Smart brands sold over 2.3 million vehicles worldwide.  Daimler's sale revenue in 2016 totaled €153 billion (approximately $180 billion).  For Mercedes-Benz brand cars alone, Daimler's sales revenue totaled €89 billion (approximately $105 billion).

28.     **Daimler North America Corporation** is a Delaware corporation with its headquarters located at 36455 Corporate Drive, Farmington Hills, Michigan 48331, and is a wholly owned subsidiary of Defendant Daimler A.G.

29.     **Mercedes-Benz U.S. International, Inc.** is an Alabama Corporation with its headquarters located at 1 Mercedes Drive, Vance, Alabama 35490, and is a wholly owned subsidiary of Defendant Daimler North American Corporation, which in turn is a wholly owned subsidiary of Defendant Daimler A.G.

30.     **Mercedes-Benz USA, LLC** ("MBUSA") is a Delaware limited liability corporation. In July 2015, MBUSA moved its principal place of business from Montvale, New Jersey to 303 Perimeter Center North, Atlanta, Georgia MBUSA employs over 1,600 U.S. workers and has approximately 380 associated dealerships in the United States.  MBUSA is a

1   wholly-owned subsidiary of Daimler AG and engages in business, including the advertising,

2   marketing and sale of Mercedes-Benz automobiles, in all 50 states.  MBUSA designed the

3   vehicles at issue in this action specifically for sale in the United States.  In 2016, MBUSA sold

4   346,451 Mercedes-Benz vehicles in the United States.  On information and belief, MBUSA was

5   aware of, and party to, the Cartel Agreement.

6       31.     **Mercedes-Benz Vans, LLC** is a Delaware Corporation with its headquarters

7   located at 8501 Palmetto Commerce Pkwy, Ladson, South Carolina 29456, and is a wholly

8   owned subsidiary of Defendant Daimler North American Corporation, which in turn is a wholly

9   owned subsidiary of Defendant Daimler A.G.

10      32.     Daimler AG develops, manufactures, advertises, markets, warrants, and

11  distributes new automobiles under the Mercedes-Benz, Mercedes-AMG, and Smart brands (as

12  well as several commercial vehicle brands and MV Agusta motorcycles) worldwide.  During the

13  alleged Cartel Period, Daimler developed, reviewed, and approved the marketing and advertising

14  campaigns designed to sell Mercedes-Benz branded automobiles in the United States.  MBUSA

15  advertises, markets, warrants, and distributes new Mercedes-Benz, Mercedes-AMG, and Smart

16  automobiles in all 50 states. Daimler AG exerts a close degree of control over MBUSA.  Daimler

17  AG uses its own Twitter™ account to market and advertise MBUSA brands on MBUSA's

18  Twitter™ account, where Daimler AG boasts of MBUSA economic impact on and physical

19  presence in the United States.  (*See*, *e.g.*, February 26, 2018 Tweet ("Mercedes-Benz employs

20  thousands of Americans, supports communities and is investing in the U.S.") and touts

21  MBUSA's recent investment of $1 billion in a Tuscaloosa, Alabama plant and creation of 600

22  new jobs.  Together, the Daimler defendants have developed, marketed, and distributed millions

23  of vehicles in the United States since joining the cartel alleged in this Complaint.  They also

24  together developed the owner's manuals, warranty booklets, product brochures, advertisements,

25

26

27

28

1   and other promotional materials relating to the vehicles they sold in the United States, with the

2   intent that these documents would be distributed in all 50 states, and caused those materials to be

3   disseminated throughout the United States.

4   **BMW Defendants**

5   33.   **Bayerische Motoren Werke AG** ("BMW AG") is a German corporation with its

6   principal place of business in Munich, Germany.  It is a major worldwide automaker and is in the

7   business of designing, developing, manufacturing, and selling automobiles.  According to its

8   website, BMW AG also distributes BMW motor vehicles for sale to U.S. consumers.  BMW AG

9   sold over 2.3 million vehicles worldwide in 2016, of which over 2 million were BMW-branded

10  automobiles.  In 2016, BMW AG's sale revenue totaled €86 billion (approximately $101 billion).

11  34.   **BMW North America, LLC** ("BMW America") is a Delaware limited liability

12  corporation with its principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake,

13  New Jersey.  BMW America is a wholly-owned subsidiary of BMW AG, and it engages in

14  business, including the advertising, marketing and sale of BMW automobiles, in all 50 states.

15  BMW America, in conjunction with its parent BMW AG, designed vehicles at issue in this

16  Complaint specifically for sale in the United States, and the vehicles appear to meet U.S. and

17  California standards and regulations regarding, among other things, emissions compliance.  In

18  addition to marketing and sales, BMW America has a financial services arm for its brands.  The

19  BMW sales organization is represented in the United States through a networks of passenger car

20  and Sports Activity Vehicle centers.  In 2016, BMW America sold 365,204 BMW automobiles

21  in the United States.  On information and belief, BMW America was aware of, and party to, the

22  Cartel Agreement.

23

24

25

26

27

28

35.    **BMW(US) Holding Corp.** is a Delaware corporation with its headquarters located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677, and is a wholly owned indirect subsidiary of Defendant BMW A.G.

36.    BMW AG develops, manufactures, advertises, markets, warrants, distributes new automobiles worldwide under the BMW, Mini, and Rolls-Royce brands (as well as BMW-brand motorcycles).  BMW America advertises, markets, warrants, distributes new BMW automobiles in all 50 states.  BMW AG exerts a close degree of control over BMW America.  Together, the BMW defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged in this complaint.  They also together developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in the United States, with the intent that these documents would be distributed in all 50 states, and caused those materials to be disseminated throughout the United States.

## III.    JURISDICTION AND VENUE

37.    Subject matter jurisdiction is proper in this Court and the Transferor Courts pursuant to 28 U.S.C. § 1331, as the Complaint raises a federal question, and § 1337, as the claims are asserted under Section 16 of the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1).

38.    Subject matter jurisdiction is also proper pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Direct Purchaser Class are citizens of a state different from any Defendant.

39.     Personal jurisdiction over each of the Defendants is proper in this Court and the Transferor Courts pursuant to 18 U.S.C. §§ 1965(a), (b), and (d) and Section 12 of the Clayton Act (15 U.S.C. § 22).

40.     Each Defendant, either directly or through the ownership and/or control of its U.S. subsidiaries (a) transacted business in the United States, including in the jurisdictions in which the Transferor Courts sit; (b) directly or indirectly sold or marketed substantial quantities of German Automobiles throughout the United States, including the jurisdictions in which the Transferor Courts sit; (c) had substantial aggregate contacts with the United States as a whole, including the states wherein the Transferor Courts sit; (d) carried out conspiratorial schemes in the United States, including in the jurisdictions in which the Transferor Courts sit; and (e) engaged in an illegal conspiracy to suppress technological advancement that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons or entities residing in, located in, or doing business in the jurisdictions in which the Transferor Courts sit, and throughout the United States, including Plaintiffs and the proposed Direct Purchaser Class.

41.     Directly, and among American subsidiaries, all defendants have a widespread operational presence in the United States, with, *inter alia*, administrative offices, storage and distribution centers, and manufacturing plants employing tens of thousands of personnel.

42.     In the ordinary course of business, executives from German base parent companies oversee their U.S. subsidiaries and affiliates during regular visits.

43.     Upon information and belief, executive personnel at American affiliates are appointed and/or approved by their Defendant German parent companies, and the Defendant German parent companies dictate and/or control key policies of their American affiliates.

44.     Defendants BMW AG, BMW (US) Holding Group and BMW (America) announced the opening of the Spartanburg, South Carolina manufacturing plant on June 23, 1992.

45.     BMW AG, BMW (US) Holding Group and BMW (America) began manufacturing automobiles at the South Carolina plant on September 8, 1994.  As of 2017, the BMW defendants have manufactured around 3.9 million vehicles at the plant and employs more than 9,000 people.

