LATHAM & WATKINS LLP
Daniel M. Wall (Bar No. 102580)
Belinda S Lee (Bar No. 199635)
Elizabeth H. Yandell (Bar No. 301725)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: *Dan.Wall@lw.com*
*Belinda.Lee@lw.com*
*Elizabeth.Yandell@lw.com*

Michael Lacovara (Bar No. 209279)
885 Third Avenue
New York, NY 10022-4834
Telephone: +1.212.906-1200
Facsimile: +1.212.751-4864
Email: *Michael.Lacovara@lw.com*

*Attorneys for Defendants BMW AG, BMW of North America, LLC, And BMW (US) Holding Corp.*

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GERMAN AUTOMOTIVE MANUFACTURERS ANTITRUST LITIGATION | Case No. 3:17-md-2796-CRB<br>MDL No. 2796 |
| This document relates to ALL ACTIONS | **DEFENDANTS' NOTICE OF MOTION AND JOINT MOTION TO DISMISS THE INDIRECT PURCHASER PLAINTIFFS' AND DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINTS**<br><br>Date: September 17, 2018<br>Time: 10:00 a.m.<br>Place: Courtroom 6 (17th Floor) |

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on September 17, 2018, at 10:00 a.m. or at such other date as may be agreed upon or ordered, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Audi AG, Audi of America, Inc., Audi of America, LLC, Bayerische Motoren Werke AG, BMW of North America, LLC, BMW (US) Holding Corporation, Daimler AG, Daimler North America Corporation, Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., Mercedes-Benz Vans, LLC, Dr. Ing. h.c. F. Porsche AG, Porsche Cars North America, Inc., Volkswagen AG, and Volkswagen Group of America, Inc. will and hereby do move this Court to dismiss the Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint, (Dkt. 241), and the Consolidated Direct Purchaser Class Action Complaint, (Dkt. 244). This Motion is made pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1), and 12(b)(6), and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, all pleading and papers filed herein, oral argument of counsel, and any other matter that may be considered by this Court on this Motion.

# TABLE OF CONTENTS


PAGE

**I. SUMMARY OF ARGUMENT ..... 1**

**II. SUMMARY OF RELEVANT ALLEGATIONS ..... 5**

**A.** The Parties ..... 5

**B.** The Conduct and Claims Alleged ..... 6

**1.** Convertible Soft-Tops ..... 7

**2.** The Size of AdBlue Tanks ..... 8

**3.** Steel Prices ..... 9

**C.** Alleged Market for "German Passenger Vehicles" ..... 9

**1.** Market Definition ..... 10

**2.** Defendants' Alleged Market Power ..... 11

**D.** Purported Evidence of Collusion ..... 12

**E.** Harm to Plaintiffs ..... 13

**III. LEGAL STANDARD ..... 14**

**IV. ARGUMENT ..... 15**

**A.** By Failing To Allege How the Challenged Conduct Reduced Competition or Injured Them, Plaintiffs Have Failed To Plead Both Antitrust Injury and Article III Standing ..... 15

**1.** Legal Standards ..... 17

**a.** Antitrust Standing ..... 17

**b.** Article III Standing ..... 18

**2.** Plaintiffs Do Not Plausibly Allege Antitrust Injury or Injury-in-Fact Based on the Alleged Conspiracy to Reduce Innovation ..... 19

**3.** Plaintiffs Do Not Plausibly Allege Antitrust Injury or Injury-in-Fact from Supracompetitive Pricing ..... 23

**4.** Plaintiffs Do Not Plausibly Allege Antitrust Injury Based on the Alleged Conduct Aimed at Suppliers ..... 24

**5.** Plaintiffs' Alleged Damages Are Too Indirect, Speculative, and Difficult to Apportion To Support

Antitrust Standing ........ 25

**B.** The Plaintiffs' Federal and State Claims Are Barred by the FTAIA ........ 28

**1.** The Complaints Do Not Allege Restraints on "Import Commerce" ........ 29

**2.** The Complaints Do Not Allege U.S. Effects That Are the Immediate Consequences of a Foreign Restraint ........ 32

**3.** Congress' Direction that U.S. Courts Cannot Police Conduct like that Alleged Here Does Not Mean that Such Conduct Goes Unregulated ........ 36

**C.** Plaintiffs Do Not Plausibly Allege that Defendants Have Market Power, an Element of Their Claims Under the Rule of Reason ........ 37

**1.** The Rule of Reason Applies to the Conduct Alleged Here ........ 37

**2.** Failure To Allege a *Per Se* Violation Requires Dismissal of Plaintiffs' Complaints ........ 40

**3.** The Complaints Do Not Allege Market Power in a Well-Defined Antitrust Market ........ 40

**a.** IPPs Ignore Reasonable Interchangeability and Instead Posit a World in Which Consumers Consider Only Buying German Cars ........ 41

**4.** IPPs Do Not Plausibly Allege Defendants Have Market Power ........ 46

**D.** Plaintiffs' Claims Are Largely Time-Barred ........ 48

**1.** The "Discovery Rule" Does Not Apply ........ 49

**2.** Fraudulent Concealment Allegations Do Not Solve Plaintiffs' Pleading Problem ........ 50

**E.** IPPs' State Law Claims Should Be Dismissed ........ 54

**1.** IPPs' State Antitrust Law Claims Should Be Dismissed ........ 54

**a.** Two States Do Not Permit Indirect Purchasers To Bring Private Antitrust Claims ........ 55

**b.** Two States Do Not Permit Indirect Purchasers To Bring Private Antitrust Class Actions ........ 55

c. Six States' *Illinois Brick* Repealer Statutes Have No Retroactive Effect........ 56

d. Two States' Laws Apply Only to Intrastate Commerce ........ 56

2. IPPs' State Consumer Protection Claims Should Be Dismissed ........ 56

a. IPPs Cannot Use Consumer Protection Claims To Circumvent Bars to Recovery Under State Antitrust Law ........ 57

b. IPPs Do Not Adequately Plead Proximate Causation........ 57

c. IPPs' State Law Consumer Protection Claims Have Additional Deficiencies ........ 58

d. IPPs Do Not Plead Price Discrimination Under Hawaii Law ........ 60

3. IPPs' State Unjust Enrichment Claims Should Be Dismissed ........ 60

a. IPPs Cannot Employ Unjust Enrichment Claims To Circumvent the Requirements of State Antitrust and Consumer Protection Law........ 61

b. Eleven States Require IPPs To Confer a Direct Benefit upon Defendants........ 62

**V. CONCLUSION........ 62**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) .......... 41

*In re Aftermarket Filters Antitrust Litig.*,
No. 08 C 4883, 2010 WL 1416259 (N.D. Ill. Apr. 1, 2010) .......... 62

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) .......... 38

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) .......... 58

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
190 F.3d 1051 (9th Cir. 1999) .......... 17, 25, 26

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) .......... 17, 18

*Amarel v. Connell*,
202 Cal. App. 3d 137 (1988) .......... 29

*In re Animation Workers Antitrust Litig.*,
123 F.Supp.3d 1175 (N.D. Cal. 2015) .......... 53

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) .......... 49, 52

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......... *passim*

*Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper*,
746 So. 2d 966 (Ala. 1999) .......... 56

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 15

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) .......... 17, 18, 26, 27

*In re ATM Fee Antitrust Litig.*,
768 F. Supp. 2d 984 (N.D. Cal. 2009) .......... 14

*Autohaus Acquisitions, Inc. v. Audi AG et al.*,
No. 2:17-cv-07536-MCA-MAH (D.N.J. Sept. 27, 2017) .......... 48

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) .......... 23

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) .......... 14, 15, 17

*Beneficial Standard Life Insurance Co. v. Madariaga*,
851 F.2d 271 (9th Cir. 1988) .......... 49

*Bhan v. NME Hospitals, Inc.*,
772 F.2d 1467 (9th Cir. 1985) .......... 25

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991) .......... 39

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) .......... 18, 37

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......... 15, 18

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) .......... 57

*Brown Shoe Co v. United States*,
370 U.S. 294 (1962) .......... 47

*Cal. Dental Ass'n v. F.T.C.*,
224 F.3d 942 (9th Cir. 2000) .......... 38

*In re Capacitors Antitrust Litig.*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 21

*In re Capacitors Antitrust Litig.*,
No. 14-CV-03264-JD, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016) .......... 29, 31

*Christy v. Miulli*,
692 N.W.2d 694 (Iowa Sup. Ct. 2005) .......... 51

*In re Circuit Breaker Litig.*,
984 F. Supp. 1267 (C.D. Cal. 1997) .......... 38

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
851 F.2d 478 (1st Cir. 1988) ........ 38

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
858 F.2d 499 (9th Cir. 1988) ........ 52, 53

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ........ 22

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
363 F.3d 761 (8th Cir. 2004) ........ 39

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........ 55, 59, 61

*Disenos Artisticos E. Industriales, S.A. v. Work*,
714 F. Supp. 46 (E.D.N.Y. 1989) ........ 44

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ........ 19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........ 27, 60

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ........ 25

*E & E Co. v. Kam Hing Enterprises, Inc.*,
No. C-08-0871 MMC, 2008 WL 1924905 (N.D. Cal. Apr. 29, 2008) ........ 40

*Easter v. Am. W. Fin.*,
381 F.3d 948 (9th Cir. 2004) ........ 19, 23

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992) ........ 46

*Epstein v. C.R. Bard, Inc.*,
460 F.3d 183 (1st Cir. 2006) ........ 50

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004) ........ 28, 36, 37

*F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*,
No. 03-724, 2004 WL 226388 (U.S. Feb. 3, 2004) ........ 36, 37

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ........ 41

*Falstaff Brewing Co. v. Stroh Brewery Co.*,
628 F. Supp. 822 (N.D. Cal. 1986) .......... 40

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) .......... 23

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......... 55

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) .......... 19, 23

*Fox v. City of Pompano Beach*,
984 So.2d 664 (Fla. Dist. Ct. App. 2008) .......... 51

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) .......... 24

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
No. 12-CV-02432-WYD-KMT, 2015 WL 4036319 (D. Colo. July 1, 2015) .......... 60

*Gaebler v. New Mexico Potash Corp.*,
676 N.E.2d 228 (Ill. App. Ct. 1996) .......... 57

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) .......... 49

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) .......... 17

*Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*,
18 N.Y.3d 722 (N.Y. 2012) .......... 29

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) .......... 42

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......... 13, 21, 59

*Green Country Food Market, Inc. v. Bottling Group*,
371 F.3d 1275 (10th Cir. 2004) .......... 44

*Guerrero v. Gates*,
442 F.3d 697 (9th Cir. 2006) .......... 49, 51

*Cal ex rel. Harris v. Safeway*,
651 F.3d 1118 (9th Cir. 2011) ........................................................................ 39

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ........................................................................... 47

*Hexcel Corp. v. Ineos Polymers, Inc.*,
681 F.3d 1055 (9th Cir. 2012) ................................................................. 49, 53, 54

*Hicks v. PGA Tour, Inc.*,
165 F. Supp. 3d 898 (N.D. Cal. 2016) ........................................................... 42, 46

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................................ 56

*In re Intel Corp. Microprocessor Antitrust Litig.*,
476 F. Supp. 2d 452 (D. Del. 2007) ................................................................. 29

*Intermedics, Inc. v. Ventritex, Inc.*,
775 F. Supp. 1258 (N.D. Cal. 1991) ................................................................. 22

*Japan Line, Ltd. v. Los Angeles Cty.*,
441 U.S. 434 (1979) .................................................................................... 28, 29

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ............................................................. 47

*Kaufman v. BMW AG et al.*,
No. 13:7-cv-05787-CRB (D.N.J. July 25, 2017) ................................................. 48

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ................................................................... *passim*

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ........................................................................................ 48

*Kruman v. Christie's International PLC*,
284 F.3d 384 (2d Cir. 2002) ....................................................................... 31, 32

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ........................................................................................................ 60

*Laughlin v. Evanston Hosp.*,
550 N.E.2d 986 (Ill. 1990) ................................................................................ 57

*Lauter v. Anoufrieva*,
642 F. Supp. 2d 1060 (C.D. Cal. 2009) .......... 51

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) .......... 22

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 18, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) .......... 58

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) .......... 55

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
No. 13-CV-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) .......... 26, 55

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
275 F.3d 762 (9th Cir. 2001) .......... 41

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 15, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) .......... 19, 23

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
339 F.3d 1087 (9th Cir. 2003) .......... 62

*Minn-Chem, Inc. v. Agrium, Inc.*,
683 F.3d 845 (7th Cir. 2012) .......... 30

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) .......... 43

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......... 25

*Nat'l Soc. of Prof'l Engineers v. United States*,
435 U.S. 679 (1978) .......... 37

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 40, 43, 46

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) .......... 61

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2015) ........................................................................ 18

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
967 F. Supp. 2d 1347 (N.D. Cal. 2013) .......................................................... 40

*In re Packaged Seafood Prod. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) .......................................................... 61

*In re Packaged Seafood Products Antitrust Litig.*,
277 F. Supp. 3d 1167 (S.D. Cal. 2017) .......................................................... 55

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*,
522 F.3d 1049 (9th Cir. 2008) ........................................................................ 50

*Pomerantz v. Microsoft Corp.*,
50 P.3d 929 (Colo. Ct. App. 2002) .................................................................. 55

*Porter v. Spader*,
239 P.3d 743 (Ariz. Ct. App. 2010) ................................................................ 51

*ProMedica Health Sys., Inc. v. F.T.C.*,
749 F.3d 559 (6th Cir. 2014) .......................................................................... 43

*Rattlesnake Coal. v. E.P.A.*,
509 F.3d 1095 (9th Cir. 2007) ........................................................................ 14

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................................... 46

*In re Refrigerant Compressors Antitrust Litig.*,
No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ......................... 62

*Sanford v. MemberWorks, Inc.*,
625 F.3d 550 (9th Cir. 2010) .......................................................................... 59

*Schwartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) .......................................................................... 51

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ........................................................ 57, 61

*Smith v. Kohlweiss, Inc.*,
No. C 11-00239 SBA, 2012 WL 1156338 (N.D. Cal. Mar. 30, 2012) ........................ 49

*Soliman v. CVS RX Servs.*,
570 F. App'x 710 (9th Cir. 2014) .......... 49

*Somers v. Apple*,
729 F.3d 953 (9th Cir. 2013) .......... 20

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .......... 18, 23

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) .......... 19, 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-01819 CW, 2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) .......... 3, 29

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007) .......... 22

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 25

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd* 895 F.2d 1417 (9th Cir. 1990) .......... 43, 45, 48

*Takhar v. Kessler*,
76 F.3d 995 (9th Cir. 1996) .......... 18

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) .......... 15

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) .......... 41

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006) .......... 37, 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. C 10-4945 SI, 2011 WL 3738985 (N.D. Cal. Aug. 24, 2011) .......... 56

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) .......... 61

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. C 09-4997 SI, 2010 WL 2609434 (N.D. Cal. June 28, 2010) .......... 14

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .......... 38

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
No. C 07-05634 CRB, 2011 WL 1753738 (N.D. Cal. May 9, 2011) .................. *passim*

*United States v. Cont'l Can Co.*,
378 U.S. 441 (1964) .................................................................................. 43

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ............................................................................ 41, 44

*United States v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013) ................................................. 40

*United States v. Hsiung*,
778 F.3d 738 (9th Cir. 2015) ............................................... 28, 30, 31, 34

*United States v. Joseph Schlitz Brewing Co.*,
253 F. Supp. 129 (N.D. Cal.), *aff'd sub nom. Jos. Schlitz Brewing Co. v. United States*, 385 U.S. 37 (1966) ................................................................ 47

*United States v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004) ............................................................ *passim*

*Universal Grading Serv. v. eBay, Inc.*,
No. C-09-2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), *aff'd sub nom. Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571 (9th Cir. 2014) ................................................................................. 40

*In re Vitamins Antitrust Litig.*,
No. 1285, 2000 WL 1511376 (D.D.C. Oct. 6, 2000) ................................. 56

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) ............................................................ 51, 52

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................................................................. 18

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
865 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................................... 38

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ............................................................ 15, 18

*In re Wiring Device Antitrust Litig.*,
498 F. Supp. 79 (E.D.N.Y. 1980) ............................................................ 56

*Xerox Corp. v. Media Scis., Inc.*,
660 F. Supp. 2d 535 (S.D.N.Y. 2009) ..................................................... 47

## STATUTES


15 U.S.C. § 6a(1)(A) .......... 3

15 U.S.C. § 6a .......... 28

15 U.S.C. § 15(b) .......... 48

15 U.S.C. § 15b .......... 49

Ala. Code § 8-19-14 .......... 54

Haw. Rev. Stat. § 481-1 .......... 60

Minn. Stat. § 325F.69(1) .......... 58

N.Y. Gen. Bus. L. § 349 .......... 59

Tenn. Code Ann. § 47-18-110 .......... 54

Utah Code Annotated §§ 13-11-4 .......... 58


## RULES


Fed. R. Civ. P. 9(b) .......... 51, 58


## TREATISES


Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011) .......... 61


## REGULATIONS


77 Fed. Reg. 488 (2012) .......... 8


## OTHER AUTHORITIES


Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Application*, (3rd & 4th eds. 2010-2017) .......... 38

*BMW X5 xDrive35d and BMW 335d To Make US Debut*, BMW GROUP (Jan. 2, 2008), https://www.bmwusfactory.com/bmw_articles/bmw-x5-xdrive35d-and-bmw-335d-to-make-us-debut/; .......... 22

Chris Tutor, *Fortune offers 10 reasons why German cars rule*, Fortune (July 2, 2012, 5:59 PM), https://www.autoblog.com/2012/07/02/fortune-offers-10-reasons-why-german-cars-rule/) .......... 45

*Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017), https://magazin.spiegel.de/SP/2017/30/152270400/index.html (English version: http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html) ........................... 45

IB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2013) §272i ........................................................................................................ 30

Jonathan M. Jacobson & Gary J. Dorman, *Joint Purchasing, Monopsony and Antitrust*, 36 Antitrust Bulletin 1, 4 (March 1, 1991) .......................................... 25

*Mercedes-Benz S-Class Drops Its Top, Top In Germany*, J.D. POWER (September 8, 2015), http://www.jdpower.com/cars/articles/car-news/2017-mercedes-benz-s-class-cabriolet-drops-its-top-germany .......................... 20

Richard A. Posner, Antitrust Law: An Economic Perspective 248 (1976)....................... 24

*Technical Data*, DAIMLER, http://media.daimler.com/marsMediaSite/en/instance/ko/Technical-data.xhtml?oid=15775157 (last visited May 17, 2018) ............................................... 22

Timothy Cain, U.S. Auto Sales Brand Rankings – 2016 Year End, goodcarbadcar.net (Jan. 4, 2017), http://www.goodcarbadcar.net/2017/01/usa-2016-auto-brand-sales-results-rankings/)........................................................................................... 45

*US Media Information Technical Data 2016 BMW X5*, BMW, https://www.press.bmwgroup.com/usa/article/attachment/T0222782EN _US/356972 .......................................................................................................... 22

*US Media Information Technical Data 2017 BMW X3*, BMW, https://www.press.bmwgroup.com/usa/article/attachment/T0165887EN _US/364328 .......................................................................................................... 22

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether Indirect Purchaser Plaintiffs' ("IPPs") and Direct Purchaser Plaintiffs' ("DPPs") (collectively, "Plaintiffs") Complaints should be dismissed for lack of subject-matter jurisdiction and failure to adequately allege a claim for relief, including because of their failure to allege injury-in-fact and antitrust injury?

