UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE: GERMAN AUTOMOTIVE MANUFACTURERS ANTITRUST LITIGATION | MDL No. 2796 CRB (JSC) |
|---|---|
| _____/ | **ORDER RE: DEFENDANTS' MOTIONS TO DISMISS** |
| This Order Relates To:<br>Dkt. Nos. 321, 339, 340, 341, 345, 377 | |
| _____/ | |

Consumers and auto dealers have filed two related consolidated class actions against the five leading German car manufacturers—Audi AG, BMW AG, Daimler AG, Porsche AG, and Volkswagen AG ("VW AG")—and their American subsidiaries. Plaintiffs allege that since the mid-1990s, Defendants have colluded to restrain trade in ways that constitute per se violations of the Sherman Act and that violate various state laws. Defendants have moved to dismiss the claims. Finding the allegations currently insufficient to state a claim, the Court GRANTS Defendants' joint motion to dismiss, with leave to amend. The Court DENIES the German Defendants' separate motions to dismiss for lack of personal jurisdiction.

## I. BACKGROUND[1]

As alleged, U.S. consumers and auto dealers have been overpaying for Audi, BMW, Mercedes, Porsche, and Volkswagen cars for over twenty years. They have paid premiums for "German engineering," a phrase that is synonymous with innovation and exceptional performance, but they have received something less.

---

[1] Citations to "IPP ¶" and "DPP ¶" are respectively to the indirect purchaser plaintiffs' and the direct purchaser plaintiffs' complaints. (Dkt. Nos. 241, 244.) The IPPs are U.S. consumers; the DPPs are U.S. auto dealers.

Plaintiffs claim that in the mid-1990s, Defendants started intentionally slowing down the pace of innovation.  (IPP ¶¶ 123, 139, 183; DPP ¶¶ 2, 76.)  Doing so resulted in their cars having "fewer features and reduced performance."  (IPP ¶ 5.)  Defendants took this approach, Plaintiffs maintain, in order to "reduce production costs" and "avoid[] price and technology wars."  (DPP ¶¶ 76, 81; *see also* IPP ¶ 92.)  All the while they continued to charge premiums for cutting edge technology and engineering.  (IPP ¶¶ 6, 92; DPP ¶¶ 68-69, 76.)

At least 200 employees are alleged to have participated in the agreement to reduce innovation, meeting for decades in dozens of working groups and at trade association events.  (IPP ¶¶ 123, 129, 196; DPP ¶¶ 77-79.)  Since 2011 alone, at least 1,000 meetings in furtherance of the agreement have purportedly taken place.  (IPP ¶ 123; DPP ¶ 77.)

All sorts of vehicle components are claimed to have been covered by the agreement (e.g., brake controls, chassis, electronics, gas and diesel engines, clutches, transmissions, exhaust systems, and drivetrains (IPP ¶¶ 123, 131; DPP ¶ 86)), although only two examples are explained in any detail in the complaints.

*Soft-top convertibles*.  Minutes from a meeting in Bad Kissingen, Germany document that Defendants discussed the cost, safety, weight, and technical risks of soft-top convertibles and then collectively agreed that their soft-top convertible roofs should only be allowed to open and close at vehicle speeds below 50 kilometers (or 31 miles) per hour.  (IPP ¶ 138.)  In memorializing this agreement, Defendants allegedly noted that there should be "[n]o arms race when it comes to speeds for [soft-top convertibles]."  (*Id.* (alterations in complaint).)

*AdBlue tanks*.  As explained in the complaints, AdBlue is a substance that is used to breakdown emissions from diesel engines into less harmful compounds.  (IPP ¶ 145; DPP ¶ 102.)  It became popular in the early 2000s when Defendants started marketing their diesel cars as fuel-efficient alternatives to electric and hybrid cars.  (IPP ¶¶ 144-45.)  With the use of AdBlue burgeoning, Defendants reportedly determined that they could save up to €80 per car by agreeing on a standard tank size.  (IPP ¶ 150.)  They first agreed, in or around 2006, to only use AdBlue tanks that were between 17 and 23 liters.  (IPP ¶¶ 149, 151.)  Several years later they shifted to smaller, 8-liter tanks after their marketing departments touted the cost savings of smaller tanks and

the benefits of having more space in the cars for passengers, cargo, and equipment. (IPP ¶¶ 148, 152.) Eight-liter tanks were then ditched in favor of 16-liter tanks after Defendants learned in 2010 that new U.S. regulations would soon require tanks to contain enough AdBlue to last for 10,000 miles before needing to be refilled. (IPP ¶¶ 153-55.) Even the 16-liter tanks were not large enough to meet U.S. standards, according to the IPP complaint. (IPP ¶ 153.) But Plaintiffs maintain that Defendants agreed to use 16-liter tanks despite knowing this. Documents purportedly reflect that VW AG encouraged the others to stick with the 16-liter tanks despite regulatory concerns (IPP ¶ 159) and Audi AG cautioned against a potential "arms race with regard to tank sizes," which "we should continue to avoid at all costs" (IPP ¶ 160).

