LATHAM & WATKINS LLP
Daniel M. Wall (Bar No. 102580)
Belinda S Lee (Bar No. 199635)
Alicia R. Jovais (Bar. No. 296172)
Elizabeth H. Yandell (Bar No. 301725)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*Dan.Wall@lw.com*
*Belinda.Lee@lw.com*
*Alicia.Jovais@lw.com*
*Elizabeth.Yandell@lw.com*

Michael Lacovara (Bar No. 209279)
885 Third Avenue
New York, NY 10022-4834
Telephone: +1.212.906-1200
Facsimile: +1.212.751-4864
*Michael.Lacovara@lw.com*

*Attorneys for Defendants BMW AG, BMW of North America, LLC, and BMW (US) Holding Corp.*

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GERMAN AUTOMOTIVE MANUFACTURERS ANTITRUST LITIGATION | Case No. 3:17-md-2796-CRB<br>MDL No. 2796 |
| This document relates to ALL ACTIONS | **DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS THE INDIRECT PURCHASER PLAINTIFFS' AND DIRECT PURCHASER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINTS**<br><br>Date: March 20, 2020<br>Time: 10:00 a.m.<br>Place: Courtroom 6 (17th Floor) |

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on March 20, 2020, at 10:00 a.m., or at such other date and time as may be agreed upon or ordered, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Audi AG, Audi of America, Inc., Audi of America, LLC, Bayerische Motoren Werke AG, BMW of North America, LLC, BMW (US) Holding Corporation, Daimler AG, Mercedes-Benz USA, LLC, Dr. Ing. h.c. F. Porsche AG, Porsche Cars North America, Inc., Volkswagen AG, and Volkswagen Group of America, Inc. will move this Court to dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. No. 391), and the Consolidated Direct Purchaser Amended Class Action Complaint (Dkt. No. 392). This Motion is made pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1), and 12(b)(6), and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, all pleadings, papers, and prior Court orders filed herein, oral argument of counsel, and any other matter that may be considered by this Court on this Motion.

# TABLE OF CONTENTS

**Page**


**I.** STATEMENT OF ISSUES To Be Decided .......... 1

**II.** SUMMARY OF ARGUMENT .......... 1

**III.** PROCEDURAL BACKGROUND .......... 5

**A.** The Parties .......... 5

**B.** The *Der Spiegel* Article and Plaintiffs' Original Consolidated Complaints .......... 6

**C.** The European Commission Narrows Its Investigation .......... 6

**D.** This Court Dismisses the Consolidated Complaints .......... 8

**IV.** SUMMARY OF THE AMENDED COMPLAINTS .......... 9

**A.** Overview .......... 9

**B.** The Conduct and Claims Alleged .......... 11

**C.** Alleged Markets for German Vehicles .......... 13

**V.** LEGAL STANDARD .......... 14

**VI.** ARGUMENT .......... 16

**A.** Plaintiffs' Allegations (Again) Do Not Plausibly Support Any Anticompetitive Agreements or Antitrust Injury .......... 16

**1.** Plaintiffs Have Again Failed To Allege an Anticompetitive AdBlue Agreement .......... 16

**2.** Plaintiffs Have Again Failed To Plead Article III Standing and Antitrust Standing Related to AdBlue Claims .......... 20

**a.** Plaintiffs Lack Article III Standing .......... 20

**b.** Plaintiffs Also Lack Antitrust Standing .......... 22

**B.** Plaintiffs Have Failed To Allege Any Other Anticompetitive Agreements .......... 24

**1.** DPPs' "No Arms Race" Conspiracy Is a Reworded Version of the "Whole Car Conspiracy" and Deserves the Same Outright Dismissal .......... 24

**2.** DPPs' Allegations of an Agreement Not To Develop an All-Electric Vehicle Are Unsupported and Do Not Articulate a Cognizable Injury .......... 25

**C.** Plaintiffs Do Not Allege a *Per Se* Antitrust Violation, and Fail To Adequately Plead a Rule of Reason Violation ........ 26

**1.** Plaintiffs Allege Information Sharing and Technical Standardization, Not a *Per Se* Output Restriction ........ 27

**2.** Plaintiffs Fail To Allege Market Power in a Well-Defined Market ........ 29

**a.** A Relevant Product Market Is Defined by Reasonable Interchangeability ........ 29

**b.** Plaintiffs' Market Definitions Are Legally Deficient Because Non-German Vehicles Are Reasonably Interchangeable with German Vehicles ........ 30

**c.** IPPs' "German Diesel Vehicle" Market Also Fails To Account for Non-Diesel Vehicles That Compete with Diesel Vehicles ........ 33

**3.** Plaintiffs Do Not Plausibly Allege Defendants Have Market Power ........ 34

**D.** The FTAIA Bars Plaintiffs' Federal and State Claims ........ 35

**1.** The FTAIA Limits the Reach of Federal and State Antitrust Law ........ 35

**2.** The Amended Complaints Do Not Allege Restraints on "Import Commerce" ........ 36

**3.** The Amended Complaints Do Not Allege Domestic Effects that Are the Immediate Consequences of a Foreign Restraint ........ 39

**E.** Plaintiffs' Claims Are Largely Time-Barred ........ 41

**1.** The "Discovery Rule" Does Not Apply ........ 42

**2.** Plaintiffs Have Not (and Cannot) Adequately Plead Fraudulent Concealment ........ 44

**F.** IPPs' State Law Claims Should Be Dismissed ........ 47

**1.** The State-Law Claims of Fourteen Plaintiffs, and All Claims Under Four States' Laws, Should Be Dismissed ........ 47

**2.** Four State Antitrust Claims Should Be Dismissed on Additional Grounds ........ 48

**3.** IPPs' Consumer Protection Claims Should Also Be Dismissed ........ 49

**4.** IPPs' State Unjust Enrichment Claims Should Also Be

Dismissed ........ 52

**VII.** CONCLUSION ........ 54

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Aftermarket Filters Antitrust Litig.*,
MDL No. 1957, 2010 WL 1416259 (N.D. Ill. Apr. 1, 2010) ....................54

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)....................51

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ....................22, 26

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ....................22

*Amarel v. Connell*,
202 Cal. App. 3d 137 (1988) ....................36

*In re Animation Workers Antitrust Litig.*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ....................46

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) ....................43, 45

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ....................29, 31, 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................50

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)....................22

*In re ATM Fee Antitrust Litig.*,
768 F. Supp. 2d 984 (N.D. Cal. 2009) ....................15

*Autohaus Acquisitions, Inc. v. Audi AG et al.*,
No. 2:17-cv-07536-MCA-MAH (D.N.J. Sept. 27, 2017)....................42

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)....................18

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................9, 10, 15

*Beneficial Standard Life Insur. Co. v. Madariaga*,
851 F.2d 271 (9th Cir. 1988) ....................43

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ....................24

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ....................50

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....................33

*Cal. Dental Ass'n v. F.T.C.*,
224 F.3d 942 (9th Cir. 2000) ....................28

*In re Capacitors Antitrust Litig.*,
No. 14-cv-03264, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016)....................36

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*,
227 F.3d 62 (3d Cir. 2000), *overruled on other grounds by Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011)....................37

*Chan Ah Wah v. HSBC N. Am. Holdings, Inc.*,
No. 15 CIV. 8974, 2016 WL 4367976 (S.D.N.Y. Aug. 11, 2016)....................40

*Chapman v. Pier 1 Imports (U.S.), Inc.*,
631 F.3d 939 (9th Cir. 2011) ....................15

*In re Chaus Secs. Litig.*,
801 F. Supp. 1257 (S.D.N.Y. 1992)....................47

*In re Circuit Breaker Litig.*,
984 F. Supp. 1267 (C.D. Cal. 1997) ....................28

*City of Moundridge v. Exxon Mobile Corp.*,
No. 04-940, 2009 WL 5385975 (D.D.C. Sept. 30, 2009)....................18

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
851 F.2d 478 (1st Cir. 1988)....................28

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
858 F.2d 499 (9th Cir. 1988) ....................45, 46

*Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*,
846 F.2d 284 (5th Cir. 1988) ....................29

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015) ....................18

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)....................48, 51, 53

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ....................................................................20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ....................................................................52

*E & G Gabriel v. Gabriel Bros., Inc.*,
No. 93 CIV. 0894, 1994 WL 369147 (S.D.N.Y. July 13, 1994) ...............................30

*Easter v. Am. W. Fin.*,
381 F.3d 948 (9th Cir. 2004) ..........................................................................20, 21, 48

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..................................................................................................34

*Emrich v. Touche Ross & Co.*,
846 F.2d 1190 (9th Cir. 1988) ..................................................................................44

*Epstein v. C.R. Bard, Inc.*,
460 F.3d 183 (1st Cir. 2006).....................................................................................43

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)...........................................................................................35, 41

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...............................................................21, 24

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004)......................................................................................24

*Fox v. City of Pompano Beach*,
984 So.2d 664 (Fla. Dist. Ct. App. 2008) .................................................................44

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
No. 12-cv-02432, 2015 WL 4036319 (D. Colo. July 1, 2015) ..................................52

*Gaebler v. New Mexico Potash Corp.*,
676 N.E.2d 228 (Ill. App. Ct. 1996) .........................................................................49

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................................42

*Gerlinger v. Amazon.com Inc.*,
526 F.3d 1253 (9th Cir. 2008) ..................................................................................25

*In re German Auto. Mfrs. Antitrust Litig.*,
392 F. Supp. 3d 1059 (N.D. Cal. 2019) ............................................................ *passim*

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ....................................................................................22

*Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722 (N.Y. 2012) ....................36

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019 (9th Cir. 2013) ....................32

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................9, 18, 52

*Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006) ....................44, 47

*Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012) ....................43, 47

*Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898 (N.D. Cal. 2016), *vacated on other grounds*, 897 F.3d 1109 (2018) ....................30

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ....................49

*In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452 (D. Del. 2007) ....................36

*Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434 (1979) ....................35, 36

*Kaufman v. BMW AG et al.*, No. 13:7-cv-05787-CRB (D.N.J. July 25, 2017) ....................42

*Kelsey K. v. NFL Enters., LLC*, 757 Fed. App'x 524 (9th Cir. 2018) ....................25

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) .................... *passim*

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ....................41

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ....................52

*Laughlin v. Evanston Hosp.*, 550 N.E.2d 986 (Ill. 1990) ....................49

*Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060 (C.D. Cal. 2009) ....................44

*Lewis v. Casey*,
518 U.S. 343 (1996)....................20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................50

*Lopez v. Bank of Am., N.A.*,
No. 13-cv-04475, 2014 WL 1117953 (N.D. Cal. Mar. 19, 2014)....................42

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007)....................23

*Los Gatos Mercantile Inc. v. E.I. Dupont De Nemours & Co.*,
No. 13-cv-01180, 2014 WL 4774611 (N.D. Cal. Aug. 11, 2015)....................23

*Lucas Auto. Eng'g Inc. v. Bridgestone/Firestone, Inc.*,
275 F.3d 762 (9th Cir. 2001)....................29

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................20

*Mackereth v. G.D. Searle and Co.*,
674 N.E.2d 936 (Ill. App. Ct. 1996)....................44

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
No. 07-cv-8455, 2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007), *aff'd*, 270 F. App'x 56 (2d Cir. 2008)....................28

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)....................14

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
339 F.3d 1087 (9th Cir. 2003)....................53

*Minn-Chem, Inc. v. Agrium, Inc.*,
683 F.3d 845 (7th Cir. 2012)....................37

*Moore v. Boating Indus. Ass'n*,
819 F.2d 693 (7th Cir. 1985)....................28

*In re Multidistrict Vehicle Air Pollution*,
538 F.2d 231 (9th Cir. 1976)....................24

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989)....................32

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015).................... *passim*

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) ....................................................................4, 29, 30, 34

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ...............................................................................49, 53

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2016) ...........................................................................................20

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
967 F. Supp. 2d 1347 (N.D. Cal. 2013) ............................................................................29

*In re Packaged Seafood Prod. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017)..............................................................................53

*Pardini* v. *Unilever United States, Inc.*,
961 F. Supp. 2d 1048 (N.D. Cal. 2013) ............................................................................48

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1720, 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) .............................................8

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*,
522 F.3d 1049,1054 (9th Cir. 2008) ..................................................................................44

*Porter v. Spader*,
239 P.3d 743 (Ariz. Ct. App. 2010)....................................................................................44

*ProMedica Health Sys., Inc. v. F.T.C.*,
749 F.3d 559 (6th Cir. 2014) ...........................................................................................32

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)..............................................................................................30

*Rattlesnake Coal. v. EPA*,
509 F.3d 1095 (9th Cir. 2007) ..........................................................................................15

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ...........................................................................................34

*In re Refrigerant Compressors Antitrust Litig.*,
No. 09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .......................................54

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
532 F.3d 963 (9th Cir. 2008) ...........................................................................................34

*Ryan v. Microsoft Corp.*,
147 F. Supp. 3d 868 (N.D. Cal. 2015) ..............................................................................45

*Sanford v. MemberWorks, Inc.*,
625 F.3d 550 (9th Cir. 2010) ...........................................................................................51

*Schwartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ....................44

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 Supp. 2d 380 (E.D. Pa. 2010) ....................50

*Smith* v. *Kohlweiss, Inc.*,
No. 11-00239, 2012 WL 1156338 (N.D. Cal. Mar. 30, 2012) ....................47

*Soliman v. CVS RX Servs.*,
570 F. App'x 710 (9th Cir. 2014) ....................42

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*
No. 14-md-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) ....................48

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ....................20

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-01819, 2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) ....................4, 35

*Stiflear v.Bristol-Myers Squibb Co.*,
931 P.2d 471 (Colo. Ct. App. 1996) ....................48

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007) ....................25

*Sugasawara v. Ford Motor Co.*,
No. 18-CV-06159-LHK, 2019 WL 3945105 (N.D. Cal. Aug. 21, 2019) ....................15

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) ....................31, 32

*Takhar v. Kessler*,
76 F.3d 995 (9th Cir. 1996) ....................20

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) ....................29

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) ....................53

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
MDL No. 1819, 2011 WL 13147214 (N.D. Cal. Apr. 26, 2011) ....................8

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
No. C 07-05634, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ....................15, 44, 45

*UGG Holdings, Inc. v. Severn*,
No. CV 04-1137-JFW, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ....................................29

*United States v. Continental Can Co.*,
378 U.S. 441 (1964)....................................................................................................31

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)....................................................................................................29

*United States v. Hsiung*,
778 F.3d 738 (9th Cir. 2015) ............................................................................ *passim*

*United States v. Joseph Schlitz Brewing Co.*,
253 F. Supp. 129 (N.D. Cal. 1966), *aff'd sub nom. Jos. Schlitz Brewing Co. v. United States*, 385 U.S. 37 (1966) ..................................................................33

*United States v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004) ..........................................................4, 5, 39, 40

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)....................................................................................................28

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) ...............................................................................44, 45

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
865 F. Supp. 2d 1002 (C.D. Cal. 2011) ......................................................................28

**STATUTES**

15 U.S.C.
§ 6a.........................................................................................................................4, 35
§ 15(b).......................................................................................................................41

Foreign Trade Antitrust Improvements Act of 1982 ................................................ *passim*

Minn. Stat. § 325F.69(1).................................................................................................51

N.Y. Gen. Bus. L. § 349 ..................................................................................................51

**RULES**

Fed. R. Civ. P. 8..............................................................................................................15

Fed. R. Civ. P. 12(b)(6).......................................................................................15, 29, 30

Fed. R. Civ. P. 9(b) ................................................................................................ *passim*

**TREATISES**

Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011)......................................53

## REGULATIONS

77 Fed. Reg. 488 (Jan. 5, 2012) ....18

## OTHER AUTHORITIES

Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Application* (3rd & 4th eds. 2010-2017) ....27, 28, 29, 37

EUROPEAN COMMISSION, ANTITRUST MANUAL OF PROCEDURES (2012) ....19

European Commission, *Commission Notice on Immunity from Fines and Reduction of Fines in Cartel Cases*, OFFICE JOURNAL OF THE EUROPEAN UNION C 298 (2006) ....19

European Commission, *Competition: Procedures in anticompetitive agreements (Article 101 TFEU cases)*, https://ec.europa.eu/competition/antitrust/procedures_101_en.html (last visited Oct. 14, 2019) ....19

Frank Dohmen & Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017, 2:10 PM), http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggestcarmakers-a-1159471.html ....6, 31

Matthew Newman, *Comment: German carmakers' EU probe may spark debate on invoking 'innovation' harm*, MLEX MARKET INSIGHT (Sept. 18, 2018), https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/europe/german-carmakerseu-probe-may-spark-debate-on-invoking-innovation-harm ....7

Press Release, European Commission, Antitrust: Commission opens formal investigation into possible collusion between BMW, Daimler and the VW group on clean emissions technology (Sept. 18, 2018), http://europa.eu/rapid/%20press-release_IP-18-5822_en.htm ....7

Press Release, European Commission, Antitrust: Commission sends Statement of Objections to BMW, Daimler and VW for restricting competition on emission cleaning technology (Apr. 5, 2019), http://europa.eu/rapid/press-release_IP-19-2008_en.htm ....41

Press Release, European Commission, Antitrust: Commission Sends Statement of Objections to BMW, Daimler and VW for restricting competition on emission cleaning technology (Apr. 5, 2019), http://europa.eu/rapid/press-release_IP-19-2008_en.htm ....8

Speech, Margrethe Vestager, European Commissioner for Competition, EU Competition Law in today's global economic relations (Nov. 7, 2018), https://ec.europa.eu/commission/commissioners/2014-2019/vestager/announcements/eu-competition-law-todays-global-economic-relations_en. ....7

Speech, Margrethe Vestager, European Commissioner for Competition, Hitting the sweet spot in antitrust enforcement (Sept. 25, 2018), https://ec.europa.eu/commission/commissioners/2014-2019/vestager/announcements/hitting-sweet-spot-antitrust-enforcement_en...........................7

## I. STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Amended Complaints[1] should be dismissed for lack of subject matter jurisdiction and failure to state a claim, including because they fail to allege an unreasonable restraint of trade, injury-in-fact, and antitrust injury?

