UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: GERMAN AUTOMOTIVE
MANUFACTURERS ANTITRUST
LITIGATION

_____/

This Order Relates To:
Dkt. Nos.  452, 453, 454, 455.

_____/

MDL No. 2796 CRB  (JSC)

**ORDER GRANTING MOTIONS TO
DISMISS**

Consumers and auto dealers (IPPs and DPPs, respectively) filed two related consolidated class actions against the five leading German car manufacturers—Audi AG, BMW AG, Daimler AG, Porsche AG, and Volkswagen (VW) AG—and their American subsidiaries.  Defendants have moved to dismiss IPPs and DPPs' second amended complaints.  See IPP Second Amended Complaint (IPP 2AC) (dkt. 447); DPP Second Amended Complaint (DPP 2AC) (dkt. 448); Joint MTD 2AC (dkt. 452); BMW MTD 2AC (dkt. 453); VW MTD 2AC (dkt. 454).  The Court grants Defendants' motions to dismiss with prejudice.

I.      BACKGROUND

Plaintiffs' initial consolidated complaints alleged that Defendants agreed to slow "the pace of innovation," reducing the quality of their cars.  See Order re First MTD (dkt. 38) at 1–2.  But Plaintiffs provided only two specific examples:  (1) an alleged agreement that soft-top convertibles should open or close only at speeds under thirty-one miles per hour, id. at 2, and (2) a series of alleged agreements about the size of AdBlue tanks, id. at

United States District Court
Northern District of California

2–3.[1]  These allegations were based on reports of investigations by the European Commission Competition department (ECC) and Germany's Federal Cartel Office.  Id. at 3.  Plaintiffs also relied on VW and Daimler's proffers to the ECC.  Id.  VW's proffer admitted agreements among Defendants about vehicle development, costs, suppliers, and markets, "exchange of . . . sensitive technical data," jointly established "technical standards," agreements to use "only certain technical solutions," and an admission that Defendants' actions may have violated European cartel law.  Id.

The Court granted Defendants' initial joint motion to dismiss.  See id.  First, the Court rejected Plaintiffs' allegations of a "whole car conspiracy to reduce innovation."  Id. at 13.  It concluded that the two alleged agreements related "to niche vehicle features" and did not evince a conspiracy to reduce innovation across the board, id., and held that any admissions in Defendants' proffers to European antitrust authorities were "too general and too vague to plausibly support [a] broad agreement to reduce innovation," id. at 15.  European investigations did not establish a whole car conspiracy in part because it was unknown whether they would "result in indictments or nothing at all."  Id. at 15.  Similarly, "[a]llegations about how Defendants used working groups and trade associations to further their 'whole car conspiracy'" lacked crucial details such as "what was agreed to in these meetings."  Id.  Second, the Court rejected other purported agreements as inadequately pleaded.  Relevant here, it concluded that Plaintiffs had not alleged injury from an agreement to "coordinate . . . purchases of car parts and steel" because such an agreement was most likely to have lowered the cost of steel and therefore the prices paid by Plaintiffs.  Id. at 17–18.  Although DPPs alleged that they were harmed because "Defendants pocketed the cost savings and did not pass along a single cent," they failed to allege either that Defendants agreed with one another to keep any cost savings or that it would be wrongful for them to do so.  Id. at 18.  Third, the Court dismissed IPPs' various state law claims because "[t]he factual bases and theories of injury for these claims

---

[1] AdBlue "is a substance that breaks emissions from diesel engines down into less harmful compounds."  Order re Second MTD (dkt. 432) at 2.

United States District Court
Northern District of California

[were] the same as those for the Sherman Act claims."  Id. at 19.

Both IPPs and DPPs filed amended complaints.  See IPP First Amended Complaint (IPP 1AC) (dkt. 391); DPP First Amended Complaint (DPP 1AC) (dkt. 392).

IPPs' First Amended Complaint focused on an alleged decade-long conspiracy to limit the development and implementation of diesel emissions control system features.  IPP 1AC ¶¶ 3–4.  IPPs alleged that Defendants agreed to standardize the rate at which AdBlue would be used in their diesel vehicles and the size of those vehicles' AdBlue tanks.  Id. ¶ 119.  IPPs relied heavily on the ECC's investigation, particularly an ECC press release announcing its "current view that the Defendants had in fact violated antitrust law by participating in a collusive scheme to restrict competition on the development of technology to clean the emissions of petrol and diesel vehicles."  Id. ¶ 150 (internal quotation marks omitted).  An ECC Statement of Objections had asserted that Defendants "coordinated their strategies" on the size of AdBlue tanks and the rate at which AdBlue would be used in diesel vehicles.  Id.  IPPs also relied on Daimler and VW's leniency proffers.  See id. ¶¶ 112–13.