46.     Attending the ceremony of the plant's 25th anniversary, Harald Kruger, Chairman of the Board of BMW AG stated that "[t]he BMW Group's success story in the US would not have been possible without the open arms and warm hearts of the people and elected officials in the great state of South Carolina and the surrounding region."

47.     Defendants Daimler North America Corporation, Mercedes-Benz U.S. International, Inc., Mercedes-Benz, LLC, Mercedes-Benz Vans, LLC and their parent, Daimler AG, operate a manufacturing plant in Tuscaloosa, Alabama, opened in 1993.

48.     In 2015, annual production at the Alabama plant was 303,000 vehicles.

49.     As a result of the success of the Mercedes line, "Daimler AG has continually invested, expanded and more than tripled production" at the Alabama plant.

50.     Daimler AG holds itself out as an entity that caters to American consumers and purposefully avails itself of the United States market for automobiles. As just one example, on February 26, 2018 Daimler AG published the following statement on Twitter.[3]

 **Daimler AG** 
@Daimler

[ Follow ]

# Mercedes-Benz employs thousands of Americans, supports communities, and is investing in the U.S. #MBinUS



**Mercedes-Benz invests $1 billion in Tuscaloosa, creates 600 new jobs**

1:38 PM - 26 Feb 2018

---

[3] https://twitter.com/Daimler/status/968193540235898882/video/1

16

51.     Between 1978 and 1987, Volkswagen AG and VWGOA manufactured vehicles in a plant located in New Stanton, Pennsylvania.

52.     After its closure in 1987, Volkswagen AG and VWGOA opened a new manufacturing facility in 2011 located in Chattanooga, Tennessee.

53.     Upon information and belief, designing, manufacturing and pricing of German branded vehicles wholesaled to franchised American dealers are directed by German-based Defendants, through their Defendant American companies. Defendants' conspiracy substantially affected commerce throughout the United States as Defendants, directly or through their agents and/or entities under their control, manufactured, promoted, sold, marketed, and/or distributed German Automobiles throughout the United States, including in the jurisdictions in which the Transferor Courts sit, thereby purposefully availing themselves of the laws of the United States and the jurisdictions in which the Transferor Courts sit.

54.     During the decades of Defendants' conspiracy, upon information and belief, they collectively wholesaled to franchised American dealers more than 20 million vehicles at an inventory cost to those dealers of hundreds of billions of dollars.

55.     All Defendants, including Defendant German-based companies, benefitted from the sales and services of Plaintiffs and the Dealer Companies in direct and/or indirect revenues in the hundreds of billions of dollars.

56.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on international commerce and the interstate commerce of the United States.  German Automobiles and their parts manufactured abroad and in the United States by Defendants and sold in the United States are goods brought into and/or

made in the United States for sale, and as such, Defendants had a direct, substantial and reasonably foreseeable effect on international commerce and the interstate commerce of the United States.

57.     Defendants' anticompetitive conduct, and such conduct's effect on commerce in the United States, as described in this Complaint, proximately caused, and continues to cause, antitrust injury and members of the Direct Purchaser Class in the United States.

58.     At all times, Defendants' conspiratorial and collusive conduct in Germany was intended to, and did, materially impact the Defendants' operations in the United States, thereby materially damaging the U.S. marketplace, Plaintiffs and the Direct Purchaser Class.  The German defendants expressly aimed their unlawful conduct at the United States.

59.     Defendants' unlawful activities substantially affect commerce throughout the United States, causing injury to Plaintiffs and Direct Purchaser Class members, as well as to the consuming public.

60.     Defendants, directly and through their agents, engaged in anticompetitive activities affecting all states, as Defendants coordinated activities related to markets, design and manufacture, pricing, parts, supplier selection, establishment of manufacturer-selected retail prices, and franchise practices.

61.     Defendants' conspiracy and anticompetitive conduct described in this Complaint caused, and continues to cause, Plaintiffs and Direct Purchaser Class members to pay unlawfully inflated prices for the German Automobiles and parts they purchased from Defendants. Plaintiffs' injuries arose from the domestic effects of Defendants' unlawful conduct as described in this Complaint.

62.     Venue is proper in this District and in the Transferor districts pursuant to 28 U.S.C. § 1391(b)-(d) and Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 12, 22).

18

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

## IV.    FACTUAL ALLEGATIONS

### A.    Defendants and German Passenger Vehicle Sales in the United States

63.    Passenger vehicles are the most common mode of transportation in the United States.  The U.S. Department of Transportation ("DOT"), with certain stated exceptions, defines a passenger vehicle as any four-wheeled vehicle that is propelled by fuel, or by alternative fuel, manufactured primarily for use on public streets, roads, and highways and rated at less than 10,000 pounds gross vehicle weight.  DOT further defines a passenger vehicle as any automobile manufactured primarily for use in the transportation of not more than 10 individuals.

64.    Defendants Volkswagen, Audi, Porsche, Daimler, and BMW collectively are the oldest and largest manufacturers of passenger vehicles in Germany.  There are other automakers in Germany, but Defendants dominate the market for German-manufactured passenger vehicles.  Defendants are horizontal competitors in the market for passenger vehicles sold in the United States.

65.    Today, Volkswagen, Audi, and Porsche exist under the same corporate umbrella, but this was not always the case.  Volkswagen acquired one of Audi's predecessor corporations from Daimler in 1965 and completed the creation of what is now Audi in 1969.  Although Volkswagen and Porsche have maintained a close relationship throughout their existence and Ferdinand Porsche's descendants long owned stock in Volkswagen, the two carmakers did not merge until 2011, long after the anticompetitive collusion alleged in this Complaint began.

66.    All Defendants maintain control over prices of vehicles sold to their U.S. franchises.  Defendants develop and carry out world-wide marketing strategies to materially impact sales and service in the U.S., affecting sales, revenues and profits of franchised American dealers.

67.     Defendants advertise their vehicles in the United States by emphasizing quality, precision engineering, and industry-leading luxury and technology features—so called, "German engineering". The advertised combination of world-leading engineering—in terms of quality, performance, technology, and luxury—has set German Automobiles apart from the rest of the wider market for passenger vehicles. Defendants understood that purchasers would pay more for premium technology and touted "German engineering" as a differentiating quality that, as further detailed below, allowed them to charge Plaintiffs and Direct Purchaser Class members higher prices for their branded German Automobiles.

68.     Defendants have been able to charge premium prices as a result. As one example, in 2012, Porsche AG reported per-car profits of more than $22,000 per car – a profit margin of some 17% or more. Other Defendants also reported high profit margins ranging from 8-11% throughout the alleged Cartel Period. These profit margins are often significantly higher than Defendants' non-German competitors.

69.     Defendants would not have been able to sustain their high profit margins without the Cartel Agreement. By entering the Cartel Agreement, Defendants sought to stifle competition amongst each other and their brands, while maintaining their premium margins. Defendants did so by agreeing to identical or very similar technological standards, agreeing to limit technological development or share technology, covering for each other's emission cheating, and colluding to lower development costs. Had Defendants actually competed over these facets of German Automobile production, the end result would have been lower prices for purchasers. However, by entering into and maintaining the Cartel Agreement, Defendants were able to avoid margin-destroying price wars.

B. **Dealers of German Automobiles**

70.     Passenger vehicles, including German Automobiles, are sold at retail in the United States through a network of independent franchised dealers.  Most states have enacted franchise laws that prohibit manufacturers of passenger vehicles from selling directly to end consumers.  In the typical case, a vehicle manufacturer, or Original Equipment Manufacturer ("OEM"), will enter into an agreement ("Sales and Service Agreement") with the dealer which gives the dealer the right to purchase passenger vehicles at wholesale prices from the OEM and to re-sell those vehicles to individuals in the United States.

71.     The dealers have at least three functions: retail sales, service/support, and nurturing/maintaining brand image.  Dealers collectively employ more than one million workers in the United States.