2. Whether IPPs' and DPPs' allegations of alleged anticompetitive conduct by Defendants in Germany during the automotive pre-design and design phase satisfies this Circuit's definition of a "direct" effect under the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA")?

3. Whether IPPs' and DPPs' claims should be dismissed for failure to plausibly plead a relevant market and market power?

4. Whether IPPs' and DPPs' claims are time-barred?

5. Whether IPPs have sufficiently pleaded all elements of their state law claims?

* * *

## I. SUMMARY OF ARGUMENT

The two Complaints in this antitrust case are based on articles from the German magazine *Der Spiegel*, which alleged in sensationalized terms that certain German automobile manufacturers engaged in numerous technical exchanges over the years that had the effect of limiting innovation competition. Two examples of this so-called "reduced innovation" were provided by *Der Spiegel*, and they are the only two examples in the Complaints: (1) an alleged agreement about the size of "AdBlue" tanks used in diesel vehicles; and (2) an alleged agreement to limit the speed at which one is able to raise or lower a convertible soft-top. Neither allegation suggests any meaningful impairment of "innovation," and neither provides a reasoned basis for pleading a class action that would encompass *every purchaser of German cars in the United States*—the vast majority of whom never purchased a diesel vehicle, much less did so with an eye to the size of an AdBlue tank, or purchased a soft-top convertible, especially with a desire to

raise and lower the top at high speeds. Plaintiffs then add to this "innovation" theory allegations about a completely separate conspiracy—a conspiracy to buy steel at unreasonably *suppressed* prices—something that on its face would *benefit* both IPPs and DPPs if it in fact happened.

On this frail foundation, IPPs and DPPs seek to support a very broad case under Section 1 of the Sherman Act, alleging in conclusory fashion—because that's all *Der Spiegel* did too—that the five automakers (evocatively referred to as the "Circle of Five" in the magazine articles) have conspired to constrain innovation for more than 20 years. Plaintiffs' obvious strategy is to use the *Der Spiegel* articles as the proverbial camel's nose under the tent—wedging their way into time-consuming and expensive discovery in hopes of finding actual anticompetitive conduct.

The Complaints are defective in numerous respects, briefly summarized here:

*First*, Plaintiffs' wholly fail to plead a coherent connection between any identified restraint on competition and any cognizable injury resulting therefrom. The problems arise at the beginning of the causal chain with the alleged restraint of trade itself, which, save for the AdBlue tank sizes and convertible soft-top examples, is not identified with even minimal specificity. It is just "reduced innovation" generally, which does not even give Defendants fair notice under Rule 8 as to what this case is about. But the more serious deficiency is at the back end of the causal chain, where Plaintiffs' allegations of consumer injury are nonexistent.

Private antitrust cases such as these are all about the alleged economic injuries to the putative classes. At the Article III threshold, Plaintiffs must allege standing based on *personal* injury, and under the Clayton Act and its state counterparts, a plaintiff must allege a plausible, fact-based theory of economic injury to herself of the type that flows from what makes the challenged conduct an antitrust violation—*i.e.*, "antitrust injury." The Complaints are indifferent to these requirements. The pleadings offer *no* theory as to how either IPPs (consumers) or DPPs (dealers) suffered any economic injury from the alleged conduct. Even with respect to the most specific allegations in the Complaints

about AdBlue tank sizes, convertible tops or steel purchasing, there is no explanation of how those alleged restraints caused personal, economic injury to consumers or dealers—much less to *all* of them. No IPP claims that he or she focused on AdBlue tank sizes when considering a diesel vehicle, or on the top's deployment speed when considering a convertible. Similarly, no dealer Plaintiff alleges it would have sold more cars or yielded higher profits had either of those features differed. And the alleged conspiracy to *lower* the price of a key input (steel) is not tied to any economic injury to Plaintiffs, who should welcome cars made with less expensive steel.

It is unfair and contrary to law to allow an antitrust case to proceed on such ill-defined injury allegations. Each Plaintiff is required to plead her own standing, and the broader injury allegations must have enough content to allow Defendants to comprehend the theory and test it under the "antitrust injury" and related doctrines. These Complaints fall short of those standards.

*Second*, the Complaints attack conduct—alleged agreements in Germany to limit innovation and coordinate purchasing—that is beyond the reach of U.S. federal and state antitrust law. Under the FTAIA, 15 U.S.C. § 6a(1)(A), non-import foreign conduct is actionable under the Sherman Act only if (as relevant here) it has "a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce in the U.S. The same limitation applies to state antitrust laws. *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5477313, at *4 (N.D. Cal. Dec. 31, 2010). An agreement to limit innovation overseas is not a restriction of import commerce. And, in this Circuit, the law is settled that overseas agreements that allegedly restrict innovation—even with respect to products destined for import—cause only an indirect effect and thus are not actionable under U.S. antitrust laws. *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004). Both Complaints, therefore, are barred by the FTAIA.

*Third*, the Complaints do not state Sherman Act causes of action because the conduct they allege is not *per se* illegal, and they fail to plead any coherent and legally

sufficient market power theory, as required under the Rule of Reason. Viewed most charitably, the Complaints assert that Defendants engaged in a long-term pattern of technical collaboration akin to private standard-setting. Because such collaboration is frequently pro-competitive, antitrust law assesses it under the Rule of Reason, not the *per se* rule reserved for naked restraints of trade such as price-fixing and market allocation. Under the Rule of Reason, Plaintiffs must plead that Defendants collectively have market power in a relevant antitrust market. Without market power, any agreements Defendants allegedly might reach "limiting innovation" could not harm competition because consumers would pass up the less innovative vehicles for competitive alternatives from automobile manufacturers in England, Japan, the United States, and elsewhere.

To meet the market power requirement, Plaintiffs posit a bizarre "market" limited to "German passenger vehicles"—a market that includes every German car from a $19,000 VW Jetta to a $250,000+ Porsche or Mercedes-Benz, but *excludes every* non-German car across that expansive price, feature, and quality spectrum. Defining a relevant market so Defendants compete *only with one another* is convenient for Plaintiffs (as it necessarily gives Defendants 100% of the "market"), but it lacks any foundation in the law (or reality) and need not be accepted, even on a motion to dismiss. Because Plaintiffs cannot plead a plausible antitrust market in which Defendants have the ability to exercise market power, the case cannot proceed.

*Fourth*, the four-year statute of limitations bars Plaintiffs' federal antitrust conspiracy claims based on conduct before September 27, 2013 (DPPs) and July 25, 2013 (IPPs). The discovery rule does not apply to federal antitrust claims or to many of IPPs' state law claims. And Plaintiffs' vague fraudulent concealment allegations do not allow them to sidestep these time bars when their belated claims rely on public information they have long known.

*Fifth* and finally, the dozens of state law claims added by IPPs in an effort to plead around the clear inadequacy of their indirect claims for damages should be dismissed.

Such claims are either invalid on their face or deficient for the same reasons that Plaintiffs' federal antitrust law claims fail.

## II. SUMMARY OF RELEVANT ALLEGATIONS

### A. The Parties

Defendants Audi AG, BMW AG, Daimler AG, Dr. Ing. H.c. F. Porsche AG, and Volkswagen AG (the "German Defendants") are German car manufacturers with their principal places of business in Germany. (IPP ¶¶ 53-66; DPP ¶¶ 15-36.)[1] Defendants Audi of America, Inc., Audi of America, LLC, BMW of North America, LLC, BMW (US) Holding Corp., Daimler North America Corporation, Mercedes-Benz U.S. International, Inc., Mercedes-Benz USA, LLC, Mercedes-Benz Vans, LLC, Porsche Cars North America, Inc., and Volkswagen Group of America, Inc. are U.S. entities, each a subsidiary of one of the German Defendants. (IPP ¶¶ 53-66; DPP ¶¶ 15-36.) Most of Defendants' named affiliates manufacture or distribute a broad range of vehicles, including "cars, SUVs, passenger vans, and light-duty trucks." (IPP ¶ 4.) Although not named as Defendants, IPPs identify as purported "co-conspirators" Robert Bosch GmbH and Robert Bosch LLC (together, "Bosch"), entities that manufacture, develop and supply automotive parts to car manufacturers (*id.* ¶¶ 67-71), and numerous other unnamed persons who allegedly "performed acts and made statements in furtherance" of the alleged conspiracy. (*Id.* ¶¶ 72-73.)

IPPs claim to be U.S.-based indirect purchasers and lessees of new passenger vehicles manufactured or sold by one or more of the Defendants. (*Id.* ¶ 245.) DPPs claim to be U.S.-based direct purchasers of vehicles manufactured by one or more of the Defendants, (DPP ¶ 129), and describe themselves as licensed and authorized dealers of vehicles manufactured and sold by Defendants. (*Id.* ¶ 3.) Both IPPs and DPPs purport to assert claims on behalf of nationwide classes of persons and entities they claim are

---

[1] Defendants cite the Consolidated Direct Purchaser Class Action Complaint, (Dkt. 244), and the Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint, (Dkt. 241) (collectively, the "Complaints"), as "DPP ¶ X" and "IPP ¶ X," respectively.

similarly situated. (*Id.* ¶ 129; IPP ¶ 245.) IPPs also purport to assert claims on behalf of 24 additional classes of indirect purchasers in particular states. (IPP ¶ 246.)

**B. <u>The Conduct and Claims Alleged</u>**

Although their underlying theories of competitive harm diverge, the Complaints both allege that Defendants violated Section 1 of the Sherman Act, and in the IPPs' case, various state antitrust, unfair competition, and consumer-protection laws, by agreeing (in essence) to reduce technical innovation with respect to their vehicles, while failing to pass the resulting savings on to purchasers. (*Id.* ¶¶ 1-3, 12; DPP ¶¶ 1-2, 69, 123-25.) The theory is based almost entirely on a few magazine articles, from which Plaintiffs quote liberally (but selectively).

The broad theme is that the German Defendants allegedly carried out the scheme in the course of thousands of meetings over many years that were intended to coordinate on technical development, costs, supplier specifications, and other issues relating to the pre-design and design of their vehicles. (*See, e.g.*, IPP ¶¶ 3, 123, 128; DPP ¶ 4.) It is a very strange antitrust conspiracy in at least two respects.

*First*, it bears none of the hallmarks of a secretive, opaque scheme of the kind typically described to support of antitrust claims. To the contrary, Plaintiffs allege it was conducted in the open over decades and thousands of meetings (whose existence was allegedly known to competitors and others), and included meetings held under the auspices of industry associations that attracted broad participation by suppliers and others not named as defendants. (IPP ¶¶ 67-71, 72-73, 93 n.15, 192, 196, 198(a)-(s); DPP ¶ 106.)

*Second*, a conspiracy to reduce innovation is illogical, as it would negate any hard-earned competitive advantages the German Defendants developed over other carmakers. DPPs, for example, contend that the conspiracy arose "in or around 1995, at a time when Japanese automotive manufacturers were making gains in the U.S. market for passenger vehicles, thanks at least in part to [their] technological advancements. . . ." (DPP ¶ 76; *see also* IPP ¶ 144 (competition with Japanese companies to curtail pollutants.).) And the

IPPs allege that Defendants' success depends on consumers perceiving "the virtues of German engineering" (IPP ¶ 87), which was obviously intended to differentiate their products from those of automobile manufacturers in other countries. A cartel to *reduce innovation* would, according to Plaintiffs' own allegations, exacerbate the problem that allegedly led to the formation of the "cartel" in the first place, and eliminate the alleged technical superiority of German cars that Plaintiffs say Defendants used – and needed – to differentiate their products. None of this makes sense.

The Complaints are notably devoid of specifics, never backing up with facts the broad contention that the purported agreement among Defendants covered "virtually every aspect of automotive development and manufacturing [including] . . . mechanical components, brake control systems, seat systems, air suspension, clutches, gasoline engines, diesel engines, and emissions technology." (DPP ¶ 79; *see also* IPP ¶ 123.) In fact, only three supposed agreements are described at any length; the description of each has gaping holes.[2]

**1. <u>Convertible Soft-Tops</u>**

Plaintiffs repeat *Der Spiegel's* claim that Defendants, after discussing safety concerns like "technical risks[] and crash issues," agreed not to produce convertible soft-tops (Plaintiffs allege nothing about hard-tops) that could be opened at speeds in excess of 30 miles per hour. (IPP ¶ 138; *see also* DPP ¶ 86.) Neither Complaint alleges that consumers *want* to have the ability to open convertible soft-tops at speeds above 30 miles per hour, and the safety-related downsides of attempting to do so would seem apparent. Nor do the Complaints explain why it would have been anticompetitive for automakers to discuss a reasonable standard for convertible tops designed to promote safe operation, thereby freeing up R&D and other resources for vigorous competition on features that

---

[2] We note, but will not discuss further, IPP's contention (based on yet another press article) that Defendants "worked closely together to generate now-debunked 'science'" to promote their diesel vehicles. (IPP ¶ 178.) IPPs do not claim these scientific studies increased the prices of Defendants' vehicles. Indeed, the study described by IPPs is not alleged to have been published, so there is no basis to suggest that its findings affected customers in any respect. (*Id.* ¶¶ 179-81.)

consumers (and dealers) *do* value. But more fundamentally, neither Complaint alleges how this alleged agreement meaningfully affects the value of the cars, thus supporting some manner of an overcharge claim.

**2. <u>The Size of AdBlue Tanks</u>**

The Complaints also repeat the *Der Spiegel* claim about a supposed conspiracy to restrict innovation in one prosaic aspect of diesel emission systems. The purported "innovation" is not anything to do with the science of reducing emissions, but rather the size of the tanks used to store the ammonia-based solution (frequently sold under the trade name "AdBlue") that helps to reduce nitrogen oxid emissions. (*See* IPP ¶¶ 144-46; DPP ¶ 83.) Plaintiffs claim there were successive anticompetitive agreements—in 2006, 2008, and 2010 (IPP ¶¶ 11, 151-52, 155)—to limit the size of AdBlue tanks because larger tanks would have taken up too much space in vehicles and been too costly. (*Id.* ¶ 148.)[3]

Again, there are no allegations explaining how this is supposed to have affected competition or caused supracompetitive pricing for diesel-powered cars, let alone for German vehicles generally, the vast majority of which are not diesels. And importantly, there are no allegations that any Defendant (much less all of them) acted in conformity with some supposed "agreement," which is notable in light of the U.S. regulation, in effect throughout most of the relevant time period, that *required* diesel vehicles to carry a specified amount of AdBlue—specifically, enough to last through the advertised interval for oil changes. *See* 77 Fed. Reg. 488. Plaintiffs' failure to plead anything about AdBlue tank uniformity is also curious because AdBlue tank sizes, of course, are no secret. The specifications for diesel vehicles typically state the AdBlue tank size, and public information about AdBlue tank sizes is easily accessible through a "Google" search.

---

[3] DPPs do not provide supporting factual allegations about the purported agreement over AdBlue tank sizes; they merely state that Audi 'warned other Defendants' not to increase AdBlue tank sizes in May 2014, without describing the nature or timing of any alleged agreement. (DPP ¶ 84.)

Plaintiffs must, therefore, be pleading around the facts, which are that there never was anything approaching uniformity in actual tank sizes across Defendants.

### 3. **Steel Prices**

The Complaints—again relying exclusively on press accounts—allege that, starting in the 1990s, Defendants colluded to combat fluctuating steel prices by adopting a standard pricing model for a portion of the cost of *buying* certain types of steel used in the production of their vehicles. (IPP ¶¶ 164-77; DPP ¶ 87.) The Complaints also allege "an investigation into collusion in the German steel industry." (IPP ¶ 132.) There is nothing to suggest that such an agreement, if it occurred, had the effect of *raising* the price Defendants paid for steel or the ultimate prices of Defendants' vehicles. To the contrary, the Complaints concede that the alleged agreement allowed Defendants to "contain their costs," (*id*. ¶ 177), and achieve "cost savings." (DPP ¶ 87.) The Complaints offer no explanation as to how any of this activity harmed consumers or dealers. (*See id*. ¶¶ 92-94.)[4]

## C. **Alleged Market for "German Passenger Vehicles"**

Plaintiffs implicitly concede that their claims are subject to the Rule of Reason by alleging elements of a full Rule of Reason analysis, including the existence of market power. Both Complaints assert the same basic market power theory: that there is a distinct antitrust market for *German* passenger vehicles, which by Plaintiffs' definition, the German Defendants dominate.