*The European investigation.* The above allegations, like most others in the complaints, are based largely on articles that were published in the German news magazine *Der Spiegel*. In the summer of 2017, *Der Spiegel* reported that the European Commission's competition department ("ECC") and Germany's Federal Cartel Office were investigating "allegations of an antitrust cartel among the Defendants." (IPP ¶¶ 119-20.) As Plaintiffs note, ECC investigations only proceed when there are "reasonable indications of a likely infringement" of competition laws. (IPP ¶ 112 (quoting Antitrust Manual of Procedures, EUROPA.EU, 102-109 (March 2012), *Opening of Proceedings, Conditions for Opening of Proceedings*).)

VW AG and Daimler AG reportedly submitted proffers to the ECC as part of the agency's leniency program. (IPP ¶¶ 113-14, 121; DPP ¶¶ 111-12.) In VW AG's proffer, it admitted (1) that "Daimler, BMW, Volkswagen, Audi and Porsche made agreements 'for many years, at least since the 1990s, up to today' about the development of their vehicles, costs, suppliers and markets;" (2) that Defendants "discussed vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems;" (3) that there had been an "exchange of internal, competitively sensitive technical data;" (4) that Defendants had jointly established "technical standards" and agreed to use "only certain technical solutions" in new cars; and (5) that "behavior in violation of cartel law" may have occurred. (IPP ¶ 124.)

Plaintiffs assert that by seeking leniency from the ECC, VW AG and Daimler AG effectively "admitted the existence of a secret cartel." (IPP ¶ 118; *see also id.* ¶ 115 ("Leniency is

3

1    not available for lesser anti-competitive infringements, nor is it available to a company that claims

2    it did not participate in a cartel." (citing *Commission Notice on Immunity from Fines and*

3    *Reduction of Fines in Cartel Cases*, OFFICIAL JOURNAL OF THE EUROPEAN UNION (Aug.

4    12, 2006), Introduction ¶ 1)).)  In October 2017, following VW AG's and Daimler AG's proffers

5    and in connection with the ECC's investigation, the ECC conducted "dawn raids" in Germany at

6    several of Defendants' headquarters, including the headquarters of BMW AG, Daimler AG, and

7    VW AG.  (IPP ¶ 120; *see also* DPP ¶ 114.)

8         *The investigation is narrowed.*  In September 2018, after Plaintiffs had filed their

9    complaints in this action, the ECC announced in a press release that the scope of its investigation

10   was changing.[2]  The ECC explained in the press release that its investigation had not unearthed a

11   vehicle-wide conspiracy to restrain technological development, but that it would be opening an in-

12   depth investigation into one issue: whether Defendants "colluded, in breach of EU antitrust rules,

13   to avoid competition on the development and roll-out of technology to clean the emissions of

14   petrol and diesel passenger cars."  (Dkt. No. 377-3 at 2 (emphasis omitted).)  The ECC announced

15   that specifically it would be examining whether Defendants colluded to limit the development and

16   roll-out (i) of "selective catalytic reduction ('SCR') systems to reduce harmful nitrogen oxides

17   emissions from passenger cars with diesel engines," and (ii) of "Otto particulate filters ('OPF') to

18   reduce harmful particulate matter emissions from passenger cars with petrol engines."  (*Id.*

19   (emphasis omitted).)

20        In its press release, the ECC emphasized that its formal investigation would concern

21   "solely the emissions control systems" just identified.  (*Id.*)  Referring to Defendants as the "circle

22   of five," the Commission explained that although Defendants had also exchanged other technical

23   information and had cooperated on other areas of vehicle development, there was no reason to

24   believe that those exchanges were unlawful:

25

26   _____

27   [2] Defendants filed a copy of that press release (*see* Dkt. No. 377-3) and the Court takes judicial
     notice of its contents as information that is from a source "whose accuracy cannot reasonably be
     questioned."  Fed. R. Evid. 201(b)(2).  The Court will not consider Defendants' supplemental

28   briefing on the press release (*see* Dkt. No. 377), as Defendants did not seek the Court's leave
     before filing the brief, as required.  *See* Civil L.R. 7-3(d).