2. Whether Plaintiffs' claims should be dismissed because the rule of reason applies to the conduct alleged and Plaintiffs have failed to plead a plausible relevant market and market power?

3. Whether Plaintiffs' allegations of anticompetitive conduct by Defendants in Germany during the automotive pre-design and design phase fail to satisfy controlling Ninth Circuit precedent defining a "direct" effect under the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") as "an immediate consequence of the defendant's activity"?

4. Whether Plaintiffs' claims are time-barred?

5. Whether IPPs have pled all elements of their various state law claims?

## II. SUMMARY OF ARGUMENT

This Court dismissed Plaintiffs' initial consolidated complaints because Plaintiffs had not plausibly alleged that Defendants made any agreement "to make a product of inferior quality," let alone a "'*de facto* whole car conspiracy' to reduce innovation." *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1069 (N.D. Cal. 2019) ("*German Auto.*"). Concerned that discovery had the potential to reach "almost every nook and cranny at five giant automakers" and would involve a "massive and expensive factual investigation," the Court insisted on "more" before Plaintiffs would be "allowed to pursue such [] broad antitrust claim[s.]" *Id.* at 1072. After receiving leave to amend, Plaintiffs filed two new Amended Complaints. These new pleadings use different words, but still say mostly the same things as before. And neither Amended Complaint addresses the Court's concerns:

- ***DPPs*** essentially ignore the Court's ruling. They continue to allege their broad,

---

[1] Citations to "IPP ¶" and "DPP ¶" are respectively to the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. No. 391) and the Direct Purchaser Plaintiffs' Consolidated First Amended Class Action Complaint (Dkt. No. 392) (collectively "Amended Complaints").

whole-car conspiracy claim (now renamed as a "no arms race" agreement), and they have added a new, and equally unfounded, claim that Defendants somehow violated the law by prioritizing the development of diesel vehicles over electric vehicles. (DPP ¶¶ 9-10, 242-48, 253-56.) DPPs also repeat their prior claim that Defendants reached an agreement as to AdBlue tank sizes and add allegations that Defendants coordinated their AdBlue dosing strategies. (*Id.* ¶¶ 249-52.)

- ***IPPs***, in contrast, have dropped their claims of a "*de facto* whole car conspiracy," which at least shows a measure of responsiveness to the Court's concerns. IPPs now focus exclusively on alleged agreements concerning "the development and deployment of SCR technology"—*i.e.*, AdBlue tank size and dosing. (IPP ¶¶ 118-19.)

Ultimately, Plaintiffs still have not cured the fundamental failings that led this Court to dismiss the prior consolidated complaints: neither Amended Complaint provides the necessary evidentiary facts of what was agreed to, by whom, or how these alleged agreements reduced innovation or otherwise injured U.S. dealers and consumers. *German Auto.*, 392 F. Supp. 3d at 1055-56; *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("*Musical Instruments*") (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)). Plaintiffs' claims are all still based on the same *Der Spiegel* articles, the same (significantly narrowed) European Commission investigation, and the same "filler material" of allegations that Defendants met together at trade association meetings. Plaintiffs have not met the Court's call for "more" in order to justify the "sprawling, costly, and hugely time-consuming" discovery they seek to impose on Defendants. *German Auto.*, 392 F. Supp. 3d at 1072.

The Amended Complaints remain deficient in particular respects, including:

*First*, Plaintiffs still fail to plead an anticompetitive agreement, as well as a coherent connection between (1) an identified agreement that unreasonably restrains competition and (2) a resulting cognizable injury to Plaintiffs as individuals or individual entities. Plaintiffs do not connect the restraints alleged—coordination on AdBlue tank sizes and dosing rates, a purported

agreement not to develop electric vehicles, and an agreement to avoid an "arms race" on innovation—to the kind of personal injury necessary to establish Article III standing or the "antitrust injury" requirement under the Clayton Act and its state counterparts. The Amended Complaints offer no plausible theory as to how either IPPs (consumers) or DPPs (dealers) suffered any injury, economic or otherwise, from the alleged conduct. Even with respect to the only examples of "technology suppression" offered in the Amended Complaints (AdBlue tank size and dosing), they do not explain how Defendants' conduct caused injury to Plaintiffs. For example, while Plaintiffs assert the alleged AdBlue agreement forced them to pay inflated prices, the Amended Complaints do not allege how or even that AdBlue tank size or dosing rate had an impact on price. No IPP alleges he or she considered the AdBlue tank size or dosing rate when considering whether to purchase a diesel vehicle, or even that each of their vehicles were equipped with AdBlue tanks (since some diesel vehicles are not). And, while DPPs assert that the conspiracy caused dealerships to pay a higher price for Defendants' cars, they offer no facts in support of that assertion. DPPs' other claim of injury, that Defendants manipulated MSRP and inventory pricing to maintain artificial profit margins, is not even explicitly alleged. DPPs suggest only that it "likely" occurred. Each Plaintiff is required to plead his or her own standing, and more broadly, Plaintiffs' allegations must be sufficiently detailed to allow Defendants the opportunity to understand and test Plaintiffs' theory of antitrust injury. Plaintiffs' Amended Complaints do not meet these standards.

*Second*, Plaintiffs have not stated *per se* antitrust claims or alleged the necessary market power foundation for rule of reason claims. *Per se* illegality applies only to a narrow set of naked restraints of trade shown by long experience to be inherently anticompetitive. The Court has already observed that the type of conduct Plaintiffs allege is not an agreement to reduce quality, but instead is at most technical collaboration and information exchange akin to private standard setting. This type of conduct is frequently pro-competitive and therefore not *per se* illegal. *German Auto.*, 392 F. Supp. 3d at 1070-71. Given that the nature of the allegedly wrongful conduct has not changed, *per se* treatment remains inappropriate.

Plaintiffs' attempts to plead rule of reason claims also fall short because they have not pled a coherent or legally sufficient market in which Defendants possess market power. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008) ("[A] plaintiff must allege that the defendant has market power within a 'relevant market.'"). This is an indispensable element of rule of reason claims because, without it, any agreements that allegedly limited innovation would simply lead consumers to substitute competing British, Japanese, American, or other cars for less innovative German vehicles. (*See* IPP ¶¶ 84-85; DPP ¶¶ 72, 79-80, 95, 111, 130 (acknowledging that Defendants' vehicles competed with non-German vehicles).) Recognizing this, Plaintiffs' Amended Complaints present two gerrymandered "markets"—a "German Diesel Vehicles" market (IPPs) and a "German Luxury Car" market (DPPs). "German Diesel Vehicles" would be a relevant antitrust market only if there were well-pled allegations that consumers would not substitute *either* (1) gas or electric vehicles or (2) non-German diesel vehicles for German diesel vehicles—and of course that has not been pled. And like before, the "German Luxury Car" market groups together widely disparate German vehicles, ranging from the $200,000 Mercedes-Benz S65 AMG to the $19,000 Volkswagen Jetta, while excluding every non-German car from the likes of Lexus, Infiniti, Jaguar, Cadillac, Tesla, Maserati, etc.—cars that common knowledge tells us are competitive with "German Luxury Cars." After two tries at pleading their claims, it is obvious that Plaintiffs still have no plausible rule of reason theory. It is the *per se* rule or nothing. And since the *per se* rule does not apply to the kinds of claims advanced, the Amended Complaints should be dismissed with prejudice.

*Third*, the Amended Complaints still attack wholly foreign conduct—alleged design and strategy decisions made by German automakers in Germany. That conduct is beyond the reach of U.S. federal and state antitrust laws. Under the FTAIA, non-import foreign conduct is not actionable under the Sherman Act unless it has "a direct, substantial, and reasonably foreseeable effect" on U.S. commerce and that effect "gives rise" to the Sherman Act claim. 15 U.S.C. § 6a. The same limitation applies to state antitrust laws. *See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819, 2010 WL 5477313, at *4 (N.D. Cal. Dec. 31, 2010). As Defendants previously argued, the Ninth Circuit's decision in *United States v. LSL*

*Biotechnologies*, 379 F.3d 672 (9th Cir. 2004), is squarely on point here. The *LSL Biotechnologies* decision holds that overseas agreements that restrict innovation—including the innovation of products destined for import into the United States—cause only an *indirect* effect on U.S. commerce and, therefore, fail the FTAIA's domestic effects test. *Id.* at 681. The only new development is that, if anything, the case has become more Euro-centric in its latest iteration, particularly as IPPs have narrowed their claims to mirror the European Commission's investigation into emission technologies used in vehicles sold in Europe.

*Fourth*, the Clayton Act's four-year statute of limitations bars Plaintiffs' federal antitrust claims based on conduct that occurred before September 27, 2013 (DPPs) and July 25, 2013 (IPPs). Many of IPPs' state law claims are similarly subject to limitations periods of no more than four years, and thus also time-barred. Neither DPPs' nor IPPs' attempts to save their stale claims have merit. The discovery rule does not apply to federal antitrust claims, nor does it apply to many of IPPs' state law claims, which instead accrue at the time of the alleged injury. Plaintiffs' fraudulent concealment allegations also fail under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). In fact, the Amended Complaints belie claims of affirmative concealment by referring to information that has long been publicly available. Accordingly, these time-barred claims should be dismissed.

*Fifth*, and finally, many of IPPs' state antitrust, consumer protection, and unjust enrichment claims suffer from pleading failures. These claims fail to sufficiently plead the required state law elements or are deficient for the same reasons Plaintiffs' federal antitrust law claims are deficient.

Many of these pleading failures were identified in the Court's June 2019 Order, and Plaintiffs' failure to cure these problems is an indication that further amendment would be futile. The Court should dismiss the Amended Complaints with prejudice.

## III. PROCEDURAL BACKGROUND

### A. The Parties

Defendants are five "leading German automobile manufacturers" (IPP ¶ 2)—Audi AG, BMW AG, Daimler AG, Dr. Ing. H.c. F. Porsche AG, and Volkswagen AG—along with their

American subsidiaries. IPPs claim to be U.S.-based consumers who indirectly purchased or leased new passenger vehicles manufactured or sold by Defendants. (*Id.* ¶¶ 22-52.) IPPs purport to represent all persons and entities who indirectly purchased or leased a new "German Diesel Vehicle" manufactured or sold by Defendants between 2006 and 2016. (*Id.* ¶¶ 19, 213.) IPPs also purport to assert claims on behalf of 14 state classes. (*Id.* ¶ 214.) DPPs claim to be U.S.-based auto dealers who directly purchased new passenger vehicles manufactured or sold by Defendants. (DPP ¶¶ 13-20.) DPPs purport to represent all persons or entities who directly purchased "Class Vehicles"—26 specific models manufactured or sold by Defendants—between 2006 and "such time as the effects of [Defendants' allegedly] unlawful conduct ceased." (*Id.* ¶ 220.)

### B. <u>The *Der Spiegel* Article and Plaintiffs' Original Consolidated Complaints</u>

In July 2017, the German news magazine *Der Spiegel* purported to expose "one of the biggest secrets of the German automotive industry"—that five automakers (Audi, BMW, Daimler, Porsche, and Volkswagen) had for decades engaged in numerous technical exchanges that supposedly had the effect of limiting innovation competition in "almost all areas of automobile development."[2] Within days of the article's publication, U.S.-based consumers and auto dealers began filing lawsuits against the German carmakers and their American subsidiaries. The cases were transferred to this Court and, in March 2018, Plaintiffs filed consolidated complaints. Plaintiffs' complaints relied almost entirely on the fact of the European Commission investigation and reporting by *Der Spiegel* to make conclusory allegations that Defendants had engaged in a 20-year-long conspiracy to reduce innovation, which Plaintiffs characterized as "a *de facto* whole car conspiracy" to reduce innovation. *German Auto.*, 392 F. Supp. 3d at 1069.

### C. <u>The European Commission Narrows Its Investigation</u>

In September 2018, the European Commission announced that its investigation of the German carmakers "concern[ed] solely" the narrow issue of possible collusion to "limit the

---

[2] Frank Dohmen & Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017, 2:10 PM), http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggestcarmakers-a-1159471.html.

development and roll-out of certain emissions control systems" for cars sold in Europe—namely, gasoline particulate filters and selective catalytic reduction ("SCR") systems in diesel engines.[3] Noting that European law permits "technical cooperation aimed at improving product quality," the European Commission explained that the "[n]umerous other technical topics" allegedly discussed by the automakers did not warrant further investigation, much less enforcement action.[4] The European Commissioner for Competition Margrethe Vestager subsequently expanded on the initial announcement by clarifying that there was "no indication that the companies agreed to fix prices" and "nothing to suggest that they increased prices by cutting the number of cars that they made[] or divided the market between them."[5] The Commissioner also noted the novelty of the investigation—calling the case "a new thing" involving "a different kind of conduct" from the typical cartel investigation.[6]

In April 2019, the European Commission announced that it had sent the German Defendants a statement of objections concerning the two emissions control systems described above; those systems (and the scope of the statement of objections) are, as Plaintiffs admit,

---

[3] Press Release, European Commission, Antitrust: Commission opens formal investigation into possible collusion between BMW, Daimler and the VW group on clean emissions technology (Sept. 18, 2018), http://europa.eu/rapid/%20press-release_IP-18-5822_en.htm. The Court has taken judicial notice of this press release, which is also attached to IPPs' Amended Complaint and referenced in both Amended Complaints. *See German Auto.*, 392 F. Supp. 3d at 1063 n.2; (IPP ¶ 144 & n.81 & Ex. 1; DPP ¶ 176).

[4] Press Release, European Commission, Antitrust: Commission opens formal investigation into possible collusion between BMW, Daimler and the VW group on clean emissions technology (Sept. 18, 2018), http://europa.eu/rapid/%20press-release_IP-18-5822_en.htm.

[5] Speech, Margrethe Vestager, European Commissioner for Competition, Hitting the sweet spot in antitrust enforcement (Sept. 25, 2018), https://ec.europa.eu/commission/commissioners/2014-2019/vestager/announcements/hitting-sweet-spot-antitrust-enforcement_en.

[6] *See* Matthew Newman, *Comment: German carmakers' EU probe may spark debate on invoking 'innovation' harm*, MLEX MARKET INSIGHT (Sept. 18, 2018), https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/europe/german-carmakerseu-probe-may-spark-debate-on-invoking-innovation-harm (quoting statements by Margrethe Vestager at a Sept. 18, 2018 European Parliament conference); Speech, Margrethe Vestager, European Commissioner for Competition, EU Competition Law in today's global economic relations (Nov. 7, 2018), https://ec.europa.eu/commission/commissioners/2014-2019/vestager/announcements/eu-competition-law-todays-global-economic-relations_en.

"limited to vehicles sold in the European Union." (IPP ¶ 16.)[7] In European Commission procedure, a statement of objections "outlines the Commission's preliminary views," *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2010 WL 3420517, at *2 (E.D.N.Y. Aug. 27, 2010), and is "comparable to a complaint against a party under investigation," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1819, 2011 WL 13147214, at *1 n.2 (N.D. Cal. Apr. 26, 2011).

### D. <u>This Court Dismisses the Consolidated Complaints</u>

In June 2019, this Court granted Defendants' joint motion to dismiss both Plaintiffs' prior consolidated complaints, holding that Plaintiffs' allegations "d[id] not plausibly support that Defendants reached a '*de facto* whole car conspiracy' to reduce innovation." *German Auto.*, 392 F. Supp. 3d at 1072.