DPPs' First Amended Complaint included new allegations relating to the purported "no arms race" conspiracy.  See DPP 1AC.  DPPs alleged additional agreements regarding parking brakes, convertible tops, and particle filters.  Id. ¶ 157.  DPPs also alleged that Defendants' failure to meaningfully invest in electric vehicles was evidence of their "no arms race" conspiracy.  Id. ¶ 254.  And they pointed to examples of Defendants updating similar vehicle lines around the same time as evidence of collusion.  Id. ¶ 199–200.  In the alternative, DPPs alleged that AdBlue agreements, id. ¶ 250, electric vehicle agreements, id. ¶ 254, and steel-purchasing agreements, see DPP Opp'n (dkt. 419) at 5 n.6, constituted Sherman Act Violations even if the "no arms race" conspiracy was not adequately pleaded.  DPPs significantly modified their steel-purchasing conspiracy allegations.  DPPs alleged that Defendants' joint agreement with steel manufacturers (i.e., to pay baseline prices plus a standard additional price indexed to the cost of raw materials) raised the prices that Defendants paid for steel—and that Defendants passed this price increase onto customers.

DPP 1AC ¶¶ 161, 165.  Finally, DPPs alleged that Defendants prevented dealerships from differentiating their vehicles based on price by setting the highest possible retail price (the MSRP) unusually close to the lowest possible retail price (the inventory price).  Id. ¶¶ 204–11.  They alleged that this and other economic evidence, including price information and Defendants' relative market share over time, showed a successful market allocation conspiracy.  Id. ¶¶ 192–98.  And DPPs pointed to various "plus factors" as evidence that Defendants had the motive and opportunity to collude.  Id. ¶¶ 181–89.

Defendants jointly moved to dismiss the first amended complaints.  See Joint MTD 1AC (dkt. 409).  VW and BMW also filed individual motions to dismiss.  See VW MTD 1AC (dkt. 411); BMW MTD 1AC (dkt. 410).

The Court granted Defendants' motions to dismiss.  See Order re Second MTD. The Court held that although IPPs and DPPs had plausibly alleged an agreement relating to AdBlue dosage rates and tank sizes, that agreement was not an unreasonable restraint on competition.  Id. at 8.  The agreement was not "per se" anticompetitive because AdBlue technical standards could plausibly reduce engine clogging and the risk of vehicle damage, create more room for other vehicle features, and generally "benefit all consumers."  Id. at 10.  The Court thus applied the "rule of reason" and held that Plaintiffs had not pleaded a relevant market because, in the United States, "German Diesel Vehicles" and "German Luxury Vehicles" faced obvious competition from non-German manufacturers.  Id. at 11–12.  Nor had Plaintiffs adequately alleged that Defendants had market power in any relevant market.  Id. at 12.  These conclusions were fatal to IPPs' claims.  Id. at 13.[2]

The Court rejected DPPs' additional claims for failure to plausibly allege agreements and injuries.  Id.  For example, DPPs had still not plausibly alleged a "no arms race conspiracy."  Allegations that Defendants agreed not to innovate regarding several vehicle features either lacked "any detail at all" or referred to features predominantly used in cars sold in Europe, and thus could "not plausibly support the existence of a conspiracy

---

[2]  The Court dismissed IPPs' state law claims for the same reasons.  See Order re Second MTD at 21.

meant to divide the American market." Id. at 14.  Similarly, DPPs' alleged agreement not to compete on steel prices could not support DPPs' "no arms race" theory because the "leap from steel prices to overall market allocation [was] not 'plausible on its face.'"  Id. at 15 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Defendants' parallel conduct could not plausibly show the "no arms race" conspiracy because there were obvious innocent explanations for that conduct.  Id. at 15–16.  And Defendants' alleged motive and opportunity to conspire did not support the "no arms race" conspiracy because DPPs failed to allege specifics about Defendants' purported agreements.  Id. at 16–17.  DPPs' allegations also failed to establish narrower unlawful conspiracies.  As alleged, Defendants' electric car strategies were not coordinated or even parallel.  Id. at 18.  And DPPs had not alleged a plausible injury based on Defendants' alleged steel-purchasing conspiracy because DPPs had not plausibly explained why the cost-plus-surcharge pricing arrangement would lead to higher steel prices.  Id. 19–20.

The Court thus dismissed Plaintiffs' first amended complaints without prejudice. Id. at 21.  Because it was "not a certainty" that Plaintiffs would be unable to plead "a relevant market" or "injury from the alleged steel-buying agreements," the Court granted leave to amend so that they could "attempt to salvage these claims."  Id.  IPPs and DPPs have now filed second amended complaints.  See IPP 2AC (dkt. 447); DPP 2AC (dkt. 448).