72.     While dealers may have Sales and Service Agreements with more than one manufacturer at a time, which allow the dealers to purchase and re-sell production of multiple automobile brands, each franchised dealer *must* buy its new branded products from the OEMs of which it is a franchisee. For example, a franchised dealer of BMW has only one source of new BMWs, *i.e.*, BMW itself, typically through its U.S. subsidiaries and/or affiliates.

73.     The franchise relationship thus arises out of a bargaining imbalance with the OEMs that leaves franchised dealers vulnerable to clandestine, anticompetitive, collusive behavior of the Defendants.  Defendants alone determine the prices they charge the dealer for German Automobiles, and franchised dealers do not have the freedom to buy branded vehicles or OEM parts from anyone other than their OEM franchisor.

C. **Defendants' History of Collusion**

74.     Defendants are no strangers to collusion.  Anecdotal evidence suggests that Defendants impermissibly have coordinated on automobile production for decades.  For

21

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

example, BMW's former executive vice president Robert Lutz recounted an exchange that

occurred in the mid-1970s between his boss, then BMW CEO Eberhard von Kuenheim, and Dr.

Joachim Zahn, then the chairman and CEO of Mercedes's parent company, Daimler-Benz AG.

At the meeting in Dr. Zahn's conference room, Dr. Zahn

> produced a file containing pictures of the BMW Turbo Coupe concept. "This," he declared, waving the images in my face, "is an outrage! Outrage! BMW has no right to display a gull-wing car! We did that with our magnificent C-111 prototype! You can't do that!"

> I asked if Mercedes had a patent or design copyright that we had violated (I knew they didn't, because we had checked) and was told, "That's beside the point! BMW has no right to copy what Mercedes does. Herr von Kuenheim, I want this stopped! Also, Herr Lutz is selling way too many big six-cylinder sedans and coupes. And that must also cease. Six-cylinder cars are our specialty! We also do fours, but we agree that's a good field for BMW, as well. You do good fours. Concentrate on those. We'll go easy on fours."

> I was speechless. Here was the CEO of our main competitor berating us for competing and not-so-deftly suggesting an illegal market-sharing initiative. I wonder what the antitrust folks in the United States would think of this conversation, was the thought that popped into my head. However, in the absence of the SEC or any lawyers, I expected my boss, the baron, to rise to the defense, to express outrage in return, to point out that it was our right and duty to compete fairly, to point out, in no uncertain terms, the impropriety of this whole meeting. Instead, my disbelieving ears heard something like this: "Of course, Dr. Zahn. Thank you for pointing out these areas of concern."[4]

75.     This cozy environment—where erstwhile competitors could cavalierly suggest a

market allocation agreement—continued until the mid-1990s. At that time, Defendants'

formalized a Cartel Agreement designed to stifle competition between their brands and illegally

coordinate on parts and materials purchases.

---

[4] Bob Lutz, Icons and Idiots: Straight Talk on Leadership, Penguin Group (2013) at 64.

76.     According to public reports detailing their secret, illegal conspiracy, Defendants entered into a secret Cartel Agreement (or Agreements) in or around 1995, at a time when Japanese automotive manufacturers were making gains in the U.S. market for passenger vehicles, thanks at least in part to the Japanese companies' technological advancements and luxury models.  Rather than independently compete on the merits to meet the challenge presented by these rival car makers, Defendants secretly banded together to form a cartel (which one publication labeled "German Cars Inc.")  to suppress competition among Defendants with each other while maintaining the façade that they were continuing to aggressively innovate and provide the highest quality products.[5]  As part of their Cartel Agreement, Defendants secretly coordinated their development and marketing programs and surreptitiously agreed on technological limitations to reduce production costs and artificially maintain their supra-competitive profit margins.[6]

77.     During the life of their cartel, more than two hundred of Defendants' managers and engineers met hundreds of times each year to refine, expand, and implement the Cartel Agreement.[7]  Indeed, over the last five years alone, Defendants secretly met more than 1,000 times.[8]  Volkswagen has admitted that it participated in these covert meetings with Audi, Porsche, Daimler, and BMW.[9]

---

[5] Frank Dohmen & Dietmar Hawranek, *Collusion Between Germany's Biggest Carmakers*, Der Spiegel (July 27, 2017), http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html, incorporated by reference.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

78.     Cartel meetings often occurred under the cover of trade associations, including the Verband der Automobilindustrie ("VDA") and the German Automobile Association.[10]  In these secret meetings, Defendants agreed to limit technological innovation, exchange competitively sensitive commercial information about the key aspects of the other Defendants' design and manufacture of their passenger automobiles, coordinate their marketing of German Automobiles, and stabilize market shares.[11]

79.     The meetings covered at least five separate aspects of automobile manufacturing: drive, set-up, chassis, electricity/electronics, and total vehicle.[12]  Within these five areas, the Defendants formed sixty different task forces to collude on virtually every aspect of automotive development and manufacturing.[13]  For example, these working groups focused on various aspects of vehicles, such as mechanical components, brake control systems, seat systems, air suspension, clutches, gasoline engines, diesel engines, and emissions technology.

80.     Throughout the alleged Cartel Period, Defendants exchanged confidential information concerning a variety of technological issues.  Such exchanges were the polar opposite of common practice in the automotive industry: true competitors placed a premium on ensuring the secrecy of their proprietary information.

81.     Defendants collectively established rules regulating technical standards that specified that no one manufacturer could be far enough ahead of another in terms of innovations to cause a co-conspirator to lose sales.  In so doing, Defendants' avoided price and technology

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

wars.  According to *Der Spiegel*—the German magazine that first reported details concerning Defendants' suspected cartel and government investigations July 2017—"[i]f a manufacturer introduced a groundbreaking technology, the others had to be capable of also offering the technology relatively quickly."[14]  This  aspect of the Cartel Agreement ensured that no one Defendant could seek to increase its sales through product differentiation at the expense of the others.  But for this Cartel Agreement market allocation rule, Defendants who lacked a breakthrough technology would have competed more vigorously on price to gain or maintain market share while simultaneously attempting to develop their own competing technology.

82.     A notorious example of Defendants' collusion is the coordination on the development of diesel engines and the emissions control systems U.S. regulators required those engines to have in order to be sold in the United States.  Defendants began this coordination under the Cartel Agreement when faced with the development of hybrid electric cars and the competitive threat such cars posed to Defendants.  Absent the Cartel Agreement, each Defendant would have competed to meet United States emissions regulations at the lowest cost and price.  This competition would have exerted downward pressure on the prices that Defendants charged to their franchised dealers for their passenger cars with diesel engines as each Defendant sought to gain or maintain market share.

83.     Rather than independently and competitively respond to the development of hybrid vehicles, Defendants instead agreed to market diesel engines as the "clean" alternative to gasoline-burning vehicles.  Defendants coordinated on the specifics of how the diesel technology would be implemented and on ways in which Defendants might circumvent emissions controls.  Diesel engines produce a pollutant known as nitric oxide which is subject to emissions

---

[14] *Id.*

regulations in the United States.  Defendants agreed to secret standards, including size limits for

tanks that hold a chemical (urea) used to implement "clean diesel" technology.  Defendants

further agreed to conceal this aspect of the Cartel Agreement so that U.S. regulators and German

Car buyers would not know that the supposed "clean diesel" technology was insufficient,

fraudulently marketed, and would in fact produce nitric oxide levels in excess of U.S. regulatory

limits.[15]

84.     In May 2014, Audi warned other Defendants that unilateral efforts to increase the

size of the chemical (urea) tanks would result in an "arms race" that Defendants should avoid.[16]

The "arms race" to which Audi referred is effectively a euphemism for competition.  But for the

Cartel Agreement, the forces of competition would have led each Defendant to develop

passenger cars that met U.S. emission standards and otherwise met the standards of the "German

engineering" that Defendants touted to sell their respective brands and to justify the supra-

competitive premium prices they charged to Plaintiffs and all other direct purchasers of German

Automobiles in the United States.