---

[4] DPPs include a chart purporting to compare the profit margins of German and Japanese automakers over a portion of the DPP Class Period, (DPP ¶ 97), ostensibly to show that Defendants were able to maintain stronger margins than their Japanese counterparts during a 2008 increase in steel prices, and did so solely as a result of an unlawful agreement. (*Id*. ¶ 98.) As that chart shows, however, Japanese automakers achieved higher profit margins for a significant portion of the DPP Class Period, and DPPs fail to plead facts suggesting that the difference in margins was attributable to changes in the price of steel, or any corresponding agreement, as distinct from numerous other microeconomic and macroeconomic factors that affected the global automobile industry during the DPP Class Period.

### 1. **Market Definition**

IPPs allege the existence of a "U.S. market for German passenger vehicles." (IPP ¶ 4 (defining "German Passenger Vehicles" as "new passenger vehicles (*e.g.*, cars, SUVs, passenger vans, and light-duty trucks) manufactured or sold by Defendants"), ¶ 84 (alleging market for German Passenger Vehicles).)[5] Similarly, DPPs allege that "Defendants dominate the market for German-manufactured passenger vehicles." (DPP ¶ 63.)

IPPs claim that German passenger vehicles are closer substitutes for one another than for non-German passenger vehicles, and therefore constitute their own differentiated market. (IPP ¶ 217; *see also* DPP ¶¶ 67-68.) The primary reason Plaintiffs give for this differentiation is in tension with the Complaints' core theory that Defendants suppressed innovation competition: German passenger vehicles enjoy a "perceived superiority" because they long "have been regarded as among the best vehicles in the world, renowned for their engineering excellence and cutting-edge technology." (IPP ¶¶ 85-86, 217; *see also* DPP ¶ 67 ("The advertised combination of world-leading engineering—in terms of quality, performance, technology, and luxury—has set German Automobiles apart from the rest of the wider market for passenger vehicles. Defendants understood that purchasers would pay more for premium technology and touted 'German engineering' as a differentiating quality[.]").)

The Complaints do not otherwise try to explain why German-made cars occupy an entirely separate market from those made in Japan, Italy, Korea, the United States, France, the United Kingdom, or Sweden. Nor do the Complaints address the obvious and well-documented substitutability of German cars with cars produced by non-German manufacturers. In fact, the Complaints concede that non-German manufacturers are

---

[5] The gerrymandered nature of this market definition is apparent from the fact that two large German car manufacturers—namely, Ford-Werke GmbH, an indirect, wholly-owned subsidiary of Ford Motor Company ("Ford"), and Opel AG, which was an indirect, wholly-owned subsidiary of General Motors Corporation throughout most of the alleged class period, are excluded from the alleged market.

Defendants' "competitors" (*see, e.g.*, IPP ¶ 87; DPP ¶ 97), allege that German and non-German vehicles compete in many "market segments" (IPP ¶ 228), allege that Defendants view Japanese automakers as longstanding competitive rivals in the U.S. market (DPP ¶¶ 76, 116), and emphasize that Defendants spend billions of dollars in advertising with the express goal of differentiating themselves from non-German competitors. (IPP ¶ 87.) The proposed market also *includes* vehicles that cannot possibly compete with one another simply because they are all made by German companies. Thus, according to Plaintiffs, a $19,000 Volkswagen Jetta would be in the same market as a $150,000 Mercedes-Benz S63 AMG luxury sports sedan, but neither Honda's $19,000 Civic nor Maserati's $130,000 Quattroporte luxury sedan, would be in the same market as the Jetta or the S63 AMG.

### 2. <u>Defendants' Alleged Market Power</u>

Plaintiffs claim that the U.S. market for German passenger vehicles is dominated by Defendants who control "100%" of the market. (IPP ¶¶ 83-84; DPP ¶ 64.) That is circular reasoning. Defendants could not have less than 100% of, or do anything other than "dominate," a "market" defined to include *only products that they manufacture.*

More realistically, the IPPs concede that Defendants' share of the overall U.S. automobile market was just 2.87 to 9.26% between 1996 and 2015, (IPP ¶ 224 & Fig. 9), and that four Defendants controlled less than half of the "luxury sector" in 2017. (*Id.* ¶ 225 & Fig. 10.) IPPs also posit that Defendants historically have controlled the "diesel sector" (*id.* ¶ 226), but that "sector" is not defined, and IPPs neither allege a separate "diesel market" nor explain the significance of the "diesel sector" to the product market they seek to allege.

Plaintiffs do not allege how Defendants were able to exercise any market power, *i.e.*, raise prices or restrict output. At most, IPPs assert—based on nebulous "economic data"—that Defendants' market dominance allowed them to charge a premium for German passenger vehicles, amounting to "additional annual revenue of between $450 million to over $1 billion," or profit margins ranging from 8 to 17%, during the

respective Class Periods. (*Id.* ¶ 228; *see also* DPP ¶ 68.) The market power assertion is implausible, as it is common knowledge that brands like Infiniti, Jaguar, Lexus, Maserati, Range Rover, and Volvo compete head-to-head with vehicles manufactured in Germany.

### D. <u>Purported Evidence of Collusion</u>

While the Complaints are based mainly on the contention that there have been ongoing, formalized "Circle of Five" meetings, they are also peppered with the usual allegations about opportunities to collude through trade associations.[6] It is unclear what Plaintiffs intend those allegations to add, particularly since Plaintiffs concede that the associations they mention encouraged broad participation by German manufacturers, non-German manufacturers, and even suppliers.[7] The Complaints do not allege that the existence of these organizations was a secret, or that their membership was restricted to the Defendants, or how any anti-competitive collusion between Defendants could possibly have taken place in these organizations and on these occasions, given the broad participation which Plaintiffs themselves allege.

The Complaints then point to the pendency of an antitrust investigation by the European Commission ("EC") and Germany's Federal Cartel Office ("FCO") regarding alleged technical coordination among the Defendants. However, Plaintiffs falsely state that EC and FCO leniency applications are "admissions" of cartel activity. (*See* IPP ¶ 8

---

[6] For example, the Complaints allege that Defendants had regular "opportunities" to conspire because their employees met frequently, through industry associations such as the *Verband der Automobilindustrie* ("VDA"); *Abgaszentrum der Automobilindustrie* and *Arbeitsgemeinschaft der Eisen und Metall verarbeitenden Industrie*, to coordinate on various aspects of technological development. (*See*, *e.g.*, IPP ¶¶ 123, 128; DPP ¶ 4.) Neither Complaint asserts that there is anything nefarious—or even unusual—about German vehicle manufacturers participating in trade associations.

[7] *See* IPP ¶ 192 ("According to the VDA's website, '[t]he Research Association of Automotive Technology (FAT) unites all German passenger and commercial vehicle manufacturers as well as numerous suppliers under the auspices of the VDA for the purpose of carrying out pro-competitive joint research.'"), ¶ 196 ("In addition to Defendants, the VDA includes foreign suppliers and foreign-owned carmakers, such as Ford and Opel."), ¶ 198 (VDA's Technical Congress is attended by "several hundred participants from the areas of business, academia, and politics, including ambassadors and delegates of foreign countries"), ¶ 198(a)-(s) (VDA Congresses were attended by professors and government ministers); DPP ¶ 106 (Ford, Opel, Fiat and others were members of the VDA).

(claiming that Volkswagen AG and Daimler AG "have admitted to the ECC and FCO both the existence and purpose of the cartel").) The EC encourages self-reporting *without* any admission of wrongdoing, so long as the information provided facilitates an investigation.[8] And the EC's substantive competition law differs from that in the United States. Thus, allegations that European leniency applications were filed do not imply admissions of unlawful activity. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (holding that the existence of investigations "carries no weight" and is a "non-factor" in pleading an antitrust conspiracy claim).[9]

**E. <u>Harm to Plaintiffs</u>**

Plaintiffs claim they somehow paid inflated prices for vehicles purchased from the Defendants (directly or indirectly) over a period of more than 20 years. (*Id.* ¶¶ 4, 10, 13-52; DPP ¶ 61.)[10] The Complaints offer no explanation of how vehicle prices were inflated; nor is that self-evident. The Circle of Five activities described are akin to standard-setting, are not inherently anticompetitive, and if anything would have *lowered* prices and *enabled* innovation and competition across a wide array of features. It is also not clear how the adoption of safety-enhancing standards like those limiting the speed at which convertible tops open and close would have *any* negative effect on consumers. And, as already noted, any agreement suppressing the price at which Defendants purchased steel should have benefited Plaintiffs.

---

[8] *See* Commission Notice on Immunity from fines and reduction of fines in cartel cases (OJ 2006/C 298/11) Part II, Section A, 8(a) (providing for full immunity to the applicant that "is the first to submit information and evidence which in the Commission's view will enable it to . . . carry out a targeted inspection . . . .").

[9] The Complaints also include allegations about regulatory investigations involving only one or two of the Defendants that have nothing to do with the conduct alleged to give rise to the claims here. (*See e.g.* IPP ¶ 112; DPP ¶ 109.) Any legitimate purpose of these allegations is elusive; in any event they are irrelevant to the question whether Plaintiffs have pleaded cognizable antitrust claims.

[10] Plaintiffs allege different class periods. DPPs allege a class period of "at least" 23 years ("from at least 1995 to the present") ("DPP Class Period"), and IPPs allege a class period of some 22 years (January 1, 1996 through the present) ("IPP Class Period," together with the DPP Class Period, the "Class Periods"). (DPP ¶ 2; IPP ¶ 10.)

## III. LEGAL STANDARD

*Failure to State a Claim.* Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of the pleadings." *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 989 (N.D. Cal. 2009) (Breyer, J.). In the antitrust context, complaints must satisfy Rule 8 by answering "the basic questions: who, did what, to whom (or with whom), where, and when" and must allege facts to support allegations so that they are "more than a conclusory statement." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (citation omitted). Plaintiffs "may not evade antitrust requirements by merely alleging a bare legal conclusion." *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d at 989 (citation omitted). Rather, district courts should "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atlantic v. Twombly*, 550 U.S. 544, 558 (2007) (internal citation and quotation omitted). A complaint fails to state a claim when the factual allegations do not "raise the right to relief above the speculative level." *Id.* at 555.

*Lack of Subject Matter Jurisdiction*. "[T]he party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1102, n.1 (9th Cir. 2007). "A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either 'facially' or 'factually.'" *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2010 WL 2609434, at *3 (N.D. Cal. June 28, 2010) (citation omitted) (granting motion to dismiss for lack of jurisdiction over plaintiff's claims related to products that were sold overseas and subsequently incorporated into plaintiff's products).

*Failure to Allege Fraud with Particularity.* Fraudulent concealment must be pleaded with particularity under Federal Rule of Civil Procedure 9(b), including the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2011 WL 1753738, at *19 (N.D. Cal. May 9, 2011) (Breyer, J.) (citations omitted).

## IV. ARGUMENT

### A. By Failing To Allege How the Challenged Conduct Reduced Competition or Injured Them, Plaintiffs Have Failed To Plead Both Antitrust Injury and Article III Standing

As the Court is aware, what we now call the *Twombly* pleading standard originated from an antitrust conspiracy case, *Twombly*, 550 U.S. 544, which was followed two years later by *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, a plaintiff must allege "enough facts to state a claim that is plausible on its face" and "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 570, 556. For a Sherman Act Section 1 claim, the Ninth Circuit has held that a plaintiff must include allegations of "who, did what, to whom (or with whom), where, and when[.]" *Kendall*, 518 F.3d at 1047. The *Twombly* standard applies to other elements of the Section 1 offense as well, including injury-in-fact and antitrust injury. *See, e.g., Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012); *Tamburo v. Dworkin*, 601 F.3d 693, 699-700 (7th Cir. 2010). In addition, it is the plaintiff's burden to plead clear facts establishing injury-in-fact for Article III standing at the time the lawsuit is filed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992). In the absence of an injury that is sufficient under Article III, dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is appropriate. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Embedded in these pleading requirements is the straightforward notion that an antitrust conspiracy claim must reflect a causally-linked series of elements— an agreement among competitors restraining trade in some specified way, that is presumably implemented by those competitors according to the terms of their agreement, and then creates an adverse effect on competition that causes individual injury to purchasers of goods and services.

In their Complaints, Plaintiffs have pleaded only disconnected links in this "chain." They allege (based on claims repeated from *Der Spiegel*) that Defendants

engaged in a vast, decades-long conspiracy to limit "innovation" on nearly "every" aspect of automotive design, but they only provide two very narrow examples. And they allege injury in equally unbounded and ambiguous terms, suggesting that every German car cost more than it should have as a result of the alleged conspiracy, without explaining how or why. Indeed, Plaintiffs have pleaded both the beginning and the end of the causation chain in conclusory terms only:

- ***At the beginning of the chain,*** Plaintiffs fail almost entirely to specify which design features are at issue or how this purported conspiracy limited innovation. In *Kendall's* terms, the "did what" is conspicuously missing. 518 F.3d at 1047. The exception proves the rule: even in the primary instance for which Plaintiffs attempt to provide some factual description of an alleged agreement among Defendants—AdBlue tank sizes—Plaintiffs still have not pleaded what it is that Defendants purportedly agreed to do as a result of the various discussions referred to in the Complaints.[11]
- ***At the end of the chain,*** Plaintiffs' injury claims are equally vague. Plaintiffs have not told Defendants or the Court how *anyone* was injured by aspects of Defendants' alleged conduct that supposedly made it anticompetitive, let alone how they *each* suffered individual injury from that conduct. The former is a failure to allege antitrust standing. The latter is a more fundamental failure to allege standing under Article III of the Constitution. Both are independent grounds for dismissal.

Of course, these failures are related. It is impossible to plead an injury (or the particular plaintiff who was, in fact, injured) without first identifying the restraint on competition that proximately caused such injury.

*Twombly* does not allow this case to go forward with gaps as fundamental as these. *Twombly* rests on the policy judgment that unless the pleadings "raise a reasonable

---

[11] Plaintiffs also include vague assertions of collusion on steel pricing, but they fail to allege how this could have injured Plaintiffs. *See* p. IV.A.4, *infra*.

expectation that discovery will reveal evidence of illegal agreement," 550 U.S. at 556, the burdens and expenses of discovery and the related *in terrorem* value of forcing defendants to defend themselves in antitrust litigation should be avoided. *Id*. at 558-59. Here, even if we assume *arguendo* that Plaintiffs have sufficiently alleged a long-term pattern of discussions among Defendants on research and design topics, that is a far cry from: (1) a multi-decade conspiracy to limit innovation "encompass[ing] nearly all areas of automobile development," (IPP ¶ 131; *see also* DPP ¶ 86); that (2) *then results* in cognizable antitrust injury to American consumers. Plaintiffs need to plead the terms of the unlawful agreement they allege *and then connect it to individual consumer injury*. They have not even tried to do that, leaving the Complaints deficient as to both antitrust injury and the personal injury-in-fact essential to Article III standing.

**1. <u>Legal Standards</u>**

**a. <u>Antitrust Standing</u>**

As antitrust plaintiffs, IPPs and DPPs must demonstrate that they are "proper part[ies] to bring a private antitrust action." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983)). This is commonly known as a showing of "antitrust standing." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("Only those who meet the requirements for 'antitrust standing' may pursue a claim under the Clayton Act[.]").[12] In the Ninth Circuit, the existence of antitrust standing turns on: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999) (citing *AGC*, 459 U.S. at 535). While no

---

[12] Plaintiffs' state antitrust law claims are deficient for the same reasons—Plaintiffs have not alleged antitrust injury and do not make a showing that the additional factors for antitrust standing set forth in *AGC* weigh in favor of antitrust standing. *See* Section IV.A.5 *infra*.

one factor is dispositive, the Ninth Circuit has noted that: "the nature of the plaintiff's alleged injury is of tremendous significance in determining whether a plaintiff has antitrust standing." *Amarel*, 102 F.3d at 1507 (internal quotation marks omitted).

In assessing the pleadings in light of these factors, the Court must determine whether Plaintiffs have "allege[d] facts that if taken as true would allow them to recover for 'an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Brantley*, 675 F.3d at 1200 (quoting *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999)).

**b. <u>Article III Standing</u>**

The issue of constitutional standing implicates the subject-matter jurisdiction of a federal court; therefore, motions raising lack of Article III standing are properly brought under Federal Rule of Civil Procedure 12(b)(1). *White*, 227 F.3d at 1242. Standing is a threshold question in all cases, including class actions. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996). It is the plaintiff's burden to establish standing at the time the lawsuit is filed. *See Lujan*, 504 U.S. at 569 n.4; *Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996) ("A plaintiff has the burden of establishing the elements required for standing[.]").

To have standing under Article III, Plaintiffs must allege: (1) personal injury (2) "that is fairly traceable" to the Defendants' allegedly unlawful conduct and (3) "likely to be redressed" by the requested relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) ("For Article III purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation.") (internal quotation marks omitted). To meet this burden at the pleadings stage, "the plaintiff must 'clearly. . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). In a class action, each of these elements must be pled personally by each of the named Plaintiffs. They must each "'allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to

which they belong and which they purport to represent.'" *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (quoting *Lewis*, 518 U.S. at 347); *see Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) ("To satisfy the traceability requirement, a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'").