> [In addition to emissions control systems,] [n]umerous other technical topics were discussed, including common quality requirements for car parts, common quality testing procedures or exchanges concerning their own car models that were already on the market. The "circle of five" also had discussions on the maximum speed at which the roofs of convertible cars can open or close, and at which the cruise control will work. Cooperation also extended to the area of crash tests and crash test dummies where the car companies pooled technical expertise and development efforts to improve testing procedures for car safety.
>
> At this stage the Commission does not have sufficient indications that these discussions between the "circle of five" constituted anti-competitive conduct that would merit further investigation. EU antitrust rules leave room for technical cooperation aimed at improving product quality. The Commission's indepth investigation in this case concerns specific cooperation that is suspected to have aimed at limiting the technical development or preventing the roll-out of technical devices.

(*Id.*)

*Other agreements*. Plaintiffs allege that Defendants reached other anticompetitive agreements in addition to their agreement to reduce innovation.

- *Price fixing*. Plaintiffs claim that Defendants agreed to "artificially fix, raise, stabilize, and control prices" for their cars in the United States. (*E.g.*, IPP ¶ 261.) No specifics on this agreement are offered.

- *Agreements on suppliers*. Defendants allegedly agreed to use the same suppliers for certain vehicle components. Three concrete examples are offered in the complaints. In or around 2006, Defendants agreed that, if possible, AdBlue tanks should be produced by only two manufactures. (IPP ¶ 156.) In 2011, one of Defendant's managers explained to a working group that Defendants needed to select the same supplier for diesel-motor sensors. (IPP ¶ 142.) And in 2013, one of Defendants' working groups reviewed and criticized the performance of a shared supplier of suspension equipment. (IPP ¶ 141.)

- *Agreement on steel purchases*. Starting in the 1990s, Plaintiffs contend that Defendants and German steel manufacturers began using a shared pricing formula for steel purchases. (IPP ¶ 169.) The formula set a fixed long-term price for raw steel and a variable price, based on a selected price index, for scrap steel, precious metals and alloys—three

5

United States District Court
Northern District of California

materials that are combined with raw steel to build cars.  (IPP ¶¶ 166, 169; DPP ¶ 91.)
The formula helped bridge a divide between Defendants and the steel manufacturers:
Defendants wanted long-term contracts with fixed, predictable costs to effectively set car
model prices, while steel manufacturers wanted short-term contracts that could be
adjusted to account for fluctuations in the markets for these materials.  (IPP ¶¶ 167-68;
DPP ¶ 90.)  Defendants apparently stopped using the variable index in 2015, after
European officials began investigating anticompetitive conduct in the German steel
industry.  (IPP ¶ 175.)  But soon after that decision, Plaintiffs submit that Defendants
started communicating about setting up a replacement index.  (IPP ¶¶ 175-76.)

- *Agreement to fund scientific studies*.  As alleged, Defendants sponsored now-debunked
scientific studies that were aimed at promoting their diesel vehicles.  (IPP ¶ 178.)
Plaintiffs claim that the studies were flawed because they purported to show that new
German-made diesel cars had low emissions, but at least some of those cars used
emissions cheating software and were not in fact clean or safe for human health.  (IPP
¶¶ 178-82.)

Both the IPPs and DPPs assert that through the conduct described above Defendants have
violated § 1 of the Sherman Act.  The IPPs also assert that Defendants have violated various state
antitrust, unfair competition, consumer protection, and unfair trade practices laws, and have
triggered certain state unjust enrichment and disgorgement statutes.  The IPPs and DPPs seek to
bring class actions respectively on behalf of all persons and U.S.-based car dealers that, since the
mid-1990s, bought or leased in the United States one or more new passenger cars manufactured or
sold by Defendants.  (IPP ¶¶ 4, 10, 245; DPP ¶ 129.)

After the complaints were filed, Defendants filed a joint motion to dismiss for failure to
state a claim.  *See* Fed. R. Civ. P. 12(b)(6); (Dkt. No. 321).  The German Defendants (Audi AG,
BMW AG, Daimler AG, Porsche AG, and VW AG) also filed individual motions to dismiss for
lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2); (Dkt. Nos. 339, 340, 341, 345).

\\

\\

## II. LEGAL STANDARDS

At the pleading stage, plaintiffs in civil proceedings must make "a prima facie showing" of personal jurisdictional over the defendants. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). They cannot rely on "bare allegations" in doing so, but "uncontroverted allegations in the complaint must be taken as true." *Id.* (citation omitted). If a prima facie case is made, the burden shifts to the defendants to "present a compelling case" for why the exercise of jurisdiction would be unreasonable. *Id.* at 1079 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)).