The Court rejected the allegations of the "only two agreements explained in any detail"—one "not to manufacture convertibles with roofs that opened when the cars were traveling above a particular speed" and another "to use the same sized AdBlue tanks in their diesel-engine cars." *Id.* at 1069 (internal quotation marks omitted). Recognizing that it was unclear "if the selected 16-liter AdBlue tanks were inferior to larger tanks" or that consumers "even want" to open convertible tops at higher (and potentially unsafe) speeds, the Court held that neither was a "compelling example of an agreement to make a product of inferior quality." *Id.* In any event, the Court found that agreements related to such "niche vehicle features" were "not enough to support a '*de facto* whole car conspiracy' to reduce innovation." *Id.*

This Court also rejected Plaintiffs' attempts to ground their "*de facto* whole car conspiracy" in Volkswagen AG's supposed admissions to the European Commission. *Id.* at 1069-70. The Court found it "hard to make much" of any of them, and explained that "an agreement [such as that alleged] to only use certain technical solutions is not the same as an

---

[7] Press Release, European Commission, Antitrust: Commission Sends Statement of Objections to BMW, Daimler and VW for restricting competition on emission cleaning technology (Apr. 5, 2019), http://europa.eu/rapid/press-release_IP-19-2008_en.htm. This press release is attached to IPPs' Amended Complaint and referenced in both Amended Complaints. (IPP ¶ 15 & n.6 & Ex. 2; DPP ¶ 136 & n.67.)

agreement to reduce product quality," as the former may be equivalent to "standard setting," which is usually "lawful" and beneficial to consumers. *Id.* at 1070-71. Importantly, the Court also recognized that pending government antitrust investigations "ordinarily carry 'no weight in pleading an antitrust conspiracy'" in this district. *Id.* at 1071 (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)). That authority applies with special force here, the Court found, because American and European antitrust laws are "not uniform," so that even a "possible violation of European cartel law does not necessarily mean that [Defendants] violated the Sherman Act." *Id.* at 1070.

Plaintiffs' allegations about Defendants' participation in working groups and trade associations "also lack[ed] sufficient detail" to support their claims because it is not enough, the Court explained, to "vaguely refer to clandestine agreements" without identifying "what was agreed to in these meetings." *Id.* ("'Mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.'" (quoting *Musical Instruments*, 798 F.3d at 1196)). The Court also rejected allegations of an agreement to combat fluctuating steel prices, observing that according to Plaintiffs' allegations steel prices "would presumably have dropped," which "would likely have benefited car purchasers, not harmed them." *Id.* at 1072-73.

Noting the "'sprawling, costly, and hugely time-consuming'" nature of antitrust discovery, the Court dismissed Plaintiffs' claims with leave to amend, holding that they "must do more" before demanding what would inevitably require a "massive and expensive factual investigation[.]" *Id.* at 1072 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007)).

## IV. SUMMARY OF THE AMENDED COMPLAINTS

### A. Overview

AdBlue remains at center stage in both of the Amended Complaints. IPPs focus on alleged collusion between 2006 and 2016 concerning "diesel emission systems for German Diesel Vehicles, which included the development and deployment of SCR technology"—*i.e.*, AdBlue tank size and (now) AdBlue dosing. (IPP ¶¶ 19, 118.) IPPs assert this alleged AdBlue conspiracy is a *per se* violation of Section 1 of the Sherman Act. (*Id.* ¶ 235.) DPPs similarly

claim that Defendants agreed to "secretly coordinate their AdBlue dosing strategies, AdBlue tank size, and refill ranges." (DPP ¶ 250.) DPPs argue that this alleged AdBlue conspiracy is a *per se* violation of Section 1 of the Sherman Act or, in the alternative, "may also be viewed as a violation of Section 1 under the 'rule-of-reason' standard." (*Id.* ¶ 252.)

In addition to the AdBlue allegations, DPPs bring something old and something new to their Amended Complaint. DPPs ignore this Court's decision and re-allege the same broad, whole-car conspiracy to reduce innovation—albeit now renamed as an agreement to avoid an "arms race" on "technological developments and brand differentiation." (*Id.* ¶¶ 9-10, 242-48.) DPPs also add new allegations of a conspiracy "not to enter into an 'arms race' to develop, produce, and market all-electric vehicles." (*Id.* ¶¶ 253-56.) As with their AdBlue claims, DPPs argue that these alleged agreements are a *per se* violation of Section 1 of the Sherman Act or, in the alternative, "may also be viewed as a violation of Section 1 under the 'rule-of-reason' standard." (*Id.* ¶¶ 248, 255.)

There are hardly any new allegations. Plaintiffs still rely almost entirely on reporting from *Der Spiegel*, other German media reports, and the (now circumscribed) European Commission investigation. They have not added any facts that meaningfully substantiate the conspiracies alleged. For instance, DPPs simply make up a conspiratorial explanation for the fact that most (but not all) German automakers did not make all-electric vehicles until fairly recently (*id.* ¶¶ 147-48), a fact true of many other non-German automakers as well. There is not a single factual allegation of who did what, with whom, where, or when in support of this new theory. DPPs allege no meetings, no conversations, no emails or communications of any kind—*nothing* that plausibly suggests the existence of an unlawful agreement, as *Twombly* requires. Nothing is alleged but independent, parallel conduct—which, without "some further factual enhancement" stops short of stating a Section 1 claim. *Twombly*, 550 U.S. at 557. And as to the previously alleged conspiracies, most of the new material is meaningless, such as the "consistency in size and naming convention" of Defendants' sedans (*id.* ¶ 197), or the fact that Defendants' cars often received "facelifts" in the same year (*id.* ¶ 200).

Further, the fact that the European Commission is continuing its enforcement efforts does not alter this Court's finding that a foreign government's investigation should carry "no weight in pleading an antitrust conspiracy" under U.S. laws. *German Auto.*, 392 F. Supp. 3d at 1071. That is especially the case here because, as Plaintiffs admit, the EC's statement of objections issued in April 2019 "was limited to passenger vehicles sold in the European Economic Area[.]" (DPP ¶ 136 n.67.; *see also id.* ¶ 137 n.68 (admitting that particle filters (a subject of the EC investigation) were "used predominantly in passenger vehicles sold in Europe").)

Finally, the Amended Complaints do *not* add allegations that would fill some of the specific gaps identified by Defendants' prior motion to dismiss—namely, how the named IPPs and DPPs suffered personal harm (as required to plead Article III standing), or whether and how that harm resulted from the alleged conspiracies (as required to plead antitrust standing).

### B. The Conduct and Claims Alleged

***AdBlue.*** The only conduct Plaintiffs allege in any detail (again) relates to AdBlue, "a pollution treatment solution" used to reduce diesel emissions. (IPP ¶ 14; DPP ¶ 114.) Plaintiffs again allege that Defendants agreed to standardize the size of the tank that carries the emission cleaning solution AdBlue. The Amended Complaints repeat the same allegations as before: an initial agreement that AdBlue tanks should not exceed 17-23 liters, which Defendants did not follow (IPP ¶ 130); a second agreement to standardize AdBlue tanks "for all diesel vehicles" at 8 liters, despite U.S. regulations that required larger tanks (DPP ¶ 128; IPP ¶ 131); and a final agreement that solved this problem by requiring 8-liter tanks in Europe and 16-liter tanks in the United States (IPP ¶ 133; DPP ¶ 138). This time, citing an article from the German tabloid *Bild*, Plaintiffs add new allegations that Defendants coordinated the rates at which AdBlue is dosed from the tank to the SCR system and used the same "dosing mode[s]," which resulted in standardized refill intervals for AdBlue. (DPP ¶ 121-22; IPP ¶ 119.) However, the Amended Complaints still do not add details or evidentiary facts that make their alleged AdBlue tank-size agreements more plausible. Further, Plaintiffs' Amended Complaints do not allege that this AdBlue dosing coordination pertained to U.S. vehicles, or that any AdBlue agreement was implemented by any Defendant.

Although Plaintiffs characterize the alleged agreements as "illegally stifl[ing] competition, hinder[ing] innovation" (IPP ¶ 2), and "lowering the quality of German luxury vehicles" (DPP ¶ 203), they do not even claim that smaller AdBlue tanks are inferior to larger tanks with longer refill intervals. And although they speculate that "[c]onsumers would prefer larger tanks" (IPP ¶ 126), Plaintiffs concede that such tanks would have "taken up more space [that] might be used otherwise, *e.g.*, for passengers, cargo or other car equipment" (*id.* ¶ 128), and "made it more difficult to install other features such as high-end stereo systems demanded by consumers" (DPP ¶ 115; *see also* IPP ¶ 126; DPP ¶ 128). These are the same trade-offs that led the Court to question in its dismissal Order whether an agreement on AdBlue tank size could even be viewed as an agreement to make an inferior product. *German Auto.*, 392 F. Supp. 3d at 1069. Plaintiffs' Amended Complaints offer nothing new to change these facts.

Plaintiffs' AdBlue claims culminate with the same general assertions as before: the alleged agreements forced them to pay inflated prices (*see*, *e.g.*, IPP ¶ 138; DPP ¶ 11) and yielded "illegal pollution" (IPP ¶ 119). Absent is any explanation of how AdBlue tank size or dosing rate had any impact on price or NOx emissions. IPPs again claim to have been deprived of "valuable vehicle performance attributes" that "more advanced emissions controls" might have provided (*id.* ¶ 121), although their pleading still declines to specify what those might be.[8]

***Electric Vehicles.*** DPPs' Amended Complaint adds the new allegation that Defendants "agreed not to engage in an arms race with regard to electric-propulsion technology" (DPP ¶ 111), which involved Defendants instead "push[ing] their 'clean diesel' luxury vehicles." (*Id.* ¶ 132; *see also id.* ¶¶ 131, 140.) DPPs have pled no facts as to how or when the agreement was made, who participated in the agreement, or the scope of the agreement. Instead, DPPs simply theorize that this agreement coincided with the demise of the alleged agreements on diesel emissions technologies in 2016. Notably, DPPs admit that most Defendants "launched

---

[8] In addition to their AdBlue allegations, DPPs assert—in a single paragraph—that Defendants agreed to "avoid, or at least delay" introducing "particle filters" in their model-year 2009 – 2014 gasoline-powered vehicles. (DPP ¶ 137.) DPPs do not specify how these alleged agreements—involving a technology not used in the United States and gasoline (not diesel) engines—harmed them with respect to their sales of diesel-powered vehicles.

plug-in/hybrid" vehicles *earlier*, beginning in 2013 (*id.* ¶ 144), the same year in which "BMW released an all-electric version of the i3" (*id.* ¶ 144 n.75). DPPs claim harm from losing "the opportunity to sell and service all-electric luxury vehicles." (*Id.* ¶ 156.)

***Other Allegations.*** DPPs allege various other conspiracies that are "[k]nown" (*id.* ¶ 157), but, for some reason, are capable of only the vaguest description. Most of these are again recycled from their dismissed complaint, and none is described in any amount of detail. These include an agreement to use only "certain technologies and suppliers" (*id.* ¶ 189), an agreement on convertible roofs and parking brakes (*id.* ¶ 157), and "other such instances which are known only to Defendants" (*id.*). DPPs also hypothesize the "likel[ihood] that [Defendants] coordinated the setting of dealer wholesale prices and MSRP to maintain artificially high profit margins." (*Id.* ¶ 204.)

DPPs again allege the same conspiracy related to pricing formulas in the steel market that the Court previously rejected. *German Auto.*, 392 F. Supp. 3d at 1072-73; (*see id.* ¶¶ 158-65). DPPs' Amended Complaint does not add new allegations or otherwise address the Court's reasons for dismissing the steel purchasing conspiracy. To the contrary, DPPs still contend that this "conspiracy" increased (rather than decreased) prices to consumers. *German Auto.*, 392 F. Supp. 3d at 1072-73.

### C. <u>Alleged Markets for German Vehicles</u>

Only DPPs expressly allege a rule of reason claim (in the alternative); however, both Amended Complaints assert market definitions that are obviously predicates for rule of reason claims:

***DPPs' "German Luxury Car Market."*** DPPs allege a "German Luxury Car Market" consisting of nineteen specific models sold by Defendants, which are a subset of DPPs' "Class Vehicles." (DPP ¶¶ 9 & nn.5 & 12.) According to DPPs, the "German Luxury Car Market is a unique product market" that is "differentiated within the overall market for passenger cars and the narrower luxury car segment of that market." (*Id.* ¶ 75.) This is purportedly so because "Defendants' marketing strategy and focus on 'German engineering' sought to set the German Luxury Cars apart from other luxury brands" (*id.*)—a statement that on its face points to a

broader, differentiated luxury car market. And DPPs would still have the Court believe unbelievable things, such as that a $40,000 BMW 3 Series competes with a $90,000 Porsche Panamera, but neither competes with *any* non-German cars.

***IPPs' "German Diesel Vehicles" Market.*** IPPs allege a different market—one for "German Diesel Vehicles," which they define to include "diesel-powered passenger vehicles (*i.e.*, cars, SUVs, and passenger vans) manufactured and/or sold by Defendants." (IPP ¶ 3.) Once again this market supposedly arises simply from product differentiation, *i.e.*, that "German Diesel Vehicles[] are considered distinct from automobiles manufactured by competitors, in part, because Defendants have spent billions of dollars advertising the virtues of German engineering." (*Id.* ¶ 85.) Ironically, one of the advertisements cited by Plaintiffs compares a Mercedes to a (Japanese) Toyota Prius. (*Id.* ¶ 84.)

***Defendants' Alleged Market Power.*** Both Amended Complaints assert the same circular market power theory: that German automakers dominate the "market" for *German* vehicles. Nevertheless, DPPs acknowledge that Defendants' cars comprise less than half of the broader "Luxury Segment." (DPP ¶ 192.) And IPPs, who allege that Defendants "controlled virtually all of the U.S. market for diesel passenger vehicles during the Class Period" (IPP ¶ 192), concede that diesels comprised "1% or less" of the overall U.S. automobile market (*id.* ¶ 194). Plaintiffs also often allege that Defendants' German vehicles *did compete* with foreign brands such as "Maserati, Bentley, etc.," but characterize that competition as occurring only "on the fringes." (DPP ¶ 80; *see also id.* ¶ 83 (referring to Defendants' "non-German competitors"); *id.* ¶ 79 (describing "Asian luxury brands[']" difficulties competing with German vehicles); *id.* ¶ 130 (suggesting that Defendants' would-be electric vehicles would have competed with the U.S.-made Tesla); IPP ¶ 84 (describing Defendants' competition with "vehicles being manufactured in Japan").)

## V. <u>LEGAL STANDARD</u>

***Lack of Subject Matter Jurisdiction.*** "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (citations omitted). "A Rule 12(b)(1)

jurisdictional attack may be facial or factual." *Sugasawara v. Ford Motor Co.*, No. 18-CV-06159-LHK, 2019 WL 3945105, at *4 (N.D. Cal. Aug. 21, 2019) (citation omitted). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id*. (citation omitted). To resolve a facial attack, the court "[a]ccept[s] the plaintiff's allegations as true and draw[s] all reasonable inferences in the plaintiff's favor . . . [to] determine[] whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id*. (citation and internal quotation marks omitted). "[T]he party asserting subject matter jurisdiction has the burden of proving its existence," *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007), and "must do more than offer 'labels and conclusions,'" *Chapman v. Pier 1 Imports (U.S.), Inc*., 631 F.3d 939, 954-55 & n.9 (9th Cir. 2011) (en banc).

***Failure to State a Claim.*** Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of the pleadings." *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 989 (N.D. Cal. 2009) (Breyer, J.). In Section 1 cases, complaints can only satisfy Rule 8 by answering "the basic questions: who, did what, to whom (or with whom), where, and when" and must allege facts to support allegations so that they are "more than a conclusory statement." *Kendall*, 518 F.3d at 1048 (citation omitted). And, they must put forth "allegations plausibly suggesting (not merely consistent with) agreement." *Twombly*, 550 U.S. at 558. Plaintiffs "may not evade antitrust requirements by merely alleging a bare legal conclusion." *In re ATM Fee Antitrust Litig*., 768 F. Supp. 2d at 989 (citation omitted). Rather, district courts "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (citation and internal quotation marks omitted). A complaint fails to state a claim when the factual allegations do not "raise [the] right to relief above the speculative level." *Id*. at 555.