IPPs have modified their claims in two ways.  First, they have supplemented their allegations of anticompetitive agreements relating to Defendants' vehicles' "diesel emissions systems" in an effort to establish a conspiracy that was (1) broader than AdBlue dosage rates and tank sizes and (2) devoid of any procompetitive effects.  See IPP 2AC ¶¶ 6.  IPPs point to factual statements from the ECC about Defendants' agreements, see id. ¶¶ 6, 9, 21, 118–119, 148, and argue that this evidence makes "clear that Defendants' collusion covered entire emissions systems and was not aimed at improving product quality or permitted standard setting."  IPP Opp. to Joint MTD 2AC (dkt. 456) at 2. Second, IPPs have recharacterized the relevant market as the "U.S. market for diesel

5

passenger vehicles." IPP 2AC ¶ 11. IPPs allege that they conducted a survey showing that less than 33% of U.S. consumers would switch from a diesel passenger vehicle to another type of vehicle when faced with a small but significant price increase, and that a "Critical Loss Analysis" examining this substitution pattern and Defendants' profit margins establishes that diesel passenger vehicles constitute their own submarket. Id. ¶¶ 176–179. Based on the survey, along with alleged (i) industry and public recognition, (ii) "peculiar characteristics," (iii) "unique production facilities," and (iv) price premiums that customers pay for diesel passenger vehicles, id. ¶¶ 173–75, 180–81, 172, 186, IPPs argue that their Second Amended Complaint plausibly alleges a relevant "market for diesel passenger vehicles sold in the U.S." and "Defendants' dominance of that market," IPP Opp. to Joint MTD 2AC at 4.

DPPs now characterize alleged agreements among Defendants, and between Defendants and steel manufacturers, as a "Steel Price-Fixing Conspiracy." DPP 2AC ¶ 274–77.[3] As before, DPPS allege that Defendants agreed to a standardized price "index" or "surcharge" on top of a baseline price to account for fluctuations in the market for raw materials. See Order re First MTD at 19; DPP 2AC ¶ 167. DPPs now allege that steel manufacturers unlawfully agreed with one another to inflate the surcharges and that Defendants agreed with one another to accept the higher prices, "which allowed them to pass on the cost increase to their customers." Id. ¶ 10. Thus, the purported steel "price-fixing" conspiracy consists of three sets of agreements: (1) a pricing conspiracy among steel manufacturers resulting in inflated surcharges; (2) an agreement among Defendants to pay the surcharges charged by the steel manufacturers, enabling the steel manufacturers to maintain inflated prices; and (3) an agreement among Defendants to pass the increased cost of steel on to consumers. See id. ¶¶ 161–181. According to DPPs, Defendants accepted the unlawful surcharges without informing authorities because they "did not want to expose the conduct and recognized that they could accept higher prices so long as they

---

[3] DPPs also incorporate IPPs' argument that diesel passenger vehicles comprise a distinct submarket. DPP 2AC ¶ 159.

United States District Court
Northern District of California

all agreed to accept the same prices so that none of them would be placed at a competitive disadvantage (as would occur if one Defendant negotiated lower steel prices than other Defendants . . .)." Id. ¶ 171.  And their agreement to accept the higher charges "would have been economically irrational unless Defendants had a mutual understanding that they would offset those higher costs by passing them on to their customers." Id. ¶ 177.  DPPs allege that, as a result, they paid inflated prices for Defendants' vehicles. Id. ¶ 232.

Defendants have jointly moved to dismiss the second amended complaints, see Joint MTD 2AC (dkt. 452), and VW and BMW have each individually moved to dismiss, see VW MTD 2AC (dkt. 454); BMW MTD 2AC (dkt. 453).

## II.    LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory. Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.  This is not a "probability requirement," but it requires more than a "sheer possibility" that the defendant is liable: "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quoting Twombly, 550 U.S. at 557).  Thus, when a plaintiff attempts to allege an unlawful agreement under § 1 of the Sherman Act, "showing parallel conduct or interdependence" with respect to price is not enough. Twombly, 550 U.S. at 554.

Evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving

7

party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court nevertheless has discretion to deny leave to amend due to, among other things, "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

## III.   DISCUSSION

Because the order dismissing Plaintiffs' first amended complaints covers Plaintiffs' previously asserted claims and allegations, the Court incorporates its prior reasoning and addresses only what is new—or purportedly new—in Plaintiffs' second amended complaints. The Court thus addresses (1) IPPs' claim that Defendants' anticompetitively agreed to not innovate with respect to their entire diesel emissions systems, causing harm to competition in the market for diesel passenger vehicles in the United States; and (2) DPPs' claim that Defendants' actively participated in a steel price-fixing conspiracy and agreed to pass on all increases in the cost of steel to their customers.