85.     The "arms race" Defendants avoided amply illustrates the deleterious effects of

the Cartel Agreement on competition for German Automobile purchasers.  Defendants agreed to

a standard chemical tank size divorced from the reality of emissions regulation and driver

preference.  The tanks did not hold enough urea to last between scheduled oil changes—the

established point of convenience for drivers.  Absent collusion, Defendants would have been

expected to compete on tank size to attract purchasers who sought a convenient filling solution.

---

[15] *Id.*

[16] *Id.*

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

Because of the Cartel Agreement, purchasers were denied that choice, and Defendants pocketed significant costs savings from their collusion that were not passed on to purchasers.

86.     Emission after-treatment was not the only area of collusion.  As *Der Spiegel* reports, "[t]he system of agreements covered ***almost all areas*** of automotive development."[17] (emphasis added).  Other known examples of Defendants' efforts to suppress competition and deter innovation include, (a) one working group set the maximum speed at which convertible roofs could be opened and closed (50 kilometers per hour); (b) a "clutch working group" discussed when parking locks should be activated in German passenger cars; (c) another working group (dealing with a technology that has not yet been publicly disclosed) specifically sought clarification as to whether there was a "standstill agreement" to restrain further innovations; (d) a "third-party motor analysis" working group exchanged data so frequently its members joked about "give and take" among them; and (e) other working groups focused on brake controls and seat systems.

87.     More recently, in an article entitled "Secret Price Fixing Among German Carmakers," *Der Spiegel* reported on yet another aspect of the Cartel Agreement:  specifically, certain Defendants colluded to fix the price of steel supplied to members of the cartel—"the very material that makes an automobile possible in the first place."[18]  Once again, Defendants pocketed the cost savings and did not pass along a single cent to the Dealer Plaintiffs.

88.     *Der Spiegel* also reported that the Federal Criminal Police Office (BKA) raided the offices of several Daimler, Bosch, BMW, and VW board members and managers in June of

---

[17] *Id.*

[18] Frank Dohmen & Dietmar Hawranek, *Secret Price Fixing Among German Carmakers*, Der Spiegel (January 30, 2018), http://www.spiegel.de/international/germany/cartel-suspicion-secret-price-fixing-among-german-carmakers-a-1190036.html, incorporated by reference.

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

2016 armed with a search warrant alleging that the companies had colluded to standardize the purchase price they paid for steel.[19]  The investigators believe such steel price-fixing agreements began in the 1990s, and continued up until possibly as late as 2016.[20]

89.     The German authorities' suspicions about Defendants' misconduct were aroused in the course of investigating an ongoing cartel case against the steel industry itself.  After the investigators obtained various protocols, documents, agendas, and meeting minutes from the Working Group of the Iron- and Metal-Processing Industry (AVI)—an organization with multiple yearly meetings typically attended by steel manufacturers, car suppliers, and car manufacturers—it became apparent to the investigators that the automobile manufacturers had agreed amongst themselves to create a unified system for the purchase of steel.[21]

90.     The price of the constituent parts of steel—including coking coal iron ore, steel scrap, and alloying elements such as copper, nickel and molybdenum—are prone to severe fluctuations in the market.  Steel manufacturers therefore seek short-term customer contracts so that they can regularly adjust prices to account for those fluctuations.  Automobile manufacturers want just the opposite: long[er]-term contracts with fixed, predictable costs that allow the manufacturers to set car model prices for the year.[22]

91.     To accommodate these divergent interests, the steel manufacturers and German automobile manufacturers jointly agreed on a set price-fixing model with two components.  First, each automobile manufacturer negotiated a longer-term set price per ton of raw steel—this was

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

essentially the "baseline" price.[23]  The German steel industry then created a purchase price "index" on top of the baseline price to account for fluctuations in the market for raw materials— this element of the cost was calculated at shorter intervals and, if the index rose or fell, the automobile manufacturers paid more or less, respectively.[24]

92.   As *Der Spiegel* pointed out, there would have been no problem if each automobile manufacturer had negotiated its own, independent solution to the fluctuation problem with the steel industry.  In the absence of a conspiracy, each German manufacturer would have competed to obtain the lowest price steel.  Instead, the automobile manufacturers jointly agreed to a price-fixing formula in which they agreed to forgo competition in exchange for standardized steel prices that they could then pass on to their customers, including plaintiffs.[25]

93.   This component of the Cartel Agreement caused Plaintiffs and all direct purchasers of German Cars to suffer economic harm.  By unlawfully colluding to standardize steel prices, Defendants were able to increase their profitability significantly.  And they did so at the expense of the direct purchasers, none of whom received the pass-on cost savings they would have received in a competitive market.

94.   The Cartel arrangement allowed OEMs to pass on artificial cost increases to direct purchasers in periods of rising steel prices.  This undermines competitive market dynamics, under which individual OEMs would be incentivized to increase market share by absorbing higher costs and competing on price.

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

95.     When steel prices were rising in 2008, RBS analysts reported that each German OEM was "confident that it is well placed for steel this year" and "getting higher prices to stick without decimating volumes" would require "the absence of a maverick producer buying market share."[26]  RBS further reported that "[European] OEMs are seeking to increase prices to offset the material price increases" associated with steel.[27]  Daimler also specifically noted their view that passing on increased costs to direct purchasers supported their position as a premium brand in the marketplace. In an analyst Q&A in late 2008, Daimler referenced Mercedes as "the strongest brand in the industry, and this has to go with a premium pricing."[28] Further, the Daimler representative reestablished their willingness to increase prices and "not be the last to move forward on the pricing front, but rather on the other end."[29]

96.     The following chart displays the fluctuating price for steel during part of the alleged Cartel Period.  Particularly relevant here, steel prices soared in 2008.

---

[26] RBS Analyst Report: "Automobiles Committed to your commitment?" dated August 1, 2008

[27] *Id.*

[28] Bloomberg LP, RBS Transcript of Earnings Q&A Session dated July 24, 2008

[29] *Id.*

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB



**Sources and notes:**
Bureau of Labor Statistics Monthly PPI Commodity data for Metals and metal products-Iron and steel, not seasonally adjusted (Series ID:WPU101).

97.     As the following chart indicates, while Defendants' operating margins decreased during the same period, Defendants were nevertheless able to maintain margins significantly higher than their Japanese competitors' during a time of significant steel price volatility.



**Sources and notes:**
Historical Global operating segment data retrieved from CapitalIQ.
German OEMs are comprised of Bayerische Motoren Werke Aktiengesellschaft, Daimler AG, and Volkswagen Aktiengesellschaft.
Japanese OEMs are comprised of Honda Motor Co., Ltd., Nissan Motor Co., Ltd., and Toyota Motor Corporation.
Margin data includes all motor vehicles, including trucks & commercial vehicles.

31

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT

Case No. 3:17-md-02796-CRB

98.     Such a phenomenon is inconsistent with what one would expect to observe in a competitive environment.  In a competitive market with a handful of players providing differentiated products, one would expect firms to absorb some portion of higher steel costs, through either lower margins or increased efficiency, as firms endeavor to increase market share through price competition (all while expecting their competitors to behave in the same way). Only in a collusive market, in which competitors make a de facto agreement to maintain margins and market share through stifled innovation, could OEMs remain assured of their ability to pass along cost increases while maintaining market share.

99.     Moreover, collusion on commodity prices may have served as a jumping-off point for collusion across a broader range of product features.  As BMW CEO Norbert Reithofer noted in a 2009 Q&A regarding a potential cooperative arrangement with Daimler, "you have to start with commodities" and "the next step is you to look, of course, into development of cars as well."[30]  Since automobiles are produced on multi-year cycles, the introduction of a collusive arrangement on price for a direct commodity input would allow the OEMs to immediately benefit from lower costs and higher profits while determining the best methods for suppressing competition on features for the following model cycle.