### 2. Plaintiffs Do Not Plausibly Allege Antitrust Injury or Injury-in-Fact Based on the Alleged Conspiracy to Reduce Innovation

Plaintiffs' primary theory of competitive harm is that Defendants secretly agreed to reduce innovation, which: (1) saved research and development costs; and then (2) increased profit margins when those cost savings were not passed on to consumers. (*See* IPP ¶¶ 91-93; DPP ¶¶ 124-25.)[13] But the Complaints contain no plausible theory of how consumers or dealers were harmed, i.e., how or in what respects innovation actually declined, and how, as a result, prices were raised above competitive levels. There is thus no plausible theory of antitrust injury—and no claim. *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015) (antitrust injury requires plausible allegations of "injury . . . resulting from the illegal conduct'") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586 (1986)); *see In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004) ("There must be evidence that the exchanges of information had an impact on pricing decisions.") (internal quotation marks omitted).

The deficiencies start with, and are rooted in, the first link in what we have called the "causal chain"—the failure to plead any cognizable restraint on competition.

As to supposed inhibited – "innovation" – Plaintiffs allege nothing but generalities—that Defendants "made agreements . . . about the development of their vehicles, costs, suppliers and markets[;]" "discussed vehicle development, brakes, petrol

---

[13] Plaintiffs also claim Defendants conspired to control or reduce a component of the price of steel while keeping the savings for themselves. (IPP ¶ 177; DPP ¶ 87.) This is discussed *infra* Section IV.A.4

and diesel engines, clutches and transmissions as well as exhaust treatment systems[;]" "jointly established technical standards and had agreed to use only certain technical solutions in new vehicles[;]" and shared "breakthrough technology" among themselves. (IPP ¶¶ 124, 136 (quotation marks omitted); *see also* DPP ¶¶ 78-80.) One cannot discern a theory of harm to competition, much less understand the basis for each Plaintiff's claim to have suffered injury, from allegations as vague as these. *Cf. Kendall*, 518 F.3d at 1047 (holding that antitrust plaintiffs must allege evidentiary facts sufficient to "give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin"). And, given how the Complaints allege that German vehicles have for over 20 years been "regarded as among the best vehicles in the world, renowned for their engineering excellence and cutting-edge technology," and grew their market share over that period, it is far more plausible that the alleged meetings led to more innovation and better vehicles. (IPP ¶¶ 83, 85.)

The only "innovation" claims alleged with any supporting facts involve allegations that Defendants agreed to: (1) install the same size AdBlue tanks for diesel vehicles; and (2) limit the speed at which convertible soft-tops can be opened while a vehicle is in motion. (IPP ¶¶ 131, 138; DPP ¶¶ 86, 104.) Yet even with respect to these two features, by far the more prominent claim, Plaintiffs fail to allege a plausible starting point for assessing antitrust injury or injury-in-fact.[14]

---

[14] The same is true for Plaintiffs' allegations as to convertible tops. Plaintiffs offer no explanation of why a limitation on the speed at which convertible soft-tops can be opened would have a substantial anticompetitive effect, as opposed to being competitively inconsequential (because consumers do not make purchasing decisions based on the speed at which they can open the top), or consistent with common but noncollusive objectives such as implementing reasonable safety standards or allocating design resources to technologies consumers desire more. *See Somers v. Apple*, 729 F.3d 953, 965 (9th Cir. 2013) (a plaintiff's theory "stops short of the line between possibility and plausibility" where there are other "obvious alternative explanation[s]" for alleged anticompetitive conduct (citation omitted)). In any event, publically available information contradicts Plaintiffs' allegations. *See e.g.*, Christian Wardlaw, *Mercedes-Benz S-Class Drops Its Top, Top In Germany*, J.D. POWER (September 8, 2015), http://www.jdpower.com/cars/articles/car-news/2017-mercedes-benz-s-class-cabriolet-drops-its-top-germany (stating that Daimler's Mercedes-AMG S63 Cabriolet soft-top can be operated at speeds up to 37 miles per hour).

Plaintiffs' allegations of an AdBlue tank size conspiracy are a recycled version of the *Der Spiegel* article, which claims various AdBlue tank discussions at different times over many years. Solely for purposes of this Motion, we must accept the allegation that Defendants talked about the size of AdBlue tanks and even made proposals to one another about AdBlue tank sizes.[15] This was a subject of industry-wide interest, as the use of AdBlue in cars was a new phenomenon and regulators and industry participants were broadly—and publicly—discussing how to develop the infrastructure for AdBlue replenishment. We also accept the allegations that the European Commission and the German competition authority are looking into this issue, although as a matter of law that is of no consequence. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1024 ("The investigation, however, carries no weight in pleading an antitrust conspiracy claim."); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1064 (N.D. Cal. 2015) (same). None of that changes the fact that to meet *Kendall's* "did what" requirement for pleading a conspiracy, (518 F.3d at 1047), and to anchor injury allegations in something tangible, Plaintiffs have to articulate what the anticompetitive agreement to which Defendants adhered (for U.S. vehicles) *actually was*.

Asking for reasonable specificity on the purported agreement as to AdBlue tank sizes is not asking for too much, or for more than *Twombly* requires. IPPs claim to own or lease cars that should embody that agreement, *and DPPs sell and service every model in every year within the scope of this case*. There is also ample public information available about AdBlue tank sizes. If Defendants were adhering to some agreement about AdBlue tank sizes, it would be easy to for Plaintiffs to allege the terms of that

---

[15] The Court can even assume at this stage that the documents Plaintiffs cite concern the United States market, although Defendants believe that assumption is contrary-to-fact. As noted earlier, U.S. regulatory guidance initially required vehicles to carry enough AdBlue so that it could be refilled at, and would not have to be filled before, the oil service interval. It is doubtful that 8- or 12-liter tanks would meet that requirement for most, if not all, of Defendants' U.S.-sold vehicles sold.

agreement because the results would be evident. Plaintiffs' problem is that public information contradicts what they are alleging; AdBlue tank sizes vary widely in size.[16]

At the end of the causation chain (when one moves from "what was agreed" to "how it harmed competition and, by extension, Plaintiffs"), the Complaints' allegations are even worse. Neither pleading contains so much as a single factual allegation explaining how the purported agreement on AdBlue tank sizes or the speed at which convertible soft-tops would operate increased the price of German cars above competitive levels or otherwise injured Plaintiffs. This deficiency is unacceptable, but in a sense it is not surprising: the only two examples of "innovation reduction" Plaintiffs include affected, at best, peripheral features in a minority of cars. Plaintiffs do not even attempt to explain how the challenged conduct affected *non-diesels and non-convertibles*. *See Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1098 (C.D. Cal. 2007) (holding bare allegations of "injury to innovation" insufficient to allege antitrust injury).

---

[16] Daimler's website shows that its vehicles have tank sizes as high as 25 liters—or over *three times* the 8-liter "maximum" supposedly agreed to by Defendants. *Technical Data*, DAIMLER, http://media.daimler.com/marsMediaSite/en/instance/ko/Technical-data.xhtml?oid=15775157 (last visited May 17, 2018). BMW's AdBlue tank sizes vary widely between models, with some having tank sizes of 18.4 liters and others as large as 29 liters. *US Media Information Technical Data 2017 BMW X3*, BMW, https://www.press.bmwgroup.com/usa/article/attachment/T0165887EN_US/364328 (last visited May 16, 2018); *BMW X5 xDrive35d and BMW 335d To Make US Debut*, BMW GROUP (Jan. 2, 2008), https://www.bmwusfactory.com/bmw_articles/bmw-x5-xdrive35d-and-bmw-335d-to-make-us-debut/; *US Media Information Technical Data 2016 BMW X5*, BMW, https://www.press.bmwgroup.com/usa/article/attachment/T0222782EN_US/356972 (last visited May 16, 2018).

Plaintiffs might argue that the information cited should be ignored for purposes of the present Motion. But we do not offer this to refute any well-pleaded facts; but rather to show that the relevant fact are easily discoverable so that there is no excuse for the absence of allegations in Plaintiffs' Complaints. This information is readily accessible to the public – and certainly to *dealers* – and posted on the Defendants' websites; Plaintiffs' pleadings feature multiple citations to information and statements posted on the same or similar websites. (DPP ¶ 100 n.31, n.32, n.34; IPP ¶ 101 n.24, n.25, n.26, ¶ 102 n.28, ¶ 104 n.30.) As such, the Court may take judicial notice of this information as material relied upon in the pleadings, or as a matter of general public record. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1261 (N.D. Cal. 1991). Alternatively, the Court may rely on such information as incorporated by reference as information referenced extensively in the pleadings. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

Even if some substantive theory of innovation-based injury could be read into the Complaints, Plaintiffs have still failed to "clearly . . . allege facts demonstrating" how they were *personally* injured by Defendants' alleged conduct. *Spokeo*, 136 S. Ct. at 1547. Only two IPPs (Brandt and Chatrath), (IPP ¶¶ 34, 44), allege they purchased convertibles, and only one (Gold) alleges he purchased a diesel vehicle, (*id.* ¶ 26). None of these three alleges that any agreement regarding the size of AdBlue tanks or the speed of convertible soft-top operation caused them harm. *See Stanislaus Food Prod. Co.*, 803 F.3d at 1093 (antitrust injury requires plausible allegations of "injury . . . resulting from the illegal conduct'") (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586). The remaining IPPs could not have been injured by the alleged agreements relating to AdBlue tanks and convertible soft-tops, and neither Complaint identifies any particular feature of their vehicles that was of diminished quality. Without a "palpable" personal injury, the Plaintiffs do not have Article III standing. *See Easter*, 381 F.3d at 961.

### 3. <u>Plaintiffs Do Not Plausibly Allege Antitrust Injury or Injury-in-Fact from Supracompetitive Pricing</u>

Similarly, the Complaints lack any factual allegations that Defendants agreed not to compete on price, or that the alleged information sharing, in fact, increased prices (either to dealers or to consumers) beyond what they would have been absent such conduct. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) (requiring "evidence that the exchanges of information had an impact on pricing decisions"); *In re Flat Glass Antitrust Litig.*, 385 F.3d at 369 (same). Instead, they allege something weaker, which is inadequate to confer antitrust standing: that Defendants' conduct "allowed" them to limit price competition and "enabled" them to pocket any cost savings, rather than pass them on to Plaintiffs. (DPP ¶¶ 87, 101, 104; IPP ¶¶ 5, 177, 232.) Naked assertions that Defendants could have charged inflated prices "fall far short of the plausibility standard set forth in *Twombly* and *Iqbal*." *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) (dismissing claims for failure plausibly to allege antitrust injury based on supracompetitive pricing and threatened harm to

innovation where Plaintiffs alleged Defendants' conduct "*could* have the ultimate result of" limiting innovation). That is particularly so where, as here, Plaintiffs do not even try to identify particular features that were priced above competitive levels or to connect such features to each individual plaintiff's vehicle.

Finally, bare statements of conclusion about price effects (to the market generally, not even to all or any of the Plaintiffs specifically) do not suffice here because they are inconsistent with well-understood economic principles. The alleged restraints on innovation are not like agreements to raise price, which one would expect to harm downstream consumers. Instead, the restraints alleged here have uncertain effects because, along with any supposed collaboration on research and development or reduction in innovation, there would be the considerable likelihood of a reduction in the Defendants' costs as well. "A firm will normally pass on some portion of its cost-per-unit savings to consumers even if it is a profit-maximizing monopolist," which Defendants are not. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 n.11 (9th Cir. 2003) ("This has nothing to do with altruism; a monopolist just makes more money by reducing its price in response to a cost decline and thus selling to more consumers."); Richard A. Posner, Antitrust Law: An Economic Perspective 248 (1976) ("[I]f the monopolist's marginal cost declines (other things being the same), he will reduce his price...."). This case is not about a standard price-fixing conspiracy, as to which higher prices can be presumed. If Plaintiffs claim supracompetitive pricing, they must connect a specific anticompetitive action to higher prices they paid personally.

#### 4. <u>Plaintiffs Do Not Plausibly Allege Antitrust Injury Based on the Alleged Conduct Aimed at Suppliers</u>

Plaintiffs also fail to allege competitive harm resulting from a supposed conspiracy to stabilize prices in a separate market for German steel and from information exchanges about component suppliers. (IPP ¶ 132 (distinguishing between steel industry and automobile industry); DPP ¶ 89 (same).) Taking the steel-related claims as an example, Plaintiffs allege that Defendants' conduct *lowered* their steel costs, (IPP ¶ 177),

which would logically *benefit* both car dealers and consumers by allowing Defendants to lower the prices of their vehicles. *See generally* Jonathan M. Jacobson & Gary J. Dorman, *Joint Purchasing, Monopsony and Antitrust*, 36 Antitrust Bulletin 1, 4 (March 1, 1991) (buyer collusion "makes input sellers unhappy[,]" but "[l]ower input prices generally yield lower prices and greater output of end products"). The parties with antitrust standing to complain about a buyer cartel are the *sellers*—those "in the same market as the alleged malefactors," *Am. Ad Mgmt.*, 190 F.3d at 1057 (quoting *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)), and the "direct victims" of the alleged conspiracy, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1137 (N.D. Cal. 2008)—not dealers or consumers, who lie far downstream from the steel buyers.

Furthermore, the Complaints do not contain a single factual allegation that supports the bald assertions that consumers were harmed because Defendants "did not pass a single cent" of their cost-savings on to consumers. (DPP ¶ 87.) This extreme assertion cuts against common sense, real-word behavior, and economic theory, and is entitled to no weight. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1198 (9th Cir. 2015) ("Plaintiffs have failed to allege enough nonconclusory facts to support the plausible inference that any agreement among the manufacturers was made. For that reason, their § 1 claim must be dismissed.").[17]

**5. Plaintiffs' Alleged Damages Are Too Indirect, Speculative, and Difficult to Apportion To Support Antitrust Standing**

Even had Plaintiffs adequately alleged an antitrust injury (*either* personal to them or shared by all purported class members), the Complaints would still not afford them

---

[17] IPPs do not even try to explain how they were injured by Defendants "work[ing] closely together to generate now-debunked 'science' that was aimed at promoting German Passenger Vehicles." (IPP ¶ 178.) Plaintiffs do not allege these scientific studies somehow affected the price of their vehicles—Plaintiffs concede the U.S.-based EUGT study that Plaintiffs criticize was never published, (IPP ¶¶ 179-81)—and a "generalized harm to the . . . environment will not alone support standing," *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), generally, much less antitrust standing.

standing. The other *AGC* factors—(1) the directness of the injury; (2) the speculative measure of the harm; (3) the risk of duplicative recovery; and (4) the complexity in apportioning damages—all weigh against standing here. *See AGC*, 459 U.S. at 545.

This defect is most severe for the self-described "indirect purchasers." Whatever their damages claims might be, those claims necessarily flow through both the deficiently-pleaded chain of causation (with the missing links) described above, but are also attenuated in a purely transactional sense. Each IPP acquired her vehicle in a transaction with intermediaries (dealers)—not Defendants—and are thus inherently indirect. *See Am. Ad Mgmt.*, 190 F.3d at 1054 (citing *AGC*, 459 U.S. at 535). Under *AGC*, IPPs must show a clear chain of causation from Defendants' conduct to their alleged injury. *Id*. But, IPPs' theory of harm instead, and again, relies solely on vaguely defined links—the idea that: (1) substantial cost savings occurred, even though Defendants were free to reinvest the supposed savings in new development; (2) Defendants somehow decided to retain 100% of any cost-savings despite Plaintiffs' failure to allege an agreement on price, and thus "overcharged" DPPs; and (3) then DPPs autonomously chose *in hundreds of thousands of transactions* to pass on some or all of that alleged (but entirely undefined) overcharge to IPPs. There are too many independent decision-makers in this chain of causation for compensable injury to exist and thus standing to attach. *See Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2014 WL 4774611, at *8 (N.D. Cal. Sept. 22, 2014) (finding injuries indirect where plaintiffs did not allege facts indicating how the alleged overcharges could be traced through distribution).

Plaintiffs' claimed injuries are also impermissibly speculative, *Am. Ad Mgmt.*, 190 F.3d at 1054 (citing *AGC*, 459 U.S. at 535), as their theory of harm posits a but-for-world in which certain Defendants would not have innovated and would have "experienced downward pressure" on the prices of their less-innovative vehicles, while other Defendants would have innovated individually more than they did as members of the alleged working groups and "experience[d] lower profit margins as a result of bearing the

costs of those innovations." (IPP ¶ 234.) This is pure conjecture, and implausible at that, given that manufacturers of the other 91% of the market did not face limitations on innovation of the sort alleged to have involved Defendants for more than 20 years.

Even ignoring that problem, it is no more likely than the alternative scenario in which Defendants would have needed to charge *higher* prices for their vehicles to cover higher research and development costs, including for technologies and components, which consumers do not value and which do not differentiate different models or manufacturers in *any* plausible but-for world. In short, "nothing but speculation informs" Plaintiffs' theory and the consequent guessing about what innovations some manufacturers would have foregone and others would have invented. *See AGC*, 459 U.S. at 543; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007) (finding harm speculative where there was "a variety of factors, for example, that could have influenced the price that each plaintiff paid for their computer (or other products)—the cost of various other components, whether those costs were themselves artificially high, etc"). And even in the unlikely event that Plaintiffs find a way to prove their speculative theories of harm, attempting to avoid duplicative recovery of the same alleged overcharge by dealers and consumers would be complex and individualized. Finally, trying to allocate damages with any level of precision would "require additional long and complicated proceedings involving massive evidence and complicated theories" to estimate the relative value of (imaginary) vehicle components in the overall vehicle price for each make and model. *AGC*, 459 U.S. at 544 (citation omitted).