The complaints must also include factual allegations that, if true, would plausibly support a claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-80 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-57 (2007). In the antitrust context, the Ninth Circuit has explained that the facts that count in this assessment are "evidentiary facts." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Evidentiary facts are those that can answer the questions "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194, n.6 (9th Cir. 2015) (quoting *Kendall*, 518 F.3d at 1047).

Unlike evidentiary facts, legal conclusions and conclusory facts will not be accepted as true. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). When the nonconclusory facts are accepted, they "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III. PERSONAL JURISDICTION

The Court first considers the German Defendants' motions to dismiss for lack of personal jurisdiction. Audi AG, BMW AG, Daimler AG, Porsche AG, and VW AG are German corporations. They also allegedly made the agreements at issue in Germany. Because they are foreign companies and the challenged conduct occurred abroad, they argue that this Court lacks personal jurisdiction over them.

In a federal antitrust case, a district court may not enter a binding judgment against a defendant that has insufficient contacts with the United States. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945) (general standard); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (applied in antitrust context). Where, as here, the defendants are not "at home in the forum," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011), personal jurisdiction will be appropriate only if they "purposefully direct[ed] [their] activities" at the forum or "purposefully avail[ed] [themselves] of the privilege of conducting activities in the forum," *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

During the relevant period, the German Defendants purposefully directed their activities at the United States. Through subsidiaries that they established in the United States, they annually sold hundreds of thousands of cars to auto dealers and consumers in this country. (DPP ¶¶ 16-18, 20-22, 25-26, 28-32, 34-36.) They designed their cars to meet federal and state motor vehicle regulations. (DPP ¶ 126; IPP ¶¶ 153-55 (alleging that Defendants chose to use larger AdBlue tanks in their U.S.-bound cars than in their Europe-bound cars because of U.S. emission standards).) Their executives publicly noted that the U.S. market was one of the "most important," a "core region," a "strategic pillar," a "very high priority," and a "second home." (Opp'n, Dkt. No. 362 at 22, 26, 29-30, 32, 34 (quoting annual reports, press releases, and statements at annual meetings.)[3] Indeed, they allegedly made billions of dollars selling their cars in the United States. (DPP ¶ 55.)

The German Defendants, in short, targeted the United States as a market for their cars; and because the claims at issue are tied to the cars that they indirectly sold in the United States, personal jurisdiction over them is appropriate. Two well-known Supreme Court decisions support this conclusion.

In *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), the Court held that an Oklahoma court could not exercise personal jurisdiction "over a nonresident automobile retailer

---

[3] The Court may consider evidence presented outside the pleadings in assessing personal jurisdiction. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).

and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma [was] the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma."  *Id.* at 287.  In reaching that holding, the Court took care to distinguish the facts before it from a scenario that would have given rise to personal jurisdiction over the nonresident defendants:

> [I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

*Id.* at 297.

Relying in part on *World-Wide Volkswagen*, a plurality of the Court in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), concluded that a Japanese valve manufacturer's "mere awareness" that its valves would reach the forum State "in the stream of commerce" after it sold the valves to a Taiwanese tire manufacturer was insufficient to support that the valve manufacturer "purposefully avail[ed] itself of the privilege of conducting activities within the forum State."  *Id.* at 105, 109, 112-13 (O'Connor, J.).  But the plurality explained that certain "[a]dditional conduct," if present, could have established the "substantial connection between the defendant and the forum State necessary for a finding of minimum contacts":

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State [and support personal jurisdiction.]  [F]or example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.* at 112 (citation omitted).

The facts that were absent in *World-Wide Volkswagen* and *Asahi*, but which the Supreme Court noted could support personal jurisdiction over a foreign defendant, are sufficiently alleged here.  During the over 20 year conspiracy that is claimed, Plaintiffs submit that more than 20

9

million of the German defendants' cars were sold in the United States (DPP ¶ 54)—far from

"simply an isolated occurrence." *World-Wide Volkswagen*, 444 U.S. at 297. And those 20 million

cars didn't simply arrive in the United States through "the stream of commerce." *Asahi*, 480 U.S.

at 112. The German defendants "establish[ed] channels for . . . marketing [their] product[s] . . . in

the [United States]" (*see* IPP ¶¶ 53-66; DPP ¶¶ 40-43), and they "design[ed] [their] product[s] for

the market in the [United States]" (*see* IPP ¶¶ 153-55; DPP ¶ 126). *Asahi*, 480 U.S. at 112.[4]

It is an "unexceptional proposition" that when a foreign manufacturer "seek[s] to serve a

given . . . market," the manufacturer may be subject to the jurisdiction of courts within that market

even "without entering the forum." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011)

(plurality). Given the German Defendants' efforts to target the U.S. market (and the success they

had), this Court "has the power to subject [them] to judgment concerning that conduct." *Id.* at

884; *see also Schwarzenegger*, 374 F.3d at 802 (explaining that personal jurisdiction exists when a

foreign defendant directs his activities at the forum, the claim arises from that forum-directed

conduct, and the exercise of jurisdiction is otherwise reasonable).