***Failure to Allege Fraud with Particularity.*** Fraudulent concealment must be pled with particularity under Federal Rule of Civil Procedure 9(b), including the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634,

2011 WL 1753738, at *19 (N.D. Cal. May 9, 2011) ("*Transpacific Passenger Air*") (Breyer, J.) (citation omitted).

## VI. <u>ARGUMENT</u>

### A. <u>Plaintiffs' Allegations (Again) Do Not Plausibly Support Any Anticompetitive Agreements or Antitrust Injury</u>

Plaintiffs' 200 pages of allegations reprise the same "evidence" that this Court deemed insufficient on the last go-round: (1) "a European antitrust investigation"; (2) a few alleged examples of "agreements by Defendants to use certain technical standards"; and (3) Defendants' alleged "participation in working groups and trade associations." *German Auto.*, 392 F. Supp. 3d at 1072. There is no new material that answers this Court's call for "more" before Plaintiffs are permitted to embark on a "sprawling, costly, and hugely time-consuming" antitrust litigation. *Id.*

#### 1. <u>Plaintiffs Have Again Failed To Allege an Anticompetitive AdBlue Agreement</u>

In their Amended Complaints, both Plaintiff groups double down on their *Der Spiegel*-based allegations of a "diesel emissions control systems" conspiracy. Neither has done anything to cure their prior defects. Of course, there are some differences between the old and new complaints. For example, Plaintiffs have dropped their allegations of a "conspiracy" related to convertible tops in favor of additional AdBlue allegations related to the rate at which cars "dose" AdBlue. (*See, e.g.*, IPP ¶ 161 ("Defendants coordinated on their AdBlue dosing strategies, AdBlue tank sizes and refill ranges with the common understanding that they were limiting AdBlue-consumption and exhaust gas cleaning effectiveness."); DPP ¶ 250 (same).) But nothing in the Amended Complaints alters this Court's prior finding that these AdBlue agreements relate to a "niche vehicle feature" of questionable interest to consumers and, therefore, cannot support a "quality reduction" conspiracy. *German Auto.*, 392 F. Supp. 3d at 1069-70. Indeed, the chance that *any* consumer buying a diesel-powered vehicle focuses on the rate of AdBlue dosing must be slim (and no individual Plaintiff asserts that AdBlue tank sizes or dosing rates factored into her purchase or lease decisions). Regardless, Plaintiffs have not supplemented their *conspiracy*

*allegations* by explaining "who, did what, to whom (or with whom), where, and when." *Kendall*, 518 F.3d at 1048.

*First*, Plaintiffs have not added any facts that support the inference of an agreement regarding AdBlue tank size. Notably, they do not supplement their contentions about alleged admissions to European regulators, even though the Court already criticized those allegations as "lack[ing] important specificity." *See German Auto.*, 392 F. Supp. 3d at 1070; (IPP ¶¶ 114-116; DPP ¶¶ 105-06). There is still no allegation that Defendants actually implemented the alleged agreements and adopted standardized tank sizes, even though both consumers and especially dealers could readily determine the size of the AdBlue tank(s) in the relevant vehicles.[9] Indeed, Plaintiffs admit there was "variation" in AdBlue tank sizes and dosing rates, reflecting incomplete—or no—implementation of the supposed agreement. (*See* IPP ¶¶ 125, 130; DPP ¶¶ 124-25.) The only reasonable inference is that Plaintiffs looked under the hood (at least metaphorically speaking) and know that the facts do not fit their allegations. A complaint that alleges neither the agreement nor the resulting parallel, anticompetitive behavior that might cause consumer harm cannot be sufficient.

*Second*, the foundation for the supposed tank-size agreement and the new AdBlue dosing-rate allegations is still just "articles that were published in the German news magazine[s] *Der Spiegel*," *German Auto.*, 392 F. Supp. 3d at 1063, and other articles that have reported on the European Commission's now-narrowed enforcement efforts (*see, e.g.*, IPP ¶¶ 140-142, 155; DPP ¶¶ 116-18, 121 nn.42-43, 134). Plaintiffs rely in particular on the European Commission's recently-issued statement of objections.[10] (IPP ¶¶ 150-52; DPP ¶¶ 176-79.) Yet that

---

[9] Publicly available information establishes that AdBlue tank sizes were not standardized across Defendants, or even among each Defendant's models. (*See* Dkt. No. 321 (Defs.' Jt. Mot. to Dismiss), at 22 & n.16.)

[10] Plaintiffs also allege that Defendants' participation in working groups during trade association meetings provided "opportunities to conspire through secret meetings." (DPP ¶ 183.) Both sets of Plaintiffs have scaled back, rather than augmented, their trade association allegations (IPP ¶¶ 163-75; DPP ¶¶ 108, 183), thus ignoring the Court's admonition that "more facts are needed to plausibly support that Defendants used working groups and trade associations" to reach any agreements. *German Auto.*, 392 F. Supp. 3d at 1072 (citing *Musical Instruments*, 798 F.3d at 1196).

investigation is no more probative now than it was when the Court dismissed Plaintiffs' complaints four months ago. It remains true that "European and American antitrust laws are not uniform," specifically because "exchange[s] of internal, competitively sensitive technical data" alone can violate European competition law, whereas that conduct does not violate U.S. antitrust law unless it results in an agreement that unreasonably restrains trade. *German Auto.*, 392 F. Supp. 3d at 1070; *see also Musical Instruments*, 798 F.3d at 1196 (affirming dismissal and noting that "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement").[11] The differences between European and American antitrust laws are especially significant here, where Plaintiffs base their entire action on Defendants' alleged collaboration and information sharing—which this Court noted might be equivalent to "standard setting." *German Auto.*, 392 F. Supp. 3d at 1070-71. The European Commission's investigation into conduct that could violate *European* law still carries "no weight in pleading an antitrust conspiracy" under *American* law. *See id.* at 1071 (citing *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1024).

There is a further, fundamental problem: Plaintiffs have failed to allege that the vehicles at issue in the European Commission's investigation ever reached the United States (or that they were, in material respects, identical to those sold here).[12] To the contrary, Plaintiffs acknowledge that the European Commission's "investigations and subsequent findings in its

---

[11] *See also, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (communications between competitors—even a lot of them—do not permit an inference of an agreement without more); *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 951 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015) ("frequent and regular communication between the parties" is not probative of conspiracy where "the substance of those communications is largely unknown"); *City of Moundridge v. Exxon Mobile Corp.*, No. 04-940, 2009 WL 5385975, at *9 (D.D.C. Sept. 30, 2009) ("Evidence that competitors had contact with each other or exchanged information does not establish a conspiracy.").

[12] Defendants' original motion also noted that many of the documents on which *Der Spiegel* (and, therefore, Plaintiffs) rely likely relate to vehicles sold in Europe, not vehicles sold in the United States. (*See* Dkt. No. 321, at 21.) For instance, U.S. regulations during the alleged conspiracy period required diesel vehicles to contain enough AdBlue to last between oil change intervals, *see* 77 Fed. Reg. 488 (Jan. 5, 2012), but allegedly agreed tank volumes would not in most cases have met that requirement. (*See, e.g.*, DPP ¶ 134 (U.S. regulators demanded AdBlue tanks that would . . . require a tank size of at least 19 liters.").)

enforcement action are correspondingly limited to vehicles sold in the European Union." (IPP ¶ 16.) This admission is critical because of differing U.S. and EU emissions standards, which drive automakers to adopt and deploy different solutions for the two regions. (*See, e.g.*, *id.* ¶ 133 (alleging that Defendants reached different agreements on tank size based on differing regulations in the United States and Europe).) For example, U.S. regulations require diesel vehicles to carry sufficient AdBlue to last through the advertised interval for oil changes. This implicitly sets a floor on AdBlue tank sizes (*i.e.*, every diesel vehicle must have a tank large enough to meet this requirement) and breaks the already-thin basis for inferring that what happened in Europe must have happened in the United States, too. (*See id.* ¶ 16 (contending that the alleged European AdBlue agreements would "necessarily extend to corresponding diesel emissions technologies contained in [vehicles] sold in the United States").) Accordingly, the existence of a European Commission investigation and its subsequent statement of objections does not help Plaintiffs meet their burdens under *Twombly*.[13] They need well-pled facts of an AdBlue-related conspiracy affecting U.S. vehicles. *See Kendall*, 518 F.3d at 1048.

---

[13] IPPs also misstate European law in two ways to embellish the relevance of the EC investigation. *First*, IPPs claim that "a Statement of Objections is only sent if the formal investigation confirms . . . that a violation of antitrust law has occurred." (IPP ¶ 152.) But as IPPs' own citation for this point explains, a statement of objections is the first step in an enforcement action and entitles defendants to review the European Commission's investigatory file, respond to the documented objections, and request a hearing before an independent officer. At that point, the European Commission "reviews and sometimes abandons (part of) its initial objections and may decide to close the case." European Commission, *Competition: Procedures in anticompetitive agreements (Article 101 TFEU cases)*, https://ec.europa.eu/competition/antitrust/procedures_101_en.html (last visited Oct. 14, 2019).

*Second*, Plaintiffs again incorrectly claim that Volkswagen and Daimler's alleged leniency applications mean that those companies "admitted [they] participated in a secret cartel." (IPP ¶ 107.) Yet the European Commission (unlike U.S. authorities) does not require leniency applicants to admit guilt or that the conduct they are reporting is illegal. *See* European Commission, *Commission Notice on Immunity from Fines and Reduction of Fines in Cartel Cases*, OFFICE JOURNAL OF THE EUROPEAN UNION C 298, at II.A.(8)-(13) (2006) (providing immunity when an applicant "submit[s] information and evidence which in the Commission's view will enable it to . . . carry out a targeted inspection[.]"); EUROPEAN COMMISSION, ANTITRUST MANUAL OF PROCEDURES 105 (2012) ("It has to be underlined that the opening of proceedings does not prejudge in any way the existence of an infringement"). Plaintiffs' misrepresentations aside, the European Commission's enforcement efforts are of little relevance to this action for the reasons described in this section.

### 2. <u>Plaintiffs Have Again Failed To Plead Article III Standing and Antitrust Standing Related to AdBlue Claims</u>

Plaintiffs' AdBlue shortcomings are not limited to the failure to allege an anticompetitive agreement. They are equally conspicuous with respect to damages and injury. As to those elements, there are still no plausible allegations of harm to any named Plaintiff (required for constitutional standing) or of "antitrust injury" (required for antitrust standing). Each is an independent ground for dismissal.

#### a. <u>Plaintiffs Lack Article III Standing</u>

Article III standing is a threshold question in all cases. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996). Plaintiffs must establish "the elements required for standing" at the time the lawsuit is filed. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996). To do so, Plaintiffs must allege: (1) personal injury that is (2) "fairly traceable" to the allegedly unlawful conduct and (3) "likely to be redressed" by the requested relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2016) ("For Article III purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation.") (internal quotation marks omitted). In class actions, named plaintiffs must plead each of these elements, separately and personally, by alleging that "they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (quoting *Lewis*, 518 U.S. at 347); *see Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) ("To satisfy the traceability requirement, a class action plaintiff must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").

***IPPs*** (consumers of automobiles) have not alleged facts that support Article III standing. No named IPP has alleged a tangible economic injury stemming from a conspiracy to standardize AdBlue tank size and dosing rates. Specifically, none of the IPPs alleges: (1) that their vehicles

used AdBlue;[14] (2) that the purported conspiracies affected their vehicles; or (3) that they considered the AdBlue tank size or dosing rate in their purchase or leasing decisions. (*See* IPP ¶¶ 22-52.) This is unsurprising, considering it is unlikely that consumers are aware of—much less base their purchase or lease decisions on—such niche features. In all events, after two rounds of pleading, this continued deficiency suggests that the individual named IPPs cannot honestly allege it. IPPs' failure to plead a plausible "distinct and palpable injury to [themselves]" that is fairly traceable to the alleged conspiracy compels dismissal. *Easter*, 381 F.3d at 961.

***DPPs*** (auto dealers) have an even bigger Article III problem. They advance two injury theories, that: (1) Defendants' purported conspiracy caused "dealerships throughout the United States [to] pa[y] a higher price for German Luxury Cars . . . than they would have in a competitive market" (DPP ¶¶ 10-11); and (2) Defendants "manipulate[ed] [MSRP] and inventory prices to maintain artificially high profit margins."[15] (*Id.* ¶ 9.) Their first theory is just a conclusion in search of logic. There is no indication that standardizing AdBlue tank sizes would *increase* vehicle prices. Standardization usually *lowers* costs and, therefore, prices. An agreement to make AdBlue tank sizes *smaller* than they would otherwise be ought to do the same. DPPs' second theory has a more fundamental shortcoming. DPPs' Amended Complaint does not allege that the conduct in fact occurred. Rather, with respect to MSRPs, DPPs suggest only that: (1) "it is *highly likely* that the manufacturers coordinated"; (2) "coordinating MSRPs obviously *makes sense*"; and (3) "price competition . . . *may be* controlled . . . by coordinating MSRPs." (*Id.* ¶¶ 204, 207.) To establish its standing, a dealer needs to plead that MSRPs were coordinated, that they were higher than the competitive level, and that any overcharges were borne by that dealer. In short, the dealer needs to plead that "this happened, and it actually injured me." *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015)

---

[14] Publicly available sources confirm that sixteen of the thirty-one named IPPs allegedly purchased or leased only vehicles that did *not* use AdBlue. *See infra*, Section VI.F.1.

[15] As the Court already observed, Defendants are not required to share higher profit margins with their customers. *German Auto.*, 392 F. Supp. 3d at 1073.

(speculative allegations of what could have been "fall far short of the plausibility standard set forth in *Twombly* and *Iqbal*"). The dealer Plaintiffs do not plead any such thing; they just say MSRPs might have been coordinated.[16]

**b. Plaintiffs Also Lack Antitrust Standing**

Finally, both sets of Plaintiffs also lack antitrust standing—the independent standing test meant to ensure that Plaintiffs are the "proper part[ies] to bring a private antitrust action." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983)); *see also Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("Only those who meet the requirements for 'antitrust standing' may pursue a claim under the Clayton Act[.]"). In the Ninth Circuit, antitrust standing turns on: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Amarel*, 102 F.3d at 1507 (citing *AGC*, 459 U.S. at 535). While no one factor is dispositive, the Ninth Circuit has noted that the first *AGC* factor—the "nature of the plaintiff's alleged injury"—is of "tremendous significance in determining whether a plaintiff has antitrust standing." *Id.* (internal quotation marks omitted); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("[A] showing of antitrust injury is necessary, but not always sufficient, to establish standing[.]"). Although there are some

---

[16] Plaintiffs have again "simply state[d] in the Claims for Relief sections of their complaints that Defendants 'agree[d] to fix, increase, maintain and/or stabilize prices[.]'" *German Auto.*, 392 F. Supp. 3d at 1072; (*see* IPP ¶ 229-30, 233; DPP ¶¶ 244-46). And again, "[n]o factual allegations support price fixing" and Plaintiffs' conclusory statements should "not be accepted as true." *German Auto.*, 392 F. Supp. 3d at 1072. The same is true for DPPs' half-hearted attempt to allege conspiracies related to "other technologies" (DPP ¶ 157) and to lower steel prices (*id.* ¶ 158). Having alleged no new facts related to steel purchases, DPPs cannot expect a different outcome. *See German Auto.*, 392 F. Supp. 3d at 1073 ("Lower input prices would likely have benefited car purchasers, not harmed them."); (*compare* Dkt. No. 244 (DPP Compl.), ¶¶ 88-98, *with* DPP ¶¶ 158-65).

variations in the manner in which individual states assess the threshold issue of antitrust standing, all of IPPs' state law claims require evidence of antitrust injury.[17] (*See* Appendix A.)

The problem here is that Plaintiffs focus on an "injury" that has no meaningful connection to competition or restraints on competition. The Court has already found that "it's also not clear if the [smaller AdBlue tanks] were inferior to larger tanks," that AdBlue is a "niche vehicle feature," and that "[l]arger tanks would need to be refilled less often, but they would also have taken up more space in cars[.]" *German Auto.*, 392 F. Supp. 3d at 1069. Indeed the Court noted that there are numerous reasons why consumers might *want* smaller AdBlue tank sizes, *id.*, a fact that Plaintiffs admit. (*See* IPP ¶¶ 120, 126, 128; DPP ¶¶ 115, 128, 134).

It was thus incumbent on Plaintiffs to plead facts indicating that, contrary to the Court's observations, there is meaningful competition on these dimensions—or, at least that AdBlue tank size and dosing are meaningful competitive differentiators. Plaintiffs know how to do that; their complaints are peppered with allegations and examples of how Defendants proclaim the superiority of German engineering. Absent, however, are any allegations that any car maker *ever* advertised or promoted its AdBlue tank size, let alone its AdBlue dosing strategy; that dealers steer consumers to diesel vehicles with larger AdBlue tank sizes; that consumers pay premiums for larger tanks or "better" dosing (whatever that could mean to a consumer); or that in any other way these arcane technical specifications are drivers of competition.