IPPs' diesel emissions system conspiracy claim fails because it is factually indistinguishable from IPPs' previously asserted AdBlue conspiracy claim, and IPPs' newly alleged submarket of "diesel passenger vehicles" is not plausible. DPPs' steel purchase and pass-through claim fails because DPPs have not plausibly alleged any injury or an agreement among DPPs to pass-through steel surcharges to their customers. Therefore, the Court grants Defendants' motions to dismiss with prejudice.

**A.  Diesel Emissions System Conspiracy**

IPPs allege that Defendants colluded to restrict competition across their vehicles' diesel emissions systems, causing harm in the market for diesel passenger vehicles in the United States.  IPP Opp. to Joint MTD 2AC at 2, 4.

### 1.  Per Se vs. Rule of Reason

Two separate tests may determine whether a restraint on trade is unreasonable. "The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to 'demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1132–33 (9th Cir. 2011) (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  "Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).  Per se treatment is reserved for conduct that is "manifestly anticompetitive" and without "any redeeming virtue." Leegin, 551 U.S. at 886.  "The Supreme Court has 'expressed reluctance to adopt per se rules where the economic impact of certain practices is not immediately obvious.'" Safeway, 651 F.3d at 1133 (quoting Dagher, 547 U.S. at 5).  To reject per se treatment is not to approve a restraint—it simply requires the Court to assess the restraint's actual effect "on competition, taking into account a variety of factors." Khan, 522 U.S. at 10.

IPPs argue that the alleged diesel emissions system conspiracy is a per se anticompetitive restraint because Defendants' collusive agreements covered their entire diesel emissions systems and the ECC found that the agreements lacked any procompetitive benefits.  See IPP 2AC ¶¶ 6, 7, 18–20, 21, 118–19, 148.  These arguments fail for at least three reasons.

First, IPPs' attempt to broaden their allegations to cover "diesel emissions systems" has no effect on the Court's analysis.  IPPs have not detailed any specific collusive agreements relating to diesel emissions system features other than AdBlue dosage rate and tank size.  See id. ¶¶ 116–141, ¶¶ 151–158.  IPPs extract phrases from ECC quotes referring to "diesel emissions 'systems'" and "emissions cleaning systems." Id. ¶¶ 148,

9

151.  But neither the full quotations (which the Second Amended Complaint incorporates by reference through attached exhibits) nor IPPs' other allegations show collusion on emissions system features beyond those discussed in IPPs' First Amended Complaint.  For example, IPPs argue that the ECC was focused on broader "Selective Catalytic Reduction ('SCR') systems," IPP Opp. to Joint MTD 2AC at 12, but the cited ECC statements regarding SCR systems reference only AdBlue features, see April 2019 ECC Press Release (attached to IPP 2AC at dkt. 447-2).  In sum, IPPs have changed this alleged restraint's label without changing its substance.

Second, any ECC finding that the alleged diesel emissions system agreements lacked procompetitive benefits would not affect whether per se treatment applies. Per se treatment is appropriate when a "kind of restraint" obviously lacks any "procompetitive benefit."  Khan, 522 U.S. at 10.  In that inquiry, the Court does not look at "specific information about the relevant business" or other details about the alleged restraint's actual effect on competition.  Id. (citation omitted).  Instead, the Court identifies the category of restraint to determine whether such a detailed, resource-intensive inquiry under the rule of reason is necessary.  See id.  Here, the kind of restraint alleged does not obviously lack any procompetitive benefit.  As the Court has explained, establishing uniform standards and agreeing to use only certain technical solutions can have procompetitive effects.  See Order re Second MTD at 10.  Because the "economic impact" of this "kind of restraint" is not "immediately obvious," per se treatment is unwarranted.  Khan, 522 U.S. at 10 (citation omitted).

Third, even if the ECC's findings mattered at this step, IPPs mischaracterize them. IPPs rely on statements in an April 5, 2019 press release to allege that Defendants agreed to "not compete on quality" and "to introduce lower standards."  IPP Opp. to Joint MTD 2AC at 12; see also IPP 2AC ¶¶ 148–149.  But the ECC statement attached to IPPs' Second Amended Complaint indicates only the ECC's "preliminary view" that Defendants "may have" entered into collusive agreements relating to AdBlue tank size and dosage rates, and that such agreements could expose Defendants to liability under European law.

See April 2019 ECC Press Release.  The ECC's additional statement that "EU competition rules do not allow [companies] to collude . . . not to improve their products, not to compete on quality" is merely describes non-binding European law; it is not a definitive conclusion that Defendants' agreements lacked any procompetitive effects.  Id.

Therefore, the Court considers whether Plaintiffs have adequately pleaded a Sherman Act claim under the rule of reason.