D.     **Defendants' Collusion Stifled Innovation**

100.    Even as they secretly agreed to, and did, suppress competition related to technological innovation in numerous ways, Defendants publicly promoted their cars as highly sophisticated vehicles with the latest technology for which Plaintiffs and all direct purchasers of German Cars should – and did – pay a premium.  For example, VW promoted "the power of

---

[30] Bloomberg LP, RBS Transcript of Q&A Session of the BMW Financial Analyst's Meeting Held on March 19, 2009

German engineering,"[31]   BMW touted its vehicles as "the ultimate driving machine[s]" due to their advanced "performance, design, innovation and efficiency,"  Daimler extolled its historical practice of "[l]eading through innovation,"[32]  Audi regularly promoted its German engineering prowess (its North American slogan was "Isn't it time for German engineering?"),[33] and Porsche claimed that "there is no substitute" and that it had a long-standing reputation for developing "technologies that have advanced vehicle performance, improved safety and spurred environmental innovations within the automotive industry."[34]

101.    From an economic perspective, the Cartel Agreement, at a minimum, enabled Defendants to reap artificially inflated profits.  In a competitive market, a less innovative product sells at lower prices, all else being equal.  A firm opting to reduce costs by offering less innovative features accordingly would have to accept lower prices, as more innovative competitors are able to sell to those customers who are willing to pay for the innovative features (often at a premium).  In a competitive automobile manufacturing market, where companies introduce product improvements every year, the effects of failing to innovate compounds each year, such that the price gap between innovative and non-innovative products widens over time.

102.    By colluding, the Defendants were able to flip these economic principles on their head and charge higher prices for less innovative products, which they never could have done in a competitive market environment.  For example, in such an environment, manufacturers would

---

[31] Vehicles, BMW: THE ULTIMATE DRIVING MACHINE, https://www.bmwusa.com/vehicles/bmwi.html.

[32] *See, e.g.,* https://www.mbusa.com/mercedes/benz/innovation.

[33] *See, e.g.,* http://adage.com/article/cmo-strategy/audi-s-truth-engineering-ads-back-bite-amid-probe/300472/.

[34] http://press.porsche.com/news/release.php?id=505.

have the incentive to maximize the size of the tanks that store the AdBlue solution used to reduce nitric oxides, since this would reduce the frequency with which customers are required to refill the tank (to the benefit of the consumer) and thereby give them a competitive advantage.  While the size of the tank would be subject to engineering constraints of the vehicles (*e.g.* space for other features, performance, etc.), vehicles with larger tanks would command higher prices than those with smaller tanks (up to the point of negative marginal returns), all else being equal.  Accordingly, manufacturers offering smaller tanks would face competition from innovative manufacturers offering larger tanks (the smaller tanks would have to be refilled more often and consequently cost consumers more to own), thereby reducing the price a manufacturer could charge for a vehicle with a smaller tank.

103.    The optimal, least cost, size of the AdBlue tank is a feature on which automakers would compete in a non-collusive environment.  Thus, competition increases innovation by providing an incentive for manufacturers to provide optimally-sized tanks without affecting other features (or an incentive to eliminate the need for additive tanks altogether).  At the same time, competition restrains prices so that vehicles with less innovative technology (*e.g.*, smaller AdBlue tanks) command lower prices.

104.    The Defendants' conspiratorial decision to limit the size of the AdBlue tanks is an example of how Defendants were able to charge higher prices and realize higher profit margins for less innovative vehicles through collusion.  By removing a feature on which they otherwise would have competed to improve, the Defendants were free to offer vehicles with smaller tanks without having to reduce prices in anticipation of competition from innovative competitors.  At the same time, the smaller tanks saved the Defendants up to €80 per vehicle.  While such a cost reduction would have been passed along to dealers in a competitive market (in the form of lower

34

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

prices), the Defendants' collusive behavior enabled them to pocket these savings in the form of higher profits.

105.     The size of the AdBlue tanks is only one of numerous features on which Defendants stifled innovation and, therefore, competition.  By diminishing the universe of features on which they competed, the Defendants were able to charge higher prices to direct purchasers while, at the same time, saving money that would have been spent on research, development, and integration of innovative features.  As a result, the collusive behavior most likely enhanced Defendants' profits at the expense of automobile dealers like Plaintiffs and Direct Purchaser Class members.

E.     **Defendants Knew Their Conduct Was Illegal**

106.     The Defendants were not willing to exchange highly sensitive, technical information with manufacturers outside of their secret group.  To the contrary, Defendants actively worked to ensure that their meetings remained secret.  When Jaguar, Volvo, Renault, and Fiat requested certain information, Defendants refused to share it.  Similarly, despite their membership in the VDA and participation in the German automotive market, Ford, Opel, Fiat, and others were not invited to the meetings.[35]

107.     Defendants understood that they were violating competition laws in Germany and elsewhere including the United States.  When they rejected information requests from other car companies, Defendants worried that those car companies might report the conspirators' meetings

---

[35] Bertel Schmitt, *Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says,* Forbes (July 22, 2017), https://www.forbes.com/sites/bertelschmitt/2017/07/22.dieselgate-product-of-vast-vw-bmw-daimler-car-cartel-conspiracy-fresh-report-says/#1dd8d5797ce8.

to the German Cartel Office.[36]  As a result, Defendants became more secretive and careful.  On October 1, 2010, leaders at a secret meeting of Defendants in Paris reminded the others not to put in writing anything [particularly delicate] that would trigger the suspicions of the cartel authorities.[37]

108.     In 2011, the European Commission ("EC") fined Daimler almost 1.1 billion euros for its membership in a truck cartel that also included Volkswagen subsidiary MAN.[38]  After that, Daimler reportedly became nervous about its secret meetings with Volkswagen and BMW. However, managers refused to stop the meetings because "otherwise [they] cannot sell cars anymore."[39]  Daimler continued to attend cartel meetings.[40]

F.     **Volkswagen Reports the Cartel Agreement to the EC**

109.     On July 4, 2016, Defendant Volkswagen AG filed a proffer with the EC acknowledging "suspected cartel infringements."[41]  According to one public report, Volkswagen

---

[36] Dohmen and Hawranek, *supra* n. 5.

[37] Max Hägler and Klaus Ott, *Lieber kungeln als konkurrieren*, Süddeutsche Zeitung (July 25, 2017), http://www.sueddeutsche.de/wirtschaft/autoindustrie-lieber-kungen-als-konkurrieren-1.3600989.

[38] Von Klaus Ott, *Wie die Autokonzerne alle Warnsignale ignorierten*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/wirtschaft/auto-kartell-wie-die-autokonzerne-alle-warnsignale-ignorierten-1.3599806, incorporated by reference.

[39] *Id.*

[40] *Id.*

[41] Dohmen and Hawranek, *supra* n. 5.

AG in its proffer conceded that Defendants colluded "'—at least since the 1990s and to this day'" regarding, among other things, various automobile features, technologies, and costs.[42]

110.    One year later, the EC publicly announced that it was reviewing allegations of an antitrust cartel consisting of a group of major German Automobile manufacturers, including (1) Volkswagen AG and its subsidiaries, affiliates and/or brands Volkswagen, Audi, Porsche, and (2) Defendants Daimler A.G. and its subsidiaries, affiliates and/or brands Mercedes-Benz and Smart and (3) BMW and its subsidiaries, affiliates and/or brands BMW and Mini.  European antitrust officials, the EC, and its German counterpart, the Bundeskartellamt, have all confirmed receipt of information from Defendants that may relate to the operation of an antitrust cartel dating from the 1990s.  As part of its review, the EC has confiscated documents from Defendants and interviewed witnesses in connection with the alleged cartel.