* * *

Plaintiffs have not explained how the conduct alleged actually decreased innovation, much less harmed them individually. Likewise, the alleged steel purchasing cartel would logically have benefitted Plaintiffs since its primary anticompetitive effect was to lower the price at which Defendants purchased steel. Plaintiffs cannot claim "antitrust injury" from that. Finally, Plaintiffs' theory of injury is too indirect and

speculative, and their purported damages will be too difficult to apportion, to support antitrust standing.

### B. <u>The Plaintiffs' Federal and State Claims Are Barred by the FTAIA</u>

There is an equally fundamental threshold issue that bars Plaintiffs' claims, even were the Court to assume that it and Defendants knew exactly what it is Defendants agreed to and how those agreements harmed Plaintiffs. U.S. law (federal or state) does not apply to the conduct Plaintiffs allege.

Through the FTAIA, Congress has explicitly limited the reach of U.S. antitrust regulation of overseas conduct. The statute has a famously complicated structure, in that it sequentially (a) establishes a general rule that all activity involving foreign commerce *falls outside* the Sherman Act's reach; (b) *excludes* "conduct involving . . . import trade or import commerce" from that rule; and then (c) *brings back* within the Sherman Act's reach foreign conduct that has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce, where such effect gives rise to a Sherman Act claim. 15 U.S.C. § 6a; *see F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). But at bottom, the FTAIA requires antitrust plaintiffs to allege either that the alleged overseas restraint operated directly on "import commerce" or that the restraint had "a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. *See United States v. Hsiung*, 778 F.3d 738, 755 (9th Cir. 2015) ("Although the statute is a web of words, it boils down to two principles. First, the Sherman Act applies to 'import trade or import commerce' with foreign nations. . . . Second, under the FTAIA, the Sherman Act does not apply to nonimport trade or commerce with foreign nations, unless the domestic effects exception is met.")

Those Congressional limitations establish the outer boundaries for extraterritorial application of state antitrust law as well. The Commerce Clause sharply limits states' authority to regulate commercial activity overseas. *See Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 449 (1979) (describing as "paramount" the "need for federal uniformity . . . in ascertaining the negative implications of Congress' power to 'regulate

Commerce with foreign Nations' under the Commerce Clause."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313, at *4 (discussing Commerce Clause limitations on state antitrust law). Courts uniformly recognize that constitutional limitation, as well as the fact that the FTAIA's limitations "would be undone if states remained free to authorize 'little Sherman Act' claims that went beyond it." *Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (N.Y. 2012). Not surprisingly, therefore, every court of which Defendants are aware that has addressed the extraterritorial application of state antitrust law has held that it reaches no further than the FTAIA. *See id.*; *see also, e.g.*, *In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2016 WL 5724960, at *7 (N.D. Cal. Sept. 30, 2016); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313, at *4; *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 457–58 (D. Del. 2007); *accord Amarel v. Connell*, 202 Cal. App. 3d 137, 149 (1988).[18]

Plaintiffs' Complaints seek to regulate foreign activities—automotive design- and supply-related discussions among German automakers in Germany—that do not act directly on "import commerce." Instead, Plaintiffs advance theories of *indirect* harm on dealers and consumers in the United States that are insufficient to satisfy the FTAIA.

**1. <u>The Complaints Do Not Allege Restraints on "Import Commerce"</u>**

Plaintiffs claim that their allegations implicate the FTAIA's "import commerce" exclusion simply because U.S. consumers purchased goods produced overseas. (*See* IPP ¶ 78 ("German Passenger Vehicles manufactured abroad by Defendants and sold in the United States are goods brought into the United States for sale, and therefore are import commerce.").) This is incorrect. The import commerce exclusion applies only to claims

---

[18] State consumer protection and unjust enrichment claims that purport to reach foreign conduct with no direct, substantial, and reasonably foreseeable effects on the U.S. economy would likewise frustrate the "need for federal uniformity" in the nation's approach to foreign commerce, and are therefore similarly impermissible. *Japan Line, Ltd.*, 441 U.S. at 449.

based on conduct that *itself* directly acts upon and restrains import transactions. Plaintiffs claim nothing like that here.

The leading Areeda and Hovenkamp antitrust treatise unpacks the "cumbersome" language of the FTAIA. *See* IB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2013) §272i ("Areeda & Hovenkamp"). It explains that the phrases "import trade" and "import commerce" are meant to signal a different kind of analysis for (a) the straightforward case of claims based on violations in "import commerce involv[ing] transactions in which the seller is located abroad while the buyer is domestic and the goods flow into the United States," as to which U.S. law clearly applies, in contrast with (b) the harder cases involving alleged violations that occur entirely overseas but nonetheless have substantial U.S. effects, and therefore require a judgment call as to whether the U.S. effects are significant enough to justify the application of U.S. antitrust laws. *Id*. The Seventh Circuit (*en banc*) described the "pragmatic reason" underlying this distinction, namely that "[t]he applicability of U.S. law to transactions in which a good or service is being sent directly into the United States, with no intermediate stops, is both fully predictable to foreign entities and necessary for the protection of U.S. consumers." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc). Theories about U.S. effects are more complicated, and call for a different and more nuanced analysis. *Id*. at 854-55.

Whether a claim is based on "conduct involving . . . import commerce" therefore turns on whether the challenged conduct acts *directly* on import *transactions*, meaning "trade involving only foreign sellers and domestic buyers." *Id*.; *Hsiung*, 778 F.3d at 755 (adopting *Minn-Chem's* definition of import commerce); *see also* Areeda and Hovenkamp §272i ("the legislative history focuses on *transactions* in determining the nature of the commerce") (emphasis in original). This normally means that a U.S. consumer is purchasing or receiving goods from a foreign seller, and that specific transaction has been compromised by a cartel. In *Hsiung*, for example, the Ninth Circuit held foreign price-fixing fell within the import commerce exception because the conduct

acted directly on transactions in which U.S. customers purchased goods from foreign manufacturers

> "During the conspiracy period, AUO employees 'had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States.' The indictment went on to allege that AUO attempted to attain the price goals set with coconspirators by, during the conspiracy period, 'regularly instruct[ing] employees of [AUOA] located in the United States to contact employees of other TFT-LCD manufacturers in the United States to discuss pricing to major United States TFT-LCD customers,' and that '[i]n response to these instructions, employees of [AUOA] located in the United States had regular contact through in-person meetings and phone calls with employees of other TFT-LCD manufacturers in the United States to discuss and confirm pricing, and at times agree on pricing, to certain TFT-LCD customers in the United States.'
>
> These allegations directly describe that the defendants and their coconspirators engaged in import commerce with the United States[.]"

778 F.3d at 755-56.[19]

In contrast, if the alleged restraint does not directly concern import commerce, but the plaintiffs claim the restraint somehow affected goods that, in later transactions, are imported into the United States, the relevant conduct is assessed under the "direct, substantial, and reasonably foreseeable effect" test. The Second Circuit's decision in *Kruman v. Christie's International PLC*, 284 F.3d 384, 395 (2d Cir. 2002), illustrates this distinction. In that case, the plaintiffs argued that the Sherman Act applied to an alleged conspiracy to fix commissions on the purchase and sale of goods at foreign auctions. The Second Circuit rejected the plaintiffs' contention that the conduct fell within the import

---

[19] The Ninth Circuit raised, but expressly did not decide, whether anticompetitive conduct concerning "commerce directed at, but not consummated within, an import market is also outside the scope of the FTAIA's import provisions." *Hsiung*, 778 F.3d at 755 n.8. Likewise, in *In re Capacitors Antitrust Litig.*, Judge Donato left open (and later never had occasion to decide) whether price-fixing on capacitors incorporated overseas into products later sold in the U.S. fell within the import commerce exception. 2016 WL 5724960, at *7. Defendants submit such cases are properly analyzed under the direct effects test, and, even if not always, at least where, as here, there is no allegation that the anticompetitive conduct itself crossed borders, as in *Hsiung*.

commerce exclusion because "[t]he plaintiffs did not describe conduct by the defendants that was directed at an import market." *Id*. The court observed that "the 'conduct' in this case was . . . the alleged agreement by defendants to fix prices in foreign auction markets," *id.* at 399, and that foreign conduct did not become "conduct involving . . . import trade or import commerce" merely because "some of the goods purchased in those auctions may ultimately have been imported by individuals in the United States." *Id*. at 395-96. However, the court then agreed with plaintiffs that the U.S. effects of the foreign conduct were sufficient under the "direct, substantial, and reasonably foreseeable" effects test. *Id*. at 401.

Plaintiffs here do not plead any facts describing conduct that directly acts upon and restrains import commerce. All the conduct they allege to have been anticompetitive, and on which they base their claims, occurs pre-production (before cars are ever built) and has to do with the design of vehicles or how components of those vehicles (like steel) are procured. Those theories do not implicate restraints on import commerce. Thus, as a matter of law, Plaintiffs must plead that the foreign conduct that was allegedly restrained had direct, substantial, and reasonably foreseeable *effects* on U.S. commerce. For the reasons explained below, they do not.

### 2. <u>The Complaints Do Not Allege U.S. Effects That Are the Immediate Consequences of a Foreign Restraint</u>

Foreign anticompetitive agreements, such as those to fix prices of products sold to U.S. purchasers, can have direct effects in the United States and thus be actionable under federal and state antitrust law. Whether federal and statute antitrust law applies depends on whether the claimed effect is direct or indirect. Much of the FTAIA jurisprudence therefore addresses what it means for a U.S. effect to be "direct." *See, e.g.*, *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *5-8.

In this case, two kinds of effects are at issue: so-called "innovation" effects stemming from collaborations in Germany on technical issues (*e.g.*, AdBlue tank sizes and convertible soft-tops) and alleged coordination in the purchase of an input (*e.g.*,

steel). Even if U.S. consumers would have been hurt by these activities, it would not have been a "direct" effect that brings this case within the reach of U.S. antitrust laws.

*Claims Based on Alleged Agreements Not To Innovate.* Most of Plaintiffs' case concerns alleged restraints on innovation, and is therefore governed by *LSL*, in which the Ninth Circuit addressed what it means for a U.S. effect to be "direct" in the highly analogous context of overseas agreements that allegedly restrict innovation in products destined for import into the United States. 379 F.3d at 672. There, the defendants—producers of 70 percent of the fresh market tomato seeds used in North America—had entered into an agreement in Israel in which an Israeli competitor agreed to forego research toward developing seeds for tomatoes with a longer shelf life, and agreed further not to sell long shelf-life tomato seeds in North America. *Id.* at 675. The U.S. Department of Justice brought suit, claiming that the overseas agreement was subject to, and violated, the Sherman Act because it "unreasonably reduc[ed] competition to develop better seeds for fresh-market, long shelf-life tomatoes for sale in the United States" and allowed the defendants to profitably charge more than they otherwise could. *Id*. at 675, 681.

The Ninth Circuit found such allegations insufficient. It emphasized that the FTAIA requires overseas conduct to have a "direct" effect on U.S. commerce in order to be subject to the Sherman Act. *Id*. at 680. And an effect is "direct," the Ninth Circuit held, only if it "follows as an immediate consequence of the defendant's activity." *Id.* Claims based on agreements that allegedly hamper overseas innovation do not qualify, because "[t]he delay of possible 'innovations' does not have a direct effect on American commerce." *Id.* at 681. The Ninth Circuit contrasted a case in which "the foreign competitor already has the good in hand" and enters into a direct agreement not to import that good into the United States. *Id.* That would directly affect the United States. However, an agreement regarding overseas research and development efforts has only *in*direct effects in the United States because it depends on speculation that, but for the agreement, the quality of goods imported into the United States would have been higher.

"An effect cannot be 'direct,'" the Ninth Circuit concluded, "where it depends on such uncertain intervening developments." *Id.*; *see also Hsiung*, 778 F.3d at 758 (same); *Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *3 (dismissing claims based on "overcharges associated with flights originating in Asia" because the theory of U.S. harm "makes numerous assumptions about travelers' spending habits that are by no means certain").

Straightforward application of *LSL* and the FTAIA's directness requirement bars all of Plaintiffs' claims concerning reduced innovation. The core premise of Plaintiffs' innovation-based claims is that, but for the alleged agreements, Defendants' automotive design and R&D efforts—conduct which Plaintiffs admit occurred in Germany (DPP ¶ 58; IPP ¶ 138)—would have been somehow different and better. Those improved vehicles, Plaintiffs assume, would then have made their way into the U.S. market, potentially forcing competitors with less innovative technologies to lower their prices in order to remain competitive. Regardless of whether that chain of events is plausible or even likely, it is unquestionably indirect. As the Ninth Circuit held in *LSL*: "The delay of possible 'innovations' does not have a direct effect on American commerce." 379 F.3d at 681.

*Claims That Defendants Colluded in Purchasing Steel.* Plaintiffs also fail to establish any sort of "direct" effect for purposes of the FTAIA based on their claims that Defendants allegedly agreed on how to determine the price of steel that they purchase. (*See* DPP ¶¶ 87-94; IPP ¶¶ 164-77.) Plaintiffs lack standing even to assert these steel-related claims, (Section IV.A.4 *infra*), but they also fail to allege facts that establish any sort of "direct" effect for purposes of the FTAIA. That is because Plaintiffs' theory of causation is that if: (1) Defendants had negotiated with steel manufacturers individually, instead of doing so as a group, (2) they would have obtained lower (not higher) prices for steel, and (3) the lower-priced steel would have affected the prices of vehicles, including U.S. vehicles. That is a quintessential indirect theory of harm. It assumes, at the very least, that in response to lower steel prices in Germany, Defendants would have opted to

lower the prices of their vehicles in the United States (rather than using the difference to increase research and development, build new production plants, pay higher wages, or make additional profit). As noted above, an "effect cannot be 'direct,'" however, "where it depends on such uncertain intervening developments." *LSL*, 379 F.3d at 681.

This Court's decision in *In re Transpacific Passenger Air Transp. Antitrust Litig.*, provides a helpful analogy. There, the plaintiffs alleged that 26 airlines had violated the Sherman Act by conspiring to fix prices of transpacific air passenger travel. 2011 WL 1753738, at *1. Applying the FTAIA, this Court dismissed claims based on "overcharges associated with flights originating in Asia," because the plaintiffs' theory about how that affected U.S. commerce was indirect. *Id.* at *3-5. Essentially, plaintiffs argued that "travelers who spent too much money on their air transportation will be forced to 'allocate a smaller fraction of their total budget to the purchase of commercial goods and services' within the United States." *Id.* at *5. Relying on *LSL*, this Court concluded that "[s]uch an effect is entirely indirect," because it "makes numerous assumptions about travelers' spending habits that are by no means certain." *Id.* "[T]his is not a type of domestic effect that is recognizable by the law." *Id.*

Here too, Plaintiffs ask the Court to reason that the end of an alleged steel purchasing cartel would somehow have put more money in Defendants' pockets, and that therefore U.S. buyers would have realized lower prices. But that theory "makes numerous assumptions about" the effect of Defendants' purchasing and spending decisions in a but-for world that are "by no means certain." *Id.* Who is to say that ending coordination among steel buyers would have reduced steel prices, or that this would have filtered into the United States? The only plausible answer based on what Plaintiffs have pleaded to date is: *"It depends."* It depends on whether and how much money (the magnitude of which has not been alleged) was saved by the alleged cartel, whether the savings on that would have affected ultimate vehicle prices, what other uses that money might have been put to, and many other factors. But whatever Plaintiffs might plead, any

speculative domestic effects of the alleged European steel purchasing cartel were necessarily indirect.

### 3. <u>Congress' Direction that U.S. Courts Cannot Police Conduct like that Alleged Here Does Not Mean that Such Conduct Goes Unregulated</u>

To be clear, Defendants are not arguing that the FTAIA necessarily precludes claims based on anything and everything that Defendants or any other actor might have done in Germany. It would not bar, for example, plausible allegations of direct price-fixing of vehicles sold in the United States. Likewise, *LSL* itself suggests that if "the foreign competitor already has [an innovative] good in hand" but agrees not to make it available in the U.S., that agreement might cause a direct U.S. effect. *See* 379 F.3d at 681. But Plaintiffs' claims do not fall into either of those categories, and the FTAIA therefore requires dismissal.

None of that means that any anticompetitive conduct by the Defendants—if it occurred—would escape legal scrutiny. Such conduct would presumably be addressed in Germany and the European Union, which have robust, sophisticated competition law regimes governing what sorts of agreements are, and are not, permissible among European competitors. Indeed, Plaintiffs emphasize the existence of investigations in Europe and Germany. (*See, e.g.* DPP ¶¶ 109-14; IPP ¶¶ 112-20.)

As Germany itself has previously explained in an *amicus* filing about the proper scope of the FTAIA, aggressive extraterritorial application of U.S. antitrust law "interferes with the sovereign interests of other nations" and "fail[s] to give proper consideration to the legitimate choices those nations have made concerning the regulation of their own commerce and competition in their own markets." Br. of Germany and Belgium as Amici Curiae in Supp. of Pets., *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, No. 03-724, 2004 WL 226388, at *10 (U.S. Feb. 3, 2004) (hereinafter "Amicus Brief of Germany"); *see also Empagran*, 542 U.S. at 167 (citing Amicus Brief of Germany favorably). "Compared to the United States, for example," Germany places a

greater "focus in obtaining the desired deterrent effect of illegal restraints of trade" through "prosecution [by] its competition authorities," which make use of "leniency policies" to encourage self-reporting and thereby make it more difficult for illegal agreements to persist. Amicus Brief of Germany, 2004 WL 226388 at *12. As the Supreme Court has recognized, "a decision permitting independently injured foreign plaintiffs to pursue private treble-damages remedies would undermine foreign nations' own antitrust enforcement policies by diminishing foreign firms' incentive to cooperate with antitrust authorities in return for prosecutorial amnesty." *See Empagran*, 542 U.S. at 168.