Plaintiffs have made a prima facie showing of personal jurisdiction. The burden

accordingly shifts to the German Defendants to "present a compelling case" for why the exercise

of jurisdiction would be unreasonable. *CollegeSource*, 653 F.3d at 1079 (quoting *Burger King*,

471 U.S. at 477); *see also Asahi*, 480 U.S. at 113-15. They have not met this burden.

Defendants first assert that the European Union and Germany have sovereign interests in

adjudicating this matter, as it involves German companies, German witnesses, and conduct in

Germany. They argue that the exercise of jurisdiction here would conflict with those sovereign

interests. A conflict with "the sovereignty of the defendant's state" is a factor that courts consider

in determining whether the exercise of personal jurisdiction is reasonable. *CollegeSource*, 653

F.3d at 1079 (*Dole Food*, 303 F.3d at 1114). But Defendants have not persuaded the Court that

---

[4] In *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017), a case on which the German Defendants rely, there were no allegations that the Japanese defendant, Yamaha Motor Co. Ltd., had designed the defective boat motors at issue for sale in the forum state of California. The Ninth Circuit's conclusion that personal jurisdiction was lacking over the foreign defendant there, even though its U.S. subsidiary sold the motors in California, *id.* at 1022-25, is thus not controlling.

10

such a conflict exists. While Germany and the European Union are investigating Defendants'
actions, Plaintiffs bring their cases for violations of U.S. antitrust laws based on conduct that is
tied to the United States. This Court will not interfere with the sovereign interests of Germany
and the European Union by considering whether Defendants violated U.S. law and harmed U.S.
consumers.

The German Defendants next note that hundreds of their employees are alleged to have
been involved in the agreements in question and most (if not all) of those employees are located in
Germany. If litigation in this forum continues, the German Defendants argue that the burdens will
be significant, as witnesses and attorneys will need to shuttle back and forth between the United
States and Europe. Inconveniences of the type asserted "will not overcome clear justifications for
the exercise of jurisdiction" unless they are "so great as to constitute a deprivation of due process."
*Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1481 (9th Cir. 1986). At this
stage, the Court cannot conclude that the identified inconveniences are of this magnitude. If
Plaintiffs' cases move forward and the travel and expense burdens that are forecasted crystalize,
the German Defendants may renew their inconvenience argument at a later date. *See IMAPizza,
LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 116 n.5 (D.D.C. 2018) (noting that "jurisdictional issues,
like merits issues, are adjudicated in stages" and considering a Rule 12(b)(6) motion after
determining that the plaintiffs made out a prima facie showing of personal jurisdiction).

Plaintiffs have made a prima facie showing of personal jurisdiction and the German
Defendants have not presented a compelling case for why the exercise of jurisdiction would be
unreasonable. The Court thus concludes that it has personal jurisdiction over the German
Defendants for Plaintiffs' Sherman Act claims. Under the doctrine of pendent personal
jurisdiction, the Court also exercises jurisdiction over the German Defendants for Plaintiffs' state
law claims, which are based on the same operative facts as their Sherman Act claims. *See
CollegeSource*, 653 F.3d at 1076 (citing *Action Embroidery*, 368 F.3d at 1180-81). The German
Defendants' motions to dismiss for lack of personal jurisdiction are DENIED.

\\

\\

Section 1 of the Sherman Act forbids competitors from entering into agreements that unreasonably restrain trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Multiple anticompetitive agreements are claimed here, although the principal focus is on an agreement by Defendants to reduce innovation.

If Defendants agreed to what is alleged—"a *de facto* whole car conspiracy" to reduce innovation (Opp'n Dkt. No. 360 at 20)—that agreement plausibly would have violated § 1. Plaintiffs maintain that the innovation-reducing agreement resulted in Defendants' cars having "fewer features and reduced performance." (IPP ¶ 5.) An agreement "to make a product of inferior quality . . . count[s] as [an] output reduction," Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1901d (3rd & 4th Eds., 2018 Cum. Supp. 2010-2017), and agreements to restrict output are per se illegal under § 1, *see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 & n.21 (1984).