---

[17] "Whether *AGC* applies to a state's antitrust statute is a question of state law." *Los Gatos Mercantile Inc. v. E.I. Dupont De Nemours & Co*., No. 13-cv-01180, 2014 WL 4774611, at *6 n.7 (N.D. Cal. Aug. 11, 2015) (citation omitted). The highest court or an intermediate appellate court has directly applied the *AGC* factors when interpreting state antitrust statutes in two states—California and New York. (*See* Appendix A.) Two other states (Colorado and Illinois) have statutory provisions that *require* their state antitrust laws be "harmonized" with analogous federal law, which courts have interpreted to include adoption of *AGC*. (*See id*.) For five remaining states (Arizona, Michigan, Oregon, Rhode Island, and Wisconsin), it is clear that their highest courts would apply the additional *AGC* factors although no high or intermediate state court has ruled on *AGC*, and harmonization is not addressed expressly in their statutes. (*See id*.) For Minnesota, the sole state that does not apply *AGC*, IPPs also fail to allege antitrust standing. The Minnesota Supreme Court has held that standing under its antitrust statute is governed by "foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007). For reasons explained in Section VI.A, that standard is not met here.

Plaintiffs have also failed to allege any new evidentiary facts to explain how the alleged standardization of AdBlue tank sizes and dosing would result in dealers and consumers suffering a price overcharge on the finished product. This failure to plead the manner in which the alleged injury "flows from that which makes defendants' acts unlawful" requires dismissal. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004) ("[T]here must be evidence that the exchanges of information had an impact on pricing decisions.").[18]

### B. <u>Plaintiffs Have Failed To Allege Any Other Anticompetitive Agreements</u>

#### 1. <u>DPPs' "No Arms Race" Conspiracy Is a Reworded Version of the "Whole Car Conspiracy" and Deserves the Same Outright Dismissal</u>

This Court held that Plaintiffs' previous allegations were insufficient to plead a "whole car conspiracy." *German Auto.*, 392 F. Supp. 3d at 1071-72. IPPs got the message, but DPPs did not. The latter simply renamed the "whole-car conspiracy to reduce innovation" as an agreement to avoid an "arms race" on "technological innovation." (DPP ¶¶ 10, 84.) But rebranding an old, deficient claim is not a substitute for alleging new facts.[19] DPPs again

---

[18] IPPs also appear to claim non-price-related antitrust injury, but they do so only in hypothetical terms. (*See* IPP ¶ 120 ("lower AdBlue dosing rates can lead to smaller tank sizes, but then tanks need to be refilled more often"); *id.* ¶ 121 ("[B]ecause emissions control goes hand-in-hand with vehicle performance in terms of torque, horsepower, and fuel economy. . . a restraint in the advancement of an emissions control technology deprives consumers of valuable vehicle performance attributes[.]").) Allegations such as these that suggest only what "could be," and do not allege what actually occurred, "fall far short of the plausibility standard set forth in *Twombly* and *Iqbal*." *Feitelson,* 80 F. Supp. 3d at 1029 (dismissing claims for failure plausibly to allege antitrust injury where Plaintiffs alleged Defendants' conduct "could have the ultimate result of" limiting innovation). Further, to the extent Plaintiffs allege that lower dosing strategies violate emissions requirements, that is simply not an antitrust concern. *See In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236 (9th Cir. 1976) (allegations that automobile manufacturers and trade association conspired to suppress development of automobile antipollution technology focused on harm that was "environmental, not economic in the antitrust sense," and therefore sought a remedy that "fails to serve any function of the antitrust laws").

[19] On its face, Defendants' alleged agreement to "avoid an arms race" and limit innovation is not a market allocation agreement, as DPPs repeatedly claim. A market allocation agreement is one in which commercial actors agree to divide a market by offering *different* products or services, or when one defendant agrees not to offer certain products or services (either at all or in

provide nothing but the same sort of generalities that this Court already found to be insufficient. They allege no details as to which vehicle features this overarching conspiracy encompassed. As pled, Defendants do not have any "idea of where to begin" responding to this claim, *Kendall*, 518 F.3d at 1047, except to again point out the implausibility that Defendants would have conspired to reduce innovation when they have "for decades" set themselves apart from foreign competition based on "industry-leading luxury and technology features." (DPP ¶¶ 75, 82.) Plaintiffs' failure to supplement these broad allegations is unacceptable, and it merits dismissal with prejudice of their "no arms race" claim. *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1098 (C.D. Cal. 2007) (holding bare allegations of "injury to innovation" insufficient to allege antitrust injury).

### 2. DPPs' Allegations of an Agreement Not To Develop an All-Electric Vehicle Are Unsupported and Do Not Articulate a Cognizable Injury

DPPs' Amended Complaint adds allegations of an entirely new agreement among Defendants: one "not to engage in an arms race with regard to electric-propulsion technology" and instead promote clean diesel technology. (DPP ¶¶ 111, 144, 253-56.) But the supposed "evidence" of this agreement is just the assertion that no German automaker was a first-mover in all-electric vehicles, which is (1) an overstatement, since BMW introduced the i3 in 2013 (DPP ¶ 154), and (2) an insufficient basis from which to infer a conspiracy. *See Musical Instruments*, 798 F.3d at 1193 ("Under *Twombly*, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior. . . . But mere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1.") (citation omitted); *Kelsey K. v. NFL Enters., LLC*, 757 F. App'x 524, 526 (9th Cir. 2018) (affirming motion to dismiss when plaintiff's allegations "just as easily suggest rational business

---

certain territories or distribution channels) to allow the other defendant a free hand in the market. *See, e.g.*, *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253 (9th Cir. 2008) (dismissing allegations that Borders agreed to abandon online book sales in return for a commission on sales it referred to Amazon). DPPs' market allocation allegations, brought in an apparent attempt to plead *per se* antitrust liability, should be ignored.

behavior"). There are many reasons why most (but not all) of the German automakers did not make all-electric vehicles earlier, including the same reasons that Jaguar, Lexus, Infiniti, Acura and other luxury car makers did not. Indeed, a decision not to invest in electric vehicles is an economically rational consequence of Defendants having historically "invested heavily in diesel engines." (DPP ¶ 112; *see id.* ¶¶ 132, 140.) Antitrust law does not allow a plaintiff to cry "conspiracy" on these speculative assertions. Under *Twombly* and its progeny, including the Ninth Circuit's *Musical Instruments* decision, "more" is required.[20]

### C. <u>Plaintiffs Do Not Allege a *Per Se* Antitrust Violation, and Fail To Adequately Plead a Rule of Reason Violation</u>

As this Court recognized when dismissing Plaintiffs' prior complaints: "It is not appropriate to infer that Defendants reached a per se illegal agreement to reduce product quality, which is what Plaintiffs allege, simply because they agreed to exchange 'competitively sensitive technical data' and to use 'only certain technical solutions.'" *German Auto*., 392 F. Supp. 3d at 1071. Plaintiffs' Amended Complaints, again, fail to allege an agreement to make a product of inferior quality and, therefore, fail to allege a *per se* illegal output restriction. Accordingly, Plaintiffs' claims are governed by the rule of reason, which requires dismissal because Plaintiffs still have not plausibly alleged a relevant market in which Defendants have market power.

---

[20] DPPs' claimed injury from this purported conspiracy is equally implausible. Their theory is that Defendants would have developed electric cars "years ago," but for the claimed agreement, thus depriving dealers of "the opportunity to sell and service all-electric luxury vehicles." (DPP ¶ 156.) To survive a motion to dismiss, multiple causal links also need to be alleged and supported with facts tending to show that: (1) Defendants would have invested in electric vehicles over diesel vehicles; (2) "consumers would have preferred to purchase all-electric vehicles" over diesel cars; (3) consumers who prefer electric vehicles would not simply purchase them from other manufacturers offering electric vehicles; and (4) dealers would have earned more servicing the hypothetical electric vehicles than they did otherwise. Even if DPPs had alleged these facts, they are too attenuated and speculative to be plausible and should not be credited as a basis on which to allow DPPs to continue searching for a theory (or facts to fit them). *See Am. Ad Mgmt.*, 190 F.3d at 1056 (requiring plaintiffs to "allege some credible injury caused by the conduct"); (*see also* DPP ¶ 151 (alleging that consumers *have substituted* non-defendant Tesla's electric cars for Defendants' equivalent non-electric models)).

### 1. **Plaintiffs Allege Information Sharing and Technical Standardization, Not a *Per Se* Output Restriction**

Just as they did in their prior complaints, Plaintiffs make cursory assertions of a *per se* illegal "output reduction" conspiracy based on their allegations that Defendants agreed to make products of inferior quality. (IPP ¶ 7; DPP ¶ 213.) As this Court previously ruled, what Plaintiffs allege here—"an agreement only to use certain technical solutions"—"is not the same as an agreement to reduce product quality." *German Auto.*, 392 F. Supp. 3d at 1070-71 (quoting Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Application* ¶ 2136a (3rd & 4th eds. 2010-2017) ("Areeda & Hovenkamp").

Plaintiffs' Amended Complaints do not say anything new that convert these same conspiracy claims to *per se* claims. There are still "no factual allegations [to] support price fixing." *German Auto*., 392 F. Supp. 3d at 1072. The same is true for DPPs' confusing references to a market allocation agreement. (*See*, *e.g.*, DPP ¶¶ 97, 110, 190, 199, 244 (referring repeatedly to an alleged agreement for all Defendants to focus on diesel vehicle development instead of electric vehicle development as a market allocation agreement).) Instead, their story remains the same—that Defendants met under the guise of trade association meetings, shared competitively sensitive information, and agreed to standardize AdBlue-related features. These are still allegations related to "niche" features of questionable importance to consumers, *German Auto*., 392 F. Supp. 3d at 1069, but with obvious likely procompetitive benefits, as Plaintiffs admit. (*See*, *e.g.*, IPP ¶ 120 ("[O]n the one hand, lower AdBlue dosing rates can lead to smaller tank sizes, but then tanks need to be refilled more often, or they do not carry enough AdBlue to effectively treat NOx emissions; on the other hand, larger AdBlue tanks can lead to there being less need to refill, as well as effective treatment of NOx emissions, but larger tanks cost more and take up more space in a vehicle."); DPP ¶ 115 ("All else equal, small tanks required drivers to refill the AdBlue solution frequently whereas larger tanks allowed drivers to go farther, but they took up space, which made it more difficult to install other features such as high-end stereo systems demanded by consumers in the luxury segments. Lower dosing ratios for AdBlue would

allow for smaller tanks or less frequent refill requirements but would also result in more NOx emissions.").)

The conduct alleged is the type of conduct analyzed under the rule of reason. *See Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-cv-8455, 2007 WL 3254421, at *8 (S.D.N.Y. Nov. 2, 2007), *aff'd*, 270 F. App'x 56 (2d Cir. 2008) (finding that "the rule of reason is the appropriate standard of review" for alleged restraint on quality where a naked agreement to restrain quality is not alleged); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011) ("As a general matter, agreements among competitors to exchange information are analyzed under the rule of reason because such exchanges can facilitate competition."); *In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1281 (C.D. Cal. 1997) (applying rule of reason because "[a]ttendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws" (quoting *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1985)). Even the exchange of *price* information (which is not alleged here) is not subject to *per se* treatment. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978) (exchanging price data and other information can increase economic efficiency and be procompetitive, which is why "we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act").

The rule of reason applies to situations in which competitors work together to create technological or industry standards, as Defendants allegedly did here. *See Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942, 947 (9th Cir. 2000) (applying rule of reason to claims that competitors allegedly set anticompetitive industry standards); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988) (activities of standard-setting organization, including promulgation of product specifications, were "not *per se* unreasonable" and are analyzed under rule of reason); *German Auto.*, 392 F. Supp. 3d at 1071 ("[M]ost instances of standard setting . . . are lawful." (quoting Areeda & Hovenkamp ¶ 2136a)). This is so because such standard-setting "serves many useful ends, such as protecting consumers from inferior goods, increasing compatibility among products that must be interchangeable with the products of other

manufacturers, or focusing customer comparison on essential rather than nonessential differences." *German Auto.*, 392 F. Supp. 3d at 1071 (quoting Areeda & Hovenkamp ¶ 2136a); *see also, e.g.*, *Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 292 (5th Cir. 1988) (holding that standard-setting body's decisions are properly reviewed under the rule of reason).

### 2. Plaintiffs Fail To Allege Market Power in a Well-Defined Market

#### a. A Relevant Product Market Is Defined by Reasonable Interchangeability

To state a rule of reason claim, Plaintiffs must present the Court with well-pled allegations of relevant geographic and product markets and market power. *See Newcal*, 513 F.3d at 1044 ("[A] plaintiff must allege that the defendant has market power within a 'relevant market.'"); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1358 (N.D. Cal. 2013) (injury to competition requires that the plaintiff "at a minimum, sketch the outline of the antitrust violation with allegations of supporting detail" including "proof of the relevant geographic and product markets and demonstration of the restraint's anticompetitive effects within those markets" (citation and internal quotation marks omitted)). Failure to do so warrants dismissal, including under Rule 12. *See Newcal*, 513 F.3d at 1045 ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." (citation omitted)); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195-1200 (N.D. Cal. 2008) (granting motion to dismiss antitrust claims due to faulty product market definition).

A relevant product market consists of "those products to which consumers will turn, given reasonable variations in price," *Lucas Auto. Eng'g Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001), and is "composed of products that have *reasonable interchangeability* for the purposes for which they are produced," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (emphasis added). Courts dismiss antitrust complaints on the pleadings when the alleged market definition violates this rule. *See UGG Holdings, Inc. v. Severn*, No. CV 04-1137-JFW, 2004 WL 5458426, at *3 (C.D. Cal. Oct. 1,

2004) ("Where a plaintiff fails to define his proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in his favor, the relevant market is legally insufficient and a motion to dismiss may be granted."); *E & G Gabriel v. Gabriel Bros., Inc.*, No. 93 CIV. 0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."). Both alleged markets fail to address reasonable interchangeability.

**b. <u>Plaintiffs' Market Definitions Are Legally Deficient Because Non-German Vehicles Are Reasonably Interchangeable with German Vehicles</u>**

Both Plaintiff groups allege that German vehicles constitute their own market because: (1) German automobile manufacturers advertise that their vehicles are "made in Germany" and higher quality, which has led to (2) some consumers preferring German vehicles over non-German vehicles due to a perception of higher quality, as well as (3) an overall price premium stemming from that perception. Based on these allegations, Plaintiffs conclude that German vehicles are a differentiated product market unto themselves—in other words, consumers do not consider any non-German car to be a substitute for any German-made car. (IPP ¶¶ 81-96; DPP ¶¶ 69-84.) Although the exact path by which IPPs and DPPs reach this conclusion differs slightly, both are implausible and defy common sense.

As an initial matter, the idea that German vehicles compete only with other German vehicles is "artificial [and] contorted to meet [the plaintiff's] litigation needs." *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 910 (N.D. Cal. 2016), *vacated on other grounds*, 897 F.3d 1109 (2018) (dismissing antitrust claims on these grounds). Even if the idea were not facially implausible, the materials Plaintiffs cite undercut the notion of a "German-only" market. For example, IPPs reproduce an advertisement that compares a Mercedes-Benz E250 BlueTEC to a *Japanese* Toyota Prius. (IPP ¶ 84.) Similarly, Plaintiffs cite numerous articles that compare

German vehicles to vehicles from countries other than Germany,[21] and, in any event, explicitly allege such inter-country competition. (*See, e.g.*, *id.* ¶ 84 (discussing competition from, *inter alia*, Japanese and other countries' hybrid vehicles); *id.* ¶ 122 (same); DPP ¶ 111 (noting competition from manufacturers from other countries, including, specifically, "Toyota (including its Lexus division), Honda, Chevrolet, and Ford (among others)," as well as Tesla Motors); *id.* ¶ 130 (noting competition from U.S.-based Tesla); *id.* ¶ 131 (same, but for competition from "hybrid and electric cars" in 2009, which Defendants did not then manufacture).)

Even if this were not enough to reject Plaintiffs' German-only alleged markets, the remainder of Plaintiffs' "evidence" is legally deficient or inconsistent with the market they allege. For example, allegations that Defendants advertise their vehicles as "made in Germany" or as including "German engineering" illustrate Defendants' attempts to differentiate themselves from vehicles that are *not German. See, e.g.*, *Psystar*, 586 F. Supp. 2d at 1199-1200 (Apple's extensive marketing efforts undercut "Apple Mac OS operating system" market definition because it showed Apple competed with other operating systems); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (premium ice cream manufacturers advertising to compete with lower-quality ice cream manufacturers).