### 2. Rule of Reason Analysis

To state a claim for relief under § 1 of the Sherman Act, a plaintiff "must allege both that a 'relevant market' exists and that the defendant has power within that market." Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1044 (9th Cir. 2008).  A complaint may be dismissed under Rule 12(b)(6) if the alleged relevant market is "facially unsustainable."  Id. at 1045.  To survive a motion to dismiss, "the market must encompass the product at issue as well as all economic substitutes for the product."  Id.  Thus, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it."  Brown Shoe v. United States, 370 U.S. 294, 325 (1962).  The relevant market must include any "producers who have actual or potential ability to deprive each other of significant levels of business."  Thurman Indus, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir. 1989).

That said, within a broader product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  Brown Shoe, 370 U.S. at 325.  To plead a relevant submarket, the plaintiff must plausibly allege "that the alleged submarket is economically distinct from the general product market."  Newcal, 513 F.3d at 1045.  Although factors like (i) industry or public recognition of the submarket, (ii) the product's peculiar characteristics, (iii) unique production facilities, (iv) distinct consumers, (v) distinct prices, (vi) consumer price sensitivity, and (vii) specialized vendors may bear on the question whether a proposed submarket is economically distinct, see Brown Shoe, 370 U.S. at 325, "their presence or absence does not automatically decide the

submarket issue," Pay 'N Pak, 875 F.2d at 1375.  At bottom, economic distinction depends on whether the purported submarket is meaningfully "insulated . . . from competition" with other products in the broader market.  Id. at 1375.

"Judicial experience and common sense" help determine whether a submarket is insulated from competition in the relevant sense.  Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting Iqbal, 556 U.S. at 679).  For example, when the Supreme Court decided Brown Shoe, "men's, women's, and children's shoes" were produced in "separate manufacturing facilities," recognized by the public as separate submarkets, had "peculiar characteristics," and were purchased by "distinct customer groups."  Pay 'N Pak, 875 F.2d at 1375 (citing Brown Shoe, 30 U.S. at 326).  But "[t]hese factors were economically significant in identifying actual fields of competition simply because men [did] not normally buy women's or children's shoes for their own use and women and children exhibit[ed] parallel purchasing habits regarding shoes made for their respective groups."  Id.  By contrast, even in the presence of "distinct customers and industry perception of a separate submarket," a purported submarket may lack "economic significance as to the actual field of competition" if there is no "barrier to customer cross-over similar to the pattern of gender and age-based purchasing at issue [in] Brown Shoe."  Id. at 1376.  For example, "in-play" advertising during golf tournaments (i.e., advertising that airs between, not during, commercial breaks) is considered "more effective," is priced more flexibly, and appeals to "smaller" customers than traditional print or television advertising; but in-play advertising is not a cognizable submarket because it nonetheless faces obvious competition from other forms of advertising.  Hicks, 897 F.3d at 1122.

Here, in defining the relevant market as "diesel passenger vehicles," IPPs have once again failed to plead a relevant market or submarket.

IPPs do not squarely argue that they have pleaded a relevant product market in the broad sense, IPP Opp. to Joint MTD 2AC at 18, nor could they.  Diesel passenger vehicles do not constitute a relevant market because that market would exclude obvious "economic substitutes." Newcal, 513 F.3d at 1045.  IPPs implicitly acknowledge that diesel passenger

United States District Court
Northern District of California

vehicles compete with (at least) other environmentally friendly vehicles.  See IPP 2AC ¶ 88 ("When Defendants needed to compete (especially from a public relations perspective) against fuel-efficient and environmentally friendly hybrid vehicles being manufactured in Japan, Defendants rebranded their diesel vehicles as 'clean diesel' and falsely promoted them as such.'").  It simply defies common sense to assert that other vehicles, including other purportedly environmentally friendly vehicles, lack the "potential ability to deprive" diesel passenger vehicles of "significant levels of business."  Pay 'N Pak, 875 F.2d at 1374.

IPPs' argument that "diesel passenger vehicles" nonetheless constitute a cognizable submarket also fails, because IPPs have not plausibly alleged any genuine "barrier to customer cross-over" between diesel passenger vehicles and other passenger vehicles.  Pay 'N Pak, 875 F.2d at 1376.  IPPs recite the Brown Shoe factors and allege corresponding facts with no bearing on "the actual field of competition," id., in an effort transparently "contorted to meet their litigation needs," Hicks, 897 F.3d at 1121.  For instance, IPPs allege a general "price premium" for diesel vehicles without reference to comparable premiums for other environmentally friendly vehicles.  IPP 2AC ¶¶ 173–175; see also Order re First MTD at 12 (stating that merely pointing to a price premium "is insufficient to establish an economically distinct submarket").  Similarly, that certain journalists and industry analysts have referred to a diesel vehicle "segment" says nothing about whether that segment was insulated from competition with other vehicles.  Id. ¶¶ 180–181.  Defendants correctly point out that these allegations show "only that diesel engines are a thing that automotive writers can address by name."  Joint MTD 2AC at 17.