111.    Information concerning Defendants' collusion had been kept secret from the U.S. public until late-July 2017, when *Der Spiegel* first reported on the suspected cartel and investigation.  Upon information and belief, *Der Spiegel*'s reporting is based, among other things, on its review of documents submitted to the German and EC authorities by Volkswagen AG.  Reportedly, Volkswagen's disclosures to regulatory authorities came as a result of its suspicion that its collusion with Daimler and BMW was about to be exposed and wanted to receive favorable treatment from the authorities in exchange for reporting it first.[43]

---

[42] *Id.*

[43] *Under German law, the first member of a cartel to self-report can avoid paying any fines.* Bertel Schmitt, German Car Cartel Trigger Rat-Out-Race Between Daimler, Volkswagen and BMW, Forbes (July 25, 2017), https://www.forbes.com/sites/bertelschmitt/2017/07/25/german-car-cartel-triggers-rat-out-race-between-daimler-volkswagen-and-bmw/2/#5e1573e35a79.

112.     Recognizing that it was violating relevant antitrust law, Daimler apparently self-reported itself to German authorities, perhaps as early as 2014.[44]  Daimler's disclosure to the authorities was not publicly revealed at the time.  Nor did Daimler tell its co-conspirators about its disclosures. To date, Daimler has not publicly commented on the allegations reported by *Der Spiegel*, except to say, "Insofar as violations of antitrust law might have occurred, as a matter of principle, Daimler A.G. cooperates openly and transparently with the responsible authorities."

113.     BMW's Chairman Harald Krueger was asked in September 2017 whether BMW was "part of a cartel."  Krueger replied "there is nothing official (in terms of charges) as far as we know, but we are taking this serious.  We are analyzing this internally, most of it goes back to the 1990s."[45]

114.     Notwithstanding Krueger's statement, the following month, EC antitrust regulators conducted an unannounced search of BMW's offices in Munich in connection with the ongoing investigation into the Cartel Agreement.[46]  Days later, EC antitrust officials conducted unannounced inspections at the offices of Volkswagen AG in Stuttgart and Daimler AG in Ingoldstadt in connection with the investigation.[47]

---

[44] *Id.*

[45] https://www.irishtimes.com/business/transport-and-tourism/bmw-boss-addresses-emissions-and-cartel-allegations-head-on-1.3218025.

[46] http://www.dw.com/en/eu-regulators-raid-auto-giant-bmw-in-german-cartel-case/a-41054252

[47] https://www.bloomberg.com/news/articles/2017-10-23/vw-daimler-raided-by-eu-investigators-in-car-cartel-probe

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

### G.   Defendants' Conduct was the Product of an Agreement and/or Concerted Action

115.   Defendants' own admissions to the regulatory authorities confirm the existence of the Cartel Agreement.  At present, only Defendants know the full scope of the Cartel Agreement and of Defendants' conduct in furtherance of it.  The evidence of the Cartel Agreement's reach and details are exclusively in the possession of the Defendants.  Defendants possess agendas, minutes, memoranda, and other documents that will more fully identify the scope of the Cartel Agreement once disclosed in discovery.

116.   In addition to certain Defendants' reported admissions to regulatory authorities, several "plus factors" demonstrate the fact of the agreement.  First, Defendants had a strong motive to conspire.  In the mid-1990s, Japanese and other auto manufacturers were making inroads with U.S. consumers of passenger vehicles by offering advanced technologies at competitive prices.  To meet that threat lawfully and maintain their reputation as the most technologically sophisticated cars in the world and thus preserve their market share, Defendants would have to spend more on research and development and sacrifice the fat profit margins to which Defendants had become accustomed.  Each Defendant sought to avoid such an "arms race," and the only way to do that was to collude with their competitors, so every Defendant could maintain their profit margins.  Defendants were also motivated to keep this conduct secret because, if exposed, it would not only have led to criminal investigations, it would have diminished Defendants' reputation, harmed the value of their respected brands, and impaired their ability to extract premiums based on that reputation.  That is not mere speculation but

inescapable inference: each Defendant's stock price dropped precipitously after disclosure of the antitrust investigation.

117.     Second, Defendants had and took advantage of literally thousands of opportunities to conspire through secret meetings.  Defendants' employees met under the cover of numerous trade association meetings to implement the Cartel Agreement.  The fact that Defendants conducted these meetings in secret reflects a consciousness of guilt, supports the inference of unlawful agreement, and explains why certain Defendants admitted they engage in cartel conduct.

118.     Third, Defendants engaged in conduct inconsistent with their independent self-interests by, among other things, revealing to each other proprietary technological information and trade secrets.  In the absence of a conspiracy, a company's trade secrets and proprietary information are among a company's most valuable assets.  In a truly competitive environment, protecting those essential resources is critical to maintaining a company's competitive edge.  In the absence of agreement, each Defendant would have kept its secret proprietary information secret and used it to innovate and attract consumers to its own brands.

119.     Fourth, throughout the alleged Cartel Period, the structure of the industry was conducive to successful collusion.  That structure and conditions that enabled competitors to collude, had existed in the German Automobile industry for decades.  Specifically, the German Automobile industry has long had the following characteristics, all of which have made it highly prone to the emergence of collusive schemes t and highly likely that those schemes will last and have market-wide impact: (a) Defendants had a collective interest in maintaining their sale

volumes while increasing prices and profits by eliminating competition among themselves, (b) significant barriers to entry, including high research and development costs, the creation of supply chain and dealer networks, and the cost of advertising and brand development, (c) a small number of German Automobile makers possessed the power to charge a price premium in the U.S. market for passenger vehicles, (d) readily observable prices and products and widespread sharing of information among alleged cartel members (which enable colluders to punish a firm that deviates from the collusive strategy), (e) the absence of competitive substitutes which enhanced cartel stability and duration, (f) the limited bargaining power of dealers of German Automobiles, (g) the prominence and importance of the German Automobile industry to Germany's economy and that of the broader European Union facilitated coordination and protected cartel behavior, (h) similar production technologies and common suppliers facilitated coordination among the Defendants, and (i) symmetry among Defendants also facilitated coordination, because all Defendants shared similar aims when it came to technology and costs, the types of customers Defendants sought and attracted, and the worldwide markets in which they operated.  In addition, in the luxury car segment of the United States automobile market, the German defendants had overwhelming market power.

H.    **Defendants' Control of Dealer Wholesale Price and MSRP Facilitated the Cartel Agreement.**

120.    In the American automotive industry, automotive franchisors of all brands exercise extraordinary control over the prices they charge their franchisees.  This control permitted Defendants to effectuate their conspiracy at Plaintiffs' and direct purchasers' expense.

41

121.    Under the automotive franchise system, Defendants have absolute and sole control over inventory prices – the prices charged to dealers for vehicles and parts at wholesale. Dealers do not have the ability to negotiate lower inventory prices.  Defendants likewise unilaterally and solely set the Manufacturer's Suggested Retail Price ("MSRP") which must be disclosed on what is known as the "Monroney Label" which has to be affixed to every new car offered for sale in the United States.  *See* 15 U.S.C. § 1232.

122.    Defendants' unilateral power to set inventory and MSRP prices further facilitated the Cartel Agreement by allowing Defendants to maintain artificial profit margins.

## V.    THE CARTEL AGREEMENT VIOLATED THE SHERMAN ACT AND CAUSED PLAINTIFFS AND CLASS MEMBERS TO SUFFER HARM

123.    The Cartel Agreement was a horizontal agreement to restrict competition on quality, innovation, and price.  As such, it constitutes a *per se* violation of the Sherman Act.  In addition, insofar as Defendants agreed that they would cap technological innovations so that no German Automobile Defendant would lose sales to another German Automobile Defendant, that constituted a form of a market share agreement that also is treated as a *per se* violation.

124.    As a proximate result of the Cartel Agreement, Defendants reduced product quality, restricted innovation, and effectively increased prices for German Cars.  The Cartel Agreement proximately caused, and continues to cause, Plaintiffs and Direct Purchaser Class members to suffer harm in several respects, including receiving lower quality products and paying supra-competitive prices for those inferior products.