In the end, this case concerns alleged foreign anticompetitive activity. Its alleged (and indirect) U.S. effects do not bring it within the scope of the FTAIA.

### C. Plaintiffs Do Not Plausibly Allege that Defendants Have Market Power, an Element of Their Claims Under the Rule of Reason

We next turn to whether Plaintiffs have adequately pleaded anticompetitive conduct. The conduct alleged, even if it occurred exactly as the Complaints say it did, would not constitute a *per se* violation of the antitrust laws. Instead, the conduct must be assessed under the Rule of Reason, whose elements the Complaints fail to adequately plead.

#### 1. The Rule of Reason Applies to the Conduct Alleged Here

*Per se* illegality is reserved for limited types of conduct—none alleged in the Complaints—that long experience has shown to be inherently anticompetitive. *See Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978). These illegal practices include "[h]orizontal price-fixing, market division, and certain types of group boycotts." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d at 1101.

Except in those limited circumstances, federal antitrust claims are governed by the Rule of Reason, which the Supreme Court has declared the presumptive or default standard to assess Sherman Act Section 1 claims. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). The claims here, for example, are that Defendants exchanged technical information and jointly developed informal standards, allegedly enabling them to control "the rate of technological innovation and

effectively share[] the costs of such innovation." (IPP ¶ 98; *see also* DPP ¶ 4.) Courts assess grievances such as these under the Rule of Reason. *See, e.g., In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011) ("As a general matter, agreements among competitors to exchange information are analyzed under the rule of reason because such exchanges can facilitate competition"); *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (Rule of Reason governs information exchange among horizontal competitors); *In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1276 (C.D. Cal. 1997).

Focusing on Plaintiffs' two specific allegations of innovation-related conduct confirms this conclusion. The first, and the one given far more significance in the pleadings, is the supposed agreement about the size of AdBlue tanks, which could only apply to diesel vehicles. (IPP ¶¶ 144-63; DPP ¶¶ 102-05.) While recognizing that engineering considerations govern tank size, Plaintiffs nonetheless equate a bigger tank with "innovation." (DPP ¶ 102.) Leaving aside the fact that Plaintiffs cannot allege that such an agreement was ever implemented, it is well-established that the Rule of Reason applies to joint conduct concerning the formulation of technological or industry standards. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-01 (1988) ("It is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations."); *Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942, 947 (9th Cir. 2000) (applying Rule of Reason to claims that competitors allegedly set anticompetitive industry standards for dental services); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988) (activities of standard-setting organization, including promulgation of product specifications, were "not *per se* unreasonable" and are analyzed under the Rule of Reason); *see also* Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Application*, ¶ 2136 (3rd & 4th eds. 2010-2017) ("[M]ost instances of standard setting are analyzed under the rule of reason, and the great majority are lawful.").

IPPs' only other articulated allegation of "reduced innovation" is the claim that Defendants supposedly agreed to a common maximum speed at which convertible soft-tops could be retracted. (IPP ¶ 138.) There are self-evident safety reasons that counsel against

enabling drivers to open what is effectively a parachute at high speed, including that doing so can obscure the views of other drivers, and endanger them if the soft-top rips off and flies into oncoming traffic. Thus, were there such an agreement, there is no doubt that Defendants could defend it under the business justification component of the Rule of Reason. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 774 (8th Cir. 2004) (holding limousine manufacturers' exclusion of non-joining manufacturers from association was not *per se* unreasonable because it was at least arguably rooted in safety concerns). And given the dubious demand for this attribute, there would have to be a full inquiry into whether the alleged agreement had any—let alone sufficient—anticompetitive effects to give rise a Sherman Act claim. *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1412-13 (9th Cir. 1991). A court assessing the issue under the Rule of Reason could readily conclude that a greater aggregate consumer benefit would accrue from devoting research and development dollars to technologies that consumers valued more highly.

DPPs nevertheless attempt to spin the alleged agreements as a *per se* illegal market division: "[I]nsofar as Defendants agreed that they would cap technological innovations so that no German Automobile Defendant would lose sales to another German Automobile Defendant, that constituted a form of a market share agreement that also is treated as a *per se* violation." (DPP ¶ 123.) But because there is no factual basis for the DPPs' claim of "market share agreement," it is not entitled to any weight under the standard of review. *See Cal ex rel. Harris v. Safeway*, 651 F.3d 1118, 1137 (9th Cir. 2011) (rejecting *per se* treatment for alleged market-allocation conduct that was not a "classic" horizontal market division agreement, *i.e.*, one in which "competitors at the same level agree to divide up the market for a given product.").

Standard-setting and information sharing of the kind alleged here generate many benefits, as even Plaintiffs concede. (*See, e.g.*, IPP ¶¶ 123-24, 129; DPP ¶¶ 78-79, 86.) It is at least equally plausible that standardizing tank sizes manufactured by suppliers saves costs and is procompetitive; certainly such standardization is not *per se* illegal. On the other hand, neither Complaint alleges any "naked" price or output agreements—or even exchanges of price information for Defendants' vehicles. (*See* IPP ¶¶ 123-43; DPP ¶¶ 76-86.) There is thus no basis

to consign the claims in this case to *per se* treatment; they should instead be evaluated under the Rule of Reason.[20]

**2. Failure To Allege a *Per Se* Violation Requires Dismissal of Plaintiffs' Complaints**

Despite the clear law set forth just above, both Complaints purport to assert a theory of *per se* liability. (DPP ¶ 123; IPP ¶ 267.) Indeed, DPPs do not even plead an unreasonable restraint of trade in the alternative. To the extent either set of Plaintiffs' claims are advanced only under a *per se* theory, which the DPPs' claims most certainly are, they should be dismissed entirely. *See e.g. Texaco*, 547 U.S. at 7 n.2 (declining to review claim under rule of reason where plaintiffs had alleged only *per se* violation); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037-1038 (N.D. Cal. 2013) (same); *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2012 WL 70644, at *4-7 (N.D. Cal. Jan. 9, 2012), *aff'd sub nom. Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571 (9th Cir. 2014) (dismissing Section 1 conspiracy claim with prejudice for, *inter alia*, failing to show that the alleged scheme produced significant anticompetitive effects within the relevant market); *Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F. Supp. 822, 827-28 (N.D. Cal. 1986) (same); *E & E Co. v. Kam Hing Enterprises, Inc.*, No. C-08-0871 MMC, 2008 WL 1924905, at *1 (N.D. Cal. Apr. 29, 2008) (same, because plaintiff failed to identify relevant market and allege defendant had market power).

**3. The Complaints Do Not Allege Market Power in a Well-Defined Antitrust Market**

To state a Rule of Reason claim, Plaintiffs must present the Court with well-pleaded allegations of (among other things) relevant geographic and product markets and market power. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008) ("[A] plaintiff must allege that the defendant has market power within a 'relevant market.'"); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1358 (N.D. Cal. 2013)

---

[20] *See* DPP ¶ 69 (referencing "technological standards"), ¶ 81 ("technical standards"), ¶ 83 ("secret standards"); IPP ¶ 125 ("technical standards"), ¶ 163 ("cover of supposed standard setting"), ¶ 183 ("jointly established 'technical standards").

(establishing injury to competition requires that the plaintiff "at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail" including "proof of the relevant geographic and product markets and demonstration of the restraint's anticompetitive effects within those markets") (internal quotations and citations omitted). Plaintiffs face these Rule of Reason hurdles because the Sherman Act prohibits only *unreasonable* restraints on trade, and myriad restraints on unbridled competition (*e.g.*, contracts, joint ventures, exclusive deals, etc.) can be both reasonable and beneficial to consumers. *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 949 (9th Cir. 1998); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457-58 (1986).

Anyone who has ever shopped for a car knows, or could at least determine from the ubiquitous online comparative shopping guides available in a few keystrokes, that German passenger vehicles face actual competition from manufacturers in the United States, Japan, Korea, Great Britain, Sweden, Italy, and elsewhere. Yet IPPs' antitrust claims hinge entirely on a supposed separate relevant market of "German passenger vehicles" that, while convenient for Plaintiffs, flunks both the common-sense test and (not surprisingly) every market definition principle that antitrust plaintiffs—even in their pleadings—are obligated to follow.

**a. <u>IPPs Ignore Reasonable Interchangeability and Instead Posit a World in Which Consumers Consider Only Buying German Cars</u>**

A relevant product market consists of "those products to which consumers will turn, given reasonable variations in price," *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001), and is "composed of products that have *reasonable interchangeability for the purposes for which they are produced*." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (emphasis added). Courts dismiss antitrust complaints on the pleadings when the alleged market definition violates this fundamental rule. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." (citation omitted));

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195-1200 (N.D. Cal. 2008) (granting motion to dismiss antitrust claims due to faulty product market definition).

Here, IPPs allege that German vehicles constitute their own market because some consumers prefer German vehicles, perceiving them as superior in quality and engineering. (IPP ¶¶ 87-88.) These characteristics supposedly make all German vehicles "closer substitutes" to one another than they are to all other passenger vehicles, (*id.* ¶¶ 212, 228), such that the buyer of a German vehicle is more likely to identify another German vehicle as second choice. (*Id.* ¶ 89 (citing without detail a so-called "second-choice survey" to this effect).) Plaintiffs' other support for their proposed market definition are the propositions that Defendants compare themselves to each other in advertising and locate dealers in similar locations. (*Id.* ¶ 88.) IPPs then allege what is simply a corollary to a preference for higher-quality goods—the consumer's willingness to pay a premium for those goods. IPPs assert that because German vehicles allegedly enjoy a price premium, they constitute a distinct market. (*Id.* ¶¶ 83-98.) The Complaints allege no facts showing that the overall car market was not competitive or that explain why other automakers were incapable (for more than two decades) of successfully countering the distorted reality supposedly created by the German automakers. Also inherent in Plaintiffs' conclusion is the proposition that *no* putative class member ever considered—or would consider—buying anything other than a German car. That suggestion is incredible, in the literal sense of the word.

As this summary makes clear, IPPs' pleading has no grounding in the rules that govern market definition. A well-pleaded product market encompasses all products that are "reasonably interchangeable," and not merely those that are the closest substitutes. *See, e.g.*, *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("[P]roducts must be reasonably interchangeable, such that there is cross-elasticity of demand[,]" but they do not need to be "fully interchangeable with those of its competitors because perfect fungibility isn't required"); *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 908 (N.D. Cal. 2016) ("[T]he market must include all products for which there is reasonable interchangeability of use or . . . cross-elasticity of demand") (quotations omitted). Consumer preference for a certain

product among different choices does not affect this interchangeability analysis. *See, e.g.*, *Newcal Indus. Inc.*, 513 F.3d at 1045 ("The consumers do not define the boundaries of the market; the products or producers do."); *United States v. Cont'l Can Co.*, 378 U.S. 441, 455 n.6 (1964) (consumers preferred one of two types of container but the relevant market was both types). Likewise, a market is not defined by the fact (or perception) that certain products embody higher quality than others with the same underlying or intended use. *See, e.g.*, *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd* 895 F.2d 1417 (9th Cir. 1990) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically *meaningless* where the differences are actually a spectrum of price and quality differences.") (collecting citations in support) (emphasis added); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (noting "that quality, price, and reputation determine the relevant product market—is difficult to maintain").

In fact, the existence of goods or services perceived to be of "higher quality" and to command corresponding "premia" are characteristics of *all* differentiated markets and show only that firms are competing with different price/value offerings. *See Psystar*, 586 F. Supp. 2d at 1199 (rejecting market definition based on price premium because "[t]he mere existence of a price differential, however, does not necessarily mean that a product is unconstrained by competition"). Not by coincidence, courts have used the myriad options available to would-be car buyers to demonstrate this very proposition. *See ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 569 (6th Cir. 2014) ("In the market for upscale sedans, for example, Audi and Jaguar might be closer substitutes for some consumers than Audi and Lincoln are. (For other consumers in the same market—say, consumers who prefer domestic brands—Lincoln and Cadillac might be closer substitutes.)").

The question here is whether the prices for German cars, "premium" or not, are constrained by competition from other cars. Assume for example that there are consumers who might make as first-order choices a Mercedes-Benz C-Class, BMW 3-Series, or Audi A4. The antitrust question is whether they would accept a significant price increase on those vehicles

before they would buy a Lexus IS, a Jaguar XE or a Volvo S60 (to name but a few comparable options). *See Psystar*, 586 F. Supp. at 1198 (explaining one "commonly used test for market definition" is identifying all products to which consumers would switch in the face of a small but substantial, non-transitory increase in price for the defendants' products). Plaintiffs skirt that issue—because the answer is obvious—and allege "premium" and "intense brand loyalty" [21] instead. That is not enough if, at or modestly above current market prices, there exists reasonable product interchangeability. *Id.*; *see also E.I. du Pont de Nemours & Co.*, 351 U.S. at 406 (cellophane was in same market as other flexible packaging materials, despite costing 2-3 times more, because the products were reasonably interchangeable despite the price difference). The pleadings' tortured use of regression analysis and unexplained (and nonsensical) exclusion of multiple brands from their comparisons only underscore that any "price premium" is a fiction of Plaintiffs' result-seeking creation.[22]

The Complaints are replete with admissions that German cars *do in fact* compete with non-German cars. The Complaints admit that Defendants did not even hold half of the "luxury vehicle sector" which Plaintiffs characterize as "overwhelming market power." (IPP ¶¶ 83, 225; DPP ¶ 119.) They admit that Acura, Cadillac, Lexus, Infiniti, and Lincoln make comparable sedans and SUVs. (IPP ¶ 230.) Defendants allegedly entered into a cartel because Japanese and other automakers were making inroads. (DPP ¶¶ 76, 116.) Defendants similarly did so because

---

[21] *See Psystar*, 586 F. Supp. 2d at 1198 ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market.") (quoting *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004)); *Disenos Artisticos E. Industriales, S.A. v. Work*, 714 F. Supp. 46, 47-48 (E.D.N.Y. 1989) (despite "intense brand loyalty" among some customers for certain brand of porcelain figurine, defining relevant product market as the market for high quality decorative giftware).

[22] IPPs allege that a "price premium" is confirmed by an (undefined and unexplained) "regression analysis." IPPs do not allege that the regression shows that prices for German cars move independently of, and are not constrained by, the prices for other cars, so the regression does not carry the weight IPPs seek to place on it. IPPs also compare prices among German and non-German vehicles in the same segments in Figures 13 and 14. (*See* IPP ¶ 230.) Yet IPPs conspicuously omit reference to vehicles that undercut any supposed "German" premium, *e.g.*, Tesla sedans and Model Xs; Range Rover SUVs; Cadillac Escalades; and other high-end Japanese, American, and European vehicles that are in the same sedan and SUV segments cited in the Figures.

of the threat from hybrid electric cars. (DPP ¶ 82; IPP ¶ 144.) The Complaints further admit that German cars competed with non-German cars in many other ways:

*Advertising.* That Defendants allegedly spend billions advertising that their cars are "Made in Germany" (IPP ¶¶ 86-87) suggests *they are* trying to distinguish their cars from cars made elsewhere—precisely because German OEMs know that their cars compete with Japanese, English, Swedish, Italian, American, Korean, and other vehicles. Judge Alsup made this point in *Psystar*, 586 F. Supp. 2d at 1199-1200, where Apple's extensive advertising campaigns undercut an Apple "Mac OS" market definition because it showed Apple competed with other operating systems. *See also In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. at 1268 (same, for premium ice cream manufacturers marketing to compete with lower-quality ice cream manufacturers).

*Plaintiffs' Newspaper Articles.* Further undercutting IPPs' contrived product market definition are the multiple sources in their Complaint which confirm that German passenger vehicles compete against vehicles produced by OEMs based outside of Germany. (*See, e.g.*, IPP ¶ 93 n.15 (citing Frank Dohmen, Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017), https://magazin.spiegel.de/SP/2017/30/152270400/index.html (English version: http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html).) The *Der Spiegel* article cited as the basis for so many of the substantive allegations in Plaintiffs' Complaints states that Defendants "are being challenged by new competitors from Silicon Valley and China." (*Id.*) IPPs also cite to a website which provides market shares for all OEMs that sell into the U.S. market; that site does not separate manufacturers by region of manufacturer. (IPP ¶ 97 n.19 (citing Timothy Cain, U.S. Auto Sales Brand Rankings – 2016 Year End, goodcarbadcar.net (Jan. 4, 2017), http://www.goodcarbadcar.net/2017/01/usa-2016-auto-brand-sales-results-rankings/).) And IPPs also cite another article referring to the "great efforts by brands like Cadillac [U.S.] and Lexus [Japan]" to compete with Audi, BMW, Mercedes-Benz and Porsche. (*Id.* at ¶ 85 n.8 (citing Chris Tutor, *Fortune offers 10 reasons why German cars rule*, Fortune (July 2, 2012, 5:59 PM), https://www.autoblog.com/2012/07/02/fortune-offers-10-reasons-why-german-cars-rule/).)

Finally, the proposed market definition is also *over-inclusive* because it is facially implausible that all German passenger vehicles compete against each other in a unitary, "German" market, regardless of vehicle segment. That is, Plaintiffs fail to distinguish among different vehicle categories and instead assume *all* German passenger vehicles compete against one another simply because they are German. But it is common knowledge, and IPPs also acknowledge, that the automobile industry "has long divided itself into segments such as sedans, coupes, convertibles, SUVs, and trucks[.]" (IPP ¶ 213; *see also id.* ¶ 230 & Figs. 13-14 (comparing prices within certain vehicle segments).) There is no segment that includes the VW Golf hatchback, Porsche 911 Turbo S, Audi Q7 SUV, Mercedes-Benz S-Class sedan, and BMW i8 electric sports car (respectively, an economy vehicle, a traditional high-end sports car, a full-size SUV, a luxury sedan, and a luxury zero-emissions sports car), nor is there any rational argument that price increases for one will cause consumers to switch to another vehicle, *but necessarily and only* one made by a German company. *See Hicks*, 165 F. Supp. 3d at 910 (dismissing antitrust claims where relevant market was obviously artificial and contrived for litigation purposes).)