The question is whether the well-pled allegations plausibly support the output reducing agreement that is claimed. After considering that question next, the Court will later address the other agreements that are described in the complaints.

**A.      Agreement to Reduce Innovation**

The complaints identify two instances in which Defendants reached consensus on vehicle specifications. As alleged, they agreed not to manufacture convertibles with roofs that opened when the cars were traveling above a particular speed, and they agreed to use the same sized AdBlue tanks in their diesel-engine cars.

Neither of these is a compelling example of an agreement "to make a product of inferior quality." Areeda & Hovenkamp ¶ 1901d. The complaints do not suggest that consumers even want convertibles with roofs that open at speeds above 31 miles per hour, the chosen limit; and common sense suggests that there are safety reasons for why consumers would *not* want that feature. It's also not clear if the selected 16-liter AdBlue tanks were inferior to larger tanks. Larger tanks would have needed to be refilled less often, but they also would have taken up more

space in the cars, as Defendants recognized.  (IPP ¶¶ 148, 152.)

Even assuming, though, that the convertible and AdBlue tank agreements reduced innovation and resulted in inferior cars, those two examples are not enough to support a "*de facto* whole car conspiracy*" to reduce innovation.  The two examples relate to niche vehicle features that are only found in a small subset of Defendants' cars.  Only two of 37 named IPPs allege that they purchased a convertible (IPP ¶¶ 34, 44), and only one alleges that he purchased a diesel-engine car (*id.* ¶ 26).  To maintain lawsuits against Defendants on behalf of almost everyone in the United States who has purchased one of their cars (of any model type) over the past 20 years, more is needed.

To support the broader agreement that they allege, Plaintiffs rely heavily on VW AG's admissions to European antitrust authorities.  To review, Plaintiffs allege that VW AG admitted to the ECC that:

1.  "Daimler, BMW, Volkswagen, Audi and Porsche made agreements 'for many years, at least since the 1990s, up to today' about the development of their vehicles, costs, suppliers and markets;" that

2.  Defendants "discussed vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems;" that

3.  there had been an "exchange of internal, competitively sensitive technical data;" that

4.  Defendants jointly established "technical standards" and agreed to use "only certain technical solutions" in new vehicles; and that

5.  "behavior in violation of cartel law" may have occurred.

(IPP ¶ 124.)

These admissions may seem significant at first glance, but it is hard to make much of them when they are examined more closely.  The first admission is vague.  That Defendants made agreements for many years "about the development of their vehicles, costs, suppliers and markets" says little about the scope of those agreements, and says nothing about the alleged agreement to reduce innovation.

The second admission is similar. VW AG admitted that Defendants "discussed vehicle development," but there is no indication of what those discussions entailed. More detail is needed because a discussion among competing auto manufacturers about brakes, or about any of the other identified car parts, need not be anticompetitive. *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010) (explaining that collaboration among competitors can "reduce costs, facilitate innovation, eliminate duplication of efforts and assets, and share risks that no individual member would be willing to undertake alone"); FTC & Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 1 (2000) (noting that "to compete in modern markets, competitors sometimes need to collaborate," and that collaboration may "not only [be] benign but procompetitive").

The third, fourth, and fifth admissions do a bit more for Plaintiffs. An "exchange of internal, competitively sensitive technical data" among Defendants may have been anticompetitive and, as VW AG appears to have acknowledged, may have violated European cartel law. Defendants' agreement to use "'only certain technical solutions' in new vehicles" also sounds similar to an agreement to reduce innovation. Yet even these allegations lack important specificity.

For one thing, European and American antitrust laws are not uniform, so Defendants' possible violation of European cartel law does not necessarily mean that they violated the Sherman Act. *See* D. Daniel Sokol, *Troubled Waters Between U.S. and European Antitrust*, 115 Mich. L. Rev. 955, 970 (2017) (explaining that "European case law and enforcement on information sharing [among competitors] is more aggressive than the United States").

Even more importantly, an agreement to only use certain technical solutions is not the same as an agreement to reduce product quality. The former may be equivalent to "standard setting," which "serves many useful ends, such as protecting consumers from inferior goods, increasing compatibility among products that must be interchangeable with the products of other manufacturers, or focusing customer comparison on essential rather than nonessential differences." Areeda & Hovenkamp ¶ 2136a. For these reasons, "most instances of standard setting . . . are lawful." *Id.* It is not appropriate to infer that Defendants reached a per se illegal

14

1    agreement to reduce product quality, which is what Plaintiffs allege, simply because they agreed to

2    exchange "competitively sensitive technical data" and to use "only certain technical solutions."