Next, even if such advertising was successful, consumer preference for certain manufacturers' products does not define a relevant market, because such preferences often exist *among* "reasonably interchangeable" products. *See, e.g.*, *United States v. Continental Can Co.*, 378 U.S. 441, 453 n.6 (1964) (consumers preferred one of two types of container but the relevant market was both types). A market is not defined by the fact or perception that certain products are higher quality than others; relevant product markets almost always include an array of

---

[21] (*See, e.g.*, IPP ¶ 110 n.46 (citing Frank Dohmen & Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL (July 22, 2017) (in the article giving rise to this case, the German authors note that the Defendants "are being challenged by new competitors from Silicon Valley and China")); *id.* ¶ 82 n.14 (citing Chris Tutor, *Fortune offers 10 reasons why German cars rule*, FORTUNE (July 2, 2012) (explaining that "brands like Cadillac [U.S.] and Lexus [Japan]" compete with Audi, BMW, Mercedes and Porsche)).)

products of varying quality and price. *See, e.g.*, *In re Super Premium Ice Cream*, 691 F. Supp. at 1268 ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically *meaningless* where the differences are actually a spectrum of price and quality differences.") (collecting citations in support); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) ("that quality, price, and reputation determine the relevant product market—is difficult to maintain"). For these reasons, IPPs' allegations regarding second-choice surveys (*e.g.*, IPP ¶¶ 87, 186-88) are irrelevant, as are both IPPs' and DPPs' allegations that some consumers perceive German vehicles as higher quality. (*See* IPP ¶¶ 187, 196-197; DPP ¶¶ 72, 75-77, 82.)

Plaintiffs' market definitions also fail a common-sense test—they would require that German vehicles are "closer substitutes" for each other, at any quality and price, than vehicles made anywhere else. That is facially implausible. The $38,000 Japanese Lexus IS (a mid-level sedan) and the $37,000 Swedish Volvo S60 (a mid-level sedan) are far better and closer substitutes for a $40,000 BMW 3 Series sedan (another mid-level sedan) than an Audi Q7 (an SUV) or a $94,000 Mercedes S Class (a luxury vehicle). In all events, it does not matter if some "reasonably interchangeable" products are "closer substitutes" than others, at least not for market definition. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("products must be reasonably interchangeable, such that there is cross-elasticity of demand," but they do not need to be "fully interchangeable with those of its competitors because perfect fungibility isn't required"); *see also ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559 (6th Cir. 2014) ("In the market for upscale sedans, for example, Audi and Jaguar might be closer substitutes for some consumers than Audi and Lincoln are. (For other consumers in the same market—say, consumers who prefer domestic brands—Lincoln and Cadillac might be closer substitutes.)").

Thus, even assuming certain German vehicles constitute each other's "closest" substitutes, Plaintiffs still have not plausibly explained why consumers would not choose a non-German vehicle if German manufacturers collectively raised prices. In other words, even assuming there are consumers who might make as first-order choices a Mercedes-Benz C-Class,

a BMW 3-Series, or an Audi A4, the antitrust question is whether they would accept a significant price increase on those vehicles rather than buy a Lexus IS (Japanese) or a Volvo S60 (Swedish). The Amended Complaints assume the answer is no, without giving the Court any facts, or even plausible theory, on which to accept that assumption.

Finally, Plaintiffs' reliance on an alleged German price premium, as well as Defendants' supposed high margins, mistakes the ability to charge higher prices (for whatever reason) with "proof" of a sub-market, an approach to market definition that has long been rejected. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) ("It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145 (N.D. Cal. 1966), *aff'd sub nom. Jos. Schlitz Brewing Co. v. United States*, 385 U.S. 37 (1966) ("There is no rational way of choosing a point along this price spectrum and saying that all beer which sells above that point constitutes a line of commerce, or even a sub-market, apart from all beer which sells below that point."); *Psystar*, 586 F. Supp. 2d at 1199 (rejecting market definition based on price premium because "[t]he mere existence of a price differential, however, does not necessarily mean that a product is unconstrained by competition").

#### c. <u>IPPs' "German Diesel Vehicle" Market Also Fails To Account for Non-Diesel Vehicles That Compete with Diesel Vehicles</u>

IPPs have narrowed their Amended Complaint to focus just on diesel vehicles, but still try to gerrymander an overly narrow relevant market by claiming that German diesel vehicles compete only with other German diesel vehicles. (IPP ¶¶ 192-95.) This is, again, facially implausible. Diesel vehicles have long been sold in the United States, and common experience shows that they are reasonably interchangeable with non-diesel vehicles. In fact, Defendants in this case routinely sold non-diesel versions of many popular models so that consumers could make a direct choice between engine technologies. What's more, IPPs' Amended Complaint makes the interchangeability abundantly clear. IPPs allege that Defendants coordinated on diesel-related technologies because of *competition from hybrid and electric cars*, and further

allege that the entire push for "clean diesel" was to provide a substitute in consumers' minds for hybrid or electric vehicles. (*See, e.g.*, IPP ¶¶ 84, 122.) Indeed, the data for Figures 3 and 4 of IPPs' Amended Complaint (*i.e.*, market shares and supposed HHI of diesel vehicles in the U.S.) comes from *hybrid*cars.com. On such allegations, it is unreasonable to conclude that diesel vehicles are nevertheless in their own market.

### 3. <u>Plaintiffs Do Not Plausibly Allege Defendants Have Market Power</u>

Once antitrust plaintiffs have adequately defined a relevant market, they must also allege plausible facts showing the defendants have "market power" within that well-defined market. *Newcal*, 513 F.3d at 1044. "Market power" is the ability of a seller (or group of sellers) to raise price *and* restrict output without losing all sales. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992). Typically, plaintiffs plead the existence of such power circumstantially, with factual allegations that: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Plaintiffs' market-power allegations all derive from their contrived market definitions, which manufacture a market in which Defendants have 100% market share. It is indisputable that Defendants have far less than a 50% share of a more reasonably defined market—*e.g.*, the U.S. automobile market, or some other subset (*e.g.*, SUV, sedan, etc.) that includes non-German vehicles. In fact, IPPs previously alleged that just 3% to 9% of the vehicles sold in the United States during the class period were manufactured by the Defendants. (*See* Dkt. No. 241 ¶ 244 & fig. 9.) Tellingly, they have omitted this allegation from their Amended Complaint, though they now allege that just "1% or less of the entire market" of vehicle sales in the United States were diesel. (IPP ¶ 194.)

Plaintiffs do not make allegations related to any alternate, more realistic market scenarios. Plaintiffs' claims should therefore be dismissed with prejudice. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint.").

**D. The FTAIA Bars Plaintiffs' Federal and State Claims**

Plaintiffs' claims fail for the additional and independent reason that neither federal nor state U.S. law applies to the conduct Plaintiffs now allege.

**1. The FTAIA Limits the Reach of Federal and State Antitrust Law**

Congress limited the extraterritorial reach of all U.S. antitrust laws by enacting the FTAIA. The FTAIA creates a statutory scheme that first establishes a general rule that places all nonimport activity involving foreign commerce *outside* the Sherman Act's reach, and then *brings that conduct back within* the Sherman Act's reach if: (1) it has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce; and (2) that effect gives rise to a Sherman Act claim. 15 U.S.C. § 6a; *see F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). Thus, the FTAIA requires antitrust plaintiffs to allege either that the overseas restraint operated directly on "import commerce," and is thus "excluded" from the FTAIA's reach, or that the restraint had "a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. *See United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) ("Although the statute is a web of words, it boils down to two principles. First, the Sherman Act applies to 'import trade or import commerce' with foreign nations. . . . Second, under the FTAIA, the Sherman Act does not apply to nonimport trade or commerce with foreign nations, unless the domestic effects exception is met.").

Those limitations establish the outer boundaries for extraterritorial application of state antitrust law as well. The Commerce Clause sharply limits states' authority to regulate commercial activity overseas. *See Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 449 (1979) (describing as "paramount" the "need for federal uniformity . . . in ascertaining the negative implications of Congress' power to 'regulate Commerce with foreign Nations' under the Commerce Clause."); *In re SRAM*, 2010 WL 5477313, at *4 (discussing Commerce Clause limitations on state antitrust law). Courts uniformly recognize that constitutional limitation, as well as the fact that the FTAIA's limitations "would be undone if states remained free to authorize 'little Sherman Act' claims that went beyond it." *Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (N.Y. 2012). Not surprisingly, therefore, no

decision known to Defendants has sanctioned extraterritorial application of state antitrust law beyond that permitted under the FTAIA. *See id.*; *see also*, *e.g.*, *In re Capacitors Antitrust Litig.*, No. 14-cv-03264, 2016 WL 5724960, at *7 (N.D. Cal. Sept. 30, 2016); *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 457-58 (D. Del. 2007); *accord Amarel v. Connell*, 202 Cal. App. 3d 137, 149 (1988).[22]

Like the prior complaints, Plaintiffs' Amended Complaints seek to regulate foreign activities—automotive design-related discussions among German automakers in Germany—that do not act directly on "import commerce." Instead, Plaintiffs advance theories of *indirect* harm on dealers and consumers in the United States arising from an alleged conspiracy in Germany relating to technologies for vehicles sold in the European Economic Area. The FTAIA bars such claims directly as to Sherman Act claims and by operation of the Commerce Clause as to state-law claims.

### 2. <u>The Amended Complaints Do Not Allege Restraints on "Import Commerce"</u>

The FTAIA's "import commerce exclusion" does not apply to Plaintiffs' claims. Plaintiffs contend that they fall within the import commerce exclusion because U.S. consumers purchased goods produced overseas. (IPP ¶ 76 ("German Diesel Vehicles manufactured abroad by Defendants and sold in the United States . . . are goods brought into the United States for sale, and therefore are import commerce.").) Plaintiffs are incorrect. The import commerce exclusion applies only to claims where the accused conduct directly acts upon and restrains import transactions, and Plaintiffs claim nothing like that here. *See Hsiung*, 778 F.3d at 755.

The leading antitrust treatise by Professors Areeda and Hovenkamp is instructive on the point. *See* Areeda & Hovenkamp § 272i. It explains that the phrases "import trade" and "import commerce" are meant to signal a different kind of analysis for (1) the straightforward case of

---

[22] State consumer protection and unjust enrichment claims that purport to reach wholly foreign conduct with no direct, substantial, and reasonably foreseeable effects on the U.S. economy would likewise frustrate the "need for federal uniformity" in the nation's approach to foreign commerce, and are therefore similarly impermissible under the Commerce Clause. *Japan Line, Ltd.*, 441 U.S. at 449.

claims based on conduct that restrains "[import] transactions in which the seller is located abroad while the buyer is domestic and the goods flow into the United States," as to which U.S. law clearly applies and no "effects" analysis is necessary, as compared to (2) the harder cases involving alleged violations that occur entirely overseas but nonetheless have direct, substantial, and reasonably foreseeable U.S. effects, and therefore require a judgment call as to whether the U.S. domestic effects are significant enough to justify the extraterritorial application of U.S. antitrust laws. *See id*. The Seventh Circuit described the "pragmatic reason" underlying this distinction, namely that "[t]he applicability of U.S. law to transactions in which a good or service is being sent directly into the United States, with no intermediate stops, is both fully predictable to foreign entities and necessary for the protection of U.S. consumers." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc). Theories about U.S. domestic effects from nonimport activity are more complicated and call for a different and more nuanced analysis. *Id*. at 854-55. Because domestic effects are assumed in the case of import restraints, the import commerce exclusion must be construed narrowly. *See Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 72 (3d Cir. 2000), *overruled on other grounds by Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462, 467 (3d Cir. 2011) ("To give the [domestic effects exception] meaning, the [import commerce exclusion] must be given a relatively strict construction.").

Whether a claim is based on "conduct involving . . . import commerce" therefore turns not merely on the locus of production of the good, but on whether the challenged conduct acts directly on import transactions, defined as "trade involving only foreign sellers and domestic buyers." *Minn-Chem, Inc.*, 683 F.3d at 853-55; *Hsiung*, 778 F.3d at 755 (adopting *Minn-Chem's* definition of import commerce); *see also* Areeda and Hovenkamp § 272i ("the legislative history focuses on *transactions* in determining the nature of the commerce") (emphasis in original). This normally means that a U.S. consumer is purchasing or receiving goods from a foreign seller, and that specific transaction has been compromised by a cartel. The classic case is a conspiracy to fix the price of goods that defendants import directly into the United States. In that

circumstance, the act and terms of importation are inseparable from the conduct claimed to be illegal.

Thus, in *Hsiung*, the Ninth Circuit held that foreign price-fixing fell within the import commerce exclusion (and outside the scope of the FTAIA) because the conduct acted directly on transactions in which U.S. customers purchased goods from foreign manufacturers:

> . . . within the conspiracy period, [Taiwanese defendant] AUO and AUOA "engaged in the business of producing and selling TFT-LCDs to customers in the United States." During the conspiracy period, [Taiwanese] AUO employees "had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States." . . . These allegations directly describe that the defendants and their coconspirators engaged in import commerce with the United States[.]

778 F.3d at 755-56.[23] *Hsiung* involved the straightforward case in which the accused conduct directly restrains transactions between U.S. plaintiff purchasers and foreign defendant cartel members. *See id.*

The Amended Complaints present the contrasting case. The conduct alleged here does not directly restrain import commerce. Instead, Plaintiffs allege only that Defendants had discussions and reached agreements in Germany about various technologies and parts that somehow affected cars that, in later transactions, may have been imported into the United States. Plaintiffs claim that Defendants agreed—years before the cars were built, let alone priced—not to focus their German-based R&D activities and spending on certain technologies. (*See, e.g.*, DPP ¶¶ 84, 107, 111, 115-16, 140; IPP ¶¶ 3, 5, 126.) Plaintiffs' speculative allegations of harm—*i.e.*, if Defendants had focused greater spending on those areas, they *might* have developed technologies that *might* have increased the quality of German cars—are even further removed from the direct restraint of import transactions required under the import commerce exclusion. (*See, e.g.*, DPP ¶¶ 84, 116, 156; IPP ¶¶ 5, 7, 89, 126.)

---

[23] The Ninth Circuit raised, but did not decide, whether anticompetitive conduct concerning "commerce directed at, but not consummated within, an import market is also outside the scope of the FTAIA's import provisions." *Hsiung*, 778 F.3d at 755 n.8. Defendants submit such cases are properly analyzed under the domestic effects test.

Because Plaintiffs do not allege restraints on import commerce transactions, they must plead that Defendants' foreign conduct had direct, substantial, and reasonably foreseeable effects on U.S. commerce that gave rise to a Sherman Act violation. As explained below, they do not, and their Amended Complaints should be dismissed.

### 3. <u>The Amended Complaints Do Not Allege Domestic Effects that Are the Immediate Consequences of a Foreign Restraint</u>

Plaintiffs' Amended Complaints do not meet the Ninth Circuit's long-standing "immediate consequences" standard for establishing a "direct" effect under the FTAIA's domestic effects test. *See Hsiung*, 778 F.3d at 758 (reaffirming the "immediate consequences" standard set forth in *LSL Biotechnologies*, 379 F.3d at 680-81). The most instructive (and binding) precedent is *United States v. LSL Biotechnologies*, in which the Ninth Circuit addressed what it means for a domestic effect to be "direct" in the highly analogous context of overseas agreements that allegedly restrict innovation in products imported into the United States. 379 F.3d at 672. In *LSL Biotechnologies*, the defendants—American companies that produced 70 percent of the fresh market tomato seeds used in North America—entered into an agreement in Israel with an Israeli competitor who agreed to forego research toward developing seeds for tomatoes with a longer shelf life and also agreed not to sell long shelf-life tomato seeds in North America. *Id.* at 675. The U.S. Department of Justice brought suit, claiming that the overseas agreement was subject to, and violated, the Sherman Act because it "unreasonably reduc[ed] competition to develop better seeds for fresh-market, long shelf-life tomatoes for sale in the United States" and allowed the defendants to charge more than they otherwise could. *Id.* at 675, 681.

The Ninth Circuit found those allegations insufficient, emphasizing that the FTAIA requires overseas conduct to have a "direct" effect on U.S. commerce in order to be subject to the Sherman Act. *Id.* at 680. And an effect is "direct," the Ninth Circuit held, only if it "follows as an immediate consequence of the defendant's activity." *Id.* Claims based on agreements that allegedly hamper overseas innovation do not qualify as a "direct" effect because "[t]he delay of possible 'innovations' does not have a direct effect on American commerce." *Id.* at 681. The

Ninth Circuit also contrasted the *LSL Biotechnologies* facts with a situation where "the foreign competitor already has the good in hand" and enters into a direct agreement not to import that good into the United States. *Id.* Only the latter has a "direct" effect in the United States. An agreement about overseas research and development efforts has only *indirect* effects in the United States because it depends on speculation that, but for the agreement, the quality of goods imported into the United States would have been higher. As the Ninth Circuit stated in no uncertain terms: "An effect cannot be 'direct' where it depends on such uncertain intervening developments." *Id.*; *see also Hsiung*, 778 F.3d at 758 (same).