On the other hand, IPPs assert new allegations regarding consumer price-sensitivity that, if plausible, could conceivably overcome the commonsense inference that diesel passenger vehicles compete with other passenger vehicles.  IPPs principally rely on this "empirical evidence," a survey meant to show that consumers have a "low sensitivity to price increases for diesel passenger vehicles."  See IPP Opp. to Joint MTD 2AC at 17; IPP 2AC ¶ 62.  Of course, hard data casting doubt on the Court's commonsense understanding

13

that diesel passenger vehicles compete with other passenger vehicles (or at least other purportedly environmentally friendly passenger vehicles) could make IPPs' otherwise absurd submarket plausible.

But to describe IPPs' survey is to recognize that it cannot save IPPs' diesel passenger vehicle submarket.  IPPs surveyed "over one thousand people in the United States who make decisions about vehicle purchases in their households and who also own a vehicle."  IPP 2AC ¶ 178.  Per IPPs' own account, this included about 300 people who had purchased a diesel passenger vehicle (more than half of whom had purchased a "new" diesel passenger vehicle).  Id.  Those people were asked whether they would have switched away from such vehicles "when faced with a $100 or $500 increase in the purchase price of the car."  Id.  67% said they would either "stick with" their diesel vehicle or purchase another diesel vehicle.  Id.

This "empirical evidence" of a distinct submarket does not pass the straight-face test.  Evaluating proposed mergers among competitors (also known as "horizontal" mergers) requires courts and government agencies to assess anticipated competitive effects in relevant product markets.  See, e.g., Saint Alphonsus Med. Center-Nampa Inc. v. St. Luke's Health Sys., 778 F.3d 775, 783 (9th Cir. 2015).  The Department of Justice has promulgated merger guidelines that include a "hypothetical monopolist test to evaluate whether groups of products in candidate markets are sufficiently broad to constitute relevant antitrust markets."  U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.1 (2010), available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 (last visited Oct. 21, 2020).  This test asks what would happen if a hypothetical monopoly firm that sells the relevant product imposed "a small but significant and non-transitory increase in price ("SSNIP")."  Id.  "Agencies most often use a SSNIP of five percent of the price paid by customers," though the percentage may change based on "the nature of the industry and the merging firms' positions in it."  Id. § 4.1.2.  The point is to see "the extent to which consumers would likely substitute away from the products in the candidate market," and "surveys" are one of many sources that can provide evidence.

14

1    Thus, a survey-based SSNIP analysis could plausibly indicate that a category of products is

2    meaningfully "insulated . . . from competition" with other products in the same market.

3    Pay 'N Pak, 875 F.2d at 1375.

4         But IPPs have not conducted such an analysis.  Without any sensible explanation,

5    IPPs applied a price increase based on the cost of engines that go into diesel passenger

6    vehicles, not based on the price of diesel passenger vehicles.  IPP 2AC ¶ 177.  IPPs thus

7    applied an insignificant price increase, in the range of 0.2% to 1%, to diesel passenger

8    vehicles.  As a result, their analysis tells the Court nothing about whether diesel passenger

9    vehicles are meaningfully shielded from competition with other vehicles.  Worse, a

10   significant number (33%) of customers surveyed said they would switch away from diesel

11   vehicles if faced with such a small price increase.[4]

12        To add analytical heft to their survey, IPPs cast their submarket argument as a

13   "Critical Loss Analysis" (CLA), not a SSNIP analysis.  Id. ¶ 176.  Courts and government

14   agencies evaluating horizontal mergers have used a CLA approach "to the extent it

15   corroborates inferences drawn from the [SSNIP] evidence noted above."  DOJ & FTC

16   Horizontal Merger Guidelines § 4.1.3.  A CLA determines "whether imposing at least a

17   SSNIP on one or more products in a candidate market would raise or lower the

18   hypothetical monopolist's profits."  DOJ & FTC Horizontal Merger Guidelines § 4.1.3.

19   Thus, a CLA examines not only consumer substitution, but also resulting company profits,

20   to determine whether a hypothetical firm could make more money even as customers

21   substitute away.  See id.  Here, IPPs' purported CLA is useless.  The cognizable submarket

22   ───────────────

23   [4] IPPs acknowledge that the DOJ & FTC Guidelines require applying a price increase to the "price
     paid by customers for the products or services to which the . . . firms contribute value."  DOJ &
24   FTC Horizontal Merger Guidelines § 4.1.2; IPP Opp. to Joint MTD 2AC at 26.  IPPs assert that
     the extent to which Defendants contribute value to the vehicles they manufacture beyond those
25   vehicles' diesel engines is a factual question.  IPP Opp. to Joint MTD 2AC at 27.  That is wrong.
     Assessing value contribution merely requires evaluating the relevant companies' positions in their
26   industry.  DOJ & FTJ Horizontal Merger Guidelines § 4.1.2.  For example, in a merger "between
     two oil pipelines," courts and government agencies would evaluate "the price charged for
27   transporting the oil, not . . . the price of the oil itself."  Id.  Thus, for auto manufacturers, the
     relevant price is the price of the vehicles (whereas in the vehicle shipping industry, the relevant
28   price would be the price of transporting vehicles).  Although special circumstances might require a
     more nuanced approach, IPPs have not explained why such circumstances apply here.