125.    The damages suffered by Plaintiffs and Direct Purchaser Class members include, without limitation, (a) the per-vehicle difference in price the Plaintiffs and Direct Purchaser Class members paid to purchase vehicles from Defendants compared to what the prices would

have been in a healthy, non-collusive, competitive, and legal market for the Defendants' German Automobiles, and (b) increased finance and insurance costs, which are based upon the aggregate value of the dealers' inventories, aggregate values that Defendants' misconduct artificially inflated.

## VI.  DEFENDANTS ENGAGED IN UNLAWFUL CONDUCT IN, AND DIRECTED AT, THE FORUM

126.  Defendants expressly aimed their unlawful conduct at the United States.  For example, the United States and its constituent States have a collection of federal and state laws that require manufacturers to build their passenger vehicles specifically to meet the requirements of those laws.  Passenger cars sold to Plaintiffs and the members of the Direct Purchaser Class thus had to be specifically designed to meet federal and state regulations and, in at least one case, Defendants colluded to circumvent emissions standards unique to the United States.

127.  Defendants' U.S. subsidiaries played an important role in implementing the Cartel Agreement.  For example, those subsidiaries entered into Franchise Agreements with Plaintiffs and the members of the Direct Purchaser Class to sell German Automobiles in the United States and negotiated with U.S. regulators to meet U.S. safety and emission requirements.  Defendants' U.S. subsidiaries acted as agents for their German parents in connection with the sale and marketing of German automobiles.

128.  Despite Defendants' reported disclosures of wrongdoing to regulatory authorities, Defendants have never publicly declared that they will stop entering into any horizontal agreements on quality, output, or price.  Defendants have not identified any safeguards that they propose to implement in trade association meetings to prevent such agreements.  Consequently, given the extraordinary duration of the Cartel Agreement, injunctive relief is warranted to ensure that Defendants' unlawful conduct has ceased and will not happen again.

**VII.    CLASS ACTION ALLEGATIONS**

A.    **Class Definition**

129.    Plaintiffs bring this action seeking damages and equitable and injunctive relief under section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and do so on behalf of themselves and the following class:

> All persons or entities in the United States (including its territories and the
> District of Columbia) who purchased German Automobiles directly from any of
> the Defendants at any time during the period from January 1, 1995 through such
> time as the effects of the unlawful conduct ceased.  German Automobiles include
> all vehicles manufactured by a Defendant or any current or former subsidiary or
> affiliate of a Defendant, and sold in the United States by a Defendant or any
> current or former subsidiary of a Defendant.

130.    Excluded from this "Direct Purchaser Class" are the Defendants, and their officers, directors, management, employees, subsidiaries, and affiliates, and any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.  Plaintiffs reserve the right to revise the Class Definition based upon information learned through discovery.

B.    **Class Certification Requirements Under Rule 23**

131.    **Numerosity: Rule 23(a)(1).**  The members of the Direct Purchaser Class are so numerous and geographically dispersed that individual joinder of all Direct Purchaser Class members is impracticable. Plaintiffs are informed and believe that the members of the Direct Purchaser Class number in the thousands.  The precise number of Direct Purchaser Class

members may be ascertained from Defendants' records.  Direct Purchaser Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and published notice.

132.    **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).**  This action involves significant common questions of law and fact, which predominate over any questions affecting individual Direct Purchaser Class members, including, but not limited to:

    a.   Whether Defendants engaged in the conduct alleged in this Complaint;

    b.   Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed German Automobiles into the stream of commerce in the United States;

    c.   Whether Defendants agreed to share regularly with each other detailed, nonpublic, and/or competitively sensitive data about current and prospective technology, prices, and market strategy;

    d.   Whether Defendants agreed to reduce or collaborate on the speed of technological innovation in German automotive engineering;

    e.   Whether Defendants' collusion resulted in the sale of inferior German Automobiles;

    f.   Whether Defendants conspired to artificially inflate the wholesale prices of German Automobiles;

    g.   Whether Plaintiffs and the other Direct Purchaser Class members overpaid for their German Automobiles as a result of Defendants' collusion;

    h.   The identity of the participants and co-conspirators in the scheme alleged in this Complaint;

i. Whether Defendants made material misrepresentations and/or concealed facts regarding the true nature of their relationships with each other;

j. Whether Defendants' concealment of the true nature of the relationship between the Defendants would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing German Automobiles;

k. Whether Defendants' conduct violated the Sherman and Clayton Acts;

l. Whether Plaintiffs and Direct Purchaser Class members had reason to know of or suspect the Defendants' conduct or means to discover the collusion;

m. Whether Defendants fraudulently concealed their conduct from Plaintiffs and Direct Purchaser Class members;

n. Whether Plaintiffs and Direct Purchaser Class members were injured in their business or property by Defendants' conduct;

o. Whether Plaintiffs and Direct Purchaser Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

p. Whether Plaintiffs and Direct Purchaser Class members are entitled to damages and other monetary relief and, if so, in what amount.

133. **Typicality: Rule 23(a)(3)(i).** Plaintiffs' claims are typical of the claims of the Direct Purchaser Class members whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3)(i), because Plaintiffs and each Class member directly purchased German Automobiles and were similarly injured as a direct and proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Direct Purchaser Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Direct Purchaser Class members.

134.   **Adequacy: Rule 23(a)(4).**  Plaintiffs will fairly and adequately represent and protect the interests of the Direct Purchaser Class members as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs have retained counsel competent and experienced in complex class action litigation, including litigation against automobile manufacturers.  Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Direct Purchaser Class members.  Therefore, the interests of the Direct Purchaser Class members will be fairly and adequately protected.

135.   **Declaratory and Injunctive Relief: Rule 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Direct Purchaser Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Direct Purchaser Class as a whole.

136.   **Superiority: Rule 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The burden and expense that would be required to individually litigate the Direct Purchaser Class claims against Defendants make it impracticable for members of the Direct Purchaser Class to individually seek redress for Defendants' wrongful conduct.

137.   Even if Direct Purchaser Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments. Individualized litigation further increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

# VIII.   STATUTES OF LIMITATION ARE TOLLED

## A.   **Discovery Rule**

138.   Plaintiffs and Direct Purchaser Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were secretly meeting and colluding on numerous aspects of their vehicles, that Defendants were concealing from and misrepresenting to the public the true nature of the "competition," or lack of it, that was ongoing among the Defendants, and/or that the Defendants were using these secret meetings to artificially inflate prices to direct purchasers, increase Defendants profit margins, and reduce or control technological advancement.

139.   Plaintiffs and members of the Direct Purchaser Class had no realistic ability to discover the presence of this collusion, or to otherwise learn of the Defendants anticompetitive behavior, until it was discovered and first reported by *Der Spiegel* on July 21, 2017.

140.   Any statutes of limitation otherwise applicable to any claims asserted in this Complaint have thus been tolled by the discovery rule.

## B.   **Fraudulent Concealment**

141.   All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged in this Complaint.

142.   As stated above, Plaintiffs had no knowledge of, nor any reason to suspect the existence of, the Cartel Agreement until it was first publicly disclosed in *Der Spiegel*.  Plaintiff did not know of the Cartel Agreement before July 2017 because Defendants affirmatively concealed its existence.

143.   Defendants have known of these secret, anticompetitive meetings since the 1990s when the Defendants began having them.  Since then Defendants have intentionally concealed, or failed to notify, regulators, Plaintiffs, Direct Purchaser Class members, and the driving public

about secret meetings.  Public disclosures of internal documents confirm these efforts.  For example, one Audi email reads:  "Hello everyone, here is the information on the 'secret' meeting in Munich."  Defendants met under cover of supposed legitimate trade association meetings to avoid arousing any suspicion of unlawful conduct.[48]  In one meeting held on October 1, 2010, in Paris, members of one working group reminded the others not to record anything sensitive in writing.[49]

144.    In 2011, the European Commission fined Daimler more than $1 billion for participating in a 14-year conspiracy to inflate truck prices.  Daimler continued to participate in the Cartel, noting at the time "otherwise [they] cannot sell cars anymore."[50]

145.    Defendants made numerous fraudulent statements to create the false appearance of competition and to conceal the Cartel Agreement.  For example:

    a.  Daimler's top executive, Dieter Zetsche, falsely boasted that the German Defendants vigorously compete, stating "as neighbors, we are constantly stepping on each other's toes. In this sense, competition is an incredibly good thing."[51]

    b.  Harald Krueger, CEO of BMW, said, "This competition constantly motivates us to achieve excellence."[52]

---

[48] Dohmen and Hawranek, *supra* n. 5.