This "market" is the ultimate contrivance. It violates just about every relevant market definition principle and is not a proper basis for an antitrust claim.

**4. <u>IPPs Do Not Plausibly Allege Defendants Have Market Power</u>**

Related to the requirement to define a relevant antitrust market, a plaintiff bringing a Section 1 claim must allege plausible facts showing the defendants have "market power" within that well-defined market. *Newcal Indus. Inc.*, 513 F.3d at 1044. "Market power" is the ability of a seller (or group of sellers) to raise price *and* restrict output without losing substantial sales. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992). Typically, plaintiffs plead the existence of market power circumstantially, with allegations of fact that: "(1) define the relevant market; (2) show that the defendant owns a dominant share of that market; and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d

1421, 1434 (9th Cir. 1995).

IPPs' allegations of market power all derive from their unsupportable market definition analysis. When market share is assessed more reasonably against the broader (and far more plausible for purposes of the claims Plaintiffs seek to plead) "U.S. automobile market," (IPP ¶ 83), Defendants had just 3-9% share throughout the class period. (*Id.* ¶ 83 n.4.) As a matter of law, defendants with such a trivial collective share cannot possess market power. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26–27 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (holding that even a 30% market share facially does not constitute a "dominant market position" necessary for a Section 1 claim).

There is no need to go further. Consumer loyalty or preference does not demonstrate market power any more than it establishes the relevant market. If some consumers (no more than 9% of the U.S. car-buying public, (*see* IPP ¶ 83 n.4), prefer German passenger vehicles because they are German, that reflects success in advertising and branding. It does not plausibly show (as Plaintiffs must) that Defendants can raise prices and restrict output without forfeiting sales to other manufacturers. And to the extent IPPs suggest that the alleged "price premium" reflects market power, they again ignore the key inquiry. Price premia are consistent with a competitive, but differentiated market. *See Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product.") (quoting *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005)); *Brown Shoe Co v. United States*, 370 U.S. 294, 326 (1962) ("It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145 (N.D. Cal.), *aff'd sub nom. Jos. Schlitz Brewing Co. v. United States*, 385 U.S. 37 (1966) ("There is no rational way of choosing a point along this price spectrum and saying that all beer which sells above that point constitutes a line of commerce, or even a sub-market, apart from all beer which sells below that point."); *Psystar*, 586 F. Supp. 2d at 1199 (rejecting market definition based on price premium because "[t]he mere existence of a price differential, however,

does not necessarily mean that a product is unconstrained by competition"); *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd* 895 F.2d 1417 (9th Cir. 1990) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically *meaningless* where the differences are actually a spectrum of price and quality differences.") (collecting citations in support) (emphasis added)).

Because of their deficient market definition and market power theories, the Complaints must be dismissed.

**D. <u>Plaintiffs' Claims Are Largely Time-Barred</u>**

Federal antitrust claims must be initiated within four years of the occurrence of the conduct that allegedly caused injury to plaintiffs. 15 U.S.C. § 15(b); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-89 (1997) (explaining that a cause of action "accrues" and the statute of limitations "begins to run when a defendant commits an act that injures a plaintiff's business"). IPPs' state law antitrust claims are all similarly subject to no more than four-year limitations periods, as are the bulk of their consumer protection claims.[23]

The limitations problem Plaintiffs face is evident from the nature of the conspiracy they have alleged: they claim that essentially the entire German auto industry—not just Defendants, but also key parts and materials suppliers—engaged in a conspiracy that covered almost every aspect of millions of cars for "decades," and was furthered through "hundreds" of meetings *every year* "during the life" of the "decades-long conspiracy." (*See* DPP ¶¶ 2, 54, 74, 77; IPP ¶¶ 3, 99, 242.) Plaintiffs commenced this litigation in July (IPPs) and September (DPPs) of 2017[24]—*decades* after the conspiracy they allege was

---

[23] Appendix A lists the limitations statutes and periods, and the associated accrual rules, applicable to IPPs' state antitrust claims. Appendix B lists the same information applicable to IPPs' consumer protection claims. The arguments advanced in text apply with equal force to all state law claims, whether those claims are pleaded under antitrust or consumer protection statutes.

[24] The earliest indirect purchaser action was filed on July 25, 2017, and the earliest direct purchaser action was filed on September 27, 2017. *See* Complaint, *Kaufman v. BMW AG et al.*, No. 13:7-cv-05787-CRB (D.N.J. July 25, 2017); Complaint, *Autohaus Acquisitions, Inc. v. Audi AG et al.*, No. 2:17-cv-07536-MCA-MAH (D.N.J. Sept. 27, 2017).

initiated. Plaintiffs' federal antitrust claims based on conduct that occurred before July and September of 2013 are time-barred on the "face of the complaint[s]," absent allegations "that the statute of limitations w[as] tolled until at least [2013]," as are most of IPP's state antitrust and consumer protection law claims." *Soliman v. CVS RX Servs.*, 570 F. App'x 710, 712 (9th Cir. 2014); *see also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1063 (N.D. Cal. 2016). In apparent recognition of this time-bar, Plaintiffs appear to advance two theories as to why their claims should survive. Neither saves the stale claims.

### 1. The "Discovery Rule" Does Not Apply[25]

Plaintiffs allege that "claims asserted in this Complaint have [ ] been tolled by the discovery rule" because they "had no knowledge of . . . the Cartel Agreement until it was first publicly disclosed in Der Spiegel [in July 2017.]" (DPP ¶¶ 139, 142; IPP ¶ 239.) Plaintiffs are wrong. "[E]xplicit, longstanding U.S. Supreme Court and Ninth Circuit authority" holds that the discovery rule does not apply to federal antitrust conspiracy claims, and that instead, "antitrust claims accrue at the time of injury." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1210 (N.D. Cal. 2015); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012); *Beneficial Standard Life Insur. Co. v. Madariaga*, 851 F.2d 271, 274-75 (9th Cir. 1988) ("In [antitrust] actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs.").

Similarly, ten of the twenty state antitrust laws and eight of the eighteen state consumer protection laws under which IPPs bring claims apply an injury or accrual rule, not the discovery rule, to antitrust claims. *See* Appendices A & B. With respect to the remaining state antitrust and consumer protection claims, IPPs' conclusory assertion that

---

[25] There is no basis for Plaintiffs' suggestion that Defendants are "estopped" from asserting limitations defenses. *See Smith v. Kohlweiss, Inc.*, No. C 11-00239 SBA, 2012 WL 1156338, at *5 (N.D. Cal. Mar. 30, 2012) ("Equitable estoppel, [ ] focuses primarily on actions taken by the defendant to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.'"); *Guerrero v. Gates*, 442 F.3d 697, 706-07 (9th Cir. 2006) (explaining that "equitable estoppel" is "also termed fraudulent concealment").

they "did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein until July 21, 2017" (IPP ¶ 239), is both unsupported by any facts and not facially plausible in light of the breadth and duration of the conspiracy they allege. Many of the facts in Plaintiffs' Complaints have long been available to Plaintiffs.[26] *See Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 188 (1st Cir. 2006) ("[K]nowledge of every fact necessary to prevail on the claim is not required to put the plaintiff on inquiry notice and trigger the accrual period."). Yet instead of investigating their possible claims, Plaintiffs waited until *Der Spiegel* published an article to file their Complaints. *See Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) ("So long as there is a reasonable ground for suspicion, the plaintiff must go out and find the facts; she cannot wait for the facts to find her." (internal quotation omitted)). Plaintiffs' claims were not tolled for all of the intervening years.[27]

Indeed, Plaintiffs' insistence that they could not have discovered the alleged conspiracy on their own just highlights a formidable conceptual flaw in the pleading: Plaintiffs ask the Court to credit *both* the notion that Defendants engaged in literally thousands of collusive meetings over "decades," involving not just themselves but also the German auto parts and steel industries, *and* that even these "diligent" Plaintiffs did not but also *could not* have ever suspected that something allegedly wrongful was afoot.

### 2. Fraudulent Concealment Allegations Do Not Solve Plaintiffs' Pleading Problem

Allegations of fraudulent concealment must satisfy Federal Rule of Civil Procedure 9(b)'s requirement to plead, with specificity, the "time, place, and specific

---

[26] *See infra* p. 52 n. 29.

[27] In addition to alleging Defendants conspired during meetings of the VDA that have long been known to the public and attended by other manufacturers, Plaintiffs point to a June 2013 book by BMW's former executive vice president, Robert Lutz, that DPPs claim is "[a]necdotal evidence" that "Defendants impermissibly have coordinated on automobile production for decades." (DPP ¶ 74; *see also* IPP ¶ 105 n.31.) Lutz's book should have given Plaintiffs "reason to discover the existence of a claim." *Platt Elec. Supply, Inc.*, 522 F.3d at 1054. Thus, IPPs' state law antitrust and consumer protection claims to which the discovery rule applies accrued no later than June 2013. *See* Appendices A & B.

content of the false representations as well as the identities of the parties to the misrepresentations." *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *19 (citing *Schwartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) and *Guerrero*, 442 F.3d at 707). Plaintiffs' claims of fraudulent concealment largely repackage their "discovery rule" assertions and do not meet this exacting standard. (DPP ¶¶ 141-47; IPP ¶¶ 236-44); Fed. R. Civ. P. 9(b).

The Ninth Circuit requires a plaintiff to allege "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (citations omitted).[28] Plaintiffs attempt to meet this burden by reference to generic statements certain of Defendants' executives made when referencing general competition between Defendants (DPP ¶¶ 145-46 ("Harald Krueger, CEO of BMW, said, 'This competition constantly motivates us to achieve excellence.'"); IPP ¶¶ 240 (same)), paired with Defendants' public criticisms of each other's vehicles (IPP ¶ 241). This is thin gruel indeed, and this Court rightly has dismissed actions that sought to excuse delay based on far more than scattered statements about the generic existence of "competition." *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *20 (rejecting fraudulent concealment when allegations were "too vague[] to meet the heightened pleading standard [applicable to fraudulent

---

[28] The state law elements of fraudulent concealment are largely the same as the federal requirements. *See, e.g., Porter v. Spader*, 239 P.3d 743, 747 (Ariz. Ct. App. 2010) (equitable tolling applies where a defendant's affirmative acts of fraud or concealment have misled a person from either recognizing a legal wrong or seeking timely legal redress); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1100 (C.D. Cal. 2009) (under California law, "[a] plaintiff alleging fraudulent concealment must establish that his failure to have notice of his claim was the result of the affirmative conduct by the defendant"); *Fox v. City of Pompano Beach*, 984 So.2d 664, 668 (Fla. Dist. Ct. App. 2008) (to establish equitable estoppel, the plaintiff "must allege that the defendant acted with an intent to mislead or deceive the plaintiff into filing late, and that the plaintiff's failure to timely file is directly attributable to the defendant's misconduct"); *Christy v. Miulli*, 692 N.W.2d 694, 702 (Iowa Sup. Ct. 2005) (fraudulent concealment requires "some affirmative act to conceal the plaintiff's cause of action independent of and subsequent to the liability-producing conduct . . . [and] the plaintiff's reliance must be reasonable" and the use of ordinary care and diligence to discover the cause of action is required).

concealment.]"); *Volk*, 816 F.2d at 1415 (a plaintiff must allege how he was "[led] to believe that he did not have a claim for relief"); *Conmar Corp. v. Mitsui & Co. (U.S.A.),* 858 F.2d 499, 502 (9th Cir. 1988) (plaintiffs must "plead with particularity the circumstances of the concealment"). Nor do Plaintiffs' tired invocation of the suggestion that the conspiracy was "inherently self-concealing" move the needle. (IPP ¶ 242.) Courts are clear that passive concealment is insufficient to toll the statute of limitations. *Volk*, 816 F.2d at 1416 (rejecting fraudulent concealment when defendants "passively concealed [the material facts] by not disclosing them"); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d at 1217 (rejecting fraudulent concealment when "Plaintiffs fail[ed] to allege facts showing that Defendants did more than passively conceal information").

Plaintiffs' allegations of affirmative concealment do not satisfy Rule 9(b); even were those allegations sufficient, the Complaints demonstrate that publicly-available information put Plaintiffs on either "actual []or constructive notice of the facts giving rise to [their] claim[s]" prior to 2013. *Conmar*, 858 F.2d at 502. Most prominently, if Plaintiffs' claims that technology and features were standardized across Defendants' products are credited, then this open signaling of coordination not only put Plaintiffs on notice of the conduct about which they now complain, but also undoes any claim that Defendants "affirmatively" concealed their alleged standardization. (*See* IPP ¶ 138; DPP ¶ 86.) Furthermore, many of Plaintiffs' threadbare allegations are drawn from information that was publicly available before the applicable limitations periods.[29]

---

[29] *See supra* Section IV.D.1; *see also* DPP ¶ 75 (relying on a conversation between Defendants from the 1970s that was published in Bob Lutz's June 2013 book—published outside of the limitations period—to allege Defendants "have impermissibly coordinated on automobile production *for decades*") (emphasis added), ¶¶ 106-07 (admitting that membership in the VDA was not limited to Defendants, and describing Jaguar, Volvo, Renault and Fiat's pre-2010 requests to join the allegedly secret meetings), ¶ 108 ("In 2011, the European Commission [] fined Daimler almost 1.1 billion euros for its membership in a truck cartel that also included Volkswagen subsidiary MAN."), ¶ 116 (alleging Defendants' "motive to conspire" originated in the 1990s). (*See also* IPP ¶ 179 (alleging that "[i]n 2007" one industry association, "the EUGT, was formed, with all of its funding coming from BMW AG, Daimler AG, Volkswagen AG, and Robert Bosch GmbH").

*Conmar*, 858 F.2d at 502 ("Any fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim." (citation omitted)); *Hexcel*, 681 F.3d at 1060 ("If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply." (citation omitted)).

Finally, despite asserting that they "could not [have] discover[ed] through the exercise of reasonable diligence" the alleged facts giving rise to their claims, Plaintiffs do not describe a single action they took—aside from reading *Der Spiegel*—to investigate their claims. (DPP ¶ 138; IPP ¶ 239.) The silence on this issue is material: Plaintiffs concede that Defendants' alleged meetings were public knowledge long before 2013. Membership in the VDA was not limited to Defendants. Manufacturers such as Fiat, Ford, Jaguar, Opel, Renault, and Volvo were all members of the VDA and requested to attend the very meetings that Plaintiffs allege were "secret." (DPP ¶¶ 106-07; *see also* IPP ¶ 93 n.15, ¶ 174 ("steelmakers' representatives" and "auto parts suppliers, such as Bosch" attended Defendants' meetings, establishing that the meetings were not secret and not confined to Defendants), ¶ 202 (in 1995 Defendants collaborated on emissions research by each contributing money and engineers to joint research under the ADA industry association), ¶ 205 (Defendants have met twice a year since 2004 as part of their AVI membership), ¶¶ 187-98 (listing the dates and locations of more than a dozen trade association meetings outside of the limitations period dating back to 1999 that allegedly provided Defendants' their opportunity to conspire).)

Plaintiffs do not even allege, as they must to survive this Motion, that, in light of this and other publicly available information, they "acted diligently in trying to uncover the facts giving rise to [their] claim[s.]" *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1204 (N.D. Cal. 2015). Rather, Plaintiffs admit that they did not engage in any investigation of their claims prior to *Der Spiegel's* July 2017 article. (*See* DPP ¶ 139 (claiming Plaintiffs had "no realistic ability to discover" the basis of their claims before it was reported in *Der Spiegel*); IPP ¶¶ 236-37 (same).) Plaintiffs' inaction until

they saw a German magazine article cannot be excused. The fact that there existed "enough information prior to [September 2013] to warrant an investigation which, if reasonably diligent, would have led to the discovery of the [alleged conduct]" renders Plaintiffs unable to hide between gossamer assertions of "fraudulent concealment" now. *Hexcel*, 681 F.3d at 1060. Plaintiffs have not sufficiently alleged that their claims based on decades-old conduct are entitled to tolling under any theory. Their federal antitrust claims for conduct before September 27, 2013 (DPPs) and July 25, 2013 (IPPs) should therefore be dismissed as time-barred by the applicable statutes of limitations. Plaintiffs' state law antitrust and consumer protection claims also should be dismissed as time-barred, as set forth in Appendices A & B.[30]

**E. IPPs' State Law Claims Should Be Dismissed**

IPPs' Complaint contains a slew of state law claims that are factually derivative of their Sherman Act claim. Like the Sherman Act claim, IPPs' state law claims should be dismissed.

**1. IPPs' State Antitrust Law Claims Should Be Dismissed**

IPPs allege that Defendants violated 20 state law analogues to Section 1 of the Sherman Act. (IPP ¶¶ 269-98.) These state antitrust claims are interpreted consistently with federal law,[31] and they should therefore be dismissed on the same bases as those

---

[30] Plaintiffs' Alabama and Tennessee consumer protection claims are time-barred for two additional reasons. First, the Alabama and Tennessee consumer protection acts have statutes of repose that begin to run when a transaction occurs. As a result, Plaintiffs' Alabama claims based on purchases of vehicles prior to July 2013, and their Tennessee claims based on purchases of vehicles prior to July 2012, are time-barred. *See* Appendix B. Second, Alabama and Tennessee claims based on allegations that Defendants conspired to stabilize the price of steel are barred in their entirety by those states' statutes of limitation (even if such conduct could plausibly be said to have harmed consumers if it indeed occurred) because both states have a one-year statute of limitations for consumer protection claims. See Ala. Code § 8-19-14; Tenn. Code Ann. § 47-18-110. Plaintiffs' allegations that Defendants conspired to stabilize the price of steel are premised almost entirely on a July 5, 2016 Bloomberg article reporting that Germany's antitrust regulator raided Volkswagen, BMW AG, and Daimler AG in June 2016 in connection with a German steel investigation. (*See* IPP ¶ 164 n.92.) Accordingly, Plaintiffs reasonably should have discovered the alleged conduct more than a year before the first complaint in this MDL was filed on July 27, 2017.