3        Also of significance, VW AG's admissions do not identify the specific types of

4    competitively sensitive technical data that Defendants exchanged, or the technical solutions to

5    which Defendants agreed.  Maybe those exchanges and technical solutions touched on many

6    different areas of vehicle development, as Plaintiffs allege.  But it is also possible that the

7    exchanges were more limited in scope.  Indeed, perhaps the exchanges and technical solutions

8    related only to the speed at which soft-top convertibles open and the size of AdBlue tanks, the two

9    examples that Plaintiffs have identified in their complaints.

10       VW AG's admissions to European antitrust authorities, in short, are too general and too

11   vague to plausibly support the broad agreement to reduce innovation that Plaintiffs allege.

12       Other allegations require even more speculation.  For example, putting aside VW AG's

13   admissions, Plaintiffs argue it is significant that the ECC is investigating Defendants' coordinated

14   activities.  But courts in this district have explained that government antitrust investigations

15   ordinarily carry "no weight in pleading an antitrust conspiracy," for it is "unknown whether the

16   investigation[s] will result in indictments or nothing at all."  *In re Graphics Processing Units*

17   *Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also In re Capacitors Antitrust*

18   *Litig.*, 106 F. Supp. 3d 1051, 1064 (N.D. Cal. 2015).

19       The ECC investigation at issue proves why this skepticism is well founded.  Since

20   Plaintiffs filed their complaints, the scope of that investigation has narrowed significantly.  The

21   ECC was initially investigating whether Defendants had unlawfully colluded on numerous areas

22   of vehicle development.  But having determined from its initial investigation that Defendants'

23   collaboration was mostly akin to standard setting, the ECC is now only looking into whether

24   Defendants colluded on the development of certain emissions technologies.  (*See* Dkt. No. 377-3

25   at 2.)  That targeted investigation into one area of vehicle development does little to support a

26   "whole car conspiracy" to reduce innovation.

27       Some allegations in the complaints do support the expansive agreement to reduce

28   innovation that is claimed, but these allegations are not well pled.  For example, Plaintiffs allege

15

that the innovation-reducing agreement covered "almost all areas of automotive development." (DPP ¶ 86 (emphasis omitted); *accord* IPP ¶ 131.)  Absent are evidentiary facts supporting this allegation.  It is a conclusory factual statement and will not be accepted as true.  *See Iqbal*, 556 U.S. at 678-79.

Allegations about how Defendants used working groups and trade associations to further their "whole car conspiracy" also lack sufficient detail.  Although the IPPs spend more than a dozen pages of their complaint discussing these working groups and trade associations, they almost never identify what was agreed to in these meetings and instead only vaguely refer to "clandestine agreements to limit technological innovation."  (IPP ¶ 129.)  More facts are needed to plausibly support that Defendants used working groups and trade associations to reach the broad anticompetitive agreement that is alleged.  *See In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

As the Supreme Court noted in *Twombly*, antitrust discovery can be "sprawling, costly, and hugely time-consuming," and can "push cost-conscious defendants to settle even anemic cases." 550 U.S. at 559 & n.6.  These concerns are at play here.  Plaintiffs propose two class actions that would include almost every purchaser and dealer of German cars in the United States over the past 20 years.  Discovery would require Defendants to search through decades of information; and because Plaintiffs allege that Defendants' agreement covered most (if not all) areas of vehicle development, discovery would reach into almost every nook and cranny at five giant automakers.

With the potential for such a massive and expensive factual investigation, the Court "retain[s] the power to insist upon some specificity in pleading."  *Id.* at 558 (citation omitted). Before Plaintiffs are allowed to pursue such a broad antitrust claim, they must do more than point to a European antitrust investigation (the scope of which is now much narrower than Plaintiffs' claims), two examples of agreements by Defendants to use certain technical standards, and Defendants participation in working groups and trade associations.  Even when viewed together,

these allegations do not plausibly support that Defendants reached a "*de facto* whole car conspiracy" to reduce innovation.[5]

## B.    The Other Agreements

While the principal focus of the complaints is on the asserted agreement to restrain innovation, Plaintiffs also allege that Defendants violated § 1 by (i) fixing prices, (ii) agreeing to only use certain part suppliers, (iii) using a shared pricing formula for steel purchases, and (iv) jointly funding now-debunked scientific studies that were aimed at promoting their diesel cars. The allegations do not support these claims.