A straightforward application of *LSL Biotechnologies* and the FTAIA's directness requirement bars all of Plaintiffs' claims concerning reduced innovation. The core premise of Plaintiffs' claims is that, but for the alleged agreements, Defendants' automotive design and R&D efforts—all of which allegedly occurred in Germany (*see, e.g.*, DPP ¶ 117; IPP ¶¶ 129, 149, 156)—would have somehow been different and better. Some fraction of those allegedly "better" vehicles, Plaintiffs assume, would have made their way into the U.S. market, potentially forcing competitors with less innovative technologies to lower their prices in order to remain competitive. (*See* DPP ¶¶ 84, 215; IPP ¶¶ 5, 7, 89.) As this Court already held, Plaintiffs' theory about the prospect of "better" emissions technology is too speculative: it ignores that, while "[l]arger [AdBlue] tanks would have needed to be refilled less often, . . . they also would have taken up more space in the cars, as Defendants recognized." *German Auto.*, 392 F. Supp. 3d at 1069. Because Plaintiffs' claims are based on a speculative theory about improved product quality, they are indirect under *LSL Biotechnologies*: "The delay of possible 'innovations' does not have a direct effect on American commerce." 379 F.3d at 681.[24]

Additionally, between the filing of Defendants' first motion to dismiss and Plaintiffs' Amended Complaints, the EC announced that its investigation is limited to an alleged scheme

---

[24] The Court's ruling as to personal jurisdiction does not impact the FTAIA analysis. *See Chan Ah Wah v. HSBC N. Am. Holdings, Inc.*, No. 15 CIV. 8974, 2016 WL 4367976, at *3 (S.D.N.Y. Aug. 11, 2016) ("Whereas personal jurisdiction considers a court's ability to hear a lawsuit involving a defendant based on that defendant's contacts with the forum, the bar on extraterritorial application of the Sherman Antitrust Act . . . is a separate (and substantive) hurdle that Plaintiffs must overcome to state a claim . . . .").

"to limit the development and roll-out of emission cleaning technology for new diesel and petrol passenger cars *sold in the European Economic Area (EEA)*"—not in the United States. (IPP ¶ 15 (quoting Press Release, European Commission, Antitrust: Commission sends Statement of Objections to BMW, Daimler and VW for restricting competition on emission cleaning technology (Apr. 5, 2019), http://europa.eu/rapid/press-release_IP-19-2008_en.htm) (emphasis added).) The limited, intra-European focus of the EC investigation confirms that the alleged conduct is not within the purview of U.S. antitrust law under the FTAIA. Defendants sell different car models, with different emissions technologies, in Europe and the United States (a fact that Plaintiffs do not address—because they cannot, without admitting their claims fail—in their Amended Complaints). Thus, any indirect effect on *cars sold in the United States* is nothing more than a byproduct of conduct directed within Europe. None of this means that any anticompetitive conduct by the Defendants—if it occurred—would escape legal scrutiny. Indeed, Plaintiffs repeatedly emphasize the existence of the investigation in Europe (which has different substantive competition laws from the U.S.) into the same conduct they allege violates U.S. law. (*See, e.g.*, DPP ¶¶ 171-79; IPP ¶¶ 9-15, 144-52.) Congress has designed the FTAIA such that the allegedly unlawful agreements in this case are for Europeans to consider under applicable European law. *See Empagran*, 542 U.S. at 168 ("America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs.").

### E. Plaintiffs' Claims Are Largely Time-Barred

Federal antitrust claims must be initiated within four years from the occurrence of the conduct that allegedly caused the alleged injury. 15 U.S.C. § 15(b); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-89 (1997) (explaining that a cause of action "accrues" and the statute of limitations "begins to run when a defendant commits an act that injures a plaintiff's business").

The bulk of IPPs' state law antitrust, consumer protection, and unjust enrichment claims are similarly subject to limitations periods of no more than four years.[25]

Plaintiffs' limitations problem is evident from the nature of the conspiracy they have alleged: they claim that essentially the entire German auto industry engaged in a conspiracy for more than a decade, which was furthered through "hundreds" of meetings "each year" and "more than 1,000" in total over the course of the alleged conspiracy—many of which were allegedly attended not just by Defendants, but also by suppliers and other automakers. (*See* DPP ¶¶ 2, 93, 107, 118, 127, 177; IPP ¶¶ 3, 69, 115, 164-71, 210.) Plaintiffs commenced this litigation in July (IPPs) and September (DPPs) of 2017[26]—a full decade after the conspiracy allegedly began. Plaintiffs' federal antitrust claims based on conduct that occurred before July and September of 2013 are time-barred on the "face of the complaint[s]" absent allegations "that the statute of limitations w[as] tolled until at least [2013]." *Soliman v. CVS RX Servs.*, 570 F. App'x 710, 712 (9th Cir. 2014); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1063 (N.D. Cal. 2016). The same is true for most of IPPs' state claims. *See Lopez v. Bank of Am., N.A.*, No. 13-cv-04475, 2014 WL 1117953, at *2 (N.D. Cal. Mar. 19, 2014) (finding state law claims to be "presumptively time-barred" when statute of limitation has elapsed).

In apparent recognition of this facial time-bar, Plaintiffs allege that the discovery rule and the doctrine of fraudulent concealment preserve their stale claims. Neither does.

**1. <u>The "Discovery Rule" Does Not Apply</u>**

Plaintiffs allege their claims have been tolled by the discovery rule because they "had no knowledge" of the alleged facts "until, at the earliest, July 21, 2017—the date when *Der Spiegel* reported on the Defendants' conduct." (DPP ¶¶ 230-31; IPP ¶ 203.) This assertion does not

---

[25] Appendix A lists the statutes and limitations periods, and the associated accrual rules, applicable to IPPs' state antitrust claims. The same information is listed for IPPs' state consumer protection claims (*see* Appendix B) and unjust enrichment claims (*see* Appendix C). The arguments advanced in text apply with equal force to all state law claims, whether pled under state antitrust, consumer protection, or unjust enrichment laws.

[26] The earliest indirect purchaser action was filed on July 25, 2017, and the earliest direct purchaser action was filed on September 27, 2017. *See* Compl., *Kaufman v. BMW AG et al.*, No. 13:7-cv-05787-CRB (D.N.J. July 25, 2017); Compl., *Autohaus Acquisitions, Inc. v. Audi AG et al.*, No. 2:17-cv-07536-MCA-MAH (D.N.J. Sept. 27, 2017).

avoid the statute of limitations. "[E]xplicit, longstanding U.S. Supreme Court and Ninth Circuit authority" holds that the discovery rule does not apply to federal antitrust conspiracy claims, and that instead, "antitrust claims accrue at the time of injury." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1210 (N.D. Cal. 2015) ("*Animation Workers*"); *see Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012); *Beneficial Standard Life Insur. Co. v. Madariaga*, 851 F.2d 271, 274-75 (9th Cir. 1988) ("In [antitrust] actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs.").

Similarly, the majority of IPPs' state-law claims are subject to the injury rule, not the discovery rule. (*See* Appendix A (6 of 10 state antitrust laws); Appendix B (6 of 11 consumer protection laws); Appendix C (8 of 13 unjust enrichment laws).) With respect to IPPs' remaining state law claims, IPPs' assertion that they "did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein until July 21, 2017" (IPP ¶ 206), is refuted by their own allegations.

Many of the allegations that Plaintiffs apparently believe render their claim plausible have been available to them for many years. *See Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 188 (1st Cir. 2006) ("[K]nowledge of every fact necessary to prevail on the claim is not required to put the plaintiff on inquiry notice and trigger the accrual period."). For example, Plaintiffs claim that features and general technology was standardized and released in lockstep across Defendants' products, allegedly an open signal of coordination. (*See* IPP ¶ 113 n.52; DPP ¶¶ 113,157, 200).[27] Yet instead of investigating their possible claims, Plaintiffs waited until *Der*

---

[27] (*See* DPP ¶¶ 168-69 (admitting that membership in the VDA was not limited to Defendants, and describing Jaguar, Volvo, Renault, and Fiat's pre-2010 requests to join the allegedly secret meetings); *id.* ¶ 120 (stating that "[i]n 2007" one industry association, "the EUGT," was formed, with all of its funding coming from defendants BMW AG, Daimler AG, Volkswagen AG, and Robert Bosch GmbH); IPP ¶ 167 (admitting that "the VDA also includes foreign suppliers and foreign-owned carmakers such as Ford and Opel that would attend official meetings with Defendants").) Plaintiffs also point to a June 2013 book by BMW's former executive vice president, Robert Lutz, which DPPs describe as "[a]necdotal evidence" that "Defendants have colluded on automobile production for decades." (DPP ¶ 93; *see also* IPP ¶ 105 n.24.) If that assertion is credited, Lutz's book gave Plaintiffs "reason to discover the

*Spiegel* published an article to file their original complaints. *See Platt Elec. Supply, Inc.*, 522 F.3d at 1054 ("So long as there is a reasonable ground for suspicion, the plaintiff must go out and find the facts; she cannot wait for the facts to find her." (internal quotation marks omitted)).

### 2. **Plaintiffs Have Not (and Cannot) Adequately Plead Fraudulent Concealment**

Plaintiffs' attempts to plead fraudulent concealment fail to satisfy the high bar of Federal Rule of Civil Procedure 9(b)'s requirement to plead, with specificity, the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Transpacific Passenger Air*, 2011 WL 1753738, at *19 (citing *Schwartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) and *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006)). Plaintiffs' claims of fraudulent concealment largely repackage their "discovery rule" assertions and do not meet this exacting standard. (DPP ¶¶ 232-238; IPP ¶¶ 203-212); Fed. R. Civ. P. 9(b).

The Ninth Circuit requires a plaintiff to allege "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (citations omitted).[28] Plaintiffs attempt to meet this burden with generic statements by

---

existence of a claim." *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049,1054 (9th Cir. 2008). Thus, IPPs' state law antitrust and consumer protection claims to which the discovery rule applies accrued no later than June 2013. (*See* Appendices A-C.)

[28] Federal courts apply state fraudulent concealment law when analyzing state law claims. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir. 1988) ("Where a district court applies or borrows a state statute of limitations, it is also required to apply the state's equitable exceptions, to the extent these are consistent with federal law."). The analysis is simplified by the fact that state law elements of fraudulent concealment are largely the same as the federal requirements. *See, e.g.*, *Porter v. Spader*, 239 P.3d 743, 747 (Ariz. Ct. App. 2010) (equitable tolling applies where a defendant's affirmative acts of fraud or concealment have misled a person from either recognizing a legal wrong or seeking timely legal redress); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1100 (C.D. Cal. 2009) (under California law, "[a] plaintiff alleging fraudulent concealment must establish that his failure to have notice of his claim was the result of the affirmative conduct by the defendant"); *Fox v. City of Pompano Beach*, 984 So.2d 664, 668 (Fla. Dist. Ct. App. 2008) (to establish equitable estoppel, the plaintiff "must allege that the defendant acted with an intent to mislead or deceive the plaintiff into filing late, and that the plaintiff's failure to timely file is directly attributable to the defendant's misconduct"); *Mackereth v. G.D.*

Defendants' executives about general competition among Defendants (DPP ¶¶ 236-237 ("Harald Krueger, CEO of BMW, said, 'This competition constantly motivates us to achieve excellence.'")), paired with Defendants' public criticisms of each other's vehicles (IPP ¶ 208), and their statements alluding to competition over environmental innovation (*id.* ¶ 209 (in 2007, Volkswagen AG's then-CEO stated, "We want to be the ecologically leading car maker by 2018.")). But this court has held that a party's general statements that it "participates in a competitive market" are insufficient to plead fraudulent concealment with particularity. *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 891-91 (N.D. Cal. 2015); *see Transpacific Passenger Air*, 2011 WL 1753738, at *20 (rejecting fraudulent concealment when allegations were "too vague [] to meet the heightened pleading standard [applicable to fraudulent concealment.]"); *Volk*, 816 F.2d at 1415 (a plaintiff must allege how he was "[led] to believe that he did not have a claim for relief"). Plaintiffs' shopworn suggestion that the conspiracy was "inherently self-concealing" is equally unavailing. (IPP ¶ 210.) An unadorned allegation of passive concealment is insufficient to toll the statute of limitations. *Animation Workers*, 87 F. Supp. 3d at 1217 (rejecting fraudulent concealment when "Plaintiffs fail[ed] to allege facts showing that Defendants did more than passively conceal information").

Plaintiffs' allegations of affirmative concealment, furthermore, do not meet the pleading standard required by Rule 9(b): the Amended Complaints demonstrate that publicly available information provided Plaintiffs "actual []or constructive knowledge of the facts giving rise to [their] claim[s]" prior to 2013. *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988). Most prominently, if Plaintiffs' claims that technology and features were standardized across Defendants' products are credited, then this open signaling of coordination not only put Plaintiffs on notice of the conduct about which they now complain, but also belies any claim that Defendants "affirmatively" concealed their alleged standardization. (*See* IPP ¶ 113 n.52; DPP ¶¶ 113,157, 200.)

---

*Searle and Co.*, 674 N.E.2d 936, 942 (Ill. App. Ct. 1996) (fraudulent concealment requires "an affirmative act or statement which concealed a potential cause of action, that the statement was known to be false or was made in reckless disregard of its truth or falsity, and that the concealment could not have been discovered by [plaintiff's] reasonable diligence.").

Finally, many of Plaintiffs' threadbare allegations are drawn from information that was public before the applicable limitations periods.[29] Despite asserting that they "could not have discovered through the exercise of reasonable diligence" the alleged facts giving rise to their claims, Plaintiffs do not describe a single action they took—aside from reading *Der Spiegel*—to investigate their claims. (DPP ¶ 229; IPP ¶ 206.) The silence on this issue is material and dispositive. Plaintiffs concede that Defendants' alleged meetings were public knowledge long before 2013. Membership in the VDA was not limited to Defendants. Manufacturers such as Fiat, Ford, Jaguar, Opel, Renault, and Volvo were all members of the VDA and requested to attend the very meetings that Plaintiffs allege were "secret." (DPP ¶¶ 168-169; *see also* IPP ¶¶ 163 n.104, 167 (German steelmakers' representatives attended Defendants' meetings, establishing that the meetings were not secret nor confined to Defendants); *id.* ¶ 173 (in 1995 Defendants began collaboration on emissions research by each contributing money and engineers to joint research under the ADA industry association); DPP ¶ 159 (Defendants attended "multiple yearly meetings" together as part of their AVI membership); IPP ¶¶ 168-69 (detailing widely attended annual industry events including "the world's largest motor show" that allegedly provided Defendants their opportunity to conspire).)

Where facts in the public domain are "sufficient to excite suspicion," Plaintiffs "must show [] [their] attempts to uncover [their] claim from those facts." *Conmar*, 858 F.2d 499 at 504. Yet, Plaintiffs do not even allege, as they must to survive this Motion, that, in light of this and other publicly available information, they "acted diligently in trying to uncover the facts giving rise to [their] claim[s.]" *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1204 (N.D. Cal. 2015). Rather, Plaintiffs admit that they did not engage in any investigation of their claims prior to *Der Spiegel's* July 2017 article. (*See* DPP ¶ 230 (claiming Plaintiffs had "no realistic ability to discover" the basis of their claims before it was reported in *Der Spiegel*); IPP ¶¶ 203-204 (same).) Plaintiffs' failure to take any "particular efforts in making or seeking to

---

[29] *See supra* Section V.D.1; *see also* Section V.E.2 at n.5-6; (DPP ¶ 93 (relying on a conversation between Defendants from the 1970s that was published in Bob Lutz's June 2013 book—outside of the limitations period—to allege Defendants "have impermissibly coordinated on automobile production *for decades*" (emphasis added)).

make discovery" of an alleged fraud is an "abject failure to have engaged in any diligen[ce]." *See In re Chaus Secs. Litig.*, 801 F. Supp. 1257, 1266 (S.D.N.Y. 1992). Because there existed "enough information [prior to September 2013] to warrant an investigation which, if reasonably diligent, would have led to the discovery of the [alleged conduct]," Plaintiffs cannot hide behind assertions of "fraudulent concealment" now. *Hexcel*, 681 F.3d at 1060.[30]

* * *

Plaintiffs have not sufficiently alleged that their claims based on decade-old conduct are entitled to tolling under any theory. Their federal antitrust claims for conduct before September 27, 2013 (DPPs) and July 25, 2013 (IPPs) should therefore be dismissed as time-barred by the applicable statutes of limitations. Plaintiffs' state law claims also should be dismissed as time-barred, as set forth in Appendices A-C.

### F. IPPs' State Law Claims Should Be Dismissed

IPPs also allege a slew of state law claims that are factually derivative of their Sherman Act claim. Because these state law analogues are interpreted consistently with federal law, IPPs' state antitrust claims should be dismissed on the same grounds as their Sherman Act claim.[31] Many of IPPs' state law claims should be dismissed for the following additional reasons.