inquiry is concerned with customer substitution, not firm profits.  See Pay 'N Pak, 875 F.2d at 1375.  And because IPPs did not conduct a legitimate SSNIP analysis, there is nothing for IPPs' CLA to corroborate.  IPPs' CLA incorporates the insignificant price increase used in the survey, and thus suffers from the same defect.

Beyond bare allegations and "empirical evidence" of no value, IPPs have alleged nothing to contradict the commonsense inference that diesel passenger vehicles compete with other passenger vehicles and do not constitute a relevant submarket.[5]  Because that is fatal to their claims, and because this is IPPs' third attempt to state a Sherman Act claim, the Court dismisses their Second Amended Complaint with prejudice.

**B.  Steel Conspiracy**

DPPs allege that Defendants participated in a "steel price-fixing conspiracy," DPP 2AC ¶ 274–77, by agreeing with each other to accept unlawfully inflated steel prices and pass those costs to their customers, id. ¶ 177.  DPPs argue that this constitutes a per se Sherman Act violation, and that (in the alternative) Defendants' conduct was unlawful under the rule of reason because it "harmed competition in the United States."  Id. ¶ 277.

The Court has previously considered DPPs' allegations that Defendants "colluded to pay higher prices, because their goal was to pay the same price for steel as their competitors, even if that meant everyone paid more," and that Defendants did so because they "could pass any price increase on to their customers."  Order re Second MTD at 19 (citing DPP 1AC ¶¶ 161–165).  The Court held that this theory was "not supported by DPPs' factual allegations."  Id.  DPPs seek to avoid a similar result by asserting a separate "price-fixing" claim against Defendants based on this conduct and alleging that Defendants specifically agreed to pass on higher steel prices to customers.  DPP 2AC ¶¶ 161–181.  Defendants argue that DPPs have not plausibly alleged that (1) DPPs were injured by Defendants' alleged agreements to accept unlawfully inflated prices for steel, or

---

[5] IPPs' allegation that Defendants comprise a concentrated set of manufacturers within a relevant market fails because it depends on IPPs' flawed definition of that market.  See IPP 2AC ¶¶ 182–193.

(2) Defendants agreed to pass those inflated costs to their customers.  Joint MTD 2AC at 23.  They frame this argument in terms of both "Article III Standing" and "Antitrust Standing."  Id. at 23, 27.

To have Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  The plaintiff "bears the burden of proof" to establish each element "with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual allegations . . . may suffice," though "bare legal conclusion[s] and "ingenious academic exercise[s] in the conceivable" do not. Maya v. Centex Corp., 658 F.3d 1060, 1068 (9th Cir. 2011).  The Ninth Circuit has nevertheless held that Twombly and Iqbal's familiar plausibility standard is not relevant to this inquiry. Id.

Here, DPPs' "general factual allegations" are enough for Article III standing. Maya, 658 F.3d at 1068.  DPPs allege that Defendants entered into a series of unlawful agreements with steel manufacturers and each other, causing DPPs to pay increased prices and thus suffer financial injury, which could be redressed via damages. See DPP 2AC ¶¶ 177, 279.

But in addition to having Article III standing, a Sherman Act plaintiff must plausibly allege "antitrust standing." Associated Gen. Contractors of CA, Inc. v. CA State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).  To do so, the plaintiff must plausibly allege (1) "the defendant's specific unlawful conduct," (2) "some credible injury caused by the unlawful conduct," (3) that this injury flowed "from that which makes defendants' acts unlawful," and (4) that the injury is "of the type the antitrust laws were intended to prevent." American Ad Mgmt., Inc. v. General Telephone Co. of California, 190 F.3d 1051, 1055–57 (9th Cir. 1999).

On this score, DPPs' allegations fall short.  DPPs have plausibly alleged that steel manufacturers agreed with one another to fix steel prices, and that Defendants agreed to

United States District Court
Northern District of California

accept standard surcharges rather than individually negotiate with steel manufacturers. DPP 2AC ¶¶ 162–169.  But DPPs have not plausibly alleged either that (1) Defendants' agreement to accept the steel manufacturers' prices resulted in higher steel prices, resulting in harm to competition in a relevant market, or (2) Defendants agreed to pass-through increased steel costs to DPPs.