[49] Ott, *supra* n. 38.

[50] *Id.*

[51] Dohmen and Hawranek, *supra* n. 5.

[52] *Id.*

c.   Volkswagen CEO Matthias Mueller praised the rivalry of the German Car brands.[53]

146.   Audi CEO Rupert Stadler said that competition had "given us all a technological advantage."[54]. Despite knowing about their anticompetitive behavior for the length of the alleged Cartel Period, Defendants did not disclose their misconduct, and in fact actively concealed it. As a result, neither Plaintiffs, the members of the proposed Direct Purchaser Class, nor the public at large knew anything about it until after *Der Spiegel* published the exposé. Defendants still deny that these meetings were in violation of the laws.

147.   Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged in this Complaint.

C.   **Estoppel**

148.   Defendants were, and are, under a continuous duty to disclose to Plaintiffs and Direct Purchaser Class members the true nature of their relationship with the other Defendants. Defendants have continuously breached that duty.  They made misleading statements to the public—both in advertising and in public statements by executives about the virtues of competition—even as they acknowledged internally that the meetings were secret and potentially illegal. Defendants actively concealed the nature of, and knowingly misrepresented, their relationship with other Defendants and the effect that relationship had on the prices and technology in German Automobiles.

149.   Plaintiffs and Direct Purchaser Class members reasonably relied upon Defendants' active concealment of these facts that rendered their statements misleading.

_____

[53] *Id.*

[54] *Id.*

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

150.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## IX.     CLAIM FOR RELIEF:  VIOLATION OF THE SHERMAN ACT AND THE CLAYTON ACT

151.     Plaintiffs and the Direct Purchaser Class hereby incorporate each preceding and succeeding paragraph as though fully set forth in this Complaint.

152.     Beginning at a time presently unknown to Plaintiffs and the Direct Purchaser Class, but at least as early as January 1, 1995 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 12, *et seq*.

153.     In furtherance of the unlawful conspiracy, each of the Defendants has committed overt acts, including, among other things:

    a.     Agreeing to fix, increase, maintain and/or stabilize prices of German Automobiles sold in the United States;

    b.     Participating in meetings, conversations, and communications with co-conspirators regarding every aspect of automotive engineering in an effort to fix, increase, maintain, and/or stabilize prices of German Automobiles sold in the United States;

    c.     Agreeing to not compete over automobile features and components in an effort to fix, increase, maintain, and/or stabilize prices of German Automobiles sold in the United States;

d.   Agreeing to standardize automobile features and component parts so as to restrict competition, maintain anticompetitive profit margins, and overcharge Plaintiffs and members of the Direct Purchaser Class and the public; and

e.   Secretly meeting with co-conspirators in order to keep the existence of the conspiracy secret so as to foster the illegal anti-competitive conduct described in this Complaint.

154.   The combination and conspiracy alleged in this Complaint has had the following effects, among others:

a.   Competition in the sale of German Automobiles sold in the United States by Defendants has been restricted;

b.   Prices for German Automobiles sold in the United States by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

c.   Plaintiffs and members of the Direct Purchaser Class have been deprived of the benefits of free and open competition;

155.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of German Automobiles sold in the United States.

156.   As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiffs and members of the Direct Purchaser Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

157.    The conduct of Defendants constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**X.    PETITION FOR RELIEF**

WHEREFORE, Plaintiffs and the Direct Purchaser Class petition that:

158.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

159.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance of it by Defendants and their co-conspirators be adjudged to have been a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Direct Purchaser Class for treble the amount of damages sustained by Plaintiffs and the Direct Purchaser Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest.

160.    Each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged in this Complaint.

161.    The Court award Plaintiffs and members of the Direct Purchaser Class such other and further relief as may be necessary and appropriate.

## XI.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs and the Direct Purchaser Class demand a jury trial as to all issues triable by a jury.

Dated: March 15, 2018

Respectfully Submitted,

/s/ Warren T. Burns
WARREN T. BURNS (TX Bar No. 24053119)
*Admitted to appear Pro Hac Vice*
wburns@burnscharest.com
WILL THOMPSON (CA Bar No. 289012)
wthompson@burnscharest.com
BURNS CHAREST, LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550 / Fax: (469) 444-5002

James R. Martin
Jennifer Duncan Hackett
Miriam R. Vishio
ZELLE LLP
1775 Pennsylvania Avenue, NW, Suite 375
Washington, D.C. 20006
Tel: 202-899-4100
E-mail: jmartin@zelle.com
E-mail: jhackett@zelle.com
E-mail: mvishio@zelle.com

Jonathan R. MacBride
ZELLE LLP
401 Plymouth Road, Suite 120
Plymouth Meeting, PA 19462
Tel: 484-532-5330
E-mail: jmacbride@zelle.com

Christopher T. Micheletti
Judith A. Zahid
Qianwei Fu
ZELLE LLP
44 Montgomery Street, Suite 3400

54

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

San Francisco, CA 94104
Tel: 415-693-0700
E-mail: cmicheletti@zelle.com
E-mail: jzahid@zelle.com
E-mail: qfu@zelle.com

Jeffrey M. Scafaria, Esq.
Dennis M. George
ARANGIO GEORGE, LLP
2000 Market Street, Suite 1440
Philadelphia, PA 19103
Tel: 215-800-1083
E-mail: Jeff@ScafariaLaw.com

Eric L. Chase
*Admitted to appear Pro Hac Vice*
Ronald J. Campione
*Admitted to appear Pro Hac Vice*
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
echase@bressler.com
rcampione@bressler.com

Donald C. Klawiter, Esq.
(*pro hac vice* motion to be filed)
KLAWITER PLLC
2101 L Street, NW, Suite 800
Washington, DC 20017
(202) 468-5222
don@klawiterpllc.com

William A. Kershaw, Esq.
Ian J. Barlow, Esq.
(*pro hac vice* motion to be filed)
KERSHAW, COOK & TALLEY, P.C.
401 Watt Avenue
Sacramento, CA  95864
(916) 779-7000

55

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

bill@kctlegal.com
ian@kctlegal.com

Thomas P. Thrash
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: (501) 374-1058
Fax: (501) 374-2222
tomthrash@thrashlawfirmpa.com

Isaac L. Diel
SHARP MCQUEEN, PA
Financial Plaza
6900 College Blvd, Suite 285
Overland Park, Kansas 66211
Tel: (913) 661-9931
Fax: (913) 661-9935
Email: idiel@sharpmcqueen.com

Charles D. Gabriel
CHALMERS BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, Georgia 30022
Tel: (678) 735-5903
Fax: (678) 735-5905
cdgabriel@cpblawgroup.com

Larry D. Lahman
MITCHELL DECLERCK
202 West Broadway Avenue
Enid, OK 73701
Tel: (580) 234-5144
Fax: (580) 234-8890
larry.lahman@sbcglobal.net

Stephen B. Murray, Sr.
Stephen B. Murray, Jr.
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130

56

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT

1

2

Tel: (504) 525-8100
Fax: (504) 584-5249
smurray@murray-lawfirm.com
smurrayjr@murray-lawfirm.com

3

4

Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Road, Suite 650
Alexandria, Virginia 22311
Tel: (703) 931-5500
Fax: (703) 820-1656
Mparfitt@ashcraftlaw.com

5

6

7

8

*Additional Counsel on behalf of Direct Purchaser Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

57

26

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
Case No. 3:17-md-02796-CRB

27

28