[31] Eleven states have enacted "harmonization" statutes that require (or permit) their antitrust laws to be interpreted in the same manner as analogous federal law. The

argued above with respect to the Sherman Act claim.[32] Certain state antitrust claims should also be dismissed on the following additional grounds:

**a. Two States Do Not Permit Indirect Purchasers To Bring Private Antitrust Claims**

IPPs cannot bring a private cause of action under either Colorado or South Carolina state antitrust law. *See Pomerantz v. Microsoft Corp.*, 50 P.3d 929, 934 (Colo. Ct. App. 2002); *In re Packaged Seafood Products Antitrust Litig.*, 277 F. Supp. 3d 1167, 1177 (S.D. Cal. 2017) (applying South Carolina law).

**b. Two States Do Not Permit Indirect Purchasers To Bring Private Antitrust Class Actions**

Illinois does not permit indirect purchasers to maintain an antitrust claim as a class action, and Hawaii does not allow indirect purchasers to bring class actions for antitrust claims without first securing the approval of the Hawaii Attorney General, which IPPs do not allege that have done here. *See* Appendix A; *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011) ("[T]he Illinois statute represents a policy judgment as to the feasibility of managing duplicative recovery, which the legislature has entrusted to the Attorney General but not to individual indirect purchasers"); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1158 (N.D. Cal. 2009) (Hawaii's "unfair competition claims are subject to the attorney general notification requirement").

---

remaining nine states have judicially-created harmonization doctrines. *See* Appendix A (citing by state-by-state supporting authority).

[32] "Whether *AGC* applies to a state's antitrust statute is a question of state law." *Los Gatos Mercantile*, 2014 WL 4774611, at *6 n.7. Courts have applied *AGC* to the antitrust laws of 19 of the 20 states at issue here. *See* Appendix A. For Minnesota, the sole state that does not apply *AGC*, IPPs also fail to allege antitrust standing. The Minnesota Supreme Court has held that standing under its antitrust statute is governed by "foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007). For reasons explained above, (*see supra* Section IV.A), that standard is also not met here.

**c. Six States' *Illinois Brick* Repealer Statutes Have No Retroactive Effect**

In *Illinois Brick Co. v. Illinois*, the Supreme Court held that indirect purchasers cannot recover money damages for federal antitrust violations. 431 U.S. 720 (1977). The legislatures of six states relevant here (Hawaii, Nevada, New York, Oregon, Rhode Island, and Utah) amended their antitrust statutes to "repeal" *Illinois Brick.* In each instance, the legislation created a new right, which cannot be applied retroactively. *See, e.g.*, *In re Vitamins Antitrust Litig.*, No. 1285, 2000 WL 1511376, at *4 (D.D.C. Oct. 6, 2000) (New York); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-4945 SI, 2011 WL 3738985, at *3-4 (N.D. Cal. Aug. 24, 2011) (New York and Nevada); *see also* Appendix A. Accordingly, IPPs' claims under the antitrust laws of these states should be dismissed to the extent they seek damages pre-dating these states' enactments of *Illinois Brick* repealer statutes.

**d. Two States' Laws Apply Only to Intrastate Commerce**

IPPs allege that Defendants' conduct affects interstate commerce, (IPP ¶ 262), but Alabama and South Carolina apply their antitrust statutes only to conduct that affects purely intrastate commerce. *See* Appendix A; *Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper*, 746 So. 2d 966, 967-68 (Ala. 1999); *In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 82-83 (E.D.N.Y. 1980) (applying South Carolina law).

**2. IPPs' State Consumer Protection Claims Should Be Dismissed**

IPPs have also asserted 18 state consumer protection law claims based on the same conduct that allegedly gives rise to their Sherman Act claim. (IPP ¶¶ 299-319.) In addition to failing to allege "unfair competition" or any other "unlawful acts or practices" (IPP ¶ 300), these claims should be dismissed because of: (1) statutory bars to recovery under state antitrust laws; (2) the failure to plead proximate cause; and (3) additional failures of pleading as discussed below.

**a. IPPs Cannot Use Consumer Protection Claims To Circumvent Bars to Recovery Under State Antitrust Law**

IPPs base their claims entirely on Defendants' alleged anticompetitive conduct. (*See, e.g.*, IPP ¶¶ 302, 303(a), 306(b).) Courts in several states have rejected efforts by indirect purchaser plaintiffs to take "classic antitrust claims" that are prohibited or insufficiently pleaded under state antitrust law and recast them as consumer protection claims. *See Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996) (dismissing "classic antitrust claims dressed in Consumer Fraud Act clothing"); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) ("It would be inconsistent to provide that the very conduct which is not sufficient to state a cause of action under the Antitrust Act is sufficient to state a cause of action under the Consumer Fraud Act."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 407-08 (E.D. Pa. 2010) (dismissing Colorado Consumer Protection Act claim because unfair trade practices do not constitute a distinct claim under the CCPA).

In particular, IPPs should not be permitted to pursue consumer protection claims in (i) the four consumer-protection-claim states that have not repealed *Illinois Brick* and thus do not permit indirect purchasers to bring private antitrust claims—Colorado, Florida, Montana, and Pennsylvania; (ii) the two consumer-protection-claim states that do not permit indirect purchasers to bring private antitrust class actions—Illinois and Hawaii; or (iii) their one consumer-protection-claim state that applies its antitrust statutes only if the conduct affects purely (or at least predominately) intrastate commerce—Alabama. Nor should IPPs be permitted to recover damages under consumer protection statutes for conduct pre-dating the enactment of an *Illinois Brick* repealer statute in Hawaii, Nevada, New York, Rhode Island, or Utah. *See supra* Section IV.E.1.c; Appendix B.

**b. IPPs Do Not Adequately Plead Proximate Causation**

In a state law, tort-based analogue to the *AGC* analysis above, IPPs' consumer protection claims are deficient because they provide no basis from which to conclude that

Defendants' alleged conduct was the proximate cause of their claimed damages. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("No injury, no tort, is an ingredient of every state's law."). Specifically, IPPs do not allege a sufficient (or, really, any) nexus between the conduct they challenge and the unspecified injuries they purportedly suffered. But every applicable state's consumer protection statute requires a plaintiff to plead facts showing exactly that nexus because, absent proximate causation, a plaintiff's purported injuries are too remote from the alleged conduct to give rise to a claim. *See* Appendix B; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) (courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute," because "[f]or centuries, it has been a well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause" (citations omitted)).

As discussed in several contexts above (*see supra* Section IV.A.5) IPPs' purported injuries are too remote from Defendants' alleged misconduct because the actions of many independent decision makers and other variables could have intervened to break the chain of causation. Their Complaint therefore fails to plead proximate causation sufficient for tort-based recovery. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (dismissing state consumer protection claims "because each statute that the defendants allegedly violated requires that the violation proximately cause the claimed injury, and because [plaintiffs'] alleged injuries are too remote to sustain their antitrust claims"); *see also* Appendix B.

#### c. **IPPs' State Law Consumer Protection Claims Have Additional Deficiencies**

*Three States Require Misrepresentation, Deceit, or Fraudulent Conduct*. Minnesota and Utah authorize consumer protection claims based only on misrepresentation, fraud, or deceptive conduct. *See* Minn. Stat. § 325F.69(1); Utah Code Annotated §§ 13-11-4. In these circumstances, IPPs "must state with particularity the

circumstances constituting fraud," Fed. R. Civ. P. 9(b), including the "the time, place, and specific content of the false representations[.]" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010); *see also* Appendix B. IPPs have not pleaded (much less done so with specificity) that any material misrepresentation was made or fraudulent conduct occurred. At most, IPPs allege that Defendants "advertis[ed] the virtues of German engineering" (IPP ¶ 87), and "fraudulently concealed" the alleged conspiracy. (IPP ¶ 240.) But IPPs never allege that any advertisements (or any other statements by Defendants) were false, much less specify any falsehoods or misrepresentations (a required pleading element of a claim of deliberate fraud or misrepresentation). These deficiencies further warrant dismissal of the Minnesota and Utah consumer protection claims.

Similarly, IPPs' claim under the consumer protection laws of New York should be dismissed because the private right of action applies only to claims involving "deceptive" conduct. *See* N.Y. Gen. Bus. L. § 349; *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 410 ("[A]nticompetitive conduct that is not premised on consumer deception is not within the ambit of the [New York] statute[.]" (citation omitted)). Here, IPPs offer only the conclusion; they fail to specify which statements were deceptive and why they were so.

*Four States Require Unconscionable or Egregious Misconduct*. In Alabama, Michigan, North Carolina, and Utah, only "unconscionable" conduct violates consumer protection laws. *See* Appendix B. "[P]leading unconscionability requires something more than merely alleging that the price of a product was unfairly high." *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1029-30. Rather, IPPs must allege facts showing unequal bargaining power, inequitable terms in the transaction in question, or both. *See id.* (dismissing price-fixing claims brought under state consumer protection laws requiring unconscionable conduct). IPPs have not done so.

*Six States Do Not Permit Plaintiffs To Maintain Consumer Protection Claims for Damages as Class Actions*. IPPs cannot maintain a consumer protection claim for

damages as a class action under Alabama, Colorado, Montana, Pennsylvania, Tennessee, or Utah law. *See* Appendix B. Courts apply this restriction to state law consumer protection claims alleged in federal pleadings, and such claims are properly dismissed here. *See, e.g.*, *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-CV-02432-WYD-KMT, 2015 WL 4036319, at *6 (D. Colo. July 1, 2015) (dismissing consumer protection claim because Colorado statute does not permit class actions for monetary damages); *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d at 1103-04 (dismissing consumer protection claim because Montana statute does not allow class actions).

**d. <u>IPPs Do Not Plead Price Discrimination Under Hawaii Law</u>**

Hawaii prohibits price discrimination, such as "selling or furnishing the . . . product . . . at a lower rate in one section, community, or city." Haw. Rev. Stat. § 481-1. Despite purporting to bring a claim under this provision, (IPP ¶ 305), IPPs do not allege that Defendants engaged in price discrimination.

**3. <u>IPPs' State Unjust Enrichment Claims Should Be Dismissed</u>**

IPPs plead in the alternative that Defendants have been unjustly enriched under the laws of 23 states as a result of the same "unlawful and inequitable conduct" that purportedly supports IPPs' other claims, and they seek a constructive trust of alleged "ill-gotten gains." (IPP ¶¶ 320-449.) For the reasons stated above (*see supra* Section IV.A, C) there was nothing unlawful or inequitable about Defendants' conduct, so any benefit Defendants received from IPPs was not wrongfully secured, and IPPs are not entitled to restitution. *See In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 966-67 (N.D. Cal. 2007) (where "[P]laintiffs' claim of unjust enrichment . . . depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability," their unjust enrichment claim "must necessarily be dismissed when the other claims are dismissed"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).

Additionally, IPPs' unjust enrichment claims should be dismissed as impermissible attempts to circumvent the strictures of state antitrust and consumer protection laws, and because IPPs have not pleaded that they conferred a direct benefit upon Defendants, as required in certain states.

**a. <u>IPPs Cannot Employ Unjust Enrichment Claims To Circumvent the Requirements of State Antitrust and Consumer Protection Law</u>**

Because IPPs' unjust enrichment claims are predicated on Defendants' alleged violations of antitrust or consumer protection laws, (*see* IPP ¶ 322), IPPs' unjust enrichment claims should be dismissed as well. IPPs cannot pursue an unjust enrichment theory where "allowance of the claim would conflict with liabilities or penalties for the interference provided by other law." Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011). In the antitrust context specifically, the Restatement explains that plaintiffs cannot recover allegedly anticompetitive "overcharges on a theory of unjust enrichment" if recovery "would conflict with the remedial scheme established by" antitrust law. *Id.* § 44 & Illustration 16.

Courts apply this rule to prohibit plaintiffs from using unjust enrichment claims to "circumvent limitations of state antitrust laws." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009).[33] "[A]fter all, unjust enrichment is an equitable remedy . . . and it would be inequitable to permit relief where the state has

---

[33] *See, e.g.*, *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014) ("This Court joins this majority of courts in concluding that allowing unjust enrichment claims in those states that explicitly disallow indirect purchasers from pursuing antitrust and consumer-protection claims would result in circumvention of the policies expressed by state legislatures through limitations inherent in those laws." (quotation marks and alterations omitted)); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 412 ("[I]t is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by [*Illinois Brick*]."); *Sheet Metal Workers Local 441 Health & Welfare Plan*, 737 F. Supp. 2d at 425 ("[I]n accordance with well-reasoned opinions both in this Court and in other jurisdictions, I will dismiss unjust enrichment claims in those states that explicitly disallow indirect purchasers from pursuing antitrust or consumer protection claims. Allowing such recovery would result in circumvention of the policies expressed by state legislatures through the limitations inherent in these laws.").

clearly made a policy determination that no such relief should lie." *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088–89 (S.D. Cal. 2017) (citing *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1089 (9th Cir. 2003)). IPPs seek precisely such "circumvention" here, and all of their unjust enrichment claims should therefore be dismissed. *See* Appendix C.

**b. <u>Eleven States Require IPPs To Confer a Direct Benefit upon Defendants</u>**

Eleven states (Arizona, Florida, Massachusetts, Michigan, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, Utah, and Wisconsin) require plaintiffs claiming unjust enrichment to have conferred a benefit directly on the defendant. *See* Appendix C. But as indirect purchasers, by definition, IPPs did not bestow a *direct* benefit on any Defendant. Instead, "[a]ny benefit that [P]laintiffs have conferred . . . would be on others in the chain of distribution from whom they purchased, not on [D]efendants." *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 1416259, at *3 (N.D. Ill. Apr. 1, 2010) (dismissing indirect purchaser unjust enrichment claims under laws of Michigan, North Carolina, Utah, among others); *see also In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756, at *25-26 (E.D. Mich. Apr. 9, 2013) (dismissing indirect purchaser unjust enrichment claims under laws of Arizona, Florida, Massachusetts, Michigan, New York, and Wisconsin, among others).

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss each of the Consolidated Amended Complaints in full.

Dated: May 17, 2018

LATHAM & WATKINS LLP

By: */s/ Daniel M. Wall*

Daniel M. Wall (Bar No. 102580)
Belinda S Lee (Bar No. 199635)
Elizabeth H. Yandell (Bar No. 301725)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: *Dan.Wall@lw.com*
*Belinda.Lee@lw.com*
*Elizabeth.Yandell@lw.com*

Michael Lacovara (Bar No. 209279)
885 Third Avenue
New York, NY 10022-4834
Telephone: +1.212.906-1200
Facsimile: +1.212.751-4864
Email: *Michael.Lacovara@lw.com*

*Attorneys for Defendants BMW AG, BMW of North America, LLC, and BMW (US) Holding Corp.*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ Shon Morgan

Shon Morgan (Bar No. 187736)
Adam Bryan Wolfson (Bar No. 262125)
Kevin Y. Teruya (Bar No. 235916)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Tel: 213-443-3000
Fax: 213-443-3100
Email: shonmorgan@quinnemanuel.com
Email: adamwolfson@quinnemanuel.com
Email: kevinteruya@quinnemanuel.com

Richard I. Werder, Jr. (*pro hac vice*)
Josef Teboho Ansorge (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: 212-849-7000
Fax: 212-849-7100
Email: rickwerder@quinnemanuel.com
Email: josefansorge@quinnemanuel.com

SQUIRE PATTON BOGGS (US) LLP

Eric J. Knapp (Bar No. 214352)
Troy Masami Yoshino (Bar No. 197850)
275 Battery Street, Suite 2600
San Francisco, CA 94111
Tel: 415-954-0200
Fax: 415-393-9887
Email: Eric.Knapp@squirepb.com
Email: troy.yoshino@squirepb.com

*Attorneys for Defendants Daimler AG, Daimler North America Corporation, Mercedes-Benz USA, LLC, Mercedes-Benz US International, and Mercedes-Benz Vans, LLC*

KING AND SPALDING LLP

By: /s/ *Norman A. Armstrong*

Norman A. Armstrong, Jr. (*pro hac vice*)
1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
Tel: 202-616-8979
Fax: 202-626-3737
Email: narmstrong@kslaw.com

*Attorney for Defendant Porsche Cars North America, Inc. and Dr. Ing. h.c. F. Porsche AG*

SULLIVAN AND CROMWELL LLP

By: /s/ *Sharon L. Nelles*

Sharon L. Nelles (*pro hac vice*)
Steven L. Holley (*pro hac vice*)
Suhana S. Han (*pro hac vice*)
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3588
Email: nelless@sullcrom.com
Email: holleys@sullcrom.com
Email: hans@sullcrom.com

Amanda F. Davidoff (*pro hac vice*)
Samantha Hynes (*pro hac vice*)
1700 New York Avenue, NW
Washington, D.C. 20006
Tel: 202-956-7500
Fax: 202-293-6330
Email: davidoffa@sullcrom.com
Email: hyness@sullcrom.com

*Attorneys for Defendants Volkswagen Group of America, Inc., Volkswagen AG, Audi of America, Inc., Audi of America, LLC, and Audi AG*

## SIGNATURE ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the signatories hereto.

By: */s/ Daniel M. Wall*

Daniel M. Wall

*Attorney for BMW AG, BMW of North America, LLC, and BMW (US) Holding Corp.*