No factual allegations support price fixing. Plaintiffs simply state in the Claims for Relief sections of their complaints that Defendants "agree[d] to fix, increase, maintain and/or stabilize prices of German Automobiles sold in the United States." (DPP ¶ 153; *see also* IPP ¶ 261 (Defendants "entered into a continuing agreement . . . to artificially fix, raise, stabilize, and control prices for new German Passenger Vehicles in the United States"). These are conclusory statements and will not be accepted as true. *See Iqbal*, 556 U.S. at 678.

For the other three agreements, even if they were reached it is unclear how Plaintiffs were injured by them. If, as is alleged, the five leading German car makers agreed to coordinate their purchases of car parts and steel, the prices they paid for those inputs would presumably have dropped. *See, e.g.*, Thomas A. Piraino, Jr., *A Proposed Antitrust Approach to Collaborations Among Competitors*, 86 Iowa L. Rev. 1137, 1178 (2001) ("If, for example, many buyers in the relevant market participate in a purchasing joint venture, the venture is more likely to give those buyers the clout to lower their purchasing costs."); Areeda & Hovenkamp ¶ 2135b (explaining that the most common purpose of "joint purchasing arrangements" is "to obtain lower prices on more favorable terms"). Lower input prices would likely have benefited car purchasers, not harmed them. *See* John B. Kirkwood, *Powerful Buyers and Merger Enforcement*, 92 B.U. L. Rev. 1485,

---

[5] As the Court reads the complaints, Plaintiffs do not offer the soft-top convertible and AdBlue tank allegations in support of separate, component-level Sherman Act claims. They instead offer those allegations to support the broader "whole car conspiracy" to reduce innovation that is claimed. The Court, then, will not separately consider whether the soft-top convertible and AdBlue tank agreements would plausibly violate the Sherman Act on their own.

1505 n.75 (2012) (noting that "[l]ower input prices generally yield lower prices and greater output of end products" (quoting Jonathan M. Jacobson & Gary J. Dorman, *Joint Purchasing, Monopsony and Antitrust*, 36 Antitrust Bull. 1, 4 (1991))).

Plaintiffs claim that they were harmed because any savings from the car-part and steel supplier agreements were not passed on to them. (*See, e.g.*, DPP ¶ 87 (alleging that with respect to the steel-purchasing agreement, "Defendants pocketed the cost savings and did not pass along a single cent to the Dealer Plaintiffs").) That result would have been odd, as "[a] firm will normally pass on some portion of its cost-per-unit savings to consumers even if it is a profit-maximizing monopolist." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 n.11 (9th Cir. 2003). But in any event, Plaintiffs do not explain why Defendants were required to pass on their cost savings. If Defendants had collectively agreed that none of them would share cost savings with consumers, then perhaps that agreement would have unreasonably restrained trade and harmed consumers. But the complaints do not include any factual allegations supporting such an agreement.

As for Defendants funding of now-debunked studies on diesel emissions, Plaintiffs do not explain how they were injured or how trade was restrained by this conduct. They do not allege that these scientific studies affected the price of their cars or that they relied on these studies in purchasing their cars; nor do they dispute that the principal study discussed in the IPP complaint was never published. (*See* Joint Mot., Dkt. No. 321 at 41 n. 17.)

To support a Sherman Act claim, a private plaintiff must "allege some credible injury caused by the [challenged] conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1056 (9th Cir. 1999). The nonconclusory, evidentiary facts in the complaints do not support a credible injury to Plaintiffs resulting from Defendants' agreements regarding part suppliers, steel purchases, and scientific studies.

\* \* \*

The well-pled allegations do not plausibly support any of the anticompetitive agreements that are alleged. The Court accordingly GRANTS Defendants' joint motion to dismiss Plaintiffs' Sherman Act claims. Having reached that conclusion, the Court need not consider other

arguments for dismissal of the Sherman Act claims that Defendants have raised.

## V.  STATE LAW CLAIMS

In addition to their Sherman Act claims, the IPPs also assert that Defendants violated various state laws.  The factual bases and theories of injury for these claims are the same as those for the Sherman Act claims.  Like the Sherman Act claims, then, the state law claims are not well pled.  Having reached that conclusion, the Court will not consider additional claim-specific arguments that Defendants have made for dismissal of the state law claims.  Their joint motion to dismiss the state law claims is GRANTED.

## VI. CONCLUSION

Plaintiffs have not stated a claim for relief.  It is not a certainty, however, that they cannot allege facts sufficient to address the identified deficiencies.  The Court thus grants them leave to amend their complaints.  To the extent that they choose to do so, they must file their amended complaints within **45 days** of this Order.

**IT IS SO ORDERED.**

Dated: June 17, 2019

_____
CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California