#### 1. The State-Law Claims of Fourteen Plaintiffs, and All Claims Under Four States' Laws, Should Be Dismissed

Sixteen named plaintiffs could not have been injured by any alleged agreements relating

---

[30] There is also no basis for Plaintiffs' suggestion that Defendants are "estopped" (IPP ¶ 211; DPP ¶¶ 239-41) from asserting limitations defenses. Fraudulent concealment and equitable estoppel are considered one and the same, so a claim of equitable estoppel suffers from the infirmities identified in text with regard to Plaintiffs' suggestions of fraudulent concealment. *See Smith* v. *Kohlweiss, Inc.*, No. 11-00239, 2012 WL 1156338, at *5 (N.D. Cal. Mar. 30, 2012) ("Equitable estoppel, [ ] focuses primarily on actions taken by the defendant to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.'"); *Guerrero*, 442 F.3d at 706-07 (explaining that "equitable estoppel" is "also termed fraudulent concealment").

[31] Six states have enacted "harmonization" statutes that require (or permit) their antitrust laws to be interpreted in the same manner as analogous federal law. The remaining four states have judicially-created harmonization doctrines. (*See* Appendix A (citing state-by-state supporting authority).)

to the size or dosing strategies for AdBlue tanks, because, as publicly available information confirms, the cars they allegedly purchased or leased do not contain AdBlue tanks.[32] Without a "palpable" personal injury, these named plaintiffs lack Article III standing to pursue claims on behalf of putative individual state classes. *See Easter*, 381 F.3d at 961 ("To satisfy the traceability requirement, a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'"). Four putative state classes—Arizona, Michigan, Pennsylvania, and Rhode Island—therefore lack a named plaintiff with Article III standing. All claims brought under the laws of these four states should be dismissed. *See Pardini* v. *Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) ("[W]here a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal.") (internal quotation marks and alterations omitted).

### 2. <u>Four State Antitrust Claims Should Be Dismissed on Additional Grounds</u>

IPPs' Colorado, Illinois, Oregon, and Rhode Island state antitrust claims should also be dismissed on the following independent grounds:

***(1) Colorado and Illinois do not permit indirect purchasers to bring private antitrust claims.*** (*See* Appendix A); *see also Stiflear v.Bristol-Myers Squibb Co.*, 931 P.2d 471, 476 (Colo. Ct. App. 1996) (applying *Illinois Brick* and noting that courts have consistently held that "indirect purchasers, such as the plaintiff[s], do not have standing under" Colorado's antitrust laws); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*. No. 14-md-02503, 2015 WL 5458570, at *17 (D. Mass. Sept. 16, 2015) (dismissing Illinois claims after concluding that the ban on class actions in the Illinois Antitrust Act applies to Rule 23 class actions in federal court); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011) ("[T]he Illinois

---

[32] These named IPPs, listed along with their state of residence, are: Timothy Edwards (Arizona), Isaac Hu (California), Benjamin Roussel (Florida resident, automobile purchased in Rhode Island), Jessica Smith (Florida resident, automobile purchased in Pennsylvania), Robert Pasternak (Florida resident, automobile purchased in Michigan), Lonny Gold (Illinois, automobile at issue 2008 ML320 CDI), Kraft Chemical Company (Illinois), Janet Berry (Michigan), Elizabeth Hatchett (Minnesota), Christopher Miller (Minnesota), Walter Lewis (New York), Walter Pummer, Jr. and Karen Pummer (Pennsylvania), Lauri Clope (Wisconsin).

statute represents a policy judgment as to the feasibility of managing duplicative recovery, which the legislature has entrusted to the Attorney General but not to individual indirect purchasers”).

***(2) Oregon’s and Rhode Island’s Illinois Brick repealer statutes have no retroactive effect.*** In *Illinois Brick Co. v. Illinois*, the U.S. Supreme Court held that indirect purchasers cannot recover money damages for federal antitrust violations. 431 U.S. 720 (1977). The legislatures of Oregon and Rhode Island have since amended their antitrust statutes in 2010 and 2013, respectively, to “repeal” *Illinois Brick*. In both instances, the legislation created a new right that cannot be applied retroactively. *See, e.g., In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D. Pa. 2014) (prohibiting recovery for injuries “incurred before the Oregon and Rhode Island [Illinois Brick] repealer statutes took effect”); (*see also* Appendix A). IPPs’ claims under the Oregon and Rhode Island antitrust law should be dismissed to the extent they seek damages for injuries pre-dating these states’ repealer statutes.

### 3. <u>IPPs’ Consumer Protection Claims Should Also Be Dismissed</u>

IPPs also assert eleven state consumer protection law claims based on the same alleged conduct underlying their Sherman Act claim. (IPP ¶¶ 258-71.) Those claims are deficient for the same reasons as IPPs’ Sherman Act claim because IPPs fail to allege “unfair competition” or any other “unlawful acts or practices.” (*See id.* ¶ 259.) The claims should also be dismissed because of: (1) statutory bars to recovery under these statutes imposed by state antitrust laws; (2) IPPs’ failure to plead proximate cause; and (3) additional pleading failures discussed below.

***(1) IPPs cannot use consumer protection claims to circumvent bars to recovery under state antitrust law***. IPPs base their claims entirely on Defendants’ alleged anticompetitive conduct. (*See, e.g., id.* ¶¶ 260(a), 261(a), 263(b).) Yet numerous state courts have rejected indirect purchasers’ efforts to take “classic antitrust claims” that are prohibited or insufficiently pled under state antitrust law and recast them as consumer protection claims. *See, e.g., Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996) (dismissing “classic antitrust claims dressed in Consumer Fraud Act clothing”); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) (“It would be inconsistent to provide that the very conduct which is not sufficient to state a cause of action under the Antitrust Act is sufficient to state a cause of

action under the Consumer Fraud Act."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 Supp. 2d 380, 407-08 (E.D. Pa. 2010) (dismissing Colorado Consumer Protection Act claim because unfair trade practices do not constitute a distinct claim under that statute).

In particular, IPPs may not pursue consumer protection claims in states that (i) have not repealed *Illinois Brick* and thus do not permit indirect purchasers to bring private antitrust claims (Colorado, Florida, Montana, and Pennsylvania) or (ii) do not permit indirect purchasers to bring private antitrust class actions (Illinois). Nor can IPPs recover damages under consumer protection statutes for conduct pre-dating the enactment of an *Illinois Brick* repealer statute (Oregon and Rhode Island). *See supra* Section VI.F.2; (Appendix B).

***(2) IPPs do not adequately plead proximate causation.*** IPPs' consumer protection claims also fail because they provide no basis on which to conclude (applying a tort-based analogue to the *AGC* analysis above) that Defendants' alleged conduct proximately caused their claimed damages. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("No injury, no tort, is an ingredient of every state's law."). IPPs offer nothing more than bare assertions of their injury "as a direct and proximate result of Defendant's conduct." (*See, e.g.*, IPP ¶ 261(e).) These bald "legal conclusions" are not "well-pleaded factual allegations" that would show whether IPPs' claims "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). More specifically, IPPs do not allege a sufficient—or, really, any—nexus between the conduct they challenge and the injuries they purportedly suffered. But every relevant state's consumer protection statute requires a plaintiff to plead facts showing exactly that nexus because, absent proximate causation, a plaintiff's purported injuries are too remote to give rise to a claim. (*See* Appendix B); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute," because "[f]or centuries, it has been a well-established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause" (citations omitted)).

As shown above (*see supra* Section VI.A.2), IPPs' purported injuries are too remote from Defendants' alleged misconduct because the actions of many independent decision-makers and other variables could have intervened to break the chain of causation. Therefore, IPPs fail to plead proximate causation sufficient for tort-based recovery. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (dismissing state consumer protection claims "because each statute that the defendants allegedly violated requires that the violation proximately cause the claimed injury, and because [plaintiffs'] alleged injuries are too remote to sustain their antitrust claims"); (*see also* Appendix B).

***(3) IPPs' consumer protection claims have additional deficiencies.***

*Minnesota and New York require misrepresentation, deceit, or fraudulent conduct.* Minnesota authorizes consumer protection claims only if those claims assert misrepresentation, fraud, or deceptive conduct. *See* Minn. Stat. § 325F.69(1). Likewise, IPPs' New York consumer protection claim fails because a private right of action exists only for claims involving "deceptive" conduct. *See* N.Y. Gen. Bus. L. § 349; *In re Digital Music Antitrust Litig.*, 812 Supp. 2d at 410 ("[A]nticompetitive conduct that is not premised on consumer deception is not within the ambit of the [New York] statute[.]" (citation omitted)). For these two consumer protection claims, IPPs "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including the "the time, place, and specific content of the false representations[.]" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010); (*see also* Appendix B). But, at most, IPPs allege that Defendants "advertis[ed] the virtues of German engineering" (IPP ¶ 85), and "fraudulently concealed" the alleged conspiracy through general statements made by executives regarding environmental innovation efforts (*id.* ¶¶ 207-09). IPPs never allege that any advertisements by Defendants were false, nor do they allege with sufficient particularity any falsehoods or misrepresentations—a required pleading element of a deliberate fraud or misrepresentation claim. *See In re Digital Music*, 812 Supp. 2d at 409-10 (finding general advertising and "failure to disclose participation" in a conspiracy insufficient to plead deception with particularity, dismissing New York claim).

*Michigan Requires Unconscionable or Egregious Misconduct*. Only "unconscionable" conduct violates Michigan consumer protection law. (*See* Appendix B.) "Pleading unconscionability requires something more than merely alleging that the price of a product was unfairly high." *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1029-30. Therefore, IPPs must allege facts that show unequal bargaining power, inequitable terms in the relevant transaction, or both. *See id.* (dismissing price-fixing claims under state consumer protection laws requiring unconscionable conduct). IPPs have not done so.

*Colorado, Montana, and Pennsylvania do not permit plaintiffs to maintain consumer protection claims for damages as class actions*. (*See* Appendix B.) Courts apply this restriction to state law consumer protection claims brought in federal court, and such claims are properly dismissed here. *See, e.g.*, *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-02432, 2015 WL 4036319, at *6 (D. Colo. July 1, 2015) (dismissing consumer protection claim because Colorado statute does not permit class actions for monetary damages); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1103-04 (N.D. Cal. 2007) (dismissing consumer protection claim because Montana statute does not allow class actions).

**4. <u>IPPs' State Unjust Enrichment Claims Should Also Be Dismissed</u>**

IPPs plead in the alternative that Defendants have been unjustly enriched under the laws of thirteen states by the same "unlawful and inequitable conduct" that purportedly supports IPPs' other claims, and they seek a constructive trust of alleged "ill-gotten gains." (*See* IPP ¶¶ 272-291.) For the reasons stated above (*see supra* Section VI.A.-B.) there was nothing unlawful or inequitable about Defendants' conduct. Hence, any benefit Defendants received from IPPs was not wrongfully secured, and IPPs are not entitled to restitution. *See In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 967 (N.D. Cal. 2007) (where "[P]laintiffs' claim of 'unjust enrichment'. . . depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability," their unjust enrichment claim "must necessarily be dismissed when the other claims are dismissed"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).

IPPs' unjust enrichment claims should also be dismissed: (1) as impermissible attempts to circumvent state antitrust and consumer protection laws; and (2) because IPPs have not pled that they conferred a direct benefit upon Defendants, as certain states require.

***(1) IPPs cannot employ unjust enrichment claims to circumvent the requirements of state antitrust and consumer protection law.*** IPPs cannot pursue an unjust enrichment theory if "allowance of the claim would conflict with liabilities or penalties for the interference provided by other law." Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011). In the antitrust context specifically, the Restatement explains that plaintiffs cannot recover allegedly anticompetitive "overcharges on a theory of unjust enrichment" if recovery "would conflict with the remedial scheme established by" antitrust law. *Id.* § 44 & illustration 16.

Courts apply this rule to prohibit plaintiffs from using unjust enrichment claims to "circumvent limitations of state antitrust laws." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009).[33] "[A]fter all, unjust enrichment is an equitable remedy. . . and it would be inequitable to permit relief where the state has clearly made a policy determination that no such relief should lie." *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088-89 (S.D. Cal. 2017) (citing *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1089 (9th Cir. 2003)). IPPs attempt precisely such "circumvention" here, and all of their unjust enrichment claims should therefore be dismissed. (*See* Appendix C.)

***(2) Arizona, Florida, Massachusetts, Michigan, New York, Pennsylvania, Rhode Island, and Wisconsin require plaintiffs claiming unjust enrichment to have conferred a benefit directly on the defendant.*** (*See* Appendix C.) IPPs, *indirect* purchasers, by definition, did not bestow a direct benefit on any Defendant. Instead, "[a]ny benefit that plaintiffs have

---

[33] *See, e.g.*, *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d at 763 ("This Court joins this majority of courts in concluding that allowing unjust enrichment claims in those states that explicitly disallow indirect purchasers from pursuing antitrust and consumer-protection claims would result in circumvention of the policies expressed by state legislatures through limitations inherent in those laws." (internal quotation marks and alterations omitted)); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 412 ("[I]t is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by [*Illinois Brick*].").

conferred . . . would be on others in the chain of distribution from whom they purchased, not on defendants." *In re Aftermarket Filters Antitrust Litig.*, MDL No. 1957, 2010 WL 1416259, at *3 (N.D. Ill. Apr. 1, 2010) (dismissing indirect purchaser unjust enrichment claims under laws of Michigan and other states); *see also In re Refrigerant Compressors Antitrust Litig.*, No. 09-md-02042, 2013 WL 1431756, at *25-26 (E.D. Mich. Apr. 9, 2013) (dismissing indirect purchaser unjust enrichment claims under laws of Arizona, Florida, Massachusetts, Michigan, New York, and Wisconsin, among others).

## VII. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Consolidated Class Action Complaints in full, and with prejudice.

Dated: October 14, 2019

Respectfully Submitted,

LATHAM & WATKINS LLP

By: */s/ Daniel M. Wall*

Daniel M. Wall (Bar No. 102580)
Belinda S Lee (Bar No. 199635)
Alicia R. Jovais (Bar. No. 296172)
Elizabeth H. Yandell (Bar No. 301725)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: *Dan.Wall@lw.com*
*Belinda.Lee@lw.com*
*Elizabeth.Yandell@lw.com*

Michael Lacovara (Bar No. 209279)
885 Third Avenue
New York, NY 10022-4834
Telephone: +1.212.906-1200
Facsimile: +1.212.751-4864
Email: *Michael.Lacovara@lw.com*

*Attorneys for Defendants BMW AG, BMW of North America, LLC, and BMW (US) Holding Corp.*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ Shon Morgan
Shon Morgan (Bar No. 187736)
Adam Bryan Wolfson (Bar No. 262125)
Kevin Y. Teruya (Bar No. 235916)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Tel: 213-443-3000
Fax: 213-443-3100
Email: shonmorgan@quinnemanuel.com
Email: adamwolfson@quinnemanuel.com
Email: kevinteruya@quinnemanuel.com

Richard I. Werder, Jr. (*pro hac vice*)
Josef Teboho Ansorge (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: 212-849-7000
Fax: 212-849-7100
Email: rickwerder@quinnemanuel.com
Email: josefansorge@quinnemanuel.com

SQUIRE PATTON BOGGS (US) LLP
Eric J. Knapp (Bar No. 214352)
Troy Masami Yoshino (Bar No. 197850)
275 Battery Street, Suite 2600
San Francisco, CA 94111
Tel: 415-954-0200
Fax: 415-393-9887
Email: Eric.Knapp@squirepb.com
Email: troy.yoshino@squirepb.com

*Attorneys for Defendants Daimler AG and Mercedes-Benz USA, LLC*

SULLIVAN AND CROMWELL LLP

By: */s/ Sharon L. Nelles*

Sharon L. Nelles (*pro hac vice*)
Steven L. Holley (*pro hac vice*)
Suhana S. Han (*pro hac vice*)
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3588
Email: nelless@sullcrom.com
Email: holleys@sullcrom.com
Email: hans@sullcrom.com

Amanda F. Davidoff (*pro hac vice*)
Samantha F. Hynes *(pro hac vice*)
1700 New York Avenue, NW
Washington, D.C. 20006
Tel: 202-956-7500
Fax: 202-293-6330
Email: davidoffa@sullcrom.com
Email: hyness@sullcrom.com

*Attorneys for Defendants Volkswagen Group of America, Inc., Volkswagen AG, Audi of America, Inc., Audi of America, LLC, Audi AG, Porsche Cars North America, Inc., and Dr. Ing. h.c. F. Porsche AG*

**SIGNATURE ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the signatories hereto.

By: */s/ Daniel M. Wall*
Daniel M. Wall

*Attorney for BMW AG, BMW of North America, LLC, and BMW (US) Holding Corp.*