### 1.  The Alleged Agreement to Accept Steel Surcharges

DPPs have not plausibly alleged that Defendants' agreement to accept the steel manufacturers' surcharges led to higher steel prices.  As the Court has explained, Defendants' decision to accept the prices charged by the steel manufacturers does not mean Defendants are responsible for an increase in the price of steel.  See Order re Second MTD at 19.  Indeed, given the broad alleged conspiracy among German steel manufacturers to fix steel prices, DPPs' allegations suggest Defendants had little control over the price of steel.  See DPP 2AC ¶¶ 162–169.  DPPs' allegation that Defendants could have reduced steel prices by reporting German steel manufacturers to the authorities is contradicted by DPPs' allegations indicating that the steel manufacturers were able to charge higher prices because Defendants had nowhere else to turn and did not want to risk disrupting the supply of steel.  See id. ¶ 172 n.1 (citing Bundeskartellamt Case Summary, German car manufacturers fined for anticompetitive practices in the purchase of long steel, November 21, 2019, available at https://tinyurl.com/y58tmtoj (last visited October 14, 2020)).  DPPs' allegations plausibly establish that steel manufacturers, not Defendants, inflated the price of steel.

Even were the Court to suspend its disbelief and assume that Defendants' agreement to not negotiate individually for steel prices plausibly raised steel prices, DPPs' allegations could not give rise to liability. [6]  First, such an agreement would not warrant per

---

[6] The former chair of the Germany Monopoly Commission Justus Haucap's statement that when steel customers do not individually negotiate prices, "competition suffers," and "usually end users, such as car buyers, suffer because they pay too high a price" is not evidence of an agreement to pass-through increased steel costs to customers.  See DPP Exhibits 1, 2 (dkt. 448).  At most, Justus Haucap's statements indicate that a lack of individual negotiation among Defendants with steel manufacturers could have led to (but did not necessarily lead to) increased steel prices.

se treatment.  Although "price-fixing agreements are unlawful per se under the Sherman Act," Arizona v. Maricopa Cnty. Medical Soc., 457 U.S. 332, 245 (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940)), an agreement among competitors to negotiate collectively with suppliers is not price-fixing, even if those suppliers (here, the steel manufacturers) are engaged in price-fixing.  For the reasons described above, such an approach could plausibly have led to lower steel prices—as alleged in DPPs' original Complaint.  Khan, 522 U.S. at 10; Order re First MTD at 18 (describing DPPs' allegation that Defendants' coordinated steel negotiations resulted in price savings they did not pass to their customers).  Second, under the Rule of Reason, DPPs have not pleaded a relevant market.  DPPs incorporate IPPs' argument that diesel passenger vehicles constitute a distinct submarket, see DPP 2AC ¶ 159.  As discussed above, this argument fails.

### 2.  The Alleged Agreement to Pass on Increased Steel Costs

DPPs have not plausibly alleged that Defendants agreed with one another to pass increased steel prices to their customers.  DPPs argue that Defendants entered into an additional pass-through agreement to make sure that any increase in steel prices would be borne by customers (i.e., DPPs).  But this allegation depends on a faulty inference:  that Defendants' agreement to accept steel surcharges would have been "economically irrational" unless they knew they could offset those surcharges by passing them on to consumers.  DPP 2AC ¶ 177.  As the Court previously explained, there are many economically rational reasons why Defendants may have agreed to accept the steel surcharges, including ensuring a stable supply of steel and avoiding frequent renegotiating with the steel manufacturers.  Order re First MTD at 19–20.  Nor do DPPs allege other facts showing a pass-through agreement as opposed to conscious parallelism.  DPPs quote a report from 2008 describing Defendants' reactions to trends in the steel market with no sign of coordination.  DPP 2AC ¶ 178.  Indeed, DPPs own allegations indicate that increased commodity prices ordinarily get passed on to "end users" without any agreement among competitors.  See DPP Exhibits 1, 2 (dkt. 448).  Given that, the specific content and nature of this alleged "pass-through" agreement is not discernable.

Because DPPs have not plausibly alleged that Defendants agreed to pass through increased steel costs to DPPs, or that DPPs were injured by any agreement among Defendants to accept the steel manufacturers' surcharges, DPPs have not plausibly alleged "some credible injury caused by [Defendants'] unlawful conduct." <u>American Ad Mgmt., Inc.</u>, 190 F.3d at 1056. DPPs' Second Amended Complaint thus fails to state a claim upon which relief may be granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss.[7] And because this is Plaintiffs' third attempt at stating claims under the Sherman Act, the Court does so with prejudice.

**IT IS SO ORDERED.**

Dated: October 23, 2020



_____
CHARLES R. BREYER
United States District Judge

---

[7] The Court also GRANTS Defendants' motion to file under seal (dkt